

1  DONALD J. PUTTERMAN (State Bar No. 90822)
   E-Mail:     *dputterman@sideman.com*
2  RYAN J. MECKFESSEL (State Bar No. 215952)
   E-Mail:     *rmeckfessel@sideman.com*
3  MARGARET A. ZIEMIANEK (State Bar No. 233418)
   E-Mail:     *mziemianek@sideman.com*
4  SIDEMAN & BANCROFT LLP
   One Embarcadero Center, Eighth Floor
5  San Francisco, California 94111-3629
   Telephone:   (415) 392-1960
6  Facsimile:   (415) 392-0827

7  TIMOTHY J. HOBAN (State Bar No. 192461)
   E-Mail:     *thoban@tollbrothersinc.com*
8  REGIONAL COUNSEL FOR TOLL BROS., INC.
9  725 Town & Country Rd, Suite 500
   Orange, California 92868
10 Telephone:   (714) 347-1300
   Facsimile:   (714) 835-9683
11
   Attorneys for Defendants
12 TOLL BROS., INC., a Pennsylvania corporation, and
   TOLL BROTHERS, INC., a Delaware corporation
13

14            IN THE UNITED STATES DISTRICT COURT

15          FOR THE NORTHERN DISTRICT OF CALIFORNIA

16                    (OAKLAND DIVISION)

17

18 STONEBRAE L.P., a Delaware limited       CASE NO.  C08-00221
   partnership,
19                                          NOTICE OF REMOVAL OF ACTION
              Plaintiff,                    UNDER 28 U.S.C. § 1441(b)
20
          v.
21
   TOLL BROS., INC., a Pennsylvania
22 corporation; TOLL BROTHERS, INC., a
   Pennsylvania corporation; DOES 1 through 15,
23 inclusive,

24            Defendants.

25

26

27

28

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3629

**TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

     **PLEASE TAKE NOTICE** that Defendant TOLL BROS., INC. ("Toll") hereby removes to the United States District Court for the Northern District of California, the action pending in the Superior Court of the State of California in and for the County of Alameda, Case No. RG07358685, based on diversity jurisdiction, pursuant to 28 U.S.C. sections 1332(a) and 1441(b). In support of its removal, Toll states as follows:

**I.**    <u>**The State Court Case**</u>

    1.    On or about November 29, 2007, Plaintiff Stonebrae L.P. (hereinafter referred to as "Stonebrae") filed this action in the Alameda Superior Court, which Stonebrae styled as "Stonebrae L.P., a Delaware limited partnership v. Toll Bros., Inc., a Pennsylvania corporation; Toll Brothers, Inc., a Pennsylvania [sic] corporation; DOES 1 through 15, inclusive, Defendants," Case Number RG07358685 (the "State Court Case").

    2.    Stonebrae served its Complaint in the State Court Case ("Complaint") on Toll on December 12, 2007.

**II.**    <u>**Toll's Removal is Timely**</u>

    1.    Toll's removal is timely in that this Notice of Removal is filed within 30 days of service of the Complaint upon Toll.

**III.**    **Toll's Removal Is Appropriate Under 28 U.S.C. § 1441(b) and § 1332(a) Because Plaintiff and Defendant Toll Are Citizens of Different States, the Amount in Controversy Exceeds the Sum of $75,000, and Fraudulently Joined Defendant Toll <u>Brothers, Inc. Must Be Ignored For Purposes of Determining Diversity of Citizenship</u>**

    1.    Toll's removal under 28 U.S.C. § 1441(b) is appropriate because this Court has original jurisdiction over the State Court Case under 28 U.S.C. § 1332(a), in that the State Court Case is between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. Toll Brothers, Inc. ("Toll Brothers"), a Delaware corporation, is a fraudulently joined defendant, as set forth with specificity in Section IV below, and is therefore ignored for the purposes of determining diversity jurisdiction. See *United Computer Systems v. AT&T Corp.* (9th Cir. 2002) 298 F.3d 756, 761.

/ / /

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

2.      Toll is currently, and was at the time of the filing of the State Court Case, a corporation organized under the laws of the State of Pennsylvania with its principal place of business in Horsham, Pennsylvania. Toll is therefore a citizen of the state of Pennsylvania for purposes of diversity jurisdiction.

3.      As alleged in paragraph 1 of the Complaint, at the time of the filing of the Complaint Stonebrae was a limited partnership organized under the laws of the State of Delaware. Accordingly, Stonebrae and Toll are diverse for purposes of 28 U.S.C. § 1332(a).

4.      In its Complaint, Stonebrae asserts among other things that Toll breached a real estate purchase agreement with a purchase price of $31,854,200 to be paid by Toll to Stonebrae. Complaint, ¶14. Among its requested damages, Stonebrae seeks an order instructing the escrow holder to draw upon the $4,774,994 letter of credit deposited by Defendant Toll. Complaint, ¶14; p. 13. Therefore, on the face of the Complaint the amount in controversy is well in excess of $75,000, exclusive of interest and costs.

5.      Attached hereto as **Exhibit "A"** is a complete copy of the Superior Court file (including the Summons, Complaint, Civil Case Cover Sheet, Notice of Case Management Conference, Notice of Judicial Assignment for All Purposes, and ADR Information Package).

6.      Following the filing of this Notice of Removal, Toll will serve all adverse parties with the Notice to Adverse Party of Removal to Federal Court. A copy of this Notice (without exhibits) is attached hereto as **Exhibit "B"**. (A Certificate of Service of Notice to Adverse Party of Removal to Federal Court will be electronically filed.)

**IV.    On Its Face, The Complaint Both Fails to State a Claim Against Toll Brothers, Inc. And Shows That Toll Brothers, Inc. Has a Complete Affirmative Defense; Therefore, Toll Brothers, Inc. Is a Fraudulently Joined Defendant**

1.      The sole cause of action alleged against Toll Brothers is the Third Cause of Action, entitled "Inducing Breach of Contract." However, no cause of action is stated against Toll Brothers because, on the face of the Complaint, (a) Plaintiff fails to plead the elements required under California law to prove inducing a breach of contract, and (b) even if Plaintiff has pled facts sufficient to state a claim for relief, Plaintiff also has pled all facts necessary to prove that Toll Brothers' conduct was privileged as a matter of law.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1

2

**A.    The Complaint Fails to Allege Conduct Sufficient To Prove that Toll Brothers Induced a Breach of the Contract at Issue in This Action.**

3          2.          To state a cause of action for inducing a breach of contract, Plaintiff must allege the

4    following: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of

5    this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the

6    contractual relationship; (4) actual breach or disruption of the contractual relationship; and

7    (5) resulting damage." *Pacific Gas & Electric Co. v. Bear Sterns & Co.* (1990) 50 Cal. 3d 1118,

8    1126.  A party cannot be liable for inducing a breach of contract unless the conduct was "intended

9    to affect the contract of a specific person.  It is not enough that one has been prevented from

10   obtaining performance of a contract as a result of the actor's conduct." *Ramona Manor*

11   *Convalescent Hosp. v. Care Enterprises, etc., et al* (1986) 177 Cal. App. 3d 1120, 1133.

12   Moreover, and especially significant here, the person alleged to have interfered with the contract

13   must have intended to affect *the specific contract at issue*.  As the Court noted in *Ramona Manor*,

14   proof of the requisite intent requires a showing that the actor intended not only the acts which

15   constituted the interference, but intended to cause the interference itself: "[t]he essential thing is

16   the *purpose to cause the result*." *See id.* at 1130 -31 (emphasis original).  "If the actor had no

17   knowledge of the existence of the contract or *his actions were not intended to induce a breach, he*

18   *cannot be held liable though an actual breach results* from his lawful and proper acts." *Id.*

19   at 1130.

20          3.          Applying the foregoing standards, on its face, the Complaint fails to allege facts

21   sufficient to state a claim for relief against Toll Brothers for purportedly inducing Toll to breach

22   its contract with Plaintiff.  At Paragraph 34, the Complaint only alleges (on information and

23   belief) that "Toll Brothers, Inc. *sought to reduce the contractual liabilities on its consolidated*

24   *financial statements*, such as that represented by [the contract at issue], and *directed its*

25   *subsidiaries and affiliates to take steps to do so*." (Emphasis added.)  Further, at Paragraph 17, the

26   Complaint specifically states (again, only on information and belief) that "*Defendant Toll had*

27   *decided*, in light of the deteriorating financial condition of Toll Brothers, Inc., and for its own

28   financial reasons, not to proceed with the close of escrow * * *." (Emphasis added.)  Thus,

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1  Plaintiff only alleges (a) that Toll Brothers issued a broad policy directive to *all* its subsidiaries

2  and affiliates, not to breach contracts in general or this contract in particular but only to reduce

3  contractual liabilities, and (b) that based upon that policy directive, Toll itself – not Toll Brothers

4  – decided not to go forward with the contract.  Plaintiff thereby admits that Toll Brothers neither

5  intended to specifically affect Plaintiff, nor specifically intended to induce breach of Toll's

6  contract with Plaintiff – or that matter, to cause any of its subsidiaries or affiliates to breach

7  any contract at all.

8         4.      Plaintiff's Complaint therefore not only fails to allege intentional acts by Toll

9  Brothers "designed to induce a breach or disruption of the contractual relationship," but actually

10  alleges the opposite.  We have found no California case in which an inducement to breach contract

11  claim has gone forward against a parent corporation based upon general corporate policies or

12  directives of the kind issued by a parent corporation to subsidiaries and affiliates, which is then

13  applied by the subsidiary or affiliate in specific circumstances and in a specific manner claimed to

14  be a breach of contract.  Indeed, if such claims were allowed, a parent corporation necessarily

15  would be obligated to actually control the minutia of its subsidiaries' and affiliates' day-to-day

16  application of corporate policies and directives – in effect, it would *require* that the parent become

17  the alter ego of its subsidiaries and affiliates.  That is neither reality nor the law.[1]

18         5.      Because the Complaint on its face fails to assert a claim for relief and pleads facts

19  admitting that Plaintiff has no claim for relief against Toll Brothers, the joinder of Toll Brothers in

20  this action was and is sham.  Toll Brothers' citizenship therefore must be ignored for purposes of

21  determining diversity.

22  / / /

---

[1]  Ironically, the ensuing closeness of identity between parent and subsidiary would then preclude liability for inducing breach, because under California law a party cannot be liable for interfering with its own contract. *See, e.g., Webber v. Inland Empire Investments, Inc., et al* (1999) 74 Cal. App. 4th 884, 898 ("It is apparent that, if the defendants are to be treated as one because they are all owned and controlled by Mr. Previti, the doctrine that a party cannot interfere with its own contract would apply. . . . ")

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

**B.    The Complaint On Its Face Establishes The Applicability of the Financial Interest Privilege**

6.    Even assuming that the Complaint could be amended to allege that Toll Brothers *intentionally* acted to induce a breach of the *specific contract* at issue, the Complaint on its face establishes that any such conduct would be within the scope of the financial interest privilege. As set forth in section 769 of the Restatement of Torts: "One who has a financial interest in the business of another is privileged purposely to cause him not to enter into or continue a relation with a third person in that business if the actor (a) does not employ improper means, and (b) acts to protect his interest from being prejudiced by the relation."

7.    While we agree that the mere existence of a parent-subsidiary relationship may not in and of itself suffice to establish the financial interest privilege, in this case the Complaint facially establishes that the privilege applies. Defendant Toll Bros., Inc. is a wholly owned subsidiary of Toll Brothers, Inc., and therefore Toll Brothers in general has a financial interest in the business of Toll Bros., Inc. See Complaint, ¶2. But Plaintiff goes on to say far more.

8.    Plaintiff specifically alleges that "*in response to its severely deteriorating financial condition*, Defendant Toll Brothers, Inc. sought to reduce the contractual liabilities on its consolidated financial statements, * * * and directed its subsidiaries and affiliates to take steps to do so." Complaint, ¶ 34 (emphasis added). Plaintiff actually pounds home the existence of the financial interest privilege by also alleging that Toll itself "decided, *in light of the deteriorating financial condition of Toll Brothers, Inc., and for its own financial reasons*" not to proceed with the contract. Complaint, ¶ 17 (emphasis added). Plaintiff thus asserts no reason other than financial for either the alleged breach or the alleged inducement to breach, but goes on to expressly concede that Toll Brothers' general directive to reduce contractual liabilities was issued to protect Toll Brothers' financial interest, and that Toll itself acted only to protect Toll Brothers' and its own financial interests. Further, not one word is included in the Complaint to show that any improper means were employed. Issuing a corporate directive or policy to reduce contractual liabilities, even assuming it occurred and that such conduct sufficed to state a claim for relief, by no stretch of the bootstraps can be deemed "improper means."

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1       9.    The Complaint therefore on its face establishes that Toll Brothers' alleged conduct

2  with respect to the contract at issue – if any – would be privileged as a matter of law.  For this

3  reason as well, Toll Brothers is a sham defendant, the citizenship of which must be disregarded for

4  purposes of determining diversity jurisdiction.

5       10.    Because Toll Brothers is a sham defendant, Defendant Toll respectfully requests

6  that Toll Brothers be dismissed from the action on the Court's own motion, pursuant to F.R.C.P.

7  21.

8

9  DATED: January 11, 2008          SIDEMAN & BANCROFT LLP

10

11                       By: _____

12                          Donald J. Putterman

                             Attorneys for Defendants

13                           TOLL BROS., INC., a Pennsylvania corporation, and

                             TOLL BROTHERS, INC., a Delaware corporation

14  0841s\527630v1

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8ᵀᴴ FLOOR
SAN FRANCISCO, CALIFORNIA 94111

℀ JS 44  (Rev. 12/07) (cand rev 1-08)                          **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| STONEBRAE L.P. | TOLL BROS., INC.; TOLL BROTHERS, INC. (fraudulently joined defendant) |

(b) County of Residence of First Listed Plaintiff **Delaware Limited**
(EXCEPT IN U.S. PLAINTIFF CASES) **Partnership**

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

SEE ATTACHED

Attorneys (If Known)

SEE ATTACHED

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

[Nature of suit checklist - box 190 Other Contract checked]

**V. ORIGIN** (Place an "X" in One Box Only)

☐ 1 Original Proceeding ☒ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Sections 1441(b), 1332(a)
Brief description of cause:
Breach of real estate purchase contract

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ in excess of $75,000
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY**
PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

**IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)**
(PLACE AND "X" IN ONE BOX ONLY)
☒ SAN FRANCISCO/OAKLAND  ☐ SAN JOSE

DATE 1/11/08    SIGNATURE OF ATTORNEY OF RECORD

## ATTACHMENT TO CIVIL COVER SHEET

**I. (c)**

PLAINTIFFS

    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
     Including Professional Corporations
    PHILIP F. ATKINS-PATTENSON, ESQ.
    E-Mail:    *patkinspattenson@sheppardmullin.com*
    ARTHUR J. FRIEDMAN, ESQ.
    E-Mail:    *afriedman@sheppardmullin.com*
    CRAIG A. PINEDO, ESQ.
    E-Mail:    *cpinedo@sheppardmullin.com*
    Four Embarcadero Center, 17th Floor
    San Francisco, California 94111-4109
    Telephone:  (415) 434-9100

    COOPER & KIRKHAM, P.C.
    JOSEF D. COOPER, ESQ.
    E-Mail:    *jdc@coopkirk.com*
    655 Montgomery Street, Suite 1700
    San Francisco, California 94111
    Telephone:  (415) 788-3030

DEFENDANTS

    SIDEMAN & BANCROFT LLP
    DONALD J. PUTTERMAN, ESQ.
    E-Mail:    *dputterman@sideman.com*
    RYAN J. MECKFESSEL, ESQ.
    E-Mail:    *rmeckfessel@sideman.com*
    MARGARET A. ZIEMIANEK, ESQ.
    E-Mail:    *mziemianek@sideman.com*.
    One Embarcadero Center, 8th Floor
    San Francisco, California 94111
    Telephone: (415) 392-1960

    TIMOTHY J. HOBAN, ESQ.
    E-Mail:    *thoban@tollbrothersinc.com*
    REGIONAL COUNSEL FOR TOLL BROS., INC.
    725 Town & Country Rd, Suite 500
    Orange, California 92868
    Telephone: (714) 347-1300
    Facsimile: (714) 835-9683

# EXHIBIT A

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
TOLL BROS., INC.; a Pennsylvania corporation; TOLL BROTHERS, INC., a
Pennsylvania corporation; DOES 1 through 15, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
STONEBRAE L.P., a Delaware limited partnership,

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

ENDORSED
FILED
ALAMEDA COUNTY

NOV 2 9 2007

CLERK OF THE SUPERIOR COURT
By Tasha Perry, Deputy

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.
Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):*<br><br>Alameda County Superior Court<br>1225 Fallon Street<br>Oakland, CA 94612 | CASE NUMBER: *(Número del Caso):*<br><br>RG 07358685 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
PHILIP F. ATKINS-PATTENSON                    Cal. Bar No. 94901        415-434-9100
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109

DATE: NOV 2 9 2007            Pat S. Sweeten        Clerk, by _Tasha Perry_____, Deputy
*(Fecha)*                          *(Secretario)*                                    *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* Toll Bros, INC., a Pennsylvania corporation
   under: ☒ CCP 416.10 (corporation)              ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

[SEAL]

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

SUMMONS

Code of Civil Procedure §§ 412.20, 465
American LegalNet, Inc.
www.USCourtForms.com

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, number, and address): | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, number, and address):
PHILIP F. ATKINS-PATTENSON    Cal. Bar No. 94901
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
TELEPHONE NO.: 415-434-9100    FAX NO.: 415-434-3947
ATTORNEY FOR (Name): Plaintiff, STONEBRAE L.P.

FOR COURT USE ONLY

ENDORSED
FILED
ALAMEDA COUNTY

NOV 2 9 2007

CLERK OF THE SUPERIOR COURT
By Tasha Perry, Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS: Same
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME:

CASE NAME: STONEBRAE v. TOLL BROTHERS

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: RG 07358603 |
|---|---|---|
| ☒ Unlimited (Amount demanded exceeds $25,000) ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☒ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☐ is ☒ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties    d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve    e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence    f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. ☒ monetary  b. ☒ nonmonetary; declaratory or injunctive relief   c. ☐ punitive
4. Number of causes of action (specify): 3
5. This case ☐ is ☒ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: November 29, 2007

Philip F. Atkins-Pattenson
(TYPE OR PRINT NAME)

► *Philip Atkins-Pattenson /bs*
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2    Including Professional Corporations
   PHILIP F. ATKINS-PATTENSON, Cal. Bar No. 94901
3  ARTHUR J. FRIEDMAN, Cal. Bar No. 160867
   CRAIG A. PINEDO, Cal. Bar No. 191337
4  Four Embarcadero Center, 17th Floor
   San Francisco, California 94111-4109
5  Telephone:    415-434-9100
   Facsimile:    415-434-3947
6  E-Mail:    patkinspattenson@sheppardmullin.com
              afriedman@sheppardmullin.com
7              cpinedo@sheppardmullin.com

8  COOPER & KIRKHAM, P.C.
   JOSEF D. COOPER, Cal. Bar No. 53015
9  655 Montgomery Street, Suite 1700
   San Francisco, California 94111
10 Telephone:    415-788-3030
   Facsimile:    415-882-7040
11 E-Mail:    jdc@coopkirk.com

12 Attorneys for Plaintiff
   STONEBRAE L.P.
13

14         SUPERIOR COURT OF THE STATE OF CALIFORNIA

15                   COUNTY OF ALAMEDA

16                  UNLIMITED JURISDICTION

17 STONEBRAE L.P., a Delaware limited          Case No. RG 07358685
   partnership,
18
                Plaintiff,                     **COMPLAINT**
19
         v.
20
   TOLL BROS., INC.; a Pennsylvania
21 corporation; TOLL BROTHERS, INC., a
   Pennsylvania corporation; DOES 1 through 15,
22 inclusive,

23                Defendants.

24

25         Plaintiff Stonebrae L.P. alleges against Defendants, and each of them, as

26 follows:

27

28

ENDORSED
ALAMEDA COUNTY

NOV 9 9 2007

CLERK OF THE SUPERIOR COURT
By Thelma Perry, Deputy

## THE PARTIES

1.     Plaintiff Stonebrae L.P. ("Stonebrae") is a limited partnership organized under the laws of the State of Delaware.  Plaintiff Stonebrae is the owner and master developer of a residential master planned community located atop the Walpert Ridge in Hayward, California.

2.     Defendant Toll Bros., Inc. ("Toll") is a corporation organized under the laws of the State of Pennsylvania.  Plaintiff Stonebrae is informed and believes, and on that basis alleges, that Defendant Toll Bros., Inc. is a wholly-owned subsidiary of Defendant Toll Brothers, Inc.

3.     Defendant Toll Brothers, Inc. is a corporation organized under the laws of the State of Delaware, and a publicly-held corporation whose shares trade on the NYSE, and which is engaged in the business of residential construction and advertises itself as "America's Luxury Home Builder."

4.     Plaintiff Stonebrae is ignorant of the true names and capacities of Defendants sued herein as Does 1 through 15, and so sues these Defendants by their fictitious names.  Plaintiff Stonebrae will seek leave to amend this Complaint when their true names and capacities have been ascertained.  Plaintiff Stonebrae is informed and believes, and on that basis alleges, that each such fictitiously-named Defendant is in some manner connected with the matters herein alleged and liable to Plaintiff Stonebrae.

5.     Plaintiff Stonebrae is informed and believes, and on that basis alleges, that in acting and/or failing to act as hereinafter alleged, each of the Defendants was serving as the agent of each of the other Defendants, and in so acting and/or failing to act, was acting within the course and scope of such agency.  Moreover, Plaintiff Stonebrae is informed and believes, and on that basis alleges, that the acts and conduct of each

1  Defendant herein were known to, authorized by and/or ratified by the remaining

2  Defendants, and each of them.

3

4                          **JURISDICTION AND VENUE**

5          6.      Jurisdiction and venue are proper in this Court as the real property

6  that is the subject of the contract at issue in this lawsuit is located in Hayward, California,

7  the contract was to be performed therein, and the amount in dispute is within the unlimited

8  jurisdiction of this Court.

9

10    **FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

11                          **The Stonebrae Development**

12         7.      Plaintiff Stonebrae is the owner and master developer of a residential

13 master planned development situated atop the scenic Walpert Ridge, Hayward, California,

14 consisting of approximately 1,600 acres (of which approximately 1,100 are dedicated as

15 permanent open space), upon which it will develop in phases approximately

16 600 residential building lots, a 650-student public elementary school for the

17 Hayward Unified School District, adjacent sports facilities to be operated by the Hayward

18 Area Recreation District, an 18-hole golf course, tennis courts, and clubhouse and related

19 amenities (collectively, the "Stonebrae Development").

20

21         8.      Plaintiff Stonebrae obtained and vested the land use entitlements, a

22 long-term Development Agreement with the City of Hayward, as well as the various

23 federal, state and local permits for construction of the Stonebrae Development.  Under the

24 development plan for the Stonebrae Development, Plaintiff Stonebrae would be

25 responsible for mass grading, infrastructure improvements, construction of the school, the

26 golf course, tennis courts, one or more clubhouses, and related amenities.  Plaintiff

27 Stonebrae would not be responsible for the construction and sale of the individual

28

1  residences; rather, Plaintiff Stonebrae would sell "finished lots" to merchant builders, such
2  as Defendant Toll, who would build the homes and sell them to the public.

3

4          9.      The Stonebrae Development was to be built in phases as provided in
5  the Development Agreement and other land use entitlements. The first phase of the
6  residential development, commonly known as "Village A," consists of 214 single family
7  residential lots, with the second phase, known as "Village B," consisting of 149 single
8  family residential lots.

9

10              **The Dealings Between Plaintiff Stonebrae and Defendant Toll**

11         10.      Plaintiff Stonebrae and Defendant Toll executed that certain Purchase
12  and Sale Agreement and Joint Escrow Instructions, dated as of July 26, 2005 (the
13  "Village A Purchase Agreement"), pursuant to which Defendant Toll agreed to purchase
14  from Plaintiff Stonebrae 102 of the 214 lots located within Village A. The close of escrow
15  under the Village A Purchase Agreement occurred on or about May 1, 2006.

16

17         11.     By virtue of the negotiation and execution of the Village A Purchase
18  Agreement, and the close of the escrow as provided for therein, Defendant Toll was able
19  to, and did, fully familiarize itself with the Stonebrae Development, the entitlements and
20  permits therefor, the work performed by Plaintiff Stonebrae, and perform its "Due
21  Diligence Investigation" as provided in Section 4.1, which included "all matters" that
22  Defendant Toll "deemed relevant" to its purchase of the 102 lots under the Village A
23  Purchase Agreement.

24

25         12.     Based on its knowledge of the Stonebrae Development from the
26  Village A Purchase Agreement, Defendant Toll negotiated with Plaintiff Stonebrae to
27  purchase additional lots located in Village B.

28

## The Village B Purchase Agreement

13.    On or about May 1, 2006, roughly contemporaneous with the close of escrow under the Village A Purchase Agreement, Defendant Toll and Plaintiff Stonebrae executed that certain Purchase and Sale Agreement and Joint Escrow Instruction (the "Village B Purchase Agreement"), pursuant to which Defendant Toll agreed to purchase 56 lots for the construction and sale of single family residences. The Village B Purchase Agreement was subsequently amended by a First Amendment, dated May 31, 2006, and a Second Amendment, dated June 2, 2006. A true and correct copy of the Village B Purchase Agreement, as amended, is attached hereto as Exhibit 1 and incorporated herein by reference.

14.    The purchase price to be paid by Defendant Toll to Plaintiff Stonebrae at the close of escrow under the Village B Purchase Agreement is $31,854,200.00. Pursuant to Section 2.2, Defendant Toll deposited in escrow a letter of credit in the amount of $4,774,944.00.

15.    Pursuant to Section 4, Defendant Toll was entitled to and did conduct its "Due Diligence Investigation" with respect to "all matters" that Defendant Toll "deemed relevant" with respect to its purchase of the 56 lots under the Village B Purchase Agreement. While Defendant Toll had the legal right during the "Due Diligence Period" not to proceed with the Village B Purchase Agreement for any reason, pursuant to Section 4.6, Defendant Toll timely provided Plaintiff Stonebrae with its written approval of its Due Diligence Investigation of the lots it was purchasing under the Village B Purchase Agreement. Upon the expiration of the "Due Diligence Period," the letter of credit became non-refundable and served as the earnest money deposit under the Village B Purchase Agreement, and Defendant Toll became obligated to close escrow and purchase the 56 lots from Plaintiff Stonebrae except only if Defendant Toll's conditions precedent to the close of escrow pursuant to Section 6.2 were not satisfied.

16.    In reliance upon Defendant Toll's approval of its "Due Diligence Investigation," the expiration of the "Due Diligence Period" and its decision to proceed with the purchase of the 56 lots, Plaintiff Stonebrae proceeded with performance of the "Stonebrae Pre-Closing Work" as described more particularly in Exhibit H to the Village B Purchase Agreement.  Plaintiff Stonebrae estimates that it has incurred in excess of $7 million performing the "Stonebrae Pre-Closing Work" and otherwise preparing to complete the close of escrow.

17.    Plaintiff Stonebrae is informed and believes, and on that basis alleges, that while Plaintiff Stonebrae was incurring these substantial sums to complete the "Stonebrae Pre-Closing Work" and otherwise preparing for the close of escrow in accordance with the Village B Purchase Agreement, Defendant Toll had decided, in light of the deteriorating financial condition of Toll Brothers, Inc., and for its own financial reasons, not to proceed with the close of escrow and the purchase of the 56 lots, which would have required Defendant Toll to pay Plaintiff Stonebrae the sum of $31,854,200.00.

18.    On or about November 8, 2007, Defendant Toll Brothers, Inc. filed its Form 8-K, announcing its preliminary 4th Quarter and FY 2007 results:

(a)    For the 4th Quarter, home building revenues declined 36% compared to FY 2006 4th Quarter, and backlog declined 36% from the same comparable period;

(b)    For the 4th Quarter, gross signed contracts declined 38% compared to FY 2006 4th Quarter, and the number of homes under contract declined 33% from the same comparable period;

(c)    For the 4th Quarter, net signed contracts declined 35% in the number of homes, and 48% in dollars, compared to the 4th Quarter of FY 2006; and

1        (d)    For FY 2007, home building revenues declined 24% and net signed

2    contracts declined 33% compared with FY 2006's year-end results.

3

4        19.    At the Stonebrae Development, Defendant Toll has a substantial

5    amount of inventory (both completed and partially completed) in Village A, and has

6    suffered many cancellations of contracts to purchase its homes in Village A. At the

7    present time, Defendant Toll has completed the sale of only 21 homes on the

8    102 residential Village A lots it purchased from Plaintiff Stonebrae.

9

10       20.    To avoid the close of escrow under the Village B Purchase

11   Agreement, Defendant Toll has offered a number of pretextual reasons why it purportedly

12   is under no obligation to close the escrow, acquire the 56 lots from Plaintiff Stonebrae and

13   pay Plaintiff Stonebrae the purchase price of $31,854,200.00, and on that basis has

14   purported to terminate the Village B Purchase Agreement and has demanded that the letter

15   of credit in escrow be released to it.

16

17   **FIRST CAUSE OF ACTION**

18   **(Declaratory Relief)**

19       21.    Plaintiff Stonebrae incorporates herein by reference the allegations

20   contained in Paragraphs 1 through 20.

21

22       22.    A genuine and justiciable controversy now exists between Plaintiff

23   Stonebrae and Defendant Toll as hereinafter alleged.

24

25       23.    Defendant Toll asserts that it is entitled to terminate the Village B

26   Purchase Agreement, not close the escrow, not pay Plaintiff Stonebrae the purchase price

27   of $31,854,200.00, and have the letter of credit in the amount of $4,774,944.00 returned

28   for several reasons, including:

1        (a)    Under Section 7, the closing of escrow was required to take place no

2    later than November 1, 2007, but did not;

3

4        (b)    That Plaintiff Stonebrae was required to complete the

5    "Stonebrae Pre-Closing Work" prior to November 1, 2007, but did not;

6

7        (c)    That Plaintiff Stonebrae has not satisfied all Conditions of Approval

8    for the Stonebrae Development that are required for the issuance of the 10 building permits

9    to Defendant Toll pursuant to Section 6;

10

11        (d)    That Plaintiff Stonebrae failed to provide civil and geotechnical

12    certificates by November 1, 2007, and the certificates provided on November 6, 2006 are

13    not current;

14

15        (e)    That the elimination of 3.25 acres of pocket parks from Village B and

16    the failure to have completed the permanent clubhouse and fitness center are contrary to

17    Toll's expectations and impact Toll's ability to market homes in the $1.5 to $2 million

18    range.

19

20        24.    Plaintiff Stonebrae disputes each and every one of Defendant Toll's

21    pretextual excuses for refusing to close escrow and terminate the Village B Purchase

22    Agreement, as follows:

23

24        (a)    The close of escrow was not required to occur on or before

25    November 1, 2007 under Section 7. Defendant Toll's interpretation of Section 7.2 would

26    render as surplusage, in violation of settled rules of contract interpretation, various other

27    provisions of the Village B Purchase Agreement, including, among others, Sections 6.2,

28    7.3, and 17.2;

1   (b) The "Stonebrae Pre-Closing Work," which is a condition to Defendant

2 Toll's obligation to close escrow, was not required to be completed by November 1, 2007.

3 Rather, Section 6.2(a) specifically provides that "Stonebrae Pre-Closing Work" can be

4 completed anytime prior to the "Outside Closing Date" (defined in Section 7.3 to mean

5 January 31, 2008). Plaintiff Stonebrae already has substantially completed all the

6 "Stonebrae Pre-Closing Work, and is ready to complete any legitimate items on a

7 "Deficient Work List" in accordance with Section 9.2 (but Defendant Toll has failed to

8 provide a "Deficient Work List" for approval by Plaintiff Stonebrae as required by

9 Section 9.2);

10

11   (c) Stonebrae has satisfied all Conditions of Approval for the

12 Stonebrae Development that are required for the issuance of the 10 building permits to

13 Defendant Toll pursuant to Section 6;

14

15   (d) The civil and geotechnical certificates are part of the

16 "Stonebrae Pre-Closing Work," that must be completed by January 31, 2008, not by

17 November 1, 2007. Further, the minor "out of tolerance" items noted by Toll during the

18 "Pre-Closing Walk Through" do not impact the existing certifications and, even if they do,

19 will be addressed through the process set forth in Section 9.2 governing completion of

20 legitimate items on the "Deficient Work List" and the lots re-certified, if required.

21

22   (e) The elimination of the Village B pocket parks in exchange for

23 Plaintiff Stonebrae's agreement to mass grade a public park adjacent to the Stonebrae

24 Development, to install artificial turf on the school soccer fields and to expand the area of

25 the paseos within the Stonebrae Development was known and consented to by Defendant

26 Toll prior to the end of its "Due Diligence Period," as evidenced in the Second

27 Amendment to the Village B Purchase Agreement and related correspondence, and the

28 completion of the permanent clubhouse and fitness center was always scheduled as part of

1    a later phase of the Stonebrae Development.  Neither item was unknown or objected to by

2    Toll at the time it gave Plaintiff Stonebrae written notice of its approval of its

3    Due Diligence Investigation in accordance with Section 4.6 of the Village B

4    Purchase Agreement.

5

6          25.    Defendant Toll is obligated to proceed to close escrow or,

7    alternatively, is in default, in which case Plaintiff Stonebrae is entitled to terminate the

8    Village B Purchase Agreement and to instruct the escrow holder to draw upon the letter of

9    credit and release the amount thereof to Plaintiff Stonebrae in accordance with

10   Section 17.1(c).

11

12         26.    In accordance with the Village B Purchase Agreement, Plaintiff

13   Stonebrae has advised Defendant Toll that its purported notice of termination is invalid

14   and improper, and has provided Defendant Toll with a notice and opportunity to cure, a

15   true and correct copy of which is attached hereto as Exhibit 2 and incorporated herein by

16   reference.

17

18         WHEREFORE, Plaintiff Stonebrae prays for judgment as hereinafter set

19   forth.

20

21                   **SECOND CAUSE OF ACTION**

22                      **(Breach of Contract)**

23         27.    Plaintiff Stonebrae incorporates herein by reference the allegations

24   contained in Paragraphs 1 through 26.

25

26         28.    Defendant Toll has breached the Village B Purchase Agreement by,

27   among other things:

28

1         (a)     Purporting to terminate the Village B Purchase Agreement, but failing

2  to provide Plaintiff Stonebrae specific notice and an opportunity to cure any alleged

3  defaults in accordance with Section 17.2(a);

4

5         (b)     Purporting to terminate the Village B Purchase Agreement on grounds

6  that are either not provided for, are inconsistent with other provision in the Village B

7  Purchase Agreement, or otherwise lack merit and are wholly pretextual;

8

9         (c)     Failing to close the escrow as provided for in the Village B Purchase

10  Agreement;  and

11

12         (d)     Breaching the implied covenant of good faith and fair dealing that is

13  an implied term of every contract under California law, and which requires parties to a

14  contract to refrain from doing anything to impair the rights of the other party to receive the

15  benefits of the contract.

16

17        29.    As a direct and proximate result of Defendant Toll's breaches of the

18  Village B Purchase Agreement, Plaintiff Stonebrae has been damaged in an amount to be

19  proven at trial.

20

21        WHEREFORE, Plaintiff Stonebrae prays for judgment as hereinafter set

22  forth.

23    ————

24                   **THIRD CAUSE OF ACTION**

25           **(Inducing Breach Of Contract – Toll Brothers, Inc.)**

26        30.    Plaintiff Stonebrae incorporates herein by reference the allegations

27  contained in Paragraphs 1 through 29.

28

1          31.  The Village B Purchase Agreement is a valid and enforceable contract

2  between Defendant Toll and Plaintiff Stonebrae.

3

4          32.  Plaintiff Stonebrae is informed and believes, and on that basis alleges,

5  that Defendant Toll Brothers, Inc. knew or was otherwise aware of the existence of the

6  Village B Purchase Agreement.

7

8          33.  Subsequent to the effective date of the Village B Purchase Agreement,

9  the financial condition of Defendant Toll Brothers, Inc. continued to deteriorate, as

10  hereinabove alleged, and Defendant Toll has a large inventory of unsold homes (completed

11  and partially-completed) in Village A of the Stonebrae Development.

12

13          34.  Plaintiff Stonebrae is informed and believes, and on that basis alleges,

14  that in response to its severely deteriorating financial condition, Defendant Toll Brothers,

15  Inc. sought to reduce the contractual liabilities on its consolidated financial statements,

16  such as that represented by the Village B Purchase Agreement, and directed its subsidiaries

17  and affiliates to take steps to do so.  Plaintiff Stonebrae is further informed and believes,

18  and on that basis alleges, that subsidiaries and affiliates of Defendant Toll Brothers, Inc.,

19  including Defendant Toll, acted pursuant to such directives from Defendant Toll Brothers,

20  Inc.

21

22          35.  As hereinabove alleged, Defendant Toll breached the Village B

23  Purchase Agreement.

24

25          36.  As a direct and proximate result of the breach of Defendant Toll

26  Brothers, Inc.'s conduct, and the resulting breach of the Village B Purchase Agreement,

27  Plaintiff Stonebrae has damaged in an amount to be proven at trial.

28

1    WHEREFORE, Plaintiff Stonebrae prays for judgment against Defendants,

2    and each of them, as follows:

3

4    1.    For a Declaratory Judgment against Defendant Toll Bros., Inc. that:

5    (a)    Plaintiff Stonebrae is not in default of its obligations under the

6    Village B Purchase Agreement;

7

8    (b)    Said Defendant wrongfully terminated the Village B Purchase

9    Agreement and demanded that the escrow holder release the letter of credit to Defendant

10   Toll; and

11

12   (c)    Said Defendant is obligated to close the escrow under the Village B

13   Purchase Agreement or, alternatively, is in default thereunder thus entitling Plaintiff

14   Stonebrae to terminate said agreement and to instruct the escrow holder to draw upon the

15   letter of credit and release the amount thereof (including accrued interest) to Plaintiff

16   Stonebrae.

17

18   2.    For liquidated damages for Defendant Toll's breach of contract as

19   provided in Section 17.1(c);

20

21   3.    For attorneys' fees and costs against Defendant Toll pursuant to

22   Section 19.7;

23

24   4.    For actual damages against Defendant Toll Brothers, Inc. in an

25   amount to be proven at trial;

26

27   5.    For costs of suit incurred herein; and

28

1            6.    For such other and further relief as the Court deems just and proper.

2

3    Dated:  November 29, 2007

4                        SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

5

6                    By       *Philip Atkins-Patterson /jpn*

7                        PHILIP F. ATKINS-PATTENSON

8                        Attorneys for Plaintiff
                    STONEBRAE L.P.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "1"

PURCHASE AND SALE AGREEMENT

AND

JOINT ESCROW INSTRUCTIONS

BETWEEN

STONEBRAE L.P.

AND

TOLL BROTHERS, INC.


FOR

Lot Numbers 29, 63-117

of Stonebrae Community Village B


DATED: May 1, 2006

# TABLE OF CONTENTS

Page

Section 1. Purchase and Sale of the Property ..............................................................................2

Section 2. Purchase Price, Deposit and Payment........................................................................2

    2.1 Purchase Price...............................................................................................................2
    2.2 Deposit...........................................................................................................................2
    2.3 Payment.........................................................................................................................3

Section 3. Escrow and Escrow Instructions..................................................................................3

    3.1 Escrow...........................................................................................................................3
    3.2 Escrow Instructions.......................................................................................................3

Section 4. Due Diligence Investigation and Materials..................................................................4

    4.1 Due Diligence Investigation .........................................................................................4
    4.2 Delivery of Due Diligence Materials.............................................................................5
    4.3 Builder's Entry onto the Property..................................................................................5
    4.4 Stonebrae and Builder Insurance ................................................................................5
    4.5 Engineers Certificates ..................................................................................................6
    4.6 Approval of Due Diligence ...........................................................................................6

Section 5. Title Insurance. ...........................................................................................................6

    5.1 Owner's Title Insurance Policy.....................................................................................6
    5.2 Permitted Exceptions ...................................................................................................6
    5.3 Monetary Liens.............................................................................................................7
    5.4 New Title Matters .........................................................................................................8
    5.5 Stonebrae's Refusal to Deliver Title ...........................................................................8

Section 6. Conditions Precedent. .................................................................................................8

    6.1 Stonebrae's Conditions................................................................................................8
    6.2 Builder's Conditions.....................................................................................................9
    6.3 Mutual Conditions ......................................................................................................10

Section 7. Closing Dates and Cancellation. ...............................................................................10

    7.1 "Close of Escrow" Defined ........................................................................................10
    7.2 Close of Escrow .........................................................................................................11
    7.3 Outside Closing Date. ................................................................................................11
    7.4 Escrow Cancellation. .................................................................................................12

Section 8. Deposits Into Escrow; Closing Instructions; Prorations. ...........................................13

    8.1 Stonebrae's Deposits Into Escrow.............................................................................13
    8.2 Builder's Deposits Into Escrow ..................................................................................13
    8.3 Escrow Holder's Closing Instructions ........................................................................14
    8.4 Post-Closing Instructions ...........................................................................................14
    8.5 Prorations and Costs. ................................................................................................15

Section 9. Work by Stonebrae. ...........................................................................................16

    9.1 Stonebrae's Work ................................................................................................16
    9.2 Pre-Closing Walk-Through and Punch-list.......................................................16
    9.3 Village B Contractor; Insurance .......................................................................16

Section 10. Development of the Project; Assignment of Plans .......................................17

Section 11. Marketing Program and Fee...........................................................................17

Section 12. Certain Additional Builder Obligations. .......................................................17

    12.1 Development Agreement. ................................................................................17
    12.2 Water Sand Sanitary Sewer Service ...............................................................18
    12.3 Department of Real Estate Reporting .............................................................18
    12.4 Development Fees............................................................................................18
    12.5 Builder's Satisfaction of Conditions ..............................................................19
    12.6 Sales Reporting by Builder to Stonebrae ........................................................19
    12.7 Agreement Not to Compete ............................................................................19
    12.8 Right of First Offer .........................................................................................19

Section 13. No Hazardous Substances. .............................................................................20

    13.1 No Hazardous Substance Activity ..................................................................20
    13.2 Compliance with Environmental Law ............................................................20
    13.3 Notice of Hazardous Substance Claims ..........................................................20
    13.4 Performance of Remedial Work ......................................................................20
    13.5 Right to Perform Remedial Work ...................................................................21
    13.6 Indemnity Regarding Hazardous Substances..................................................21
    13.7 Definitions.......................................................................................................21
    13.8 Design Guidelines...........................................................................................22

Section 14. Representations and Warranties......................................................................23

    14.1 By Builder........................................................................................................23
    14.2 By Stonebrae...................................................................................................24
    14.3 Deemed Re-Made At Closing..........................................................................25
    14.4 Survival of Representations and Warranties....................................................25
    14.5 Meaning of Best Knowledge ..........................................................................25

Section 15. "As Is"; Indemnity; Release...........................................................................25

    15.1 No Representations; "AS-IS"; Certain Disclosures. ......................................25
    15.2 Limitation on Stonebrae's Liability................................................................29
    15.3 Indemnity and Release by Builder ..................................................................30
    15.4 Intentionally Omitted. .....................................................................................31
    15.5    Nonexclusive Assignment of Rights..........................................................31

Section 16. Confidentiality. ..............................................................................................31

    16.1 Prior to the Close of Escrow ...........................................................................31
    16.2 After Close of Escrow......................................................................................33
    16.3 Survival of Confidentiality .............................................................................33

Section 17. Default and Remedies. ....................................................................................33

    17.1 Builder Defaults and Stonebrae Remedies. ..........................................................33
    17.2 Stonebrae Defaults and Builder Remedies. ..........................................................34

Section 18. Development Documents..................................................................................36

    18.1 Master CC&Rs................................................................................................36
    18.2 Grant Deed ....................................................................................................36

Section 19. Miscellaneous. .............................................................................................36

    19.1 Brokerage Commissions .................................................................................36
    19.2 Notices .........................................................................................................36
    19.3 Time of the Essence .......................................................................................38
    19.4 Interpretation; Governing Law ........................................................................38
    19.5 Severability ...................................................................................................38
    19.6 Performance of Acts on Business Days .............................................................38
    19.7 Attorneys' Fees..............................................................................................38
    19.8 Post-Judgment Attorneys' Fees .......................................................................38
    19.9 Waiver of Jury Trial........................................................................................38
    19.10 Further Assurances; Survival .........................................................................39
    19.11 Entire Agreement; Amendments.....................................................................39
    19.12 No Waiver...................................................................................................39
    19.13 Assignment. ................................................................................................39
    19.14 Binding Effect.............................................................................................40
    19.15 Headings; Cross-References; Exhibits..............................................................40
    19.16 Backup Withholding .....................................................................................40

## List of Exhibits

| Exhibit "A" | Graphic of Property |
| Exhibit "B" | General Escrow Provisions |
| Exhibit "C" | Due Diligence Materials |
| Exhibit "D" | Insurance Requirements |
| Exhibit "E" | Form of RJA Engineer's Certificate |
| Exhibit "F" | Form of Engeo Engineer's Certificate |
| Exhibit "G" | Preliminary Report |
| Exhibit "H" | Stonebrae's Work |
| Exhibit "I" | Partial Assignment of Development Agreement |
| Exhibit "J" | Nonforeign Transferor Declaration |
| Exhibit "K" | Development Fees Payable by Builder |
| Exhibit "L" | Description of Carden Property |
| Exhibit "M" | Grant Deed |
| Exhibit "N" | City Approved Plans |
| Exhibit "O" | Builder's Stock Plans |

PURCHASE AND SALE AGREEMENT
AND JOINT ESCROW INSTRUCTIONS

THIS PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (the "Agreement"), is made and entered into as of May 1, 2006 (the "Agreement Date"), by and between Stonebrae L.P., a Delaware limited partnership ("Stonebrae"), and Toll Bros., Inc., a Pennsylvania corporation ("Builder").

RECITALS

A) Stonebrae is owner and master developer of the Stonebrae master planned residential community located within the City of Hayward ("City"), County of Alameda ("County"), State of California, which consists of approximately 556 residential lots (the "Stonebrae Community"). Stonebrae also intends to construct a 650-student elementary school which will be dedicated to the Hayward Unified School District ("HUSD") upon completion (the "School"), and an 18-hole championship golf course, clubhouse and related facilities (the "Golf Course"), both adjacent to the Stonebrae Community. The Stonebrae Community, the School and the Golf Course are referred to collectively herein as the "Stonebrae Development".

B) Stonebrae has obtained approval of Vesting Tentative Tract Map No. 5354 for the Blue Rock Country Club Project, approved by City Council Resolution No. 02-132 adopted September 10, 2002 (the "Tentative Map"), which provides for the subdivision of the Stonebrae Development subject to the satisfaction of the Final Project Conditions of Approval adopted by City in January of 1998 and supplemented on September 10, 2002 (the "Tentative Map Conditions" or "Conditions of Approval"). Based on the Tentative Map, Stonebrae filed that certain final subdivision map for Tract 5354 in Map Book 285, Pages 1 through 40, inclusive, in the Alameda County Records (the "Official Records") on July 29, 2005 (the "First Final Map") and is in the process of obtaining or has obtained approval of the second in a series of phased final maps of the Stonebrae Development (the "Second Final Map"), which is subject to certain conditions as set forth on the Tentative Map and the Tentative Map Conditions (the "Final Map Conditions").

C) The Stonebrae Community is being mapped and constructed in phases. The first phase ("Phase One") consists of, among other property, lots 1 through 214 as shown on the First Final Map and is commonly identified as "Village A". The second phase ("Phase Two") will consist of, among other property, approximately 56 single family lots shown on the Second Final Map, and is commonly identified as "Village B".

D) Pursuant to that certain Purchase and Sale Agreement and Joint Escrow Instructions between Stonebrae and Builder, dated as of July 26, 2005 (the "Village A Purchase Agreement"), Builder has agreed to purchase certain finished lots within Phase One.

E) Stonebrae desires to sell to merchant builders the residential lots comprising Phase Two in three separate groupings (each, a "Product Group"), based on the product type and size to be constructed on the lots in each Product Group. One such Product Group consists of Lots 29, 63-117 ("Type 3 Lots") as shown on the Second Final Map (collectively, the "Property"). A graphic depiction of the Property is attached hereto as Exhibit A. The remaining two Product Groups shall be sold to one or more other merchant builders selected by Stonebrae (the "Other

Builders"). The residential lots comprising the Property shall be referred to individually as a "Lot" and collectively as the "Lots."

F) Builder desires to purchase the Property from Stonebrae and to construct on the Property a total of fifty-six (56) (the "Maximum Density") single-family detached residential units (individually a "Residence" and collectively the "Residences") that Builder intends to market to the general public. Builder's development of the Residences on the Property is referred to herein as the "Project."

G) Stonebrae and Builder desire that the Property be developed, landscaped and maintained in a manner consistent with the overall development of the Stonebrae Community. To facilitate the development, landscaping and maintenance of the Stonebrae Community and the Residences, Stonebrae and Builder shall complete certain construction work as set forth herein.

H) Development of the Stonebrae Community is subject to among other things (i) those certain Stonebrae Design Guidelines (November 2005), which were adopted by the City Council of Hayward (the "City Council") on November 22, 2005, by Resolution No. 05-143 (the "Design Guidelines") with final publication dated December, 2005, and (ii) that certain Stonebrae Master Declaration of Restrictions (CC&Rs), recorded in the Official Records on March 1, 2006, as Series No. 2006-76865 (the "Master CC&Rs"). The Stonebrae Design Review Committee has been established under the Design Guidelines (the "Design Review Committee").

Agreement

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein and in the other documents referred to herein relating to the purchase and sale of the Property, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Stonebrae and Builder hereby agree as follows:

Section 1. **Purchase and Sale of the Property.** Stonebrae hereby agrees to sell the Property to Builder and Builder hereby agrees to purchase the Property from Stonebrae, at the price, on the terms and conditions, and for the purposes set forth in this Agreement.

Section 2. **Purchase Price, Deposit and Payment.**

2.1 **Purchase Price.** The purchase price of the Property shall be Thirty-One Million Eight Hundred Fifty-Four Thousand Two Hundred and No/100 Dollars ($31,854,200) (the "Purchase Price"):

2.2 **Deposit.**

a. **First Deposit.** On the Agreement Date, Builder shall deliver to the Escrow Holder (as defined below), a deposit in the amount of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) (the "First Deposit").

b. **Second Deposit.** Within one (1) business day after the Due Diligence Date (as such term is defined below), if this Agreement has not been terminated, Builder shall deliver to Escrow Holder a deposit in the amount Four Million Five Hundred

Twenty Four Thousand Nine Hundred and Forty-Four and No/100 Dollars ($4,524,944.00) (the "Second Deposit"). The First and Second Deposit actually delivered to Escrow Holder is referred to herein collectively as the "Deposit". The Deposit shall be nonrefundable, but any cash proceeds thereof shall be credited against the Purchase Price.

c.    Letter of Credit. The First Deposit shall be in the form of cash. The Second Deposit shall be in the form of a letter of credit which shall be (i) issued in the amount of the First Deposit and the Second Deposit including any interest earned on the First Deposit; (ii) issued to Escrow Holder as beneficiary; (iii) issued by a bank or other financial institution reasonably acceptable to Stonebrae and Stonebrae's construction lender, HSBC Realty Credit Corporation USA, a Delaware corporation ("Lender") and in form and substance reasonably acceptable to Stonebrae and Lender, and (iv) shall be drawable at an office of the issuer located in San Francisco, California (the "Letter of Credit"). Upon receipt of the Letter of Credit, Escrow Holder shall promptly return to Builder cash in the amount of the First Deposit including any interest actually earned on the First Deposit while in Escrow.

d.    Conditions of Draw. Escrow Holder shall draw upon the letters of credit if, and only if, (i) Builder is in default under this Agreement and Stonebrae has terminated this Agreement and delivered a notice to Escrow Holder pursuant to Section 17.1(b), or (ii) either letter of credit will expire in ten (10) days and has not been replaced or renewed with a letter of credit in conformance with this Section 2.2. Escrow Holder shall notify Stonebrae and Builder immediately upon making a draw. Any cash obtained by Escrow Holder's draw on the letters of credit shall be held and disbursed in accordance with the terms of this Agreement. If the proceeds of the letters of credit are not to be immediately disbursed in accordance with the terms of this Agreement, Escrow Holder shall invest the cash in one or more interest-bearing accounts. The Deposit shall be deemed to include any interest earned on such proceeds. The letters of credit, if not drawn, shall be returned to Builder upon the Close of Escrow or if this Agreement is terminated for any reason other than a default of Builder.

2.3 Payment. The Purchase Price (less any cash proceeds of the letters of credit if drawn by Escrow Holder pursuant to Section 2.2(d)(ii) above and paid to Stonebrae at the Close of Escrow) shall be paid by Builder to Stonebrae in cash (the "Cash Balance Due") at the Close of Escrow.

Section 3. **Escrow and Escrow Instructions.**

3.1 Escrow. The purchase and sale of the Property shall be consummated through an escrow (the "Escrow") at Old Republic Title Insurance Company, 555-12th Street, Suite 2040, Oakland, CA 94607 (the "Escrow Holder"), or another escrow company selected by Stonebrae and Builder. Escrow shall be opened upon Escrow Holder's receipt of a fully executed copy of this Agreement together with the First Deposit. Escrow Holder shall notify each of the parties in writing of the date Escrow was opened.

3.2 Escrow Instructions. This Agreement, together with the General Escrow Provisions attached hereto as Exhibit B ("General Escrow Provisions") and incorporated herein by this

reference, shall constitute the Escrow Holder's instructions. However, in the event of any conflict or inconsistency between this Agreement and the General Escrow Provisions, the terms of this Agreement shall govern the duties of the Escrow Holder and the rights and obligations of Stonebrae and Builder. In addition, Stonebrae and Builder agree to execute and deliver to the Escrow Holder such additional and supplemental instructions as the Escrow Holder may require or as Stonebrae or Builder may deem necessary or appropriate in order to clarify the Escrow Holder's duties under this Agreement. Stonebrae and Builder hereby authorize that any such additional and supplemental instructions may be executed and delivered by or through their respective attorneys.

## Section 4. <u>Due Diligence Investigation and Materials.</u>

4.1 <u>Due Diligence Investigation.</u> The Period from the Agreement Date through 5:00 P.M. Pacific Daylight Savings Time on the date which is thirty days after the date of this Agreement (the "<u>Due Diligence Date</u>") is referred to herein as the "<u>Due Diligence Period</u>". Prior to and during such Due Diligence Period, Builder acknowledges that it has or shall complete a due diligence investigation of the Property and of all matters which Builder has deemed relevant to Builder's purchase of the Property (the "<u>Due Diligence Investigation</u>"). In the course of the Due Diligence Investigation, Builder has made or shall make such independent investigations as Builder deemed necessary or appropriate concerning: the use, sale, development or suitability for development of the Property, including but not limited to any desired investigations or analyses of present or future laws, statutes, codes, rules, regulations, ordinances, limitations, restrictions or requirements concerning the use, density, location or suitability of the Property or any existing or proposed development or condition thereof (collectively "<u>Regulations</u>"), including but not limited to zoning, subdivision, environmental or other such Regulations; the necessity or availability of any general or specific plan amendments, rezoning, zone variances, conditional use permits, development permits, grading permits, building permits, stormwater discharge permits, environmental impact reports, supplemental or focused environmental impact reports, parcel or subdivision maps, public reports by the California Department of Real Estate ("<u>DRE</u>") under the Subdivided Lands Act, or any other governmental permits, approvals or acts (collectively, the "<u>Permits</u>"); the necessity or existence of any dedications, fees, charges, costs or assessments that may be imposed in connection with any Regulations or the obtaining of any required Permits; the effect of and limitations imposed by any tentative or final subdivision map related to the Property and any conditions of approval related to it; the economic value of the Property; the size, dimensions, location or topography of the Property; the availability or adequacy of access to the Property, or of water, sewage or any other utilities serving the Property; the presence or adequacy of infrastructure, subdrain or other improvements on, near or concerning the Property; the extent or condition of any grading, compaction or other site work already performed or hereafter required for the Property, including any mass, rough or other grading performed by or on behalf of Stonebrae; any surface, soil, subsoil, geologic or ground water conditions or other physical conditions of or affecting the Property, such as climate, drainage, air, water or minerals and the existence of contaminants or Hazardous Substances (as defined below) on, in or near the Property or in the ground water; the extent or condition of title to the Property; and all other matters concerning the condition, use, development or sale of the Property. Builder has delivered or shall deliver to Stonebrae promptly following their preparation copies of all studies, reports, applications and other materials relating to Builder's investigation or planned development of the Property (not including Builder's internal market

studies, plans, specifications and other design documents in connection with construction of the Residences and other proprietary materials), but without any representation or warranty concerning the completeness or accuracy thereof or otherwise.

4.2 <u>Delivery of Due Diligence Materials</u>. Prior to the execution and delivery of this Agreement, Stonebrae has made available to Builder, and Builder hereby acknowledges receipt of, the Due Diligence Documents (as such term is defined on <u>Exhibit C</u>) through the internet website described on <u>Exhibit C</u>. Except for additional Due Diligence Materials relating to the development of Village B and materials which reflect planned and as-built changes in the remaining undeveloped Villages in the Stonebrae Community (for example, revised grading and landscape plans) that will be made available to Builder within five (5) business days after the Agreement Date (either in hard copy or via the internet website described on <u>Exhibit C</u>), Stonebrae warrants that to the actual knowledge of Steven Miller and Mike Letchinger of Stonebrae, the specific documents listed on <u>Exhibit C</u> are all of the documents within the description of applicable Due Diligence Documents.

4.3 <u>Builder's Entry onto the Property</u>. Builder acknowledges that Stonebrae has permitted Builder access to the Property to conduct its due diligence investigation. Stonebrae shall continue to permit Builder reasonable access to the Property to conduct such studies and investigations as Builder may deem reasonably necessary. In connection with any entry by Builder, its agents, employees or contractors onto the Property, Builder shall give Stonebrae reasonable advance notice of such entry and shall conduct such entry and any related inspections so as to minimize interference with Stonebrae's activities on the Property. Without limiting the foregoing, Builder acknowledges that Stonebrae will be conducting grading and other construction activity on the Property and Builder, its agents, employees or contractors entry onto the Property shall be at their own risk. Builder shall maintain, and shall assure that its agents and contractors maintain, public liability and property damage insurance in amounts and in form and substance adequate to insure against all liability of Builder and its agents, employees and contractors, arising out of any entry or inspections of the Property pursuant to the provisions hereof, and Builder shall provide Stonebrae with evidence of such insurance coverage upon request by Stonebrae. Builder shall indemnify and hold Stonebrae harmless from and against any costs, damages, liabilities, losses, expenses, liens or claims (including, without limitation, reasonable attorneys' fees) arising out of or relating to any entry on the Property by Builder, its agents, employees or contractors in the course of performing the inspections, testings or inquiries whether before or after execution of this Agreement; provided, however, that this indemnity shall not apply to impacts on the value of the Property arising from conditions discovered by Builder's testing, inspection or investigation. The foregoing indemnity shall survive beyond the Closing, or, if the sale is not consummated, beyond the termination of this Agreement.

4.4 <u>Stonebrae and Builder Insurance</u>. Stonebrae shall maintain, in full force and effect, in connection with the Stonebrae Work and the development of the Stonebrae Community, the insurance set forth on <u>Exhibit D</u> hereto during the period specified in <u>Exhibit D</u> (collectively, "<u>Stonebrae's Insurance</u>"). Builder shall maintain, in full force and effect, in connection with Builder's ownership and development of the Lots, the insurance set forth on <u>Exhibit D</u> hereto during the period specified in <u>Exhibit D</u> (collectively, "<u>Builder's Insurance</u>").

4.5 <u>Engineers Certificates</u>. Stonebrae, Builder, Ruggeri-Jensen-Azar and Associates ("<u>RJA</u>") and Engeo, Inc. ("<u>Engeo</u>") have agreed upon the form of engineers' certificates to be executed by RJA (a form of which is attached hereto as <u>Exhibit E</u>) and Engeo (a form of which is attached hereto as <u>Exhibit F</u>). Such certificates are collectively referred to herein as the "<u>Engineers' Certificates</u>".

4.6 <u>Approval of Due Diligence</u>. Builder shall have the right, in its sole discretion, to elect not to proceed under this Agreement for any reason or no reason during the Due Diligence Period. If Builder fails to notify Stonebrae of its written approval of the Due Diligence Investigation of the Property, on or before the Due Diligence Date, then this Agreement shall terminate and the rights and obligations of the parties to each other shall cease without further liability. In the event of termination, Stonebrae and Builder shall instruct the Escrow Holder to cancel the Escrow and return the Deposit to Builder. In such an event, Builder shall pay the Escrow fees.

Section 5. <u>**Title Insurance**</u>.

5.1 <u>Owner's Title Insurance Policy</u>.

a.     <u>Standard Title Policy</u>. At the Close of Escrow (as such term is defined below) and as a condition thereto, the Title Company shall issue to Builder at Stonebrae's expense an ALTA owner's policy of title insurance (1970 B policy form) (the "<u>Standard Title Policy</u>") in an amount equal to the Purchase Price, showing title to the Property, vested in Builder in fee simple, subject only to (i) the Permitted Exceptions (as defined below), (ii) those exceptions to title commonly known as Title Company's "Regional Exceptions," and (iii) such other matters as to which Builder may consent in writing or which are deemed approved by Builder pursuant to <u>Section 5.4</u>. In addition, Stonebrae shall, at Stonebrae's expense, cause the Title Company to issue CLTA Endorsement No. 101.4 to Builder's title policy with respect to all work performed by Stonebrae prior to the Closing Date.

b.     <u>Extended Coverage</u>. Builder may, by prior written notice to Stonebrae and the Escrow Holder, request the Title Company to issue to Builder at the Close of Escrow, an ALTA owner's policy of title insurance (1987 policy form) without the Regional Exceptions (the "<u>Extended Coverage Title Policy</u>") instead of the Standard Title Policy, provided (i) Builder shall bear all costs associated with the issuance of the Extended Coverage Title Policy as well as the additional amount of the premium for the Extended Coverage Title Policy over the premium for the Standard Title Policy, and (ii) the Close of Escrow shall not be delayed by reason of any such request or Title Company's inability for any reason to comply therewith, provided that the delay does not arise from any breach of this Agreement by Stonebrae.

5.2 <u>Permitted Exceptions</u>. The following exceptions to title shall constitute the "<u>Permitted Exceptions</u>":

a.     <u>Title Report Exceptions</u>. The exceptions affecting the Property set forth in (i) the body of that certain Preliminary Report for Title Insurance No. 1117003324-JM

issued by Old Republic Title Insurance Company (the "Title Company") and dated March 17, 2006 (the "Preliminary Report"), a copy of which is attached hereto as Exhibit G, except for title exception nos. 9, 15, and 16-17 set forth therein;

b.    Closing Documents. The encumbrance or effect of all documents to be recorded prior to or through the Escrow as set forth in this Agreement or in connection with any financing obtained by Builder;

c.    The Second Final Map. The encumbrance or effect of the Second Final Map, and any easements shown or referred to in the Second Final Map.

d.    Maintenance Assessment Districts. The parties acknowledge that, prior to the Close of Escrow, one or more landscape, lighting, water management or other maintenance assessment districts including the Property shall be established, pursuant to which assessments for maintenance of various community facilities shall be levied against the Property. Builder hereby consents to the following assessment districts and, if such districts are not in place as of the Close of Escrow, Builder agrees to cooperate, with respect to the establishment of such districts, and to execute such documents as are necessary to include the Lots in such districts:

(i)    a "zone of benefit" district to be established by EBRPD pursuant to Condition of Approval no. 15, to assess homeowners an annual fee for their proportional share of open space maintenance, including local trails, fencing and related improvements and long term maintenance items, all as set forth in such condition of approval.

(ii)    The Fairview Avenue landscaping and lighting maintenance assessment district to be established to assess homeowners an annual fee for their proportionate share of landscaping and lighting maintenance for the Stonebrae Community.

(iii)    A water quality and detention basin maintenance district to be established to assess homeowners an annual fee for their proportionate share of water quality management and detention basin maintenance.

Stonebrae shall deliver to Builder, when available, notice of the establishment of any maintenance assessment districts and all information in connection therewith reasonably and promptly requested by Builder.

e.    Other Exceptions. All exceptions caused by the acts or omissions of Builder or the Builder's agents, employees, contractors or invitees (collectively, "Builder's Representatives") including without limitation mechanic's or materialman's liens or other liens or claims, or potential liens or claims, arising from Builder's inspections and investigations of the Property.

5.3    Monetary Liens. At its expense, Stonebrae shall remove at or before the Close of Escrow all monetary liens (collectively, the "Monetary Liens") related to obligations of Stonebrae or Stonebrae's predecessor in interest, Hayward 1900, Inc., including, without

limitation, (i) all delinquent property taxes, any delinquent bonds or special assessments to pay the cost of capital improvements, including interest and penalties (current taxes and assessments shall be prorated as of the Close of Escrow); (ii) all other monetary liens arising from agreements entered into by, indebtedness or acts or omissions of, Stonebrae or any affiliate of Stonebrae whether or not shown on the Preliminary Report (including judgment and mechanic's liens, whether or not liquidated and mortgages and deeds of trust, with Stonebrae being fully responsible for any fees or penalties); and (iii) Stonebrae shall either cause to be removed from title to the Property or indemnify Builder against the monetary obligations arising under the items described as exception numbers 10-11 and 13-14 on the Preliminary Report. Notwithstanding the foregoing, Monetary Liens shall not include any ongoing monetary obligations in or arising in connection with the Permitted Exceptions to the extent accruing after the Closing Date, non-delinquent property taxes or assessments (except as set forth in Section 5.3(i)) or the liens created by any maintenance assessment districts.

5.4  New Title Matters. If either party discovers a new title matter that materially affects the Property and is not reflected in the Preliminary Report or otherwise described in Section 5.2, Builder may object to the new title matter by delivering written notice to Stonebrae within ten (10) days after Builder receives written notice of the exception. If Builder fails to so notify Stonebrae, or if the new title matter was caused by Builder or Builder's Representatives, then the new title matter shall be deemed approved. Stonebrae shall have ten (10) days from Builder's notice to notify Builder whether Stonebrae will cause the new title matter to be removed at or before the Close of Escrow. If Stonebrae fails to so notify Builder, Stonebrae will be deemed to have elected not to remove the new title matter. If Stonebrae refuses to remove the new title matter, Builder may terminate this Agreement upon written notice to Stonebrae within forty (40) days following Builder's notice. In the event of termination, Builder shall instruct the Escrow Holder to cancel the Escrow and return the Deposit to Builder. Stonebrae and Builder shall share equally the Escrow Fees. If Builder does not terminate this Agreement, the new title matter shall be deemed approved.

5.5  Stonebrae's Refusal to Deliver Title. If, at the Close of Escrow, title remains subject to any exceptions that Stonebrae has agreed to remove pursuant to Sections 5.3 or 5.4, or if title is subject to an exception that Stonebrae caused to occur after the date of this Agreement other than (i) a Permitted Exception (ii) any exception required by any governmental agency; (iii) any maintenance assessment district (iv) any other exception approved by Builder in writing, then Builder may, at its election, (i) terminate this Agreement and exercise any remedies it may have pursuant to Section 17.2; or (ii) proceed to the Close of Escrow and deduct from the Purchase Price the actual, out of pocket cost to remove such exceptions if such exceptions can be removed by the payment of money, provided that if and only if the exception is a new title matter that was not voluntarily recorded against the Property by or with the consent of Stonebrae, then Builder's right to deduct the actual out of pocket cost to remove such exception from the Purchase Price shall be limited to $2,000,000.00.

Section 6.  Conditions Precedent.

6.1  Stonebrae's Conditions. The following shall constitute conditions precedent to the Close of Escrow for the benefit of Stonebrae, which conditions may be waived only by a written waiver executed by Stonebrae and delivered to Builder and Escrow Holder:

a.   Representations and Warranties.  All of Builder's representations and warranties set forth in Section 14.1 below shall be true and correct as of the Close of Escrow without exception;

b.   No Default.  There shall not then exist a Builder Default (as defined below); and

c.   Schedule of Projected Residence Size and Prices.  Builder shall deliver to Stonebrae a written schedule and any updates of the projected range of sizes and sales prices for the Residences which Builder intends to construct on the Lots.

6.2 Builder's Conditions.  The following shall constitute conditions precedent to the Close of Escrow for the benefit of Builder, which conditions may be waived only by a written waiver executed by Builder and delivered to Stonebrae and Escrow Holder:

a.   Completion of Stonebrae Pre-Closing Work.  Stonebrae shall have satisfactorily completed the "Stonebrae Pre-Closing Work" described on Exhibit H by the Outside Closing Date (as such term is defined in below).  For all purposes hereof, Stonebrae shall be deemed to have satisfactorily completed the Stonebrae Pre-Closing Work upon satisfactory completion of the Pre-Closing Walk-Through described in Section 9.2, satisfactory completion by Stonebrae of all items on the "Deficient Work List" described in Section 9.2, and Stonebrae shall have delivered or caused to be delivered to Builder the Engineers' Certificates for the Lots;

b.   Representations and Warranties.  All of Stonebrae's representations and warranties set forth in Section 14.2 below shall be true and correct as of the Close of Escrow without exception;

c.   No Default.  There shall not then exist a Stonebrae Default (as defined below);

d.   Building Permits.  City shall have issued, or shall be prepared to issue upon payment of all fees due in connection therewith, 10 building permits for construction of Residences, provided that this condition shall be operative only if Builder shall have submitted complete application packages conforming to City requirements for such permits using City Approved Plans (as such term is defined below) on or before the earlier to occur of either: (i) the date which is ninety (90) days after Stonebrae's receipt of Builder's 50th Sale Notice, or (ii) September 7, 2007.  Stonebrae agrees to join in Builder's application for building permits to the extent required by City, provided that Builder shall be solely responsible for preparing such applications and Stonebrae shall not incur any expense in connection therewith.  As used in this Agreement, the term "City Approved Plans" are those certain master plan sets for residences as listed on Exhibit N hereto as amended and approved by the City and such additional Builder's Stock Plans as may be approved by City.

e.   Partial Assignment of Development Agreement.  City shall have consented to a Partial Assignment of the Development Agreement to Builder, in a form substantially similar to the form Partial Assignment of Development Agreement attached hereto as Exhibit I (the "Partial Assignment of Development Agreement").  Pursuant to

the Partial Assignment of Development Agreement, Builder shall assume the agreed upon Conditions of Approval, and Builder shall accept any other conditions imposed by City on Builder in connection with City's consent to the Partial Assignment of Development Agreement, so long as such conditions do not materially delay Builder's ability to obtain building permits or certificates of occupancy for the Residences or materially increase the cost of constructing the Residences.

6.3 Mutual Conditions. The following shall constitute conditions precedent to the Close of Escrow for the benefit of both Stonebrae and Builder, which conditions may be waived only by written waivers executed by and exchanged between Builder and Stonebrae and delivered to Escrow Holder:

a.    Approval of Builder's Plans. In the event that Builder desires to utilize plans other than Builder's Stock Plans (as such term is defined below), Builder shall have submitted to the Design Review Committee, and the Design Review Committee shall have approved in writing, plans and specifications for all improvements to be constructed by Builder on the Lots (including without limitation the Residences), all in accordance with the terms of Design Guidelines, provided that this condition shall be operative only if Builder shall have submitted such plans and specifications in conformance with Design Review Guidelines to the Design Review Committee on or before the earlier to occur of either: (i) Stonebrae's receipt of Builder's 50th Sale Notice, or (ii) July 6, 2007. Stonebrae acknowledges receipt of and approves of those certain plans set forth on Exhibit O hereto ("Builder's Stock Plans"). Stonebrae acknowledges that Builder's Stock Plans are all in accordance with the terms of the Design Guidelines. To the extent Stonebrae has control over the Design Review Committee, Stonebrae agrees that the Design Review Committee shall not unreasonably withhold or delay its approval of Builder's Stock Plans or any other plans and specifications submitted by Builder.

b.    Recordation of the Second Final Map; Expiration of Appeals Period. The Second Final Map shall have been recorded and the period provided by law for the filing of any appeals of or judicial challenges to the City's approval of the Second Final Map shall have expired without the filing of any appeals or judicial challenges, or in the event that one or more appeals or judicial challenges of the foregoing approvals is timely filed, such appeal or judicial challenge has been withdrawn or resolved so that approval of the Second Final Map is not subject to further appeal or challenge. If the resolution of such appeal or challenge materially adversely affects the Lots and such resolution is not satisfactory to Builder in Builder's reasonable judgment, then Builder may terminate this Agreement by notice to Stonebrae given within ten (10) days after Builder's receipt of notice from Stonebrae describing such resolution.

Section 7.  Closing Dates and Cancellation.

7.1 "Close of Escrow" Defined. The term "Close of Escrow" shall mean the time when the Escrow Holder shall have recorded all of the instruments to be recorded as set forth in Section 8.4 below. Additionally, the term "Closing Date" shall mean the date upon which the Close of Escrow occurs.

7.2 <u>Close of Escrow</u>. Provided that (y) this Agreement has not been earlier terminated pursuant to the terms and provisions hereof, and (z) of all of the conditions set forth in <u>Sections 6.1, 6.2 and 6.3</u> which are then currently operative have been satisfied or have been waived in writing by the party benefited thereby, THEN Close of Escrow shall occur on the earlier of either: (i) the date which is one hundred and fifty (150) days after Stonebrae receives Builder's 50th Sale Notice (the "<u>Builder Notice Closing Date</u>"), (ii) November 1, 2007 (the "<u>Date Certain Closing Date</u>"), or (iii) such later date as permitted pursuant to <u>Section 7.3(a)</u> below. Builder shall deliver to Stonebrae written notice that Builder has executed its fiftieth (50th) purchase contract with separate individual buyers for Type 3 Lots within Village A within five business days after execution of the final of such contracts (the "<u>Builder's 50[th] Sale Notice</u>").

Upon the Close of Escrow, the Escrow Holder shall be deemed to have irrevocably committed to cause the Title Company to issue the Standard Title Policy or the Extended Coverage Title Policy, as applicable. Consent by either party to the Close of Escrow shall be deemed a waiver of any unsatisfied conditions for such party's benefit.

7.3 <u>Outside Closing Date.</u>

a. <u>Outside Completion Date</u>. If, on or before January 31, 2008 (the "<u>Outside Completion Date</u>"), Stonebrae has not completed the Stonebrae Pre-Closing Work, Builder shall have the right to instruct the Escrow Holder, in writing with a copy to Stonebrae, to proceed with the Close of Escrow (the "<u>Builder's Closing Demand</u>") and the Close of Escrow shall occur on the date which is thirty (30) days after the Outside Completion Date as extended due to Force Majeure. Notwithstanding the foregoing, if Stonebrae is delayed in the completion of the Stonebrae Pre-Closing Work due to Force Majeure (as that term is defined in <u>Exhibit H</u>), the Date Certain Closing Date, the Builder's Notice Closing Date and the Outside Completion Date shall be extended by the length of such delay, provided, however, that in no event shall the Outside Completion Date be extended beyond June 1, 2008. Failure by Stonebrae to complete the Stonebrae Pre-Closing Work by January 31, 2008 due to Force Majeure shall not constitute a default on the part of Stonebrae. If Stonebrae fails to complete the Stonebrae Pre-Closing Work by June 1, 2008 due to Force Majeure, then Builder may elect (i) to terminate this Agreement by notice to Stonebrae, (ii) to extend the date for Close of Escrow until the Stonebrae Pre-Closing Work has been completed, or (iii) to close escrow and waive the condition regarding completion of the Stonebrae Pre-Closing Work, in which event Stonebrae shall have no further obligation to construct or complete the Stonebrae Pre-Closing Work.

b. <u>Deficient Work Estimate</u>. Within five (5) days after Stonebrae's receipt of Builder's Closing demand, Stonebrae and Builder shall conduct a mutual inspection of the Stonebrae Pre-Closing Work. Builder shall promptly deliver to Stonebrae Builder's itemized list of any unfinished Stonebrae Pre-Closing Work (the "<u>Deficient Work</u>") and Builder's reasonable estimate of the cost to complete the Deficient Work (the "<u>Deficient Work Estimate</u>") which shall be subject to Stonebrae's reasonable written approval or disapproval. If Stonebrae does not provide its written approval or disapproval within five (5) business days of Stonebrae's receipt of the Deficient Work Estimate, the Deficient Work Estimate shall be deemed disapproved. If Stonebrae approves the Deficient Work

Estimate, then, upon Closing, the Escrow Holder shall holdback and not release from Escrow one hundred twenty percent (120%) of the Deficient Work Estimate (the "Escrow Holdback") for any Deficient Work not completed by the Close of Escrow. Builder shall perform or cause to be performed the work set forth in the approved Deficient Work Estimate. Stonebrae shall reimburse Builder within ten (10) days of receipt of documentation from Builder for the lesser of the Escrow Holdback or the actual, out of pocket costs incurred by Builder to complete such work provided that: (a) all such work by Builder shall be at competitive rates and prices, and (b) the provisions of this Agreement and the Development CC&Rs applicable to the construction of improvements, including without limitation, Stonebrae's review and approval of plans, Builder's indemnity and release, and Builder's insurance, shall apply to any such work by Builder. Stonebrae may reimburse Builder by authorizing the Escrow Holder to release funds to Builder from the Escrow Holdback. If Stonebrae does not approve the Deficient Work Estimate, or if the Deficient Work Estimate is deemed disapproved, then the Builder may (i) elect to waive the condition set forth in <u>Section 6.2(a)</u> and proceed to Close Escrow, in which event Stonebrae shall have no further obligation with respect to the Pre-Closing Work; (ii) submit the Deficient Work Estimate to a neutral civil engineer as set forth below; or (iii) exercise one of its remedies set forth in <u>Section 17.2(b)</u> after delivery to Stonebrae of a default notice and expiration of the applicable notice and cure period set forth in <u>Section 17.2(a)</u>. If Builder elects to submit the Deficient Work Estimate to a neutral civil engineer, then Builder shall notify Stonebrae and both Stonebrae and Builder shall have a reasonable opportunity to confer with such engineer regarding the Deficient Work Estimate. The parties agree that such neutral civil engineer shall be Joseph Azar of RJA, if he is able and willing to serve. If Mr. Azar is unable and willing to serve, the independent neutral civil engineer shall be chosen by the agreement of the parties. The decision of the neutral civil engineer as to the amount of the Deficient Work Estimate shall be final and binding on the parties.

7.4  <u>Escrow Cancellation.</u>

a.    <u>Default.</u> In the event that, due to the failure of a party (the "<u>Defaulting Party</u>") to perform any of its obligations hereunder, the Close of Escrow does not occur as scheduled, then the non-Defaulting Party may, at any time thereafter, cancel Escrow by written notice to the Defaulting Party and to the Escrow Holder. If Escrow is cancelled and Stonebrae is the Defaulting Party, Stonebrae shall pay the Escrow and title fees and cancellation charges and the Escrow Holder (or Stonebrae, if the Deposit has already been released) shall return the Deposit to Builder. If Escrow is cancelled and Builder is the Defaulting Party, Builder shall pay the Escrow and title fees and cancellation charges, and Stonebrae shall have the right to terminate this Agreement, and if Escrow Holder still holds the Deposit instruct the Escrow Holder by written notice with a copy thereof to Builder ("<u>Stonebrae's Notice</u>") to draw the letters of credit and disburse the proceeds thereof, together with any cash Deposit then held by Escrow Holder to Stonebrae in which event the Escrow Holder shall draw the letters of credit and make such disbursement to Stonebrae on the date that is five (5) days after delivery of Stonebrae's Notice (or if the Deposit has already been released, it shall be retained by Stonebrae) as its liquidated damages as provided in <u>Section 17</u> without further instructions or confirmation by either party.

   b.  Return of Instruments. In the event of any Escrow cancellation, the Escrow Holder shall return to the parties delivering same all instruments which are then held by the Escrow Holder in connection with the Escrow.

   c.  Costs of Cancellation; Return of Deposit. If Escrow is cancelled for any reason other than the default of either party hereunder, then Builder and Stonebrae shall each bear one-half of the Escrow and title fees and cancellation charges and Escrow Holder shall return the Deposit to Builder. If Escrow is cancelled due to the default of either party, then the defaulting party shall pay all Escrow and title fees and cancellation charges.

## Section 8. Deposits Into Escrow; Closing Instructions; Prorations.

 8.1 Stonebrae's Deposits Into Escrow. On or before one (1) business day prior to the date set for the Close of Escrow, Stonebrae shall deposit in Escrow the following documents duly executed by Stonebrae and acknowledged as required and with appropriate insertions (the "Stonebrae Deposits"):

   a.  The Grant Deed (as defined below);

   b.  A nonforeign transferor declaration in the form of Exhibit J attached hereto (the "Nonforeign Transferor Declaration");

   c.  Internal Revenue Service Form 1099-S;

   d.  California Franchise Tax Board Form 593-C;

   e.  If any of Stonebrae's representations and warranties are not true and correct as of the Closing Date, the Schedule of Exceptions (as defined below); and

   f.  A counterpart Partial Assignment of Development Agreement executed and acknowledged by Stonebrae and consented to by City.

 8.2 Builder's Deposits Into Escrow. On or before one (1) business day prior to the date set for the Close of Escrow, Builder shall deposit in Escrow the following funds and documents duly executed by Builder and acknowledged as required and with appropriate insertions (the "Builder Deposits"):

   a.  Immediately available funds in the amount of the applicable Cash Balance Due and Builder's share of prorations and costs described in Section 8.6;

   b.  A Preliminary Change of Ownership Report as required by law (the "Preliminary Change of Ownership Report");

   c.  If any of Builder's representations and warranties are not true and correct as of the Closing Date, the Schedule of Exceptions (as defined below); and

d.    A counterpart Partial Assignment of Development Agreement executed and acknowledged by Builder.

8.3 <u>Escrow Holder's Closing Instructions</u>. At such time as the conditions precedent to the Close of Escrow have been satisfied or waived, the Escrow Holder shall:

a.    <u>Date</u>, as of the date of the Close of Escrow, all instruments calling for a date and combine the counterparts of instruments delivered in counterpart;

b.    <u>Prepare</u> a separate documentary transfer tax statement in the form accompanying the form of the Grant Deed (the "<u>Documentary Transfer Tax Statement</u>");

c.    <u>Instruct</u> the Office of the Alameda County Recorder (the "<u>Recorder's Office</u>") not to make the Documentary Transfer Tax Statement a part of the public record, as permitted by Section 11932 of the California Revenue and Taxation Code;

d.    <u>Record</u> the Grant Deed and the Partial Assignment of Development Agreement in the Official Records of the Recorder's Office ("<u>Official Records</u>").

e.    <u>Submit</u> to the Recorder's Office, the Preliminary Change of Ownership Report, concurrently with the submission of the Grant Deed for recordation;

f.    <u>Give Stonebrae and Builder</u> telephonic notice that the Close of Escrow has occurred, send final closing statements to each party by facsimile, and deliver to Stonebrae the net amount due to Stonebrae from Escrow in accordance with Stonebrae's and Builder's instructions, provided that at one hundred twenty percent (120%) of the Deficient Work Estimate (reduced by such amounts as the parties may have mutually agreed for work that has been completed between the inspection and Close of Escrow) shall not be released but shall be retained in Escrow, if applicable;

g.    <u>Deliver</u> to Builder either the Standard Title Policy or the Extended Coverage Title Policy, as the case may be;

h.    <u>Deliver</u> to Stonebrae and Builder conformed copies of all documents recorded through Escrow showing recording information; and

i.    <u>Make</u> all required filings with the federal and state tax authorities.

8.4 <u>Post-Closing Instructions</u>. The instruments described below that are required to be recorded under this Agreement shall provide that the Recorder's Office shall return them to the Escrow Holder after recordation, and upon receipt thereof, the Escrow Holder shall deliver the following:

a.    <u>To Stonebrae</u>:

(i)    A copy, as recorded, of the Grant Deed and the Partial Assignment of Development Agreement; and

(ii)    Plain copies of the Nonforeign Transferor Declaration, the Preliminary Change of Ownership Report, the Documentary Transfer Tax Statement, Internal Revenue Service Form 1099-S, California Franchise Tax Board Form 593-C, and the final Escrow closing statement.

b.    <u>To Builder</u>:

(i)    The recorded original of the Grant Deed, and the original Nonforeign Transferor Declaration;

(ii)    Copies, as recorded, of the recorded original documents provided to Stonebrae; and

(iii)    Plain copies of the Documentary Transfer Tax Statement, the Preliminary Change of Ownership Report, and the final Escrow closing statement.

c.    <u>To Sheppard Mullin Richter & Hampton LLP, counsel to Stonebrae</u>: Copies of all documents delivered to Stonebrae following the Close of Escrow.

d.    <u>To Bingham McCutchen LLP, counsel to Builder</u>:    Copies of all documents delivered to Stonebrae following the Close of Escrow.

8.5    <u>Prorations and Costs</u>.

a.    <u>Prorations</u>.  Upon the Close of Escrow, the Escrow Holder shall prorate real property taxes as to the Property between Stonebrae and Builder as of the Close of Escrow based upon the latest available tax bill and based upon the ratio that the area of the Property bears to the area of the County Assessor's tax parcel or parcels of which the Property is a part.  The parties agree that if such prorations are inaccurate because the latest available tax bill does not represent the taxes actually assessed, then the parties will, as soon as tax bills actually covering the period during which the Close of Escrow takes place are available, make such further adjustments outside of the Escrow as may be appropriate.

b.    <u>Costs to be Paid by Stonebrae</u>.  Upon the Close of Escrow, Stonebrae shall pay the following costs:

(i)    The premium for the Standard Title Policy;

(ii) .  Documentary transfer taxes as specified on the Documentary Transfer Tax Statement; and

(iii)    One-half (1/2) of the Escrow fee.

c.    <u>Costs to be Paid by Builder</u>.  Upon the Close of Escrow, Builder shall pay the following costs:

(i)    Fees for recording all documents to be recorded through Escrow;

(ii)    One-half (1/2) of the Escrow fee; and

(iii)    The additional premium for the Extended Coverage Title Policy and the cost of any title endorsements to the extent the same exceeds the premium for the Standard Title Policy; and

(iv)    any costs incurred in connection with any financing obtained by Builder.

Section 9.    Work by Stonebrae.

9.1 Stonebrae's Work.  Stonebrae's responsibility to perform or cause to be performed any work on or related to the Property is more particularly described as the "Stonebrae Pre-Closing Work" and the "Stonebrae Post-Closing Work" on Exhibit H hereto, and shall also include the work of the master developer under the Development Agreement with respect to improvements in and to Village B not described on Exhibit H, which may be performed by Stonebrae before or after Closing, at Stonebrae's election (collectively, "Stonebrae's Work"). Stonebrae shall not have any other obligation to Builder to perform any other work.  Stonebrae shall complete all Stonebrae Work in compliance with the respective completion dates in Section 7.3(a) and Exhibit H subject to Force Majeure; provided, however, that notwithstanding anything contained herein to the contrary, Stonebrae shall have no obligation to commence any portion of Stonebrae's Work before Builder's 50th Sale Notice. All Stonebrae Work shall be completed at Stonebrae's sole cost and expense.

9.2 Pre-Closing Walk-Through and Punch-list.  Stonebrae shall deliver written notice to Builder upon substantial completion of the Stonebrae Pre- Closing Work (subject to completion of the punch-list items referred to below).  Within ten (10) days after delivery of such notice, Builder and Stonebrae shall conduct a joint inspection (the "Pre-Closing Walk-Through") of the Stonebrae Pre-Closing Work.  At such Pre-Closing Walk-Through, Builder and Stonebrae shall jointly prepare a "punch list" of any and all agreed upon patent defects with respect to the Stonebrae Pre-Closing Work and Stonebrae shall complete the designated work within a reasonable time thereafter.  In addition, Stonebrae shall deliver, or cause to be delivered to Builder the Engineers Certificates, executed by RJA and Engeo, respectively.

9.3 Village B Contractor; Insurance.  Builder shall have the right to approve Stonebrae's contractor for Village B (the "Contractor").  Builder's approval shall not be unreasonably withheld or delayed.  Builder hereby pre-approves Granite Construction Company, a California corporation, as Contractor in the event that Stonebrae desires to retain Granite as Contractor. Stonebrae shall use commercially reasonable efforts to enforce the insurance requirements set forth in all construction contracts between Stonebrae and Contractor, copies of which will be delivered to Builder upon execution, as such insurance requirements relate to the Stonebrae Pre-Closing Work.  Stonebrae shall require that such insurance policies carried by Contractor name Builder as an additional insured.  Stonebrae shall require any additional contractor which performs any of the Stonebrae Pre-Closing Work, or any work in connection with the Property, to obtain and maintain commercially reasonable insurance from good and reputable insurers qualified to do business in the State of California and name Builder as an additional insured.

Section 10.  Development of the Project; Assignment of Plans.  Builder shall design and obtain necessary approvals to construct and market the Residences at its sole expense in accordance with the provisions of the Development Documents.  If this Agreement is terminated for any reason other than a Stonebrae Default, Builder shall, upon Stonebrae's request, assign to Stonebrae and provide copies of all non-proprietary maps, environmental reports, civil and soils engineering reports and site plans in Builder's possession or control with respect to the Property without consideration or expense to Stonebrae.  Builder agrees to execute, within ten (10) days of a request by Stonebrae, such documents as Stonebrae reasonably requests to memorialize the foregoing assignments.  All of the above assignments shall be without representation or warranty by Builder.

Section 11.  Marketing Program and Fee.  Separate from and in addition to the Purchase Price, Builder shall pay Stonebrae a master marketing fee equal to three-quarters of one percent (0.75%) of the gross sales price for each Residence (the "Marketing Fee").  Builder shall pay the Marketing Fee for each Residence at the close of escrow for the sale of each such Residence and Stonebrae shall have the right to make a demand for the payment of the Marketing Fee in any escrow for the closing of the sale of each such Residence.  The Marketing Fee shall support and promote a marketing communication program, advertising, public relations, collateral materials, interest lists, etc., for the entire Stonebrae Community or discrete neighborhoods thereof.  The design and operation of the marketing program, the elements thereof, and the use of the Marketing Fee for such purposes shall be entirely Stonebrae's decision in its sole discretion with respect to the Stonebrae Community as a whole and the golf course, and shall be subject to Builder's approval with respect to the marketing of the Residences, which approval shall not unreasonably be withheld or delayed.  Stonebrae shall provide Builder periodic reports regarding the implementation of the marketing program and an accounting of Stonebrae's use of the Marketing Fee.

Section 12.  Certain Additional Builder Obligations.

12.1  Development Agreement.

a.  Development Agreement.  Builder acknowledges the existence of that certain Blue Rock Country Club Project Development Agreement between Stonebrae (as successor-in-interest to Hayward 1900, Inc.) and the City with respect to the Stonebrae Development recorded on April 18, 1998, as Instrument No. 98128317, in the Official Records of the Recorder's Office of Alameda County, California (the "Development Agreement").  Subject to the consent of City, Builder and Stonebrae shall execute and deliver at the Close of Escrow the Partial Assignment of the Development Agreement described in Section 6.2(e).

b.  Communication with Agencies.  Builder shall not hold meetings with, consult with, or engage in any other type of oral or written communication with representatives of the City or any other governmental agency concerning the Development Agreement including, without limitation, any communication concerning any amendment or modification of the Development Agreement, unless in conjunction with an appropriate Stonebrae representative or unless Stonebrae shall have given its prior written approval thereto.

12.2 <u>Water Sand Sanitary Sewer Service</u>. The Property is within the service area of the City of Hayward. Upon the request of the City of Hayward, Builder shall pay to the City of Hayward all water and sewer connection fees imposed by the City of Hayward in connection with the development of the Property.

12.3 <u>Department of Real Estate Reporting</u>. Stonebrae shall take all commercially reasonable steps to be taken by Stonebrae to cause the California Department of Real Estate ("<u>DRE</u>") to issue to Builder a "white paper" permitting Builder to market and convey the Residences. "Commercially reasonable steps" shall include issuing bonds for incomplete work that is the responsibility of Stonebrae in its completion of Stonebrae's Pre-Closing Work. Stonebrae has taken the necessary steps to have the Master CC&Rs and the Articles of Incorporation and Bylaws for the Stonebrae Homeowners Association (the "<u>Master Association</u>") submitted to and approved by the DRE under Business and Professions Code §11010.10 and RE Form 610, and (ii) prepared budgets for the Master Association and the grant deeds for the Common Areas to be conveyed to the Master Association pursuant to the Second Final Map. For purposes hereof, "<u>Common Areas</u>" shall mean the areas identified on either the First or Second Final Map for future conveyance to the Master Association. Stonebrae shall perform the following reporting as required by the California Department of Real Estate ("<u>DRE</u>") and shall use good faith efforts to comply with the schedule set forth below:

Stonebrae will have prepared the grant deeds for the Common Areas to be conveyed to the Master Association pursuant to the Second Final Map. Builder is responsible for obtaining Builder subdivision public reports for Builder's Residences from the DRE and shall include the appropriate Master Association budget and Common Areas to be conveyed to the Master Association in Builder's public report application for each of Builder's phases. Stonebrae and Builder shall cooperate in coordinating the Common Area to be included in the Builder's phases and the estimated dates when the Common Area is to be conveyed to the Master Association. Stonebrae shall convey the Common Area in Builder's phases to the Master Association no later than the date required by the DRE. In addition, if the improvements and landscaping within the Common Area to be conveyed to the Master Association are not completed at the time of the conveyance and the DRE requires that a bond or other collateral be posted to secure the completion, Stonebrae shall post the required collateral in a timely and proper manner.

Builder shall cooperate with Stonebrae in connection with such filings and shall disclose the DRE report to all buyers of the Residences and comply with all other DRE requirements in connection with the marketing and sale of the Residences other than the reporting to be performed by Stonebrae set forth in this <u>Section 12.3</u>.

12.4 <u>Development Fees</u>. Builder shall be responsible for the payment or satisfaction of any and all fees, expenses, costs, charges, taxes, assessments and other liabilities (i) which Builder is obligated to pay pursuant to this Agreement or may otherwise assume in writing, (ii) which are incurred by or on account of Builder performing or otherwise satisfying Builder's obligations under this Agreement or the obligations assumed by Builder pursuant to the Partial Assignment of Development Agreement or (iii) which are otherwise incurred by or on account of Builder's ownership or use of the Property, including, without limitation, the construction and sale of the Residences thereon and permitting in connection therewith; including, without limitation, the fees described on <u>Exhibit K</u> hereto (collectively, the "<u>Builder's Development</u>

Fees"). Stonebrae shall be responsible for the payment of any and all development fees or other fees hereunder that may be necessary in connection with Stonebrae's Work, any required permitting for Stonebrae's Work and Stonebrae's obligations under the Development Documents not assumed by Builder pursuant to this Agreement. If any development fees which are the responsibility of a party hereunder are charged to and/or paid by the other party, then, upon request, the responsible party shall promptly reimburse the other party for the same.

12.5  Builder's Satisfaction of Conditions. By purchasing the Property, Builder agrees, at its sole cost and expense, to comply with and satisfy all conditions of approval, requirements and regulations of Governing Agencies (defined below) related to the development of the Property and the sale of the Residences. Without limiting the generality of the foregoing, Builder agrees to comply and satisfy, at Builder's sole cost and expense, and hereby assumes, all of Stonebrae's outstanding obligations with respect to the Property under the Development Agreement and other Governmental Development Documents (as defined below). Notwithstanding the provisions of this paragraph, however, Stonebrae shall be responsible for satisfying those conditions of approval and requirements of Governing Agencies related to the development of the Property shown as Stonebrae's Work. "Governing Agencies" means each and every Federal, state and local governmental authority having or exercising jurisdiction or authority over the Property and/or Stonebrae Development.

12.6  Sales Reporting by Builder to Stonebrae. Upon Stonebrae's reasonable request, Builder shall deliver to Stonebrae quarterly a list of sales prices, lot premiums and house prices with respect to sales of Residences. Such report shall include the Lot number for each sale reported.

12.7  Agreement Not to Compete. Builder acknowledges that Stonebrae desires to purchase certain property located near the Property, which property is described on Exhibit K hereto (the "Carden Property") and that Stonebrae has been unsuccessful in its attempts to purchase the Carden Property. Builder agrees that it will not deliver an offer to purchase, solicit or respond to an offer to sell or other negotiate for the purchase of the Carden Property or compete in any other with Stonebrae's efforts to purchase the Carden Property for a period of ten (10) years after the Agreement Date.

12.8  Right of First Offer. After the Close of Escrow, if Builder desires to sell any Lot on which Builder has not constructed a Residence, Builder shall provide Stonebrae with written notice of the economic terms and conditions upon which Builder is willing to transfer the Lot (the "Offer Notice"). Stonebrae shall have the opportunity to acquire the Lot on the economic terms and conditions of the Offer Notice prior to Builder offering the Lot to a third party. Stonebrae shall have a period of ten (10) business days in which to notify Builder of its agreement to acquire the Lot on the stated economic terms. If Stonebrae notifies Builder of its acceptance of the Offer Notice, then Stonebrae shall have thirty (30) days from the date of the acceptance to close escrow. If Stonebrae has not notified Builder of its acceptance within the ten-business day period, then the Builder may, for a period of one hundred eighty (180) days, enter into a binding agreement to transfer the Lot to any third party or its assignee and shall not be required to re-offer the Lot to Stonebrae unless the net present value of all of the economic terms to Builder in the proposed transaction is less than ninety-five percent (95%) of the net present value of the economic terms to Builder in the transaction offered to Stonebrae. If the Lot

is not subject to a binding agreement of sale or transfer within the one hundred and ninety (190) days from the Offer Notice, it shall again be subject to the provisions of this Section. The net present value shall be calculated on a monthly basis using a discount rate of nine percent (9%) per annum. All of the non-economic terms not stated in the Offer Notice shall be those customary for a similar type of Lot transaction, with any disagreement over the non-economic terms settled by arbitration before a single arbitrator in accordance with the Arbitration procedures in the California Code of Civil Procedure.

Section 13.    No Hazardous Substances.

13.1    No Hazardous Substance Activity. Neither Stonebrae, Builder, or either party's respective contractors, subcontractors, agents, employees, licensees, invitees or representatives, or any other parties directly or indirectly employed by any one of the foregoing or reasonably under the control of any of the foregoing or for whose acts any of the foregoing may be liable (collectively, "Party's Representatives"), shall engage in any "Hazardous Substance Activity" (as hereinafter defined) or otherwise violate any "Environmental Law" (as hereinafter defined) in connection with the Stonebrae Development.

13.2    Compliance with Environmental Law. Prior to Closing Stonebrae shall, and after Closing Builder shall keep and maintain, and cause their respective Party's Representatives to keep and maintain, the Property in compliance with every Environmental Law.

13.3    Notice of Hazardous Substance Claims. Each party shall immediately notify the other in writing of (a) any and all Hazardous Substance Claims against or with respect to the Property; (b) any remedial action taken by such party in response to any (i) Hazardous Substance in, on, under or about the Property or (ii) Hazardous Substance Claims with respect to the Property; and (c) such party's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property or any part thereof to be classified as "border-zone property" under the provisions of California Health and Safety Code Sections 25220 *et seq.*, or any regulation adopted in accordance therewith, or to be otherwise subject to any restrictions on the ownership, occupancy, transferability or use of the Property under any Environmental Law. Each party will provide the other party with copies of all communications with federal, state and local governments or agencies relating to Hazardous Substance Claims with respect to the Property.

13.4    Performance of Remedial Work. In the event any investigation, site monitoring, containment, cleanup, removal, restoration or other remedial work of any kind or nature (the "Remedial Work") is required under any Environmental Law, any judicial order or by any governmental entity because of, or in connection with, a default by Stonebrae or Builder with respect to any of their respective obligations under the Development Documents or the current or future presence, suspected presence, threatened or existing release or suspected release of a Hazardous Substance in or into the air, soil, groundwater, surface water or soil vapor at, on, under or about the Property, the defaulting party shall, within such period of time as may be required under applicable law, regulation or order, commence to perform, or cause to be commenced, and thereafter diligently prosecute to completion all such Remedial Work. Stonebrae shall remain responsible for any such Remedial Work necessitated by Hazardous Substance Activity engaged in by Stonebrae or Stonebrae's Representatives after the date of this

Agreement. Each party shall indemnify the other from and against any claim, loss, cost or expense arising from its failure to comply with this <u>Section 13.4</u>.

13.5 <u>Right to Perform Remedial Work</u>. Should either party at any time default in or fail to perform or observe any of its obligations under this <u>Section 13</u>, the non-defaulting party shall have the right (but not the obligation), without limitation on any of such party's other rights hereunder, upon twenty (20) days' written notice to the defaulting party, to perform or cause to be performed the Remedial Work, and such defaulting party shall pay to the non-defaulting party, immediately upon demand, all costs and expenses incurred by the non-defaulting party in connection therewith, including without limitation actual attorneys' fees.

13.6 <u>Indemnity Regarding Hazardous Substances</u>. Without limiting the generality of other indemnification provisions elsewhere in this Agreement or other agreements referred to herein, effective as of the Close of Escrow, Stonebrae and Builder each agrees to indemnify, defend and hold harmless the other, its members, and their respective divisions, subsidiaries, partners and affiliated companies and its and their, employees, officers, directors, shareholders, agents, representatives, and its and their respective successors and assigns (individually, an "<u>Indemnitee</u>," and, collectively, the "<u>Indemnitees</u>"), and their property, from and against any foreseeable or unforeseeable claim, action, suit, proceeding, loss, cost (including any clean-up costs), damage (including, without limitation, any consequential damage), liability, deficiency, fine, penalty, punitive damage or expense (including, without limitation technical consulting fees and attorneys' fees) (collectively, the "<u>Environmental Losses</u>") directly or indirectly, resulting from, arising out of, or based upon (a) the presence, release, use, generation, discharge, storage or disposal of any Hazardous Substance on or from the portion of the Stonebrae Development owned by such party or any residual contamination affecting any natural resource or the environment, but excluding the presence of any Hazardous Substances which existed on the Property prior to the Closing (b) the violation, or alleged violation by the indemnifying party of any Environmental Law relating to the Property, or (c) any breach of the agreements and obligations of the indemnifying party under this <u>Section 13</u>; provided, however that no Indemnitee shall be entitled to indemnification under this paragraph for any Environmental Loss established by a court of competent jurisdiction to have been caused solely by the gross negligence or willful misconduct of such Indemnitee (and the acts or failure to act of any consultant, contractor or other agent or representative of any Indemnitee shall not be attributed to such Indemnitee). This indemnity shall include, without limitation, any damage, liability, fine, penalty, punitive damage, cost or expense arising from or out of any claim, action, suit or proceeding for personal injury (including sickness, disease or death), tangible or intangible property damage, compensation for lost wages, business income, profits or other economic loss, damage to the natural resources or the environment, nuisance, pollution, contamination, leak, spill, release or other adverse effect upon the environment. Each party's indemnity in this paragraph does not in any way nullify or affect its respective representations and warranties in <u>Article 14</u> below.

13.7 <u>Definitions</u>. As used in this Agreement, the following terms shall have the following meanings:

a. "<u>Environmental Laws</u>" means any and all present and future federal, state and local laws (whether under common law, statute, rule, regulation or otherwise),

permits, and other requirements of governmental authorities relating to the environment or to any Hazardous Substance or Hazardous Substance Activity including, without limitation, (i) the Toxic Substances Control Act, 15 U.S.C. Section 2601 et seq., (ii) the Clean Water Act, 33 U.S.C. Section 1251 et seq., (iii) the Resource and Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq., (iv) the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq., (v) the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801 et seq., (vi) the California Hazardous Waste Control Act, Health and Safety Code Section 25100 et seq., (vii) the California Hazardous Substance Account Act, Health and Safety Code Section 25249.5 et seq., (viii) the Hazardous Waste Treatment Reform Act of 1995, Health and Safety Code Section 25179.1 et seq., (ix) Hazardous Materials Release Response Plans and Inventory, Health and Safety Code Section 25500 et seq., or (x) the California Porter-Cologne Water Quality Control Act, Water Code Section 13000 et seq., all as amended from time to time.

b.    "Hazardous Substance" means (i) any chemical, compound, material, mixture or substance that is now or hereafter defined or listed in, or otherwise classified pursuant to, any Environmental Law as a "hazardous substance," "hazardous material," "hazardous waste," "extremely hazardous waste," "infectious waste," "toxic substance," "toxic pollutant" or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity, reproductive toxicity, or "EP toxicity" and (ii) petroleum, natural gas, natural gas liquids, liquefied natural gas, synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas), ash produced by a resource recovery facility utilizing a municipal solid waste stream, and drilling fluids, produced waters and other wastes associated with the exploration, development or production of crude oil, natural gas or geothermal resources.

c.    "Hazardous Substance Activity" means any actual, proposed or threatened storage, holdings, existence, release, emission, discharge, generation, processing, abatement, removal, disposition, handling or transportation of any Hazardous Substance from, under, into or on the Property or surrounding property; provided, however, that the use, installation, storage and maintenance by Builder or Stonebrae in compliance with all applicable laws, ordinances, orders and regulations, of materials reasonably necessary and normally used in the development of the Property, as contemplated herein or in other Development Documents, shall not be considered a Hazardous Substance Activity.

d.    "Hazardous Substance Claims" shall mean any and all enforcement, clean-up, removal or other governmental or regulatory actions or orders threatened, instituted or completed pursuant to any Environmental Law, together with all claims made or threatened by any third party against Builder, Stonebrae, the other Indemnitees or the Property, relating to damage, construction, cost recovery compensation, loss or injury resulting from any Hazardous Substance.

13.8  Design Guidelines. The parties acknowledge that the Design Guidelines contain certain provisions regarding the handling of Hazardous Substances on the Property. In the event

of any conflict between such provisions and this Article 13, the Design Guidelines shall be controlling.

Section 14.   Representations and Warranties.

14.1   By Builder.   As a material inducement to Stonebrae to enter into this Agreement, Builder covenants, represents and warrants to Stonebrae as of the Agreement Date, as follows:

> a.   Authority and Qualification.   Builder is a duly organized, validly existing corporation formed under the laws of the State of Pennsylvania. Builder is qualified to do business in the State of California and has the full right, power and authority to enter into and carry out the transaction's contemplated by this Agreement. The entering into of this Agreement and the carrying out of the transactions contemplated hereby does not and will not constitute a default (or an event which, with the giving of notice or the passage of time, would constitute a default) under any agreement to which Builder is a party. Builder is experienced in the construction and marketing of single-family detached residential units in projects similar to the Project. To the extent that Builder constructs any improvements on property within the Stonebrae Community owned by any person or entity other than Builder, Builder shall hold all necessary contractor's licenses required in order to perform such improvements. Builder shall cause a duly licensed general contractor fully qualified under all applicable laws to develop the Project.

> b.   Soils Conditions.   Builder has examined those certain geotechnical investigation reports and other materials listed on the Due Diligence Materials list (collectively, the "Geotechnical Investigation Report"). Builder further acknowledges that (i) the Geotechnical Investigation Report did not consider Builder's plans and specifications for construction of the Project, (ii) the Geotechnical Investigation Report was not prepared for the specific use of Builder, and (iii) the data set forth in the Geotechnical Investigation Report may not include all pertinent data with respect to the soils conditions affecting the Project. In connection with the construction and development of the Project, Builder shall take such steps as may be prudent (including, but not limited to, obtaining a soils report prepared by a soils engineer who has reviewed the plans and specifications for the Project) to determine that the soils conditions on the Property are suitable for the Project and to determine what precautions in design and construction of the Project should prudently be taken. In any event, Builder covenants that it will observe generally accepted engineering standards concerning geotechnical and soils conditions in connection with the development of the Property, and will construct all Residences and other improvements on the Property using standards no less stringent than those in the then current Uniform Building Code. Without limiting the foregoing, the parties acknowledge that, pursuant to a separate agreement between Builder and Engeo, Builder has obtained from Engeo a soils report with respect to Builder's proposed construction of Residences on the Lots in accordance with plans submitted by Builder to Engeo (the "Builder's Soils Report"), a copy of which has been delivered by Builder to Stonebrae.

> c.   Purpose.   Builder is entering into this Agreement for the sole purpose of purchasing and developing the Property and constructing the Project thereon and selling

the Residences. Builder has no present intention to resell or lease all or any portion of the Property prior to development, to hold the Property for speculation, to construct any improvements upon the Property other than the Project, to lease any or all of the Residences, or to make any use of the Property whatsoever other than as hereinabove covenanted, represented and warranted.

14.2  By Stonebrae.  As a material inducement to Builder to enter into this Agreement, Stonebrae covenants, represents and warrants to Builder as of the date hereof, as follows:

a.  Authority and Qualification.  Stonebrae is a duly organized, validly existing limited partnership formed under the laws of the State of Delaware. Stonebrae is qualified to do business in the State of California and has the full right, power and authority to enter into and carry out the transactions contemplated by this Agreement. The entering into of this Agreement and the carrying out of the transactions contemplated hereby does not and will not constitute a default (or an event which, with the giving of notice or the passage of time, would constitute a default) under any agreement to which Stonebrae is a party.

b.  Hazardous Substances Violations.  During its ownership of the Property neither Stonebrae, nor, to the best knowledge of Stonebrae, any third party, has released or deposited any Hazardous Substances on the Property.

c.  Hazardous Substances Notices.  Stonebrae has received no written notice from any Governing Agency alleging a violation of Hazardous Substances Laws with respect to the Property.

d.  Hazardous Substances Documents.  To the best knowledge of Stonebrae, there are no reports, data, surveys, maps, assessments or other documents in the possession of Stonebrae concerning the environmental condition of the Property or the presence of Hazardous Substances on, beneath or from or in the surface, ground water or ambient air associated with the Property except as made available to Builder pursuant to Section 4.2.

e.  Contamination.  To the best knowledge of Stonebrae, there are no Hazardous Substances on, beneath or from or in the surface, the ground water or the ambient air of the Property except as set forth in the Due Diligence Materials.

f.  Stonebrae's Assets.  The fair market value of the Property is substantially less than 50% of the fair market value of all assets owned by Stonebrae as of the date of this Agreement.

g.  Builder's Soils Report.  Stonebrae has no actual knowledge of any material inaccuracy in Builder's Soils Report except for any inaccuracy that may be revealed by the Due Diligence Materials. This representation is not intended as a guaranty of the accuracy or reliability of Builder's Soils Report and Builder acknowledges that neither Stonebrae nor any employees of Stonebrae are soils engineers or have any geotechnical expertise.

14.3 <u>Deemed Re-Made At Closing</u>. By closing the purchase and sale of the Property, each of Builder and Stonebrae shall be deemed to have re-made, as of the Closing Date, the respective representations and warranties made by them above to the other party, except for matters, if any, set forth on a schedule of exceptions to representations and warranties delivered to Escrow Holder and the other party prior to the Closing Date (the "<u>Schedule of Exceptions</u>").

14.4 <u>Survival of Representations and Warranties</u>. The covenants, representations and warranties pursuant to this <u>Section 14</u> shall survive the Close of Escrow or the termination of this Agreement by Stonebrae or Builder.

14.5 <u>Meaning of Best Knowledge</u>. Reference to the "best knowledge" or "knowledge" or words to that effect in connection with a representation or warranty of either party hereto shall mean the current actual knowledge without any duty of inquiry or investigation of the party's employee having primary responsibility for the subject matter of such representation or warranty.

Section 15. <u>"As Is"; Indemnity; Release</u>.

15.1 <u>No Representations; "AS-IS"; Certain Disclosures</u>.

a.    <u>No Representations by Stonebrae</u>. Except for Stonebrae's representations set forth in <u>Section 14.2</u> above, in entering into this Agreement, Builder is relying, and will rely, solely upon its own inspection, investigation and analyses of the Property and is not relying in any way upon any representations, statements, agreements, warranties, studies, reports, descriptions, guidelines or other information or material furnished by Stonebrae or its representatives, whether oral or written, express or implied, of any nature whatsoever regarding any such matters. Builder agrees that its opportunity for an inspection of the Property is in lieu of any notice required by Section 25359.7 of the California Health and Safety Code or any other similar code or statute applicable to the Property, and Builder hereby waives any requirement for a notice pursuant to any such provision. Builder expressly acknowledges that Stonebrae has not made and will not make any representations or warranties regarding the substance or enforceability against any Governing Agency of the Development Agreement, the City's specific plan applicable to the Stonebrae Development, any maps applicable to the Property, or any other agreements with or entitlements or approvals from Governing Agencies (collectively, the "<u>Governmental Development Documents</u>"). Builder understands and acknowledges that the Governmental Development Documents are subject to reversal by reason of challenges thereto by private parties or Governing Agencies, and Builder specifically assumes the risk of such an occurrence. Builder agrees that it shall have the right to enforce such Governmental Development Documents only with respect to entitlement to build Residences and other improvements on the Property as contemplated by this Agreement, and that Builder shall not otherwise seek to enforce the Governmental Development Documents or to amend the same without the prior written consent of Stonebrae, which consent may be withheld in Stonebrae's sole and absolute discretion. Stonebrae shall enforce the Governmental Development Documents and defend against any challenge by private or public parties thereto in the event that the challenge interferes with Builder's development of the Property.

b.    Builder to Acquire "AS IS".  Except for Builder's rights pursuant to Section 15.6, the "Stonebrae Post-Closing Work," and the representations made by Stonebrae pursuant to Section 14.2, Builder will acquire the Property, if at all, "AS IS," in its condition existing at the Close of Escrow, and without representation by Stonebrae or its representatives as to any matter, express or implied. Except as otherwise expressly set forth in this Agreement, no patent or latent condition affecting the Property in any way, such as but not limited to the matters listed in this Section 15.1, whether or not known or discoverable or hereafter discovered, shall affect Builder's obligations contained in this Agreement, or shall give rise to any cause of action whether for damages, rescission or otherwise against Stonebrae and the other Indemnitees.

c.    Subdivided Lands Act.  Builder acknowledges and agrees that Builder's purchase of the Property under this Agreement is exempt from the Subdivided Lands Act, and, accordingly, that no final public report has been issued by the DRE or other governmental authority covering the Property.  Builder shall be responsible for complying with the Subdivided Lands Act prior to selling or leasing any subdivision interest in the Property, unless such sale or lease is exempt from the Subdivided Lands Act.

d.    Air and Storm Water Requirements.  Builder shall comply with all Governmental Authority requirements respecting storm water discharges in connection with the use of the Property.  Without limiting the foregoing, upon the Close of Escrow Builder shall file a "notice of intent" with the California State Water Resources Control Board ("SWRCB"), obtain a general construction activities storm water permit, file a storm water pollution prevention plan and perform inspections of storm water pollution prevention measures, all as required by the SWRCB and in compliance with SWRCB Order No. 99-08-DWQ, as modified by SWRCB Resolution No. 2001-046 (NPDES General Permit For Storm Water Discharges Associated With Construction Activity) and any guidelines promulgated thereunder (including, without limitation and if adopted, the Storm Water Sampling Guidance Document).  Upon the Close of Escrow or anytime thereafter, Stonebrae may file a New Owner Information and Change of Information Form (in such form as may be required by the SWRCB) with the SWRCB. In addition, Builder shall comply with the requirements of the Bay Area Air Quality Management District ("BAAQMD") Rule 403 (governing fugitive dust emissions), including, if applicable, the requirements of any approved fugitive dust emissions control plan prepared by Stonebrae or Builder for the Property.  If no such approved fugitive dust emissions control plan exists for the Property, and if such plan is required by BAAQMD or any other applicable governmental entity, Builder at its sole cost shall prepare and implement such plan in accordance with Rule 403.  Builder shall provide Stonebrae with copies of all storm water pollution prevention plans and fugitive dust emissions control plans.

e.    Water and Utilities.  Builder acknowledges that there will be limited water and utilities available on the Property and that, due to construction of roads and other infrastructure, Builder will have only a limited access to the Property until such date when the roads and infrastructure work are completed.

f.    No Security Commitment.   Stonebrae shall not provide any security or similar police or guard protection services for the benefit of Builder or any other person on or about the Property or Stonebrae Development; and, Builder shall make such arrangements as Builder deems prudent and reasonable regarding the same provided that Builder shall advise and otherwise keep Stonebrae fully informed as to any and all such activities.

g.    Certain Disclosures.   Without in any way limiting the generality of the foregoing provisions of this Section 15.1, Builder expressly acknowledges the following disclosures to Builder and agrees, except as may be agreed to the contrary in writing by Stonebrae, to cause disclosures concerning and describing the following matters (and such other matters as reasonably requested by Stonebrae) to be inserted in the Final Subdivision Public Reports obtained by Builder from the DRE and relating to the Property.   In addition to the disclosures listed below, Builder shall disclose the maintenance assessment districts described in Section 5.2d.   In addition, Builder shall cause each purchaser of a Residence to sign, prior to the execution of a purchase agreement for such Residence, a contiguous area report and/or other disclosure notice of the items set forth below (and such other matters as reasonably requested by Stonebrae). Builder shall submit the form of disclosure notice to Stonebrae for review and comment, and Builder shall incorporate any additional disclosures requested by Stonebrae which (i) Stonebrae is obligated to make or require under applicable law or regulations or any Governmental Development Documents (as that term is defined in Section 15.1) or (ii) which are approved by Builder, which approval shall not unreasonably be withheld.   At Stonebrae's request, Builder shall deliver to Stonebrae, through escrow for each Residence, such disclosure notices signed by the purchaser for such Residence.   In any event, Builder shall retain in its files and make available to Stonebrae upon request copies of all such disclosure notices.   In no event are the following matters intended to be an exhaustive list of disclosures that Builder should make to its homebuyers and Builder should disclose about these listed items whatever additional information it deems to be desirable, necessary or appropriate, and it should also disclose any other material matters concerning the Property not listed below.   Without limiting the foregoing, Builder acknowledges that Builder is required to comply with the applicable provisions of California Business and Professions Code Section 11000 et. seq. prior to the offer for sale or lease any lot, parcel or other subdivision interest acquired by Builder pursuant to this Agreement.

(i)    EBRPD Lands.   A large open space area owned by the East Bay Regional Park District ("EBRPD") is located adjacent to the easterly, southerly and northerly boundaries of the Stonebrae Development (the "EBRPD Lands").   The EBRPD Lands are not part of the Stonebrae Community and are not owned by Stonebrae.   Access into the EBRPD Lands is restricted.   All or a portion of the EBRPD Lands may be used for cattle grazing.   Use of the EBRPD Lands for cattle grazing and related activities such as operation of trucks and manure removal may give rise to noise, odor and dust.

(ii)    High Voltage Power Lines.   High voltage powerlines owned and operated by Pacific Gas and Electric ("PG&E") are located on the northerly and easterly boundaries of the Stonebrae Community within areas shown on recorded easements.

PG&E's easement is a strip of land 75 feet wide and roughly parallel to the eastern boundary of the Stonebrae Community. The voltage of the lines for PG&E is 230 kV, respectively. In addition, underground electric distribution lines owned, operated and maintained by PG&E are or will be located within the Stonebrae Community. Numerous scientific and epidemiological studies have been conducted as to whether there are any adverse health effects from electric and magnetic fields ("EMF") generated by electric power lines. The California Department of Health Services has conducted research in this area. Further information on this subject is available from many sources including without limitation the following: (1) California EMF Program, Department of Health Services, 1515 Clay Street, Suite 1700, Oakland, CA 94612, (510) 622-4500, http://www.dhs.ca.gov/ehib/em8/RiskEvaluation/riskeval.html, (2) Pacific Gas & Electric; and (3) the California Utilities Commission.

(iii)    Golf Course.  An eighteen (18) hole golf course is currently planned for a portion of the Stonebrae Development, although Stonebrae makes no commitment regarding the Golf Course generally, including without limitation, when it may be completed or where it will be located. Areas located near the golf course will be subject to the hazards of errant golf balls and other typical risks and impacts inherent in golf courses.

(iv)    Wild Animals.  The Property is located adjacent to an undeveloped area and, as with any unimproved land, certain risks exist. For example, the Property is known to be home to wild animals including mountain lions, wild pigs and poisonous snakes and appropriate precautions must be taken as a result.

(v)    Public School.  Completion of construction of the School is tentatively scheduled for September, 2006 (although Stonebrae shall not be liable to Builder or any other person for later completion except as otherwise expressly set forth in this Agreement). The School shall be dedicated upon completion to HUSD. Stonebrae cannot guarantee that enrollment at the School will be available to all Stonebrae Community residents. An agreement between HUSD, the Hayward Area Recreational Department ("HARD"), and the City shall be executed and shall control the use and maintenance of the playing fields to be constructed adjacent to the School. Certain Agreements between HARD, the EBRPD and Stonebrae (including Stonebrae's predecessor-in-interest) have been executed and provide that, among other things, EBRPD shall have certain rights to use as a trailhead and staging area a portion of the parking facilities associated with the School and such playing fields.

(vi)    No Protected Views.  The undeveloped and partially graded areas and hillsides in and surrounding the Property and the remainder of the Stonebrae Development are, to a significant degree, designated for future development. For further detailed information refer to long range planning documents available at the City and County. Builder and its homebuyers should be aware that heavy duty grading equipment will be utilized during development of these areas and that existing topography may be substantially modified and existing views may be modified or eliminated during the course of development.

(vii)   Wildland Fire Hazard.   The Property is located in a wildland region characterized by seasonally dry weather conditions and high winds. Due to such dry conditions and winds, the vegetation in the wildlands may ignite due to natural or man made causes, resulting in a wildland fire which may be dangerous to persons or property in the area. Proper landscaping and fire prevention procedures may be required by Governing Agencies in an effort to minimize or prevent such fire hazards.

15.2   Limitation on Stonebrae's Liability.   Builder has certain rights with respect to losses resulting from work performed by Stonebrae, as more fully set forth in Section 15.6. Except as set forth in Section 15.6, to the maximum extent permitted by law, Stonebrae and the other Indemnitees shall not be liable for any loss, damage, injury or claim of any kind or character to any person or property arising from, caused by or relating to (a) the development of the Property and the construction or sale or other conveyance of Residences or other improvements thereon including, without limitation, any loss, damage, injury or claim arising from or caused by or alleged to have arisen from or have been caused by (i) the use of the Property or any part thereof, (ii) a defect in the design or construction of or material in any structure or other improvement on the Property, (iii) the condition of the Property or, to the extent it affects the Property, the condition of the land in the vicinity of the Property, including without limitation a defect in soils or in the preparation of soils or in the design and accomplishment of grading or other work on the Property or such other land (including any mass or rough grading, construction of retaining or other walls, or installation of infrastructure performed on the Property or such other land prior to or after the date hereof by Stonebrae or any other party), (iv) the presence or existence of any Hazardous Substances in or on the soil or ground water of the Property, whether known or unknown and whether resulting from occurrences caused by Builder, its agents, employees or contractors prior to or after the Agreement Date, (v) any act or omission of Builder any of Builder's Representatives, (vi) an accident or casualty on the Property occurring after the Close of Escrow, (vii) a representation by Builder or any Builder's Representatives, (viii) a violation or alleged violation by Builder or any Builder's Representatives of any law now or hereinafter enacted, (ix) a slope erosion, sluffing or failure or subsurface geologic or groundwater condition, on, adjacent to or near the Property, including the effect of such slope or subsurface condition on the Property and the Residences, as well as the effect on such slopes and subsurface areas of Builder's development on the Property and use of the Residences (including watering), (x) the design, construction, engineering or other work with respect to the Property provided or performed by or for Stonebrae either before or after the Agreement Date, (xi) any other cause whatsoever in connection with Builder's use of the Property or Builder's performance under the Development Documents, (xii) the act or failure to act of any homeowner association or committee, officer, agent, or representative thereof relating to any of the Residences or other portions of the Property (whether or not any of the Indemnitees are on the board of directors of such association or are on a committee thereof or are an officer, agent or representative thereof), or (xiii) the application of the principles of strict liability with respect to any act or omission of Builder or Stonebrae or their respective agents, employees, licensees, invitees or contractors in connection with the Property, including without limitation the grading thereof and/or the existence of any contaminants or Hazardous Substances in or on the soil (subject to the obligations of Stonebrae pursuant to Article 13), (xiv) the presence of any meal catering truck and/or its personnel on or near the Property, or (xv) any act or failure to act of Stonebrae or any other Indemnitee in reviewing, approving, disapproving, consenting to or joining in any plans, specifications, application, permit, map or other document relating to development of the

Property or in observing, inspecting or testing any work or improvement on the Property (but this clause (xv) shall not alter Stonebrae's responsibility to comply with the time periods for approval or disapproval in this Agreement or the Development Documents); (b) the negligence or willful misconduct of Builder or any Builder's Representative in the development, construction, grading or other work performed off the Property pursuant to the Development Documents or any defect in any such work, (c) the breach by Builder of any of its obligations under the Development Documents, or (d) the active or passive negligence (but not gross negligence or willful misconduct) of any Indemnitee in connection with any of the above.

   15.3 Indemnity and Release by Builder. Furthermore, as a material part of the consideration of this Agreement, except as expressly set forth in this Agreement, Builder hereby waives on its behalf all claims and demands against Stonebrae and the other Indemnitees for any such loss, damage, injury or claim described in Section 15.2 and agrees to indemnify, defend and hold harmless Stonebrae and its property and the other Indemnitees from all loss, liability, damages, costs and expenses (including attorneys' fees) arising from or related to any such loss, damage, injury or claim whether incurred or made by Builder or any other person(s). The foregoing waiver and indemnity shall apply to any claim or action brought by a private party or by a Governing Agency under any statute or common law now or hereinafter in effect and, is intended to apply with respect to loss, damage, injury or claim arising before or after the conveyance of all of the Residences. With respect to design, construction methods, materials, locations and other matters for which Stonebrae has given or will give its approval, recommendation or other direction, the foregoing waiver and indemnity shall apply irrespective of Stonebrae's approval, recommendation or other direction. Notwithstanding anything to the contrary in this Section or Section 15.2(d) above, nothing herein or therein shall operate to relieve Stonebrae or any Stonebrae Indemnitee from any loss, damage, injury or claim found by a court of competent jurisdiction to have been caused solely by the gross negligence or willful misconduct of such Stonebrae Indemnitee. Further notwithstanding the foregoing, the Builder's indemnity obligations hereunder with respect to Stonebrae shall not include any loss related Stonebrae's Work to the extent of (i) insurance proceeds available to Stonebrae with respect to the Loss from Stonebrae's Insurance or (ii) any insurance proceeds or other payment received by Stonebrae from Contractor, Engeo, or RJA or their respective insurers with respect to the Loss. Stonebrae shall use commercially reasonable efforts to pursue recovery through (i) and (ii) above.

   BUILDER ACKNOWLEDGES THAT IT HAS BEEN ADVISED BY ITS LEGAL COUNSEL AND IS FAMILIAR WITH THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

        "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

   BUILDER BEING AWARE OF SAID CODE SECTION, HEREBY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE THEREUNDER, AS WELL AS UNDER ANY OTHER STATUTE OR COMMON LAW PRINCIPLE OF SIMILAR EFFECT.

The provisions of <u>Section 15.2</u> and this <u>Section 15.3</u> shall survive any termination of this Agreement. The provisions of <u>Section 15.2</u> and this <u>Section 15.3</u> do not in any way nullify or affect Stonebrae's representations and warranties in <u>Section 14.2</u> above.

15.4    <u>Intentionally Omitted.</u>

15.5    <u>Nonexclusive Assignment of Rights.</u>  In the event Builder incurs any loss, damage, injury or liability Builder believes to arise from Stonebrae's Work or any other work performed by Stonebrae on the Property or any other portion of the Stonebrae Development such as a defect in soils, or in the preparation of soils, or in the design and accomplishment of grading, upon Builder's written request, Stonebrae shall assign to Builder on a nonexclusive basis Stonebrae's rights under applicable consulting and construction contracts to seek indemnity for the defective Stonebrae Work or other work performed by Stonebrae from contractors and consultants hired by Stonebrae to perform the applicable work.  Builder acknowledges and agrees that Stonebrae's agreement in this Section is effective only to the extent that (a) Stonebrae's rights described above are assignable on a nonexclusive basis and, (b) any such assignment does not impair Stonebrae's continuing rights under the consulting and construction contracts described above.

15.6    <u>Stonebrae's Limited Liability With Respect to Stonebrae's Work.</u>  Any other provision of this Agreement to the contrary notwithstanding, in the event of any actual loss, cost or expense incurred by Builder in connection with any defect in the work, including damage to the Property caused by defective work in other parts of the Stonebrae Development, performed by Stonebrae or caused to be performed by Stonebrae, its contractors or consultants, (collectively, "<u>Loss</u>") Builder shall use diligent efforts to seek recovery for the Loss through its rights as an additional insured under the insurance polices carried by Contractor, Engeo, and RJA, as applicable, and through any rights it may have under the assignment of contracts and warranties set forth in <u>Section 15.5</u>.  In the event Builder does not so recover the total Loss, then Builder shall be entitled to payment by Stonebrae of the amount of such unrecovered Loss up to the proceeds of Stonebrae's Insurance (with Stonebrae funding any deductible amounts and self-insured retention).  Notwithstanding anything to the contrary herein, Loss recoverable by Builder hereunder shall be limited to actual, direct loss, cost or expense and shall not include consequential damages.

Section 16.  <u>Confidentiality.</u>

16.1    <u>Prior to the Close of Escrow.</u>  As a material inducement to Stonebrae to enter into this Agreement, Builder covenants that it shall maintain strict confidentiality through the Close of Escrow with respect to (a) the negotiations concerning the Development Documents, and (b) the terms and provisions of the Development Documents ("<u>Agreement Terms</u>").  In connection therewith, neither Builder nor any Builder's Representative shall issue any Public Statement (as defined below) regarding any of the above matters without the prior written consent of Stonebrae.  The term "<u>Public Statement</u>" means a statement of any type made to the public or any person regarding the negotiations for the purchase of the Property, the Agreement Terms, or other matters concerning the Project, the Property or the Stonebrae Community, including any oral or written statement made to any representative of the mass media, or any statement in Builder's reports to stockholders, internal newsletters, or financial statements distributed to any

person or entity other than those described below. Notwithstanding the above provisions of this Section, however, Builder may make the following disclosures of confidential information after reasonable prior notice to Stonebrae:

a.    To General Public.  Builder may make a Public Statement that it has purchased the Property and may describe the Project, including the physical characteristics of the Property and Builder's intentions for developing the Property.

b.    To Governmental Entities.  Builder may disclose information concerning the physical characteristics of the Property and the applicable Maximum Density to a governmental entity to the extent that such governmental entity requires such disclosure prior to its issuance of any governmental permits or approvals concerning the Project which are required or contemplated hereunder.

c.    To Contractors.    Builder may disclose to Builder's contractors, subcontractors, engineers and other consultants any information Builder deems reasonably necessary to enable Builder to negotiate and enter into contracts concerning the development or construction of the Project as contemplated herein; provided, however, that Builder shall instruct the persons and entities to whom disclosure is made that the information so disclosed is confidential and that such person or entity must keep such information strictly confidential.

d.    Public Company Disclosure.  If in the opinion of Builder's attorneys or accountants the reporting obligations of the Securities Exchange Act of 1934 which are applicable to Builder require Builder to disclose information concerning the Agreement Terms, Builder may disclose such information in the manner and to the extent mandated by such reporting requirements; provided, however, that Builder (i) shall notify Stonebrae of its intent to disclose information concerning this Agreement at least ten (10) days prior to such disclosure, and (ii) shall use its commercially reasonable efforts to obtain confidential treatment from the Securities and Exchange Commission of the material Agreement Terms prior to making such disclosure.

e.    Required by Law.  If Builder is compelled to disclose information by judicial or administrative process or by other requirements of law, Builder may disclose information otherwise prohibited from disclosure hereunder in the manner and to the extent required by such judicial or administrative process or other requirements of law.

f.    To Consultants.  Builder may disclose any information hereunder to Builder's attorneys, accountants or lenders to the extent that such disclosure is necessary to enable such entities to provide their services to Builder in connection with the development of the Property; provided, however, that Builder shall instruct each such person or entity that such information is confidential and that such person or entity must keep such information strictly confidential (including, but not limited to, refraining from making Public Statements regarding such information) and may not disclose such information without Stonebrae's prior written consent.

16.2  <u>After Close of Escrow</u>.  As a material inducement to Stonebrae to enter into this Agreement, Builder covenants that, at all times following the Close of Escrow, it shall maintain strict confidentiality with respect to the Agreement Terms, except for the disclosures permitted under <u>Section 16.1</u>.

16.3  <u>Survival of Confidentiality</u>.  The obligations of Builder pursuant to this <u>Section 16</u> shall survive any termination of this Agreement.

Section 17.  <u>Default and Remedies</u>.

17.1  <u>Builder Defaults and Stonebrae Remedies</u>.

a.  <u>Builder Defaults</u>.  The occurrence of any of the following, prior or subsequent to the Close of Escrow after expiration of the cure period set forth in <u>Section 17.1(b)</u> below, shall be a material default by Builder of its obligations hereunder (a "<u>Builder Default</u>"):

(i)  <u>Deposits</u>.  The failure by Builder to deliver the Deposit as required hereby; or

(ii)  <u>Representations and Warranties</u>.  Stonebrae's discovery that any of Builder's representations and warranties set forth herein were untrue or misleading in any material respect when made by Builder; or

(iii)  <u>Bankruptcy</u>.  The filing of a petition or the institution of proceedings of, by, or against Builder pursuant to the federal Bankruptcy Code or pursuant to any state bankruptcy, insolvency, moratoria, reorganization, or similar laws which is not dismissed within sixty (60) days; or Builder's making a general assignment for the benefit of its creditors or the entering by Builder into any compromise or arrangement with its creditors generally; or Builder's becoming insolvent in the sense that Builder is unable to pay its debts as they mature or in the sense that Builder's debts exceed the fair market value of Builder's assets; or

(iv)  <u>Confidentiality</u>.  The failure of Builder to comply with the provisions of this Agreement concerning confidentiality; or

(v)  <u>Other Material Failures</u>.  The failure of Builder to perform any other material act to be performed by Builder or to refrain from performing any other material prohibited act under this Agreement, where such failure is not cured within the relevant time periods set forth below.

b.  <u>Notice and Opportunity to Cure</u>.  Builder shall not be in default of any obligation to pay money unless the default continues uncured for a period of three (3) business days after receipt of notice from Stonebrae.  Builder shall not be in default of any other obligations hereunder unless the default continues for a period of ten (10) days after receipt of written notice (the "<u>Default Notice</u>") from Stonebrae; provided, however, that if such failure is of such a nature that it cannot be cured within such ten (10) day period, then Builder shall commence a cure within such ten (10) day period and shall

diligently pursue such cure to completion not later than sixty (60) days following receipt of the Default Notice. The cure period specified in this Section 17.1(b) shall not apply to the Builder Defaults specified in Section 17.1(a)(iii) or (iv) or any default under Section 17.1(a)(ii) that is not susceptible of cure.

    c.    <u>Stonebrae Remedies.</u>

        (i)    <u>Generally.</u> Upon the occurrence of any Builder Default, Stonebrae shall have such rights or remedies as Stonebrae may have under this Agreement or otherwise at law or in equity without limitation except as follows: if such Builder Default is subject to the liquidated damages provision set forth below, then Stonebrae's sole remedy for Builder's failure to close Escrow shall be liquidated damages as provided in clause (ii).

        (ii)    <u>Liquidated Damages for Failure to Close.</u> IN THE EVENT THAT BUILDER FAILS TO CLOSE ESCROW AS REQUIRED HEREIN BY REASON OF A BUILDER DEFAULT, THEN STONEBRAE SHALL HAVE THE RIGHT, AS ITS SOLE REMEDY FOR SUCH BUILDER DEFAULT, TO TERMINATE THIS AGREEMENT BY WRITTEN NOTICE TO BUILDER AND THE ESCROW HOLDER AND INSTRUCT THE ESCROW HOLDER (IF ESCROW HOLDER STILL HOLDS THE DEPOSIT) TO DRAW THE LETTERS OF CREDIT AND THE DISBURSE THE PROCEEDS THEREOF AND ANY CASH DEPOSIT THEN HELD BY ESCROW HOLDER TO STONEBRAE TOGETHER WITH ALL ACCRUED INTEREST THEREON (IN WHICH EVENT, ON OR ABOUT THE DATE THAT IS FIVE (5) DAYS AFTER SUCH NOTICE, THE ESCROW HOLDER SHALL IMMEDIATELY DRAW THE LETTERS OF CREDIT AND MAKE SUCH DISBURSEMENT TO STONEBRAE WITHOUT FURTHER INSTRUCTION FROM EITHER PARTY), AS STONEBRAE'S LIQUIDATED DAMAGES. IF THE DEPOSIT AND ANY ACCRUED INTEREST HAS ALREADY BEEN RELEASED TO STONEBRAE FROM ESCROW, STONEBRAE SHALL RETAIN THE SAME AS STONEBRAE'S LIQUIDATED DAMAGES. THE PARTIES EXPRESSLY UNDERSTAND AND AGREE (A) THAT STONEBRAE'S ACTUAL DAMAGES RESULTING FROM SUCH BUILDER DEFAULT WOULD BE SUBSTANTIAL BUT EXTREMELY DIFFICULT TO ASCERTAIN AND (B) SUCH AMOUNT IS A REASONABLE SUM CONSIDERING ALL OF THE CIRCUMSTANCES EXISTING AS OF THE AGREEMENT DATE.

Builder:    _____        Stonebrae:    _____
        (initials)                      (initials)

        _____                 _____
        (initials)                      (initials)

17.2 <u>Stonebrae Defaults and Builder Remedies.</u>

    a.    <u>Stonebrae Defaults.</u> It shall be a "Stonebrae Default" ("<u>Stonebrae Default</u>") if Stonebrae fails to perform any material act to be performed by Stonebrae, or

diligently pursue such cure to completion not later than sixty (60) days following receipt of the Default Notice. The cure period specified in this <u>Section 17.1(b)</u> shall not apply to the Builder Defaults specified in <u>Section 17.1(a)(iii)</u> or (iv) or any default under <u>Section 17.1(a)(ii)</u> that is not susceptible of cure.

    c.    <u>Stonebrae Remedies</u>.

    (i)    <u>Generally</u>. Upon the occurrence of any Builder Default, Stonebrae shall have such rights or remedies as Stonebrae may have under this Agreement or otherwise at law or in equity, without limitation except as follows: if such Builder Default is subject to the liquidated damages provision set forth below, then Stonebrae's sole remedy for Builder's failure to close Escrow shall be liquidated damages as provided in clause (ii).

    (ii)    <u>Liquidated Damages for Failure to Close</u>. IN THE EVENT THAT BUILDER FAILS TO CLOSE ESCROW AS REQUIRED HEREIN BY REASON OF A BUILDER DEFAULT, THEN STONEBRAE SHALL HAVE THE RIGHT, AS ITS SOLE REMEDY FOR SUCH BUILDER DEFAULT, TO TERMINATE THIS AGREEMENT BY WRITTEN NOTICE TO BUILDER AND THE ESCROW HOLDER AND INSTRUCT THE ESCROW HOLDER (IF ESCROW HOLDER STILL HOLDS THE DEPOSIT) TO DRAW THE LETTERS OF CREDIT AND THE DISBURSE THE PROCEEDS THEREOF AND ANY CASH DEPOSIT THEN HELD BY ESCROW HOLDER TO STONEBRAE TOGETHER WITH ALL ACCRUED INTEREST THEREON (IN WHICH EVENT, ON OR ABOUT THE DATE THAT IS FIVE (5) DAYS AFTER SUCH NOTICE, THE ESCROW HOLDER SHALL IMMEDIATELY DRAW THE LETTERS OF CREDIT AND MAKE SUCH DISBURSEMENT TO STONEBRAE WITHOUT FURTHER INSTRUCTION FROM EITHER PARTY), AS STONEBRAE'S LIQUIDATED DAMAGES. IF THE DEPOSIT AND ANY ACCRUED INTEREST HAS ALREADY BEEN RELEASED TO STONEBRAE FROM ESCROW, STONEBRAE SHALL RETAIN THE SAME AS STONEBRAE'S LIQUIDATED DAMAGES. THE PARTIES EXPRESSLY UNDERSTAND AND AGREE (A) THAT STONEBRAE'S ACTUAL DAMAGES RESULTING FROM SUCH BUILDER DEFAULT WOULD BE SUBSTANTIAL BUT EXTREMELY DIFFICULT TO ASCERTAIN AND (B) SUCH AMOUNT IS A REASONABLE SUM CONSIDERING ALL OF THE CIRCUMSTANCES EXISTING AS OF THE AGREEMENT DATE.

| Builder: | _____ | Stonebrae: | _(signature)_ |
|---|---|---|---|
| | (initials) | | (initials) |
| | _____ | | _(signature)_ |
| | (initials) | | (initials) |

17.2    <u>Stonebrae Defaults and Builder Remedies</u>.

    a.    <u>Stonebrae Defaults</u>. It shall be a "Stonebrae Default" ("<u>Stonebrae Default</u>") if Stonebrae fails to perform any material act to be performed by Stonebrae, or

to refrain from performing any material prohibited act, prior to the Close of Escrow under any of the Development Documents, where such failure is not cured by Stonebrae within ten (10) days after receipt by Stonebrae of a Default Notice from Builder; provided, however, that if such failure is of such a nature that it cannot be cured within such ten (10) day period, then a Stonebrae Default shall not occur if Stonebrae shall commence a cure within such ten (10) day period and shall diligently pursue such cure to completion not later than sixty (60) days following receipt of the Default Notice.

b.    Builder Remedies.  As a material part of Stonebrae's consideration, without which Stonebrae would not have entered into this Agreement, Builder's only and mutually exclusive remedies for a Stonebrae Default shall be (i) to terminate Escrow and this Agreement by giving written notice of such termination to Stonebrae and Escrow Holder whereupon (A) Escrow Holder shall return the Deposit to Builder, (B) Stonebrae shall reimburse Builder for documented due diligence costs and expenses incurred and paid by Builder after the Agreement Date to third parties which are not directly or indirectly affiliated with Builder, and (C) Builder waives all other claims against Stonebrae and any other Indemnitee or (ii) Builder may bring and maintain an action for specific performance of Stonebrae's obligations under this Agreement.  Builder waives any right it may have to seek damages of any type or any other remedy against Stonebrae or any other Indemnitee under or in connection with this Agreement.  In the event of any such termination, the provisions specified in this Agreement to survive termination, including the provisions of this Section, shall survive such termination. Notwithstanding the foregoing, if Stonebrae has defaulted in its obligation to complete the Stonebrae Pre-Closing Work, then Builder may exercise its rights under Section 7.3(b) in lieu of the remedies set forth herein and further notwithstanding the limitation of Builder's remedies set forth above, if the Stonebrae Default is limited to Stonebrae's breach of its obligation to perform the Stonebrae Post-Closing Work, Builder's sole remedy for such Stonebrae Default shall be self-help as more particularly described on Exhibit G.

Builder: _____ (initials)        Stonebrae: _____ (initials)

_____ (initials)                _____ (initials)

c.    Lis Pendens.  If Builder desires to bring an action for specific performance, prior to recording a *lis pendens* against the Property Builder shall deliver to Stonebrae notice of Builder's intent to record a lis pendens (a "Lis Pendens Notice"). Within three (3) business days after Stonebrae receives a Lis Pendens Notice, Stonebrae may, by notice delivered to Builder, elect to have an arbitrator determine whether there is a reasonable basis upon which Builder may record a lis pendens.  If Stonebrae fails to deliver it's notice of election to commence arbitration within the three (3) business day period it shall be deemed to have waived its right to arbitration and Builder may record a lis pendens if otherwise allowed by law.  If Stonebrae elects to arbitrate, binding arbitration shall be conducted by Judicial Arbitration & Mediation Services, Inc. ("JAMS") or other agreed upon arbitrator.  The arbitrator shall be a retired California Superior Court or Court of Appeal judge, selected by mutual agreement of Stonebrae and

W02-SF:SJS\61486R22.7

to refrain from performing any material prohibited act, prior to the Close of Escrow under any of the Development Documents, where such failure is not cured by Stonebrae within ten (10) days after receipt by Stonebrae of a Default Notice from Builder; provided, however, that if such failure is of such a nature that it cannot be cured within such ten (10) day period, then a Stonebrae Default shall not occur if Stonebrae shall commence a cure within such ten (10) day period and shall diligently pursue such cure to completion not later than sixty (60) days following receipt of the Default Notice.

b.    Builder Remedies.    As a material part of Stonebrae's consideration, without which Stonebrae would not have entered into this Agreement, Builder's only and mutually exclusive remedies for a Stonebrae Default shall be (i) to terminate Escrow and this Agreement by giving written notice of such termination to Stonebrae and Escrow Holder whereupon (A) Escrow Holder shall return the Deposit to Builder, (B) Stonebrae shall reimburse Builder for documented due diligence costs and expenses incurred and paid by Builder after the Agreement Date to third parties which are not directly or indirectly affiliated with Builder, and (C) Builder waives all other claims against Stonebrae and any other Indemnitee or (ii) Builder may bring and maintain an action for specific performance of Stonebrae's obligations under this Agreement. Builder waives any right it may have to seek damages of any type or any other remedy against Stonebrae or any other Indemnitee under or in connection with this Agreement. In the event of any such termination, the provisions specified in this Agreement to survive termination, including the provisions of this Section, shall survive such termination. Notwithstanding the foregoing, if Stonebrae has defaulted in its obligation to complete the Stonebrae Pre-Closing Work, then Builder may exercise its rights under Section 7.3(b) in lieu of the remedies set forth herein and further notwithstanding the limitation of Builder's remedies set forth above, if the Stonebrae Default is limited to Stonebrae's breach of its obligation to perform the Stonebrae Post-Closing Work, Builder's sole remedy for such Stonebrae Default shall be self-help as more particularly described on Exhibit G.

Builder:                                         Stonebrae:

_____                                  _____
(initials)                                       (initials)

_____                                  _____
(initials)                                       (initials)

c.    Lis Pendens.    If Builder desires to bring an action for specific performance, prior to recording a *lis pendens* against the Property Builder shall deliver to Stonebrae notice of Builder's intent to record a lis pendens (a "Lis Pendens Notice"). Within three (3) business days after Stonebrae receives a Lis Pendens Notice, Stonebrae may, by notice delivered to Builder, elect to have an arbitrator determine whether there is a reasonable basis upon which Builder may record a lis pendens. If Stonebrae fails to deliver it's notice of election to commence arbitration within the three (3) business day period it shall be deemed to have waived its right to arbitration and Builder may record a lis pendens if otherwise allowed by law. If Stonebrae elects to arbitrate, binding arbitration shall be conducted by Judicial Arbitration & Mediation Services, Inc. ("JAMS") or other agreed upon arbitrator. The arbitrator shall be a retired California Superior Court or Court of Appeal judge, selected by mutual agreement of Stonebrae and

Builder, and if the parties cannot agree within three (3) business days after the Lis Pendens Notice, the arbitrator shall be selected through the procedures regularly followed by JAMS. The arbitration shall be held in the Oakland, California area, as soon as possible after the arbitrator is selected. In the event that the arbitrator determines that Builder has established by a preponderance of the evidence the probable validity of its claim and that such claim is a real property claim within the meaning of Section 405.31 of the California Code of Civil Procedure, Stonebrae shall pay the arbitrator's fees and expenses and Builder may record a lis pendens, Stonebrae shall be deemed to have waived its right to bring an action to expunge the lis pendens prior to adjudication of the underlying action. The arbitrator's decisions shall be final and binding. If the arbitrator determines that Builder has failed to establish by a preponderance of the evidence the probable validity of its claim and that such claim is a real property claim within the meaning of Section 405.31 of the California Code of Civil Procedure, Builder shall pay the arbitrators fees and expenses, and shall not record a lis pendens. Stonebrae shall not transfer the Property during the period between Stonebrae's receipt of the Lis Pendens Notice and three (3) business days following the arbitrator's binding decision.

Section 18. <u>Development Documents</u>. As part of the purchase, sale and development of the Property, and as material consideration without which Stonebrae would not enter into this Agreement, Builder has already entered into or shall enter into and execute either concurrently with the execution and delivery of this Agreement or as of the Close of Escrow, and shall comply with, the following related agreements and documents which, together with this Agreement are referred to herein as the "<u>Development Documents</u>":

18.1 <u>Master CC&Rs</u>. The Property and other property within the Stonebrae Community are subject to the Master CC&Rs. Builder acknowledges that it has reviewed and approved the Master CC&Rs and acknowledges that the Master CC&Rs may be amended from time to time.

18.2 <u>Grant Deed</u>. Stonebrae will convey fee title to the Property to Builder by a grant deed in the form of <u>Exhibit L</u> attached hereto with appropriate insertions (the "<u>Grant Deed</u>").

Section 19. <u>Miscellaneous</u>.

19.1 <u>Brokerage Commissions</u>. Each party warrants and represents to the other that except as expressly provided herein no broker, finder or other intermediary hired or employed by it is entitled to a commission, finder's fee or other compensation based upon the transaction contemplated hereby and each party (the "<u>Indemnitor</u>") shall indemnify and hold harmless the other party from and against any and all claims, liabilities, losses, damages, costs and expenses (including, but not limited to, reasonable attorneys' fees, court costs and litigation expenses) caused by or arising out of the claim of any broker, finder or other intermediary alleging to have been employed or hired by the Indemnitor, to a commission, finder's fee or other compensation based upon the transaction contemplated hereby. The obligations of Stonebrae and Builder pursuant to this <u>Section 19.1</u> shall survive any termination of this Agreement.

19.2 <u>Notices</u>. All notices or other communications between Stonebrae and Builder required or permitted hereunder shall be in writing and personally delivered or sent by certified mail, return receipt requested and prepaid, or sent by reputable overnight courier (such as Federal

Express, UPS or DHL), or transmitted by electronic facsimile transmission (with electronic confirmation of receipt) to the following addresses:

If to Stonebrae:

        Stonebrae LP
        170 Maiden Lane, Suite 800
        San Francisco, CA 94108
        Telefacsimile No.: (415) 781-1220
        Attn:  Mr. Paul Yuen

with a copy to:

        Sheppard Mullin Richter & Hampton LLP
        Four Embarcadero Center
        Seventeenth Floor
        San Francisco, CA 94111
        Telefacsimile No.: (415) 434-3947
        Attn:  Rebecca V. Hlebasko, Esq.

If to Builder:

        Toll Bros., Inc.
        100 Park Place, Suite 140
        San Ramon, CA 94634
        Telefacsimile No.: (925) 855-9927
        Attn:  James L. Meek
                H. Jon Paynter

with a copy to:

        Toll Bros., Inc.
        725 Town & Country Road Suite 500
        Orange, CA 92868
        Telefacsimile No.: (714) 835-9685
        Attn:  James Boyd
                Mark Foster

with a copy to:

        Bingham & McCutchen LLP
        1333 N. California Blvd., Suite 210
        Walnut Creek, CA 94596
        Telefacsimile No.: (925) 975-5390
        Attn:  Edward S. Merrill, Esq.

A notice shall be effective on the date of personal delivery if personally delivered before 5:00 p.m., otherwise on the day following personal delivery, or on the date of receipt, if transmitted by electronic facsimile transmission (with electronic confirmation of receipt) prior to 5:00 p.m. or otherwise on the next business day, or two (2) business days following the date the notice is postmarked, if mailed, or on the day following delivery to the applicable overnight courier, if sent by overnight courier. Either party may change the address to which notices are to be given to it by giving notice of such change of address in the manner set forth above for giving notice.

19.3 <u>Time of the Essence</u>. Time is of the essence of this Agreement and each and every term and provision hereof.

19.4 <u>Interpretation; Governing Law</u>. This Agreement shall be construed as if prepared by both parties. This Agreement shall be construed, interpreted and governed by the laws of the State of California and the laws of the United States of America prevailing in California.

19.5 <u>Severability</u>. In the event that any phrase, clause, sentence, paragraph, section, article or other portion of this Agreement shall become illegal, null or void, or against public policy, for any reason, or shall be held by any court of competent jurisdiction to be illegal, null or void, or against public policy, the remaining portions of this Agreement shall not be affected thereby and shall remain in force and effect to the full extent permissible by law.

19.6 <u>Performance of Acts on Business Days</u>. Unless specifically stated to the contrary, all references to days herein shall be deemed to refer to calendar days. In the event that the final date for payment of any amount or performance of any act hereunder falls on a Saturday, Sunday or holiday, such payment may be made or act performed on the next succeeding business day.

19.7 <u>Attorneys' Fees</u>. In the event of any legal action or other proceeding between the parties regarding this Agreement or the Property (an "<u>Action</u>"), the prevailing party shall be entitled to the payment by the losing party of its reasonable attorneys' fees, court costs and litigation expenses, as determined by the court. The term "prevailing party" as used herein includes, without limitation, a party: (a) who agrees to dismiss an Action on the other party's performance of the covenants allegedly breached, (b) who obtains substantially the relief it has sought, or (c) against whom an Action is dismissed (with or without prejudice).

19.8 <u>Post-Judgment Attorneys' Fees</u>. The prevailing party in any Action shall be entitled, in addition to and separately from the amounts recoverable under <u>Section 19.7</u>, to the payment by the losing party of the prevailing party's reasonable attorneys' fees, court costs and litigation expenses incurred in connection with (a) any appellate review of the judgment rendered in such Action or of any other ruling in such Action, and (b) any proceeding to enforce a judgment in such Action. It is the intent of the parties that the provisions of this Section be distinct and severable from the other rights of the parties under this Agreement, shall survive the entry of judgment in any Action and shall not be merged into such judgment.

19.9 <u>Waiver of Jury Trial</u>. The parties hereby waive their respective right to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding or hearing brought by a party hereto or its successors and assigns on any matter whatsoever arising out of, or in any way connected with, this Agreement, the relationship of the parties hereto, or

the enforcement of any remedy under any law, statute, or regulation, emergency or otherwise, now or hereafter in effect.

19.10 Further Assurances; Survival. Each party will, whenever and as often as it shall be requested to do so by the other party, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all such further conveyances, assignments, approvals, consents and any and all other documents and do any and all other acts as may be necessary to carry out the intent and purpose of this Agreement. Notwithstanding the foregoing, in the event Builder requests and Stonebrae agrees to (a) permit Builder to process any lot line adjustment with regard to the Property, (b) execute any subordination agreement with regard to any Property or (c) amend or modify this Agreement or any document related hereto, Builder shall reimburse Stonebrae for all of Stonebrae's out-of-pocket costs and expenses, including but not limited to Stonebrae's attorneys fees. All covenants and obligations contained in this Agreement which imply or require performance after the Close of Escrow (including without limitation all provisions regarding indemnity and release) and all representations and warranties of the parties contained in this Agreement shall survive such Close of Escrow.

19.11 Entire Agreement; Amendments. This Agreement, together with the other written agreements referred to herein, is intended by the parties to be the final expression of their agreement with respect to the subject matter hereof, and is intended as the complete and exclusive statement of the terms of the agreement between the parties. As such, this Agreement supersedes any prior understandings between the parties, whether oral or written. Any amendments to this Agreement shall be in writing and shall be signed by all parties hereto.

19.12 No Waiver. A waiver by either party hereto of a breach of any of the covenants or agreements hereof to be performed by the other party shall not be construed as a waiver of any succeeding breach of the same or other covenants, agreements, restrictions or conditions hereof.

19.13 Assignment.

a. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heir, executors, estates, successors and permitted assigns. Neither Builder nor Stonebrae shall assign all or any portion of its interest in this Agreement without the prior written consent of the other; provided, however, that (a) Stonebrae shall have the right to assign its rights under this Agreement to Lender as security for the construction loan made by Lender to Stonebrae and secured by the Property and Lender shall not be obligated or deemed to assume the obligations of Stonebrae in connection with any such assignment and (b) Builder shall have the right to assign this Agreement, without Stonebrae's consent, in whole or in part to an entity which owns or controls, is owned or controlled by, or is under common control with Builder, including an affiliate organized for this Project controlled by Builder.

b. Builder may further assign its right, title and interest in and to this Agreement immediately prior to the Close of Escrow to an assignee who will purchase the Property and grant Builder options to acquire the Property, provided that (i) assignee shall not transfer the Lots other than to Builder or construct Residences on the Lots or permit any person or entity other than Builder to construct Residences on the Lots unless

assignee shall have first offered the Lots to Stonebrae as set forth below; (ii) such assignee shall not be required to assume Builder's obligations under this Agreement except for the obligation to pay the Purchase Price and (iii) Stonebrae shall have the right to review the documents evidencing such assignment to confirm compliance with this Section 19.13, which documents may be redacted to delete the economic terms of the assignment. The assignee under this Section 19.13b. shall agree not to transfer any Lots other than to Builder without first offering them to Stonebrae on the terms and in accordance with the procedure set forth in Section 12.8. Assignee shall agree not to construct Residences on the Lots or permit the construction of Residences on the Lots. Stonebrae shall have a period of ten (10) business days after receipt of assignee's notice in which to notify assignee of its agreement to acquire the Lots on the terms set forth herein. If Stonebrae so notifies assignee, then Stonebrae shall have thirty (30) days from the date of Stonebrae's notice to assignee to close escrow. All non-economic terms of such purchase shall be those customary for a similar type of Lot transaction, and any disagreement over the non-economic terms shall be settled by arbitration before a single arbitrator in accordance with the Arbitration procedures in the California Code of Civil Procedure.

      c.    No assignment of this Agreement or any interest therein shall release Builder from its obligations under this Agreement. Builder shall give Stonebrae prior written notice of any assignment hereunder.

19.14 <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and permitted assigns.

19.15 <u>Headings; Cross-References; Exhibits.</u>. The headings and captions used in this Agreement are for convenience and ease of reference only and shall not be used to construe, interpret, expand or limit the terms of this Agreement. All cross-references in this Agreement, unless specifically directed to another agreement or document, shall refer to provisions in this Agreement and shall not be deemed to be references to any other agreements or documents. Each of the exhibits attached to this Agreement is hereby incorporated into this Agreement by this reference.

19.16 <u>Backup Withholding</u>. If any regulations proposed or promulgated by the Internal Revenue Service subject the transactions contemplated hereunder to backup withholding (which would require Builder to withhold a portion of the Purchase Price from Stonebrae), then Stonebrae will provide Builder with the necessary declaration in order to exempt such transactions from backup withholding.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Agreement Date.

"Stonebrae"

STONEBRAE L.P.,
a Delaware limited partnership

By:   YCS Nevada, Incorporated,
a Nevada corporation, dba
Stonebrae YCS, Inc., its General
Partner

By     _____
Name: Paul W. Yuen
Title:  Authorized Representative

By     _____
Name: Michael J. Letchinger
Title:  Authorized Representative

"Builder"

TOLL BROS., INC.,
a Pennsylvania corporation

By:  _____
Name:  _____
Its:  _____

By:  _____
Name:  _____
Its:  _____

W02-SF:5JS\61486822.7

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Agreement Date.

"Stonebrae"                                          "Builder"

STONEBRAE L.P.,                                      TOLL BROS., INC.,
a Delaware limited partnership                       a Pennsylvania corporation

By:   YCS Nevada, Incorporated,                      By: _____
      a Nevada corporation, dba                      Name: _____
      Stonebrae YCS, Inc., its General               Its: _____
      Partner

      By _____                     By: _____
      Name: Paul W. Yuen                             Name: _____
      Title:  Authorized Representative              Its: _____

      By _____
      Name: Michael J. Letchinger
      Title:  Authorized Representative

W02-SF:SJS\61486822.7

## ACCEPTANCE BY ESCROW HOLDER

Old Republic Title Insurance Company hereby acknowledges that it has received a fully executed copy of the Purchase and Sale Agreement and Joint Escrow Instructions and agrees to act as the Escrow Holder thereunder and to be bound by and perform the terms thereof as such terms apply to the Escrow Holder. Escrow Holder shall execute two originals of this Acceptance and deliver one original to each of Stonebrae and Builder promptly following the opening of Escrow for attachment to their execution originals of this Agreement.

DATE: _5\5\06_, 2006

Old Republic Title Insurance Company

By: _____
Name: _____
Title: _____

Exhibit A
Graphic of Property



All lots located in ③

Exhibit B
General Escrow Provisions

1.  **Deposit of Funds and Disbursements.**

Escrow Holder shall deposit all funds received in this escrow in any financial institution insured by a federal agency of the United States Government, including financial institutions affiliated with Escrow Holder's company, in one or more general escrow demand accounts. Unless Escrow Holder is handed a W-9 form and specific investment instructions from the buyer and seller, all funds delivered to Escrow Holder pursuant to these instructions will be deposited in a non-interest bearing fiduciary account. All disbursements shall be made by Escrow Holder's check unless otherwise instructed in writing. Escrow Holder is authorized not to close escrow or disburse until collected funds have been confirmed in escrow.

2.  **Good Funds Law.**

The parties understand that ALL funds to close escrow and/or to be released early must be deposited into escrow prior to the date of closing or early release to allow sufficient time for clearance of the funds prior to disbursement. In the event such funds are not in the form of a cashier's, certified or teller check drawn on a financial institution, sufficient time must be allowed for clearance to comply with any "good funds" law which is in effect. (For escrows conducted in California, the "good funds" law is Section 12413.1 of the California Insurance Code.) Funds may be wired directly into Escrow Holder's Old Republic depository bank account to avoid waiting for clearance.

3.  **Prorations and Adjustments.**

The expression "close of escrow" used in this escrow means the date on which instruments referred to herein are recorded and relates only to prorations and/or adjustments unless otherwise specified.

All prorations and/or adjustments are to be made on the basis of a thirty (30) day month unless otherwise instructed in writing.

4.  **Recordations of Documents.**

Escrow Holder is authorized to record any documents delivered through this escrow, the recording of which is necessary or proper in the issuance of the requested policy of title insurance.

5.  **Authorization to Furnish Copies.**

Escrow Holder is to furnish a copy of these instructions, amendments thereto, closing statements and/or any other documents deposited in this escrow to the lender(s), the real estate broker(s), the attorneys(s) and/or the accountant(s) involved in this transaction upon the request of the lenders, brokers, attorneys, or accountants.

6.    **Personal Property Taxes.**

No examination, UCC Search or insurance as to personal property and/or the amount or payment of personal property taxes is required unless otherwise instructed in writing.

7.    **Right of Cancellation.**

Any party instructing Escrow Holder to cancel this escrow shall file notice of cancellation in Escrow Holder's office in writing. Within a reasonable time, Escrow Holder shall mail, by certified mail and regular mail, one copy of the notice to each of the other parties at the addresses stated in this escrow. Unless a written objection to cancellation is filed in Escrow Holder's office by a party within ten (10) days after the date of mailing, Escrow Holder is authorized at its option to comply with the notice and demand payment of Escrow Holder's cancellation charges as provided in these General Provisions. If a written objection is filed, Escrow Holder is authorized at Escrow Holder's option to hold all the money and documents contained in this escrow and take no further action until otherwise directed, either by the parties' mutual written instructions, or final order of a court of competent jurisdiction.

8.    **Action of Interpleader.**

The parties hereto expressly agree that Escrow Holder, has the absolute right at Escrow Holder's election to file an action in interpleader requiring the parties to answer and litigate their several claims and rights between themselves and Escrow Holder is authorized to deposit all documents and funds held in escrow with the clerk of the court. In the event such action if filed, the parties jointly and severally agree to pay Escrow Holder's cancellation charges and costs, expenses and reasonable attorney's fees which Escrow Holder is required to expend or incur in the interpleader action, the amount thereof to be fixed and judgment therefore to be rendered by the court. Upon the filing of the action, Escrow Holder shall thereupon be fully released and discharged from all obligations to further perform duties or obligations otherwise imposed by the term of this escrow.

9.    **Termination of Agency Obligation.**

If there is no action taken on this escrow within six (6) months after the "time limit date" as set forth in the escrow instructions or written extension thereof, Escrow Holder's agency obligation shall terminate at Escrow Holder's option and all documents, monies, or other items held by Escrow Holder shall be returned to the parties depositing same.

In the event of cancellation of this escrow, whether it be at the request of any of the parties or otherwise, the fees and charges due in connection with this escrow including expenditures incurred and/or authorized shall be paid by the parties hereto.

10.    **Conflicting Instructions.**

Should Escrow Holder before or after close of escrow receive or become aware of any conflicting demands or claims with respect to this escrow or the rights of any of the parties hereto, or any money or property deposited herein or affected hereby, Escrow Holder shall have the right to discontinue any or all further acts on Escrow Holder's part until the conflict is

resolved to Escrow Holder's satisfaction, and Escrow Holder shall have the further right to commence or defend any action or proceedings for the determination of the conflict as provided in the "Right of Cancellation" and "Action in Interpleader" paragraphs of these General Provisions.

11. **Usury.**

Escrow Holder is not to be concerned with any question of usury in any loan encumbrances involved in the processing of this escrow and Escrow Holder is hereby released of any responsibility and/or liability therefor.

12. **Indemnify for Attorney Fees and Costs.**

In the event suit is brought by any party to this escrow, including the Escrow Holder or any other party, as against each other or others, including the Escrow Holder, claiming any right they may have as against each other or against the Escrow Holder, then in that event, with the exception of negligence and willful misconduct by the Escrow Holder, the parties hereto agree to indemnify and hold the Escrow Holder harmless against any attorney's fees and costs incurred by it.

13. **Amendments to Escrow Instructions.**

Any amendments or supplement to these escrow instructions must be in writing. These escrow instructions and any written amendments, supplemental or exhibits attached thereto constitute the entire escrow agreement among the Escrow Holder and the parties hereto with respect to the subject matter hereof and supersedes all prior understandings, with respect thereto.

14. **Property Taxes Subsequent to Close of Escrow.**

Buyer and seller herein acknowledge that there may be supplemental and/or additional taxes which may be assessed by reason of a change in ownership or completion of construction. This will be reflected in the policy of title insurance issued at the close of escrow. Escrow Holder shall not be concerned with any adjustment(s) of supplemental taxes between the parties for bills received by the parties after the close of escrow. In the event seller has received supplemental Tax Bills(s) prior to close of escrow, seller will provide them to Escrow Holder with an explanation of time periods covered by the tax bill(s) for proration purposes (in California the applicable provisions are found in California Revenue and Taxation Code Sections 75 and following).

In the event buyer or seller has applied, or applies for a reduced assessment, and a refund of taxes is received by Old Republic Title Insurance Company as Agent, Escrow Holder is to retain the funds in one or more of Escrow Holder's general escrow demand accounts until Escrow Holder has received mutual written instructions from the parties directing Escrow Holder as to the property disposition of the tax refund.

15.   __Change of Ownership Forms.__

Buyer will furnish Escrow Holder with a completed Preliminary Change of Ownership Report which Escrow Holder is instructed to submit at time of recordation pursuant to Section 480.3 of the California Revenue and Taxation Code. In the event this escrow is otherwise ready to close and buyer has not provided the above report, Escrow Holder is instructed to close this escrow and collect from buyer for the County Recorder any additional fee required for recordation when a Preliminary Change of Ownership Report does not accompany the documents being recorded. Buyer is aware that if the above report is not submitted at the time of recordation as required, a Change of Ownership Statement must be filed by the buyer directly with the County Assessor not later than 45 days after recordation and failure to do so will result in additional penalties. Buyer acknowledges that Escrow Holder shall have no responsibility and/or liability for the county Recorder's acceptance or rejection of the Preliminary Change of Ownership Report. For escrows involving property in states other than California, parties will provide Escrow Holder with applicable documents as may be required by the county recorder or taxing authority to close this transaction.

16.   __Insurance Policies Other Than Title Insurance.__

When dealing with real property and/or improvements located thereon it is advisable to obtain fire, hazard or liability insurance coverage. In all acts in this escrow relating to insurance, including adjustments, if any, Escrow Holder may assume that each policy is in force and that the necessary premium has been paid. Escrow Holder shall not be responsible for obtaining fire, hazard or liability insurance, unless Escrow Holder has received written instruction prior to close of escrow from the parties or their respective lenders.

17.   __Facsimile Instructions.__

In the event the parties utilize "facsimile" transmitted signed documents, buyer and seller hereby agree to accept and instruct the Escrow Holder to rely upon such documents as if they had original signatures. Buyer and seller hereby acknowledge and agree to provide to Escrow Holder, within seventy-two (72) hours of transmission, such documents bearing the original signatures. Buyer and seller further acknowledge and agree that documents necessary for recording with other than original signatures (i.e., facsimiles) will not be accepted for recording by the County recorder thereby delaying the close of escrow.

18.   __Execute in Counterpart.__

These escrow instructions and any subsequent amendments may be executed in one or more counterparts, each of which independently shall have the same effect as if it were the original, and all of which taken together shall constitute one and the same instruction.

IF THE TRANSACTION WHICH IS THE SUBJECT OF THIS ESCROW IS A SALE, THE PARTIES TO THIS TRANSACTION MAY HAVE CERTAIN TAX REPORTING AND WITHHOLDING OBLIGATION PURSUANT TO STATE LAW OR FEDERAL LAW REFERRED TO IN GENERAL PROVISIONS 19-21 BELOW.

19.    <u>Reporting to the Internal Revenue Service.</u>

The Tax Reform Act of 1986 provides that the Escrow Holder must report certain information regarding certain real estate transactions to the Internal Revenue Service. This information includes, among other things, the seller's social security number and/or tax identification number and forwarding address, and the gross sales price of the transaction. This is not a requirement generated by Escrow Holder, but rather a means of complying with the new tax law. This information must be provided to Old Republic Title Insurance Company upon the opening of escrow, and neither can escrow be closed, nor can the deed or any other documents be recorded until the information is provided and the seller certifies the accuracy of the information in writing. By execution of these escrow instructions, the parties acknowledge receipt of this notice.

20.    <u>Tax Reporting and Withholding Obligations of the Parties.</u>

<u>State Law.</u>

In accordance with Sections 18662 and 18668 of the California Revenue and Taxation Code, a buyer may be required to withhold an amount equal to three and one-third (3-1/3) percent of the sales price, in the case of the disposition of California real property interest by either:

1.    A seller who is an individual with a last known street address outside of California or when the disbursement instructions authorize the proceeds be sent to a financial intermediary of the seller, OR

2.    A corporate seller which has no permanent place of business in California.

For failure to withhold, the buyer may become subject to penalty for failure to withhold an amount equal to the lesser of ten percent (10%) of the amount required to be withheld or Five Hundred and no/100 Dollars ($500.00).

However, notwithstanding any other provision included in the California statutes referenced above, no buyer will be required to withhold any amount or be subject to penalty for failure to withhold if:

a.    The sales price of the California real property to be conveyed does not exceed One Hundred Thousand and no/100 Dollars ($100,000.00), OR

b.    The seller executes a written certificate, under the penalty of perjury, certifying that the seller is a resident of California, or if a corporation, has a permanent place of business in California, OR

c.    The seller, who is an individual, executes a written certificate, under the penalty of perjury, that the California real property being conveyed is the seller's principal residence (as defined in Section 1034 of the Internal Revenue Code).

The seller is subject to penalty for knowingly filing a fraudulent certificate for the purpose of avoiding the withholding requirement.

The California statutes referenced above include provisions which authorize the Franchise Tax Board to grant reduced withholding and waivers from withholding on a case-by-case basis.

The seller may request a reduction in withholding or waiver and the buyer and seller may obtain additional information by contacting the:

> Franchise Tax Board
> Withhold at Source Unit
> P.O. Box 651
> Sacramento, CA 95812-0651
> (916) 845-4900

Law of States Other Than California.

If the parties are required to withhold by the law of a state other than California, the parties understand that the withholding obligation is the exclusive obligation of the parties to this transaction and that Escrow Holder is not obligated to withhold or notify the parties of any withholding obligation they may have.

Federal Law.

Internal Revenue Code Section 1445 places special requirements for tax reporting and withholding on the parties, to a real estate transaction where the seller (transferor) is a non-resident alien, a non-domestic corporation or partnership, a domestic corporation or partnership or partnership controlled by non-residents or, non-resident corporations or partnerships.

With respect to California law, the laws of states other than California and federal law referred to above, the parties to this transaction are seeking an attorney's, accountant's or other tax specialist's opinion concerning the effect of these laws on this transaction. The parties to this transaction should NOT be acting on or relying on any statements made or omitted by the escrow officer, title officer, or other closing officer with respect to tax reporting or withholding requirements. By execution of these escrow instructions, the parties acknowledge receipt of this notice.

21.   Disclosure of Taxpayer Identification Numbers.

Internal Revenue Code Section 6109(h) imposes requirements for furnishing, disclosing, and including taxpayer identification numbers in tax returns on the parties to a residential real estate transaction involving seller-provided financing. The parties understand that the disclosure reporting requirements are exclusive obligations between the parties to this transaction and that Escrow Holder is not obligated to transmit the taxpayer identification numbers to the Internal Revenue Service or to the parties. Escrow Holder is not rendering an opinion concerning the effect of this law on this transaction, and the parties are not acting on any

statements made or omitted by the escrow or closing officer. By execution of these escrow instructions, the parties acknowledge receipt of this notice.

To facilitate compliance with this law, the parties to this escrow hereby authorize Escrow Holder to release any party's taxpayer identification number to any requesting party who is a party to this transaction. The requesting party shall deliver a written request to escrow. The parties hereto waive all rights of confidentiality regarding their respective taxpayer identification numbers and agree to hold Escrow Holder harmless against any fees, costs, or judgment incurred and/or awarded in connection with the release of taxpayer identification numbers.

PURSUANT TO CIVIL CODE SECTION 1057.7 OLD REPUBLIC TITLE COMPANY CONDUCTS ESCROW BUSINESS UNDER UNDERWRITTEN TITLE COMPANY LICENSE NO. 257 ISSUED BY THE STATE OF CALIFORNIA DEPARTMENT OF INSURANCE.

Exhibit C
Due Diligence Documents

The term "Due Diligence Documents" includes all of the following that are in Stonebrae's possession which are material to the ownership or development of the Lots by Builder:

(a)   written easements, covenants, restrictions, leases, agreements, contracts, waivers, notices and current applications, existing as of the Agreement Date, that affect the Property;

(b)   all material documents and records relating to transactions which will be binding on Builder after Closing with taxing authorities, assessment districts governmental agencies, contractors, and utilities;

(c)   all current binding authorizations, approvals, permits, variances, allocations and entitlements with respect to land use, utilities and governmental services for the Property, and all current improvement plans, grading plans, engineering and soils reports, and the current draft Final Map, with respect to the Property;

(d)   all current plans, specifications, engineering drawings, as-builts and other drawings and prints with respect to the construction of the Lots by Stonebrae owned by Stonebrae or in Stonebrae's possession or control; and

(e)   all construction contracts related to Stonebrae's Work on the Property, indemnity agreements and other agreements related to any improvements of the Property.

Stonebrae has made the Due Diligence Documents available to Builder as of the Agreement Date through the internet website located at:

"http://63.150.62.82/DFSTheme/Login.aspx?ReturnURL=%7e%2fProductSearch.aspx."

Stonebrae shall maintain Builder's access to the internet website and shall maintain the Due Diligence Documents on the internet website until the date that is the second anniversary of the Closing.

List of Due Diligence Documents

| Stonebrae Online Plan Room Projects & Documents Index |
|---|

I.    APPROVALS

    A.    Hayward Blvd & Fairview Ave Improvement Plans - 6.27.05

    B.    Recorded Final Map

    C.    Specifications

        1.    2005 Grading Permit

        2.    2081 Permit - confirmation of Set-Aside Funds

        3.    2081 Permit - irrevocable letter of credit

        4.    2081 Permit - Minor Amendment

        5.    2081 Permit- renewal

        6.    Biological Opinion

        7.    City Council Resolution -- Final Map

        8.    Conditions of Approval

        9.    Council Resolution - Grading 05-25-05

        10.    Development Agreement

        11.    Mitigation & Monitoring Plan - Vol. 1

        12.    Mitigation & Monitoring Plan Vol. II

        13.    Mitigation Monitoring Plan

        14.    Time Extension from Dept of the Army

        15.    Water-Sewer Will Serve

    D.    Supplement to Precise Plan

    E.    Vesting Tentative Map

    F.    Village B--E Mass Grading Plans

G.    Village A Grading Plans - With updated cover sheet 2.17.06

H.    Village A Improvement Plans - Updated 12.27.05

II.    PLANS UNDER REVIEW AS OF 01.01.06

    A.    Plans

        1.    Landscape Construction Documents – 12.20.05

        2.    Village B – Improvement Plans

        3.    Village B – Fine Grading Plans

        4.    Village B – Mass Grading Plans – Revision #2

        5.    Village E – Improvement Plans

        6.    Village E – Grading Plans

        7.    Village B – Final Map

        8.    Village A – Landscape Fine Grading Plans

    B.    Specifications

III.    GOLF

    A.    Preliminary Foundation Design Criteria for Proposed Vehicular Bridge Crossing

IV.    LANDSCAPE

    A.    Specs

        1.    Planting Pits for Trees on Slopes

    B.    Plans

V.    PROJECT

    A.    Specifications

        1.    Stonebrae_Guidelines_1.13.06

        2.    City Council Design Guidelines Resolution 11.22.05

        3.    Conceptual Fuel Management - 04.2001

        4.    Geologic Map

5.    Modification Phase One Environmental Site Assessment-12.13.2000

6.    Storm Water Pollution Prevention Plan

7.    Supplemental Geotechnical Exploration

8.    Tree Preservation & Management Plan

9.    Phase One Environmental Site Assessment

10.    Detailed Blasting Plan

11.    Detention Facility Design-Village A 12.28.04

12.    Supplemental Grading Recommendations

13.    Stonebrae CC&Rs.decV4

VITA Design Guidelines

1.    Stonebrae Guidelines 1.13.06

Preliminary Geotechnical Reports

1.    Letter Report by Louke & Associates

2.    Volume 1 Preliminary Geologic Investigation Soda Ranch

3.    Volume 2 Preliminary Geologic Investigation Soda Ranch

4.    Preliminary Soil Investigation

5.    Geotechnical Review - The Ridge

6.    Geotechnical Investigation - The Ridge - Jan. 28, 1987

7.    Geotechnical Investigation for The Ridge - Water Tanks

8.    Geotechnical Investigation - The Ridge - March 14, 1990

Preliminary Title Reports - Entire Project

1.    Preliminary Title Report-1117001935

2.    Agreement-2000-170621

3.    Agreement-99-419809

4.    Annexation Agreement-67-2051-294

5.    Annexation Agreement-82-175023

6.    Assignment of Leases-04-554183

7.    Blue Rock Development Agreement 1-98-128317

8.    Blue Rock Development Agreement 2-98-128317.

9.    Blue Rock Development Agreement 3-98-128317

10.    Blue Rock Development Agreement 4-98-128317

11.    Blue Rock Development Agreement 5-98-128317

12.    CC&Rs 2000-227806

13.    DT-04-554182

14.    Easement-61-314-177

15.    Easement-80-188914

16.    Easement-80-188915

17.    Easement-80-188916

18.    Easement-80-188918

19.    Easement-89-101940

20.    Easement-89-101941

21.    Easement-89-101942

22.    Easement-89-242873

23.    Easement-89-242874

24.    Easement-89-242875

25.    GD-04-538500

26.    GD-60-137-381

27.    GD-80-175266

28.    GD-80-175299

29.    GD-85-61542

      30.   GD-90-150254

      31.   Grant of License-88-126792

      32.   Indemnity Agreement 92-338396

      33.   Indemnity-92-338396

      34.   Offer of Dedication(part 1)-04-492244

      35.   Offer of Dedication(part 2)04-492244

      36.   Resolution-98-005620

  B.   Building Setbacks

  C.   Land Use Map for Entire Site

  D.   Graphic Image

      1.   Builders

      2.   Community

      3.   Golf

  E.   Stonebrae Country Club Drive PRV Stations

      1.   Plans

      2.   Documents

          a.   PRV Station Technical Specifications

VI.   REFERENCE

  A.   Specifications

      1.   Rev. Certified Supplemental

      2.   Walpert Ridge Specific Plan

      3.   Hillside Design & Urban Wildland Guidelines

VII.   SCHOOL

  A.   Specifications

      1.   Geotechnical Exploration

2.    Retaining Wall Design Criteria Addendum

3.    Supplemental Retaining Wall Design Criteria

4.    HUSD Completion-Dedication Agreement

5.    HUSD May 2000 Mitigation Agreement

6.    HUSD Will Serve Letter

7.    Modified Phase One Environmental Site Assessment

8.    Blue Rock Elem School - 11x17 Project Manual lores

9.    Blue Rock Elem School - Project manual lores

B.    Blue Rock Elementary School

    1.    Drawings

        a.    FME Set

    2.    Saramark Set

        a.    Index A

        b.    Index B - 4000AX

        c.    Index B - 4000AXR

        d.    Saramark 3000R & 4000R Expo 97

        e.    Saramark 4000 Expo 97

    3.    Specifications

        a.    Blue Rock Elem School - Project manual lores

        b.    Blue Rock Elem School - 11x17 Project Manual lores

        c.    PC 01

        d.    PC-03

        e.    PC-05

        f.    PC-06

        g.    PC-07

VIII.  UTILITIES

    A.  Specifications

        1.  Tract 5354 - Blue Rock Village A

        2.  Will Serve Letter

        3.  Comcast Will Serve Letter & Pre-Wire Specs

    B.  Approved Joint Trench Plans - 9.28.05

IX.  WATER SYSTEMS

    A.  Specifications

        1.  Revised Foundation Recommendations.tif

        2.  Revised Water Tank Locations.tif

        3.  Site Response Analysis.tif

        4.  Slope Stability Analysis & Grading Plan Review

        5.  Geotechnical Exploration Zone 1255 Water Tank

        6.  Geotechnical Exploration Zone 1500 Water Tanks

        7.  Specifications for Construction of Stonebrae

        8.  Pad Readiness Report for 1285 & 1530 Reservoirs

    B.  Plans

        1.  1285 Reservoir & Pump Station - Updated December 2005

            a.  1285 Reservoir & Pump Station - Updated December 2005

Exhibit D
Insurance Requirements

Stonebrae and Builder shall each purchase and maintain, at their own expense, with an insurer or insurers authorized to do business in the State in which the Property is located, listed in the most recent Best's rating guide as having not less than an A:V rating, at least the following minimum coverages during the term of this Agreement and continuing, unless otherwise provided for herein, during Builder's ownership of the Property.

(a) Builders Risk property insurance upon the Property and any improvements thereto, to the full insurable value thereof and without any co-insurance requirements. Such insurance shall be on an "All Risks" basis.

(b) Commercial General Liability insurance, written on an occurrence or close of escrow policy form, with limits not less than $10,000,000 per occurrence, including the following coverages: Personal Injury; Explosion, Collapse and Underground Property Coverage; Broad Form Property Damage Coverage, including Completed Operations; Contractual Liability; and Bodily Injury Coverage. Completed operations coverage shall extend ten (10) years beyond the completion of the work. Commercial General Liability coverage provided under this subparagraph may also be in the form of a "wrap" policy. Limits may be obtained using primary and excess policies.

(c) Commercial Automobile Liability insurance covering owned, non-owned and hired automobiles, trucks and trailers, or semi-trailers, including any machinery or apparatus attached thereto, with limits not less than $5,000,000 per occurrence limits for bodily injury and property damage liability. Limits may be obtained using primary and excess policies.

(d) Workers compensation insurance (statutory limits complying with the laws of the State in which the Property is located) and employers liability insurance with limits not less than $1,000,000 bodily injury by accident (each accident), $1,000,000 bodily injury by disease (policy limit), and $1,000,000 bodily injury by disease (each employee). Such insurance shall contain a waiver of subrogation in favor of the other party.

Stonebrae and Builder shall each be responsible at its own cost for satisfaction of all deductibles and/or self-insured retentions under each party's such insurance. Stonebrae and Builder may purchase and maintain any other insurance that Stonebrae or Builder deems necessary or desirable for Stonebrae or Builder's further protection.

Builder shall name Stonebrae as additional insured under the General Liability insurance, Automobile Liability and umbrella/excess insurance in this Exhibit "D" by utilizing ISO endorsement form CG2010 (11/85) Additional Insured or its equivalent. The additional insured entities shall include:

Stonebrae shall name Builder as additional insured under the General Liability insurance, Automobile Liability and umbrella/excess insurance in this Exhibit D by utilizing ISO endorsement form CG2010 (11/85) Additional Insured or its equivalent. The additional insured entities shall include Toll Brothers Inc., its subsidiaries and affiliates.

No later than two business day prior to Closing, Stonebrae shall deliver to Builder and Builder shall deliver to Stonebrae a certificate of insurance evidencing the coverages referred to in this Exhibit D. All certificates of insurance must provide thirty (30) days advance written notice of cancellation, intent to non-renew, or adverse material change in the reduction of coverage, except on the builder's risk property coverage.

Stonebrae and Builder waive all rights against each other for damages caused by fire or other perils to the extent coverage by insurance required by this Exhibit D or any other insurance carried by Stonebrae or Builder. All insurance policies required hereunder shall permit and recognize such waivers of subrogation.

Exhibit E
Form of RJA Engineer's Certificate

Job No. 031090

Date: XXX

Mr. Michael Letchinger
Stonebrae, LP
170 Maiden Lane, Suite 800
San Francisco, CA 94108

RE:    Tract _____, Stonebrae, Hayward, California - Pad Certification Lot XX

Dear Mike:

Our survey crew performed a check of the pad grade on the above-referenced lot and found it to be within substantial conformance (0.1') with the pad elevation of XXX, as shown on the grading plans dated _____ __, 200__ prepared by Ruggeri-Jensen-Azar & Associates.

If you have any questions, please call at (925)227-9100.

Very truly yours,
Ruggeri-Jensen-Azar & Associates

Richard Cheung, P.E.
Project Manager

cc:    Standard Pacific Homes
       or
       Warmington Homes
       or
       Toll Brothers

Exhibit F
Form of Engeo Engineer's Certificate

Project No.
_____

Pub date
Mr.
Subject:

REPORT ON LOT PAD READINESS

Reference:    1._____

Dear Mr. _____:

ENGEO Incorporated is providing testing and observation services on a full-time basis during the grading for Lots ____ through _____ at the _____ project in _____, California. The purpose of our services is to confirm that the development of the lot pads is accomplished in general conformance with the recommendations contained in the referenced geotechnical exploration report and grading plans. We also provided additional geotechnical consultation and recommendations during the grading operations as necessary.

The recommendations contained in the referenced geotechnical report for general fill placement within the pads included a minimum relative compaction of ____ percent at a moisture content of at least ___ percentage points above optimum for expansive clayey soils. For non-expansive site soils or import fills, a minimum relative compaction of ____ percent at a moisture content of at least ____ percentage points above optimum was recommended.

Based on the findings of ENGEO's field testing and observation services, it is our opinion that all lots within _____ in _____ have been graded in general accordance with the recommendations contained in the referenced geotechnical exploration report and are ready for further development. At the completion of the mass grading operations, Engeo will prepare a final report on the testing and observation services undertaken during the grading of _____. A summary of the field density testing with the finished pad grade test results will be provided in that report.

We look forward to continue working with your office on this project. If you have any questions, please do not hesitate to contact us.

Very truly yours,

ENGEO INCORPORATED                              Reviewed by:

Exhibit G

Preliminary Report

[TO BE ATTACHED]



# OLD REPUBLIC TITLE COMPANY

555 12th Street  Suite 2040 • Oakland, CA • 94607 • (510) 272-1121 • Fax: (510) 208-5045

## PRELIMINARY REPORT

Issued for the sole use of:

SHEPPARD MULLIN RICHTER & HAMPTON, LLP
4 EMBARCADERO CENTER, 17TH FLOOR
SAN FRANCISCO, CA 94111

Attention: JOHN A. SCHEURING

AMENDED PRO-FORMA

Our Order Number  1117003324-JM

When Replying Please Contact:

Julie Massey
(510) 272-1121

Property Address:

Stonebrae Village B Lots 29, 63-96 and 97-117, HAYWARD, CA 94540

In response to the above referenced application for a policy of title insurance, OLD REPUBLIC TITLE COMPANY hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception below or not excluded from coverage pursuant to the printed Schedules, conditions and Stipulations of said policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said Policy or Policies are set forth in Exhibit A attached. Limitations on Covered Risks applicable to the Homeowner's Policy of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Exhibit A. Copies of the Policy forms should be read. They are available from the office which issued this report.

Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit A of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.
It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

Dated as of March 17, 2006, at 7:30 AM

**OLD REPUBLIC TITLE COMPANY**
For Exceptions Shown or Referred to, See Attached

OLD REPUBLIC TITLE COMPANY
**ORDER NO.** 1117003324-JM
AMENDED PRO-FORMA

The form of policy of title insurance contemplated by this report is:

A CLTA Standard Coverage Owner's Policy; AND an ALTA Loan Policy. A specific request should be made if another form or additional coverage is desired.

The estate or interest in the land hereinafter described or referred or covered by this Report is:

a Fee.

Title to said estate or interest at the date hereof is vested in:

STONEBRAE L.P., a Delaware Limited Partnership

The land referred to in this Report is situated in the County of ALAMEDA, City of HAYWARD, State of California, and is described as follows:

Lots 29, 63 through 96 and 97 through 117, both inclusive, as shown on the map of Tract 7736, filed _____, in Map Book ____, Pages ___ through ___, inclusive, Alameda County Records.

Being a portion of APN: 085A-6428-015

At the date hereof exceptions to coverage in addition to the Exceptions and Exclusions in said policy form would be as follows:

1.   Taxes and assessments, general and special, for the fiscal year 2006 - 2007, a lien, but not yet due or payable.

2.   Taxes and assessments, general and special, for the fiscal year 2005 - 2006, as follows:

| | | |
|---|---|---|
| Assessor's Parcel No | : | 085A-6400-008-01 |
| Bill No. | : | 229234-00 |
| Code No. | : | 25-158 |
| 1st Installment | : | $6,547.72 | Marked Paid |
| 2nd Installment | : | $6,547.72 | NOT Marked Paid |
| Land | : | $1,266,759.00 |
| Imp. Value | : | $0.00 |
| Exemption | : | $0.00 |

Affects this and other property.

OLD REPUBLIC TITLE COMPANY
**ORDER NO.** 1117003324-JM
AMENDED PRO-FORMA

3.    Taxes and assessments, general and special, for the fiscal year 2005 - 2006, as follows:

| | | |
|---|---|---|
| Assessor's Parcel No | : | 085A-6400-008-02 |
| Bill No. | : | 229235-00 |
| Code No. | : | 25-158 |
| 1st Installment | : | $19,496.33 | Marked Paid |
| 2nd Installment | : | $19,496.33 | NOT Marked Paid |
| Land | : | $3,776,327.00 |
| Imp. Value | : | $0.00 |
| Exemption | : | $0.00 |

Affects this and other property.

4.    Taxes and assessments, general and special, for the fiscal year 2005 - 2006, as follows:

| | | |
|---|---|---|
| Assessor's Parcel No | : | 085A-4200-001-15 |
| Bill No. | : | 229026-00 |
| Code No. | : | 25-207 |
| 1st Installment | : | $4,893.06 | Marked Paid |
| 2nd Installment | : | $4,893.06 | NOT Marked Paid |
| Land | : | $940,875.00 |
| Imp. Value | : | $0.00 |
| Exemption | : | $0.00 |

Affects this and other property.

5.    Taxes and assessments, general and special, for the fiscal year 2005 - 2006, as follows:

| | | |
|---|---|---|
| Assessor's Parcel No | : | 085A-4250-001-03 |
| Bill No. | : | 229039-00 |
| Code No. | : | 25-163 |
| 1st Installment | : | $667.55 | Marked Paid |
| 2nd Installment | : | $667.55 | NOT Marked Paid |
| Land | : | $124,532.00 |
| Imp. Value | : | $0.00 |
| Exemption | : | $0.00 |

Affects this and other property.

OLD REPUBLIC TITLE COMPANY
**ORDER NO.** 1117003324-JM
AMENDED PRO-FORMA

6.    Taxes and assessments, general and special, for the fiscal year 2005 - 2006, as follows:

| | | |
|---|---|---|
| Assessor's Parcel No | : | 085A-6300-001-02 |
| Bill No. | : | 229224-00 |
| Code No. | : | 25-206 |
| 1st Installment | : | $10,683.11 | Marked Paid |
| 2nd Installment | : | $10,683.11 | NOT Marked Paid |
| Land | : | $2,025,484.00 |
| Imp. Value | : | $0.00 |
| Exemption | : | $0.00 |

Affects this and other property.

7.    Taxes and assessments, general and special, for the fiscal year 2005 - 2006, as follows:

| | | |
|---|---|---|
| Assessor's Parcel No | : | 085A-6400-002-07 |
| Bill No. | : | 229229-00 |
| Code No. | : | 25-002 |
| 1st Installment | : | $13,649.88 | Marked Paid |
| 2nd Installment | : | $13,649.88 | NOT Marked Paid |
| Land | : | $2,645,489.00 |
| Imp. Value | : | $0.00 |
| Exemption | : | $0.00 |

Affects this and other property.

8.    The lien of supplemental taxes, if any, assessed pursuant to the provisions of Section 75, et seq., of the Revenue and Taxation Code of the State of California.

9.    An easement affecting that portion of said land and for the purposes stated herein and incidental purposes as provided in the following

| | | |
|---|---|---|
| Granted To | : | Pacific Telephone and Telegraph Company |
| For | : | Use of existing private roadway |
| Recorded | : | August 1, 1960 in Book 137 of Official Records, Page 381 |
| | | |
| Affects | : | A portion of said land |

OLD REPUBLIC TITLE COMPANY
**ORDER NO.** 1117003324-JM
AMENDED PRO-FORMA

Easement for ingress and egress, reserved by The Pacific Telephone and Telegraph Company, in the quitclaim deed to AT&T Communications of California, Inc., recorded January 9, 1984 of Official Records, Series No. 84-4120

Easement for ingress and egress, reserved by AT&T Communications of California, Inc., in the Quitclaim Deed to American Towers, Inc., recorded February 2, 2000, in Official Records, Series No. 2000-34955

Upon the terms and conditions contained herein.

The following is noted on the filed map: Easement will be quitclaimed.

The interest of American Towers, Inc., was conveyed to Walpert Ridge Corporation, a California Corporation, by quitclaim deed recorded March 2, 2006, in Official Records, Series No. 2000-34955

10.   Agreement for    :   Easthills Annex No. 1 (Revised) Annexation

      Executed By     :   City of Hayward

      and Between     :   Y. C. Soda and Helen Soda, his wife

      On the terms, covenants and conditions contained therein,

      Recorded        :   October 6, 1967 in Reel 2051 of Official Records, Image 294
      Affects a portion of said land

            And as modified by an instrument, executed by Y.C. Soda, et uz and the City of Hayward, recorded September 22, 1982 in Official Records under Recorder's Serial Number 87-175023.

OLD REPUBLIC TITLE COMPANY
**ORDER NO.** 1117003324-JM
AMENDED PRO-FORMA

11.    Agreement for        :    Hayward Boulevard Annex No. Annexation

Executed By        :    Y. C. Soda and Helen Soda

and Between        :    City of Hayward, a municipal corporation

On the terms, covenants and conditions contained therein,

Recorded        :    September 22, 1982 in Official Records under Recorder's Serial
Number 82-175023

Affects a portion of said land

12.    Agreement for    :    Blue Rock Country Club Project Development

Executed By        :    Hayward 1900, Inc., a California corporation

and Between        :    City of Hayward, a municipal corporation

On the terms, covenants and conditions contained therein,

Dated        :    April 8, 1998
Recorded        :    April 16, 1998 in Official Records under Recorder's Serial
Number 98-128317

Assignment and Assumption of Development Agreement, by and between Hayward 1900,
Inc., and Stonebrae L.P., a Delaware limited partnership, recorded July 29, 2005, in Official
Records, Series No. 2005-324255

13.    Agreement for    :    Transfer of Territory

Executed By        :    Castro Valley Unified School District, a Governmental entity

and Between        :    Hayward 1900, Inc., a California corporation

On the terms, covenants and conditions contained therein,

Dated        :    November 9, 1999
Recorded        :    November 17, 1999 in Official Records under Recorder's Serial
Number 1999-419809

OLD REPUBLIC TITLE COMPANY
**ORDER NO. 1117003324-JM**
AMENDED PRO-FORMA

14.   Agreement for  :  School Mitigation

       Executed By    :  Hayward Unified School District

       and Between   :  Hayward 1900, Inc., a California Corporation

       On the terms, covenants and conditions contained therein,

       Dated        :  May 25, 2000
       Recorded   :  June 6, 2000 in Official Records under Recorder's Serial
                     Number 2000-170621

15.   Declaration of Conditions, Covenants and Restrictions, whereas, San Francisco
       District Engineer, U.S. Army Corps of Engineers, authorized certain improvements
       on or adjacent to said property, recorded July 31, 2000, Series No. 2000-227806,
       Official records

16.   Deed of Trust to secure an indebtedness of the amount stated below and any other amounts
       payable under the terms thereof,

       Amount            :  $100,000,000.00
       Trustor/Borrower   :  STONEBRAE L.P., a Delaware limited partnership
       Trustee           :  Old Republic Title Company
       Beneficiary/Lender :  HSBC Realty Credit Corporation (USA), a Delaware Corporation
       Dated            :  August 30, 2005
       Recorded      :  August 30, 2005 in Official Records under Recorder's Serial
                     Number 2005-371649
       Loan No.        :  H4251-0050
       Returned to     :  Allen, Matkins, Leck, Gamble & Mallory, LLP
                     Three Embarcadero Center, 12th Floor
                     San Francisco, CA 94111

       Affects this and other property.

       In Connection therewith, said trustors executed an Assignment of Rents,

       Recorded      :  August 30, 2005 in Official Records under Recorder's Serial
                     Number 2005-371650

OLD REPUBLIC TITLE COMPANY
**ORDER NO.** 1117003324-JM
AMENDED PRO-FORMA

17.   Deed of Trust to secure the performance of an obligation and any other terms,

| | | |
|---|---|---|
| Trustor | : | Stonebrae L.P., a Delaware limited partnership |
| Trustee | : | Old Republic Title Company |
| Beneficiary | : | Roman Catholic Bishop of Oakland |
| Dated | : | August 18, 2005 |
| Recorded | : | August 30, 2005 in Official Records under Recorder's Serial Number 2005-371651 |

And re-recorded February 22, 2006 in Official Records under Recorder's Serial Number 2006-65447.

NOTE: Said Deed of Trust by the provisions of an agreement

| | | |
|---|---|---|
| Dated | : | August 30, 2005 |
| Recorded | : | August 30, 2005 in Official Records under Recorder's Serial Number 2005-371652 |
| Executed By | : | Roman Catholic Bishop of Oakland |

was made subordinate to the Deed of Trust referred to herein as Instrument No. 2005-371649.

Affects this and other property.

18.   An easement affecting that portion of said land and for the purposes stated herein and incidental purposes as shown on the filed map.

| | | |
|---|---|---|
| For | : | Public service |
| Affects | : | A portion of said land |

19.   NOTE: This is a PRO FORMA Preliminary Report furnished to or on behalf of the party to be insured. It does not reflect the present status of title and is NOT A COMMITMENT to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any affirmative coverage shown herein. Any such commitment must be an express written undertaking on appropriate forms of the Company.

OLD REPUBLIC TITLE COMPANY
**ORDER NO.** 1117003324-JM
AMENDED PRO-FORMA

-------------------- **Informational Notes** --------------------

A.   The applicable rate(s) for the policy(s) being offered by this report or commitment appears to be section(s) to be determined.

B.   Short Term Rate ("STR") applies (but may be precluded or limited by application of the above shown section(s) of our Schedule of Fees and Charges.)

C.   NOTE: Recorded transfers or agreements to transfer the land described herein within the last two years prior to the date hereof are as follows:

Instrument Entitled   :   Grant Deed
By/From               :   Hayward 1900, Inc., a California corporation
To                    :   Stonebrae L.P., a Delaware limited partnership
Recorded              :   July 6, 2005 in Official Records under Recorder's Serial Number
                          2005-280078

D.   In addition to existing requirements pertaining to sellers who are non-residents of California, as a result of recent changes to Section 18662 of the Revenue and Taxation Code, in transactions closing after January 1, 2003 the buyer may then be responsible to withhold 3 1/3% of the sales price (as defined therein) from any seller, if this property is not the seller's principal residence. The statute, as modified, also provides for certain exemptions to the buyer's responsibility to withhold, which may apply.



Exhibit A

### CALIFORNIA LAND TITLE ASSOCIATION
### STANDARD COVERAGE POLICY - 1990
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.  (a)  Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.-

    (b)  Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2.  Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3.  Defects, liens, encumbrances, adverse claims or other matters:

    (a)  whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;

    (b)  not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;.

    (c)  resulting in no loss or damage to the insured claimant;

    (d)  attaching or created subsequent to Date of Policy; or

    (e)  resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4.  Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5.  Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6.  Any claim, which arises out of the transaction vesting in the insured estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.

    Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2.  Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land which may be asserted by persons in possession thereof,

3.  Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.



Exhibit A

### AMERICAN LAND TITLE ASSOCIATION LOAN POLICY(10—17-92)
### AMERICAN LAND TITLE ASSOCIATION LEASEHOLD LOAN POLICY (10—17-92)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.    (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

(b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2.    Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3.    Defects, liens, encumbrances, adverse claims or other matters.

(a) created, suffered, assumed or agreed to by the insured claimant;

(b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

(c) resulting in no loss or damage to the insured claimant;

(d) attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material or to the extent insurance is afforded herein as to assessments for street improvements under construction or completed at Date of Policy); or

(e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.

4.    Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.

5.    Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6.    Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.

7.    Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:

(i) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or

(ii) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine of equitable subordination; or

(iii) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:

(a) to timely record the instrument of transfer, or

(b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

The above policy forms may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following General Exceptions:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.

    Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2.  Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or by making inquiry of persons in possession thereof.

3.  Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

# OLD REPUBLIC TITLE COMPANY

### Privacy Policy Notice

### PURPOSE OF THIS NOTICE

Title V of the Gramm-Leach-Bliley Act (GLBA) generally prohibits any financial institution, directly or through its affiliates, from sharing nonpublic personal information about you with a nonaffiliated third party unless the institution provides you with a notice of its privacy policies and practices, such as the type of information that it collects about you and the categories of persons or entities to whom it may be disclosed. In compliance with the GLBA, we are providing you with this document, which notifies you of the privacy policies and practices of OLD REPUBLIC TITLE COMPANY

We may collect nonpublic personal information about you from the following sources:

> Information we receive from you such as on applications or other forms.
> Information about your transactions we secure from our files, or from [our affiliates or] others.
> Information we receive from a consumer reporting agency.
> Information that we receive from others involved in your transaction, such as the real estate agent or lender.

Unless it is specifically stated otherwise in an amended Privacy Policy Notice, no additional nonpublic personal information will be collected about you.

We may disclose any of the above information that we collect about our customers or former customers to our affiliates or to nonaffiliated third parties as permitted by law.

We also may disclose this information about our customers or former customers to the following types of nonaffiliated companies that perform marketing services on our behalf or with whom we have joint marketing agreements:

> Financial service providers such as companies engaged in banking, consumer finance, securities and insurance.
> Non-financial companies such as envelope stuffers and other fulfillment service providers.

WE DO NOT DISCLOSE ANY NONPUBLIC PERSONAL INFORMATION ABOUT YOU WITH ANYONE FOR ANY PURPOSE THAT IS NOT SPECIFICALLY PERMITTED BY LAW.

We restrict access to nonpublic personal information about you to those employees who need to know that information in order to provide products or services to you. We maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

ORT 287-C      5/07/01

All lots located in ③



Exhibit H
Stonebrae's Work

Stonebrae's Work shall consist of the "Stonebrae Pre-Closing Work," which except as otherwise provided for herein, shall occur prior to the Close of Escrow, and the "Stonebrae Post-Closing Work," which Stonebrae anticipates will occur following the Close of Escrow. All work set forth below shall be completed in a good and workmanlike manner; provided that any objections to Stonebrae's Pre-Closing Work shall be identified in the Pre-Closing Walk Through described in Section 9.2 of the Agreement. All reference to the "Approved Improvement Plans" shall mean those Improvement Plans – Village B – Tract 7736 – prepared by RJA and dated November 30, 2005, as amended to meet the requirements of approval and acceptance by the City of Hayward.

Stonebrae's obligation to locate utilities identified in this Exhibit as a "left" or "right" location is strictly limited to such Lots for which Builder has provided a written improvement plan identifying both the location of the driveway and desired utility connection point between such driveway and the closest sideyard property line on or before the earlier to occur of (i) the date which is forty-five (45) days after Stonebrae's request for such information, or (ii) October 1, 2006 (the "Utility Location Notice Date"). The location shall be deemed satisfactory if provided between such driveway and side-yard property line. If no such written direction is provided by the Utility Location Notice Date, the relocation of a utility shall be at Builder's expense.

Each Lot Stonebrae has completed in compliance with the "Blue Top Pad" standards below shall be a "Finished Lot".

Stonebrae Pre-Closing Work.

1.  Blue Top Pad

    A.  Substantial conformance with grading elevations and building setbacks as shown on the Mass Grading Plans – Revision #2 – Village B – prepared by RJA and dated as of March 27, 2006 (the "Grading Plan"). Substantial conformance shall mean the tolerance reported in the certification letter provided to Builder by RJA.

    B.  Certified compaction as verified by ENGEO in the certification letter provided to Builder.

    C.  With soils in a condition to allow standard footing design as follows:

        "Cut Lots" will include over-excavation and replacement of fill to a minimum of three feet below grade; and

        "Fill Lots" and "Transition Lots" will include at least three feet of fill material below grade.

    D.  Stonebrae will use commercially reasonable efforts to coordinate finish grade details with Builder in an attempt to allow for spoils generated during vertical construction to be lost or used (to the greatest extent physically possible) on that specific lot.

H-1

2.    Services

A.    Water services/laterals stubbed with valve to each lot as defined by the Approved Improvement Plans.

B.    Water service to be located within property lines on each lot as defined by Approved Improvement Plans and stubbed 2'-0" on to the lot passed the property line. Provided the required notice is delivered by Builder by the Utility Location Notice Date, water services to be coordinated to allow for a left or right orientation of the house on each lot.

C.    The fire hydrants, backflow preventers and other related water system as shown on the Approved Improvement Plans. Provided the required notice is delivered by Builder by the Utility Location Notice Date, structures to be located after coordinating said location with driveways.

D.    Sewer services/laterals to each lot as defined by the Approved Improvement Plans.

E.    Sewer service to be located within the property lines on each lot as defined by the approved civil improvement drawings. Provided the required notice is delivered by Builder by the Utility Location Notice Date, sewer services to be coordinated to allow for a left or right orientation of the house on each lot. Sewer services/stubs to be provided at a depth no greater than 4'-0" from finish pad.

F.    Sewer service to be extended a distance of 2'-0" into the lot to be defined by the Approved Improvement Plans.

G.    Electric services to each lot from the joint utilities trench in front of the lot as shown on the Approved Improvement Plans. Provided the required notice is delivered by Builder by the Utility Location Notice Date, such location shall be coordinated with Builder related to left – right orientations of house.

H.    Transformer and pull box locations to be coordinated with driveways, telephone and cable television pedestals, handicap ramps, fire hydrants, etc. and defined by Approved Improvement Plans.

I.    Street lighting to be provided as required and approved by any and all governing authorities and as depicted on the Approved Improvement Plans.

J.    Electric service to be stubbed into each lot a distance of 3 feet from the joint utilities trench running in front of the lot as depicted on the Approved Improvement Plans and provided the required notice is delivered by the Builder by the Utility Location Notice Date, coordinated to eliminate services/laterals running under driveways where possible

K.    Telephone service to each lot from the joint utilities trench in front of the Lot as depicted on the Approved Improvement Plans.

L.  Telephone conduit to be coordinated with driveways provided that the required notice is delivered by Builder by the Utility Location Notice Date, transformers, pull boxes and cable television pedestals, handicap ramps, fire hydrants, etc. as depicted on the Approved Improvement Plans.

M.  Telephone service to the closest shared switch box location closest to the lot and open conduit in the joint utilities trench running in front of the lot as depicted on the Approved Improvement Plans. Builder to pull the number of twisted pairs it desires to the individual structures.

N.  Natural gas service to each lot as depicted on the Approved Improvement Plans

O.  Cable television service to each lot from the joint utilities trench as depicted on the Approved Improvement Plans.

P.  Cable television service to be stubbed into each lot a distance of 3 feet from the joint utilities trench as depicted on the Approved Improvement Plans. And provided the required notice is delivered by the Builder by the Utility Location Notice Date designed to eliminate services/laterals running under driveways where possible

Q.  If and only if provided to Stonebrae at no cost by SBC, fiber optic cable in the joint utilities trench as depicted on the Approved Improvement Plans and distributed through the same conduit in which telephone service is provided. Such cable only to be pulled, if at all, following installation of the telephone wiring

R.  If and only if provided to Stonebrae at no cost by SBC, fiber optic cable to the same conduit stub through which telephone service is provided. Such cable only to be pulled, if at all, following installation of the telephone wiring

3.  General

A.  Recorded and dedicated public utility easements as required for above listed Services.

B.  Recorded addresses per lot as required

C.  Retaining walls/rockeries as depicted on the approved grading plans and Approved Improvement Plans

D.  Surface improvements (paving/concrete) as depicted on the Approved Improvement Plans approved by any and all governing agencies

E.  Approved wet and dry utility improvements (sewer, storm, water, electric, telephone, gas, cable television and if applicable fiber optic cable) by any and all governing agencies

F.     Street signs as required for permit or certificate of occupancy

G.     Traffic signs as required for permit or certificate of occupancy

H.     Subdivision monumentation and/or perimeter fencing

I.     Notices of transfer of responsibility from Stonebrae's SWPPP plan compliance as required without any uncured violation previously noticed by the Regional Water Quality Board. Builder will cooperate with the transfer and will thereafter be responsible to maintain its own SWPPP plan. Builder will remove all SWPPP mitigation measures installed by Stonebrae on the Property.

J.     Dust control measures in place for those areas that continue to be developed as required by any and all governing authorities.

K.     Designated site has been provided by Stonebrae for disposal of spoil generated off each lot, as required, during the construction of the house (provided there is no basement or swimming pool). Including, but not limited to, spoils generated from secondary utility services, foundation excavation, driveway cuts and drainage swales up to a maximum of 10 cubic yards per Lot.

L.     All rear property corners installed with wood hub or fence post.

M.     All property line slashes installed for the front curbs of each lot.

Stonebrae Post-Closing Work.

Stonebrae shall use reasonable efforts to complete the following work prior to the dates set forth below (the "Stonebrae Post-Closing Work").

A.     All common area and public right of way landscaping within Village B, including but not limited to, the street trees (unless a builder has requested delay) and common area landscaping in compliance with the approved landscaping plan shall be completed on or before the date which is 120 days after the Close of Escrow.

B.     The construction of all Village B parks, including pocket parks, within the property purchased by Builder shall be completed upon a schedule that is consistent with the Stonebrae Conditions of Approval, but does not materially delay Builder's development of the Property.

Force Majeure.

All of the above completion dates for Stonebrae's Work shall be subject to extension due to delays caused by the occurrence of any of the following events: (a) acts of Builder or any Builder's Representatives which unreasonably interfere with the performance of Stonebrae's Work; (b) governmental moratoria, delays in obtaining required governmental approvals or delays in the performance of other acts to be taken by governmental entities; (c) rain, floods, earthquakes, fires, other casualties, or unknown geological conditions; (d) acts of war; (e) acts of

God; (f) insurrection, strikes, lockouts, walk-outs, riots, boycotts, or similar obstructive actions; (g) shortages of labor, materials or supplies; or (h) any other cause beyond the reasonable control of Stonebrae, but excluding Stonebrae's financial inability to perform Stonebrae's Work.

<u>Builder's Self-Help</u>.

Should Stonebrae fail to perform the Stonebrae Post-Closing Work (excluding the School construction) by the date specified, Builder's remedy for such failure shall be expressly limited to the following procedure and Builder hereby waives all other claims against Stonebrae as a result of such failure including without limitation any claim for damages. In the event of such a failure, Builder shall give Stonebrae written notice thereof and Stonebrae shall have sixty (60) days to cure the failure and complete the subject Stonebrae Post-Closing Work or diligently pursue such work to completion if not susceptible of being completed in 60 days. If such work is not completed within such sixty (60) day period, Builder shall have the right, but not the obligation, by a second written notice to Stonebrae, to complete such Stonebrae Post-Closing Work whether or not the same is located on the Property. In such event, Stonebrae shall reimburse Builder, within ten (10) days of receipt of documentation from Builder, one hundred ten percent (110%) of the actual costs incurred by Builder to complete such work provided that: (a) all such work by Builder shall be at competitive rates and prices, and (b) the provisions of this Agreement and the Development CC&Rs applicable to the construction of improvements, including without limitation, Stonebrae's review and approval of plans, Builder's indemnity and release, and Builder's insurance, shall apply to any such construction by Builder.

Exhibit I
Partial Assignment of Development Agreement

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

_____

_____

_____

Attn: _____

THIS SPACE ABOVE FOR RECORDER'S USE

## PARTIAL ASSIGNMENT AND ASSUMPTION AGREEMENT
### (Stonebrae to _____)

THIS PARTIAL ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Assignment") is entered into as of _____, 2006, between STONEBRAE L.P., a Delaware limited partnership ("Assignor"), and _____, a _____ ("Assignee").

### RECITALS

A.   Assignor is owner and master developer of the Stonebrae master planned residential community located within the City of Hayward (the "City"), County of Alameda (the "County"), State of California (the "Stonebrae Project"). The Stonebrae Project was originally known as the Blue Rock Country Club project.

B.   Hayward 1900, Inc., Assignor's predecessor-in-interest ("Hayward 1900"), and City entered into that certain Blue Rock Country Club Project Development Agreement dated as of April 8, 1998, and recorded on April 18, 1998, as Document No. 98128317 in the Official Records of the Recorder's Office of the County, which was subject to those certain conditions of approval attached to the Blue Rock Country Club Project Development Agreement as Exhibit D, as such conditions of approval were amended in September of 2002 (collectively, together with the conditions of approval as amended, the "Development Agreement").

C.   Development of the Stonebrae Project is also subject to those certain Stonebrae Design Guidelines (November 2005), which were adopted by the City Council of Hayward (the "City Council") on November 22, 2005, by resolution No. 05-143 (the "Design Guidelines").

D.   As set forth in that certain Purchase and Sale Agreement and Joint Escrow Instructions between Assignor and Assignee, dated as of _____, 2006 (the "Purchase Contract"), Assignee has agreed to purchase certain finished lots within Village B of the Stonebrae Project, more particularly described on Exhibit A hereto (the "Property"). The balance of the Stonebrae Project, exclusive of the Property, is referred to herein as the "Retained Property."

E.   As conditions to the transfer of the Property to Assignee, the Purchase Contract requires, among other things: (i) that Assignor assign to Assignee, to the extent the Development Agreement relates to the Property, certain rights and obligations of Owner under the Development Agreement; and (ii) that the City Council consent to this Assignment.

F.   Accordingly, Assignor and Assignee desire that Assignor shall assign to Assignee all of Assignor's right, title and interest as Owner, and Assignee shall assume all of the Owner's obligations under the Development Agreement to the extent that the Development Agreement relates to the Property. The rights and obligations being assigned by this Assignment are more specifically described below.

AGREEMENT

NOW, THEREFORE, in consideration of the mutual agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignee and Assignor agree as follows:

1.   <u>Recitals</u>.  The Recitals set forth above are true and correct and are incorporated herein by this reference.

2.   <u>Assignment of Rights</u>.  To the extent the Development Agreement relates to the Property, Assignor hereby assigns to Assignee, and Assignee hereby accepts from Assignor, all of Assignor's right, title and interest as "Owner" under the Development Agreement.

3.   <u>Assumption of Obligations</u>.  To the extent the Development Agreement relates to the Property, Assignee hereby assumes, agrees to comply with, be bound by, and to timely fulfill the terms, covenants, conditions, and obligations of Assignor as "Owner" under the Development Agreement, which obligations are more specifically identified on <u>Exhibit B</u> hereto.  In addition, to the extent the Design Guidelines relate to the Property, Assignee hereby agrees to comply with and be bound by the terms, conditions and obligations thereunder.

4.   <u>Limited Scope</u>.  This Assignment, among other things, transfers rights and obligations of the Development Agreement as it relates to the Property.  In no event shall this Assignment be deemed to transfer any rights and/or obligations under the Development Agreement as it relates to the Retained Property.  In addition, notwithstanding anything else contained herein to the contrary, this Assignment shall not release, in whole or in part, Stonebrae from its obligations as "Owner" under the Development Agreement.

5.   <u>Remedies Upon Assignee's Default of Development Agreement Obligations</u>.  Any action or inaction of Assignee, or those under Assignee's control, which constitutes a default under the Development Agreement which impairs development of the Retained Property or impairs the rights or obligations of Assignor under the Development Agreement, where such action or inaction is not cured within the relevant time periods set forth below, shall constitute a default under this Assignment (each, an "<u>Assignee Default</u>").  In the event of an Assignee Default, Assignor shall have the right, but not the obligation, to arrange for the cure of such Assignee Default by providing the involved or necessary parties any commercially reasonable incentives seen fit.  Assignee shall cooperate with Assignor to effect the purposes of this self-help right.  Within thirty (30) days of Assignee's receipt of an itemized request for reimbursement from

Assignor for the costs of curing an Assignee Default, and documentation reasonably substantiating the same, Assignee shall reimburse Assignor for such costs. Assignee shall not be in default for any obligation to pay money unless the default continues uncured for a period of three (3) business days after receipt of notice from Assignor. Assignee shall not be in default of any other obligations unless the default continues for a period of ten (10) days after receipt of written notice (the "Assignee Default Notice") from Assignor; provided, however, that if such failure is of such a nature that it cannot be cured within such ten (10) day period, then Assignee shall commence a cure within such ten (10) day period and shall diligently pursue such cure to completion not later than sixty (60) days following receipt of the Assignee Default Notice. The cure period specified herein shall not apply to any default of Assignee that is not susceptible of cure.

6.  Remedies Upon Assignor's Default of Development Agreement Obligations.  Any action or inaction of Assignor, or those under Assignor's control, which constitutes a default under the Development Agreement which impairs development of the Property or impairs the rights or obligations of Assignee under the Development Agreement, where such action or inaction is not cured within the relevant time periods set forth below, shall constitute a default under this Assignment (each, an "Assignor Default").  In the event of an Assignor Default, Assignee shall have the right, but not the obligation, to arrange for the cure of such Assignor Default in a commercially reasonable manner.  Assignor shall cooperate with Assignee to effect the cure of such Assignor default.  Within thirty (30) days of Assignor's receipt of an itemized request for reimbursement from Assignee for the costs of curing an Assignor Default, and documentation reasonably substantiating the same, Assignor shall reimburse Assignee for such costs.  Assignor shall not be in default for any obligation to pay money unless the default continues uncured for a period of three (3) business days after receipt of notice from Assignee.  Assignor shall not be in default of any other obligations unless the default continues for a period of ten (10) days after receipt of written notice (the "Assignor Default Notice") from Assignee; provided, however, that if such failure is of such a nature that it cannot be cured within such ten (10) day period, then Assignor shall commence a cure within such ten (10) day period and shall diligently pursue such cure to completion not later than sixty (60) days following receipt of the Assignor Default Notice. The cure period specified herein shall not apply to any default of Assignor that is not susceptible of cure.

7.  Notice.  All notices or other communications between Assignor and Assignee shall be given in the manner set forth in the Purchase Contract.

8.  Miscellaneous.  This Agreement: (i) shall be construed in accordance with the laws of the State of California; (ii) may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument; and (iii) shall bind and inure to the benefit of Assignor and Assignee and their successors and assigns. The headings and captions of the paragraphs of this Agreement are for convenience and reference only and in no way define, describe or limit the scope or intent of this Agreement or any of the provisions hereof. If any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or any remaining provision of this Agreement. In the event that either party hereto brings an action at law or in equity to enforce or interpret or seek redress for breach of this Agreement, the prevailing party in

such action shall be entitled to recover from the other its litigation expenses and reasonable attorneys' fees in addition to all other appropriate relief. The parties hereby waive their respective right to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding or hearing brought by a party hereto or its successors and assigns on any matter whatsoever arising out of, or in any way connected with, this Agreement, the relationship of the parties hereto, or the enforcement of any remedy under any law, statute, or regulation, emergency or otherwise, now or hereafter in effect. The parties hereto agree that the rule of contract construction that ambiguities are to be construed against the drafter shall not apply to this Agreement and that this Agreement shall be interpreted as though prepared by both parties.

[REMAINDER OF PAGE LEFT BLANK]
[SIGNATURES FOLLOW ON NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

ASSIGNEE:

_____,
a _____

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

ASSIGNOR:

STONEBRAE L.P.,
a Delaware limited partnership

By:   YCS Nevada, Incorporated,
      a Nevada corporation,
      its General Partner

      By _____
      Name: Paul W. Yuen
      Title:   Authorized Representative

      By _____
      Name: Michael J. Letchinger
      Title:   Authorized Representative

The City hereby confirms that the Development Agreement remains in full force and effect, and consents to the partial assignment of the Development Agreement by Assignor to Assignee on the terms and conditions contained herein.

CITY OF HAYWARD

By: _____
Name: _____
Title: _____

Attest:

By: _____
Name: _____
Title:   City Clerk

Approved as to form:

By: _____
Name: _____
Title:   City Attorney

**EXHIBIT A**
DESCRIPTION OF PROPERTY

**EXHIBIT B**
## LIST OF DEVELOPMENT AGREEMENT OBLIGATIONS
## AND CONDITIONS OF APPROVAL RELATING TO THE PROPERTY

| Development Agreement Obligations | Conditions of Approval |
|---|---|
| 3.1 | 3(c) |
| 3.2 | 3(p) (with respect to lot landscaping) |
| 3.3 | 52-53 |
| 3.4 | 56 |
| 3.7 | 64 |
| 3.9 | 74-75 |
| 4.1-4.3 | 78 |
| 4.7 | 85 |
| 6 | 87 |
| 7 | 96 |
| 8 | 170-180 |
| 9 | 185-200 |
| 10 | 207-214 |
| 12-14 | 216 |
| | 246 |
| **Addendum to Condition of Approval** | |
| 10 | |
| 12 | |

Exhibit J
Nonforeign Transferor Declaration

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform _____, a _____ ("Transferee"), the transferee of the real property described on Schedule "1" attached hereto and incorporated herein by this reference, that withholding of tax is not required upon the disposition of the above-referenced real property by Stonebrae L.P., a Delaware limited partnership ("Transferor"), the undersigned hereby declares the following on behalf of Transferor:

1.    I am the _____ of Transferor, and I have the authority to execute this declaration on behalf of Transferor.

2.    Transferor is not a foreign person (as those terms are defined in the Internal Revenue Code and Income Tax Regulations).

3.    Transferor's U. S. employer identification number is 84-1642636.

4.    Transferor's office address is 170 Maiden Lane, Suite 800, San Francisco, CA 94108.

5.    Transferor understands that this declaration may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

I declare under penalty of perjury that I have examined this declaration, and to the best of my knowledge and belief it is true, correct and complete.

Executed this _____ day of _____, 20___, at _____, CA.

_____

Schedule "1"
to
Nonforeign Transferor Declaration

Description of the Property

All that certain land situated in the County of Alameda, State of California, described as follows:

Parcel _____ of [Title Final Map], recorded on _____, 2006, as Instrument No. _____, in the Official Records of the County Recorder of Alameda County, California.

Exhibit K
Development Fees Payable by Builder

| 1 | BUILDING PERMIT, PLAN CHECK, PERMIT ISSUANCE |
|---|---|
| 2 | ELECTRICAL |
| 3 | PLUMBING |
| 4 | MECHANICAL |
| 5 | CONSTRUCTION TAX |
| 6 | SUPP. CONSTRUCT TAX |
| 7 | SITE PLAN REVIEW FOR MASTER SET OF HOUSE PLANS PREPARED AND SUBMITTED BY BUILDER |
| 8 | PARK FEES |
| 9 | FIRE DEPT FEES |
| 10 | SEWER |
| 11 | WATER |
| 12 | DRIVEWAY, CURB-CUT & MISC. |

Exhibit L
Description of Carden Property

The land referred to is situated in the County of Alameda, City of Hayward, State of California, and is described as follows:

PARCEL ONE:

Commencing at the Southeastern corner of the Rancho San Lorenzo (Castro); run thence along the Eastern boundary line thereof, North 0° 17' West, 1657.35 feet; thence North 73° 37' 20" West, 843.21 feet; thence North 35° 09' 20" West, 304.35 feet; thence North 65° 37' 20" West, 1345.70 feet; thence North 89° 29' 20" West, 181.65 feet; thence South 69° 50' 40" West, 232.85 feet; and thence South 84° 17' 30" West, 152 feet to the true point of beginning of the parcel of land herein described; running thence South 84° 17' 30" West, 293.1 feet; thence South 88° 21' West, 226.4 feet; thence South 13° 00' 20" East, 187.50 feet; thence South 65° 09' West, 413.30 feet; thence South 29° 22' 20" East, 67 feet; thence Easterly along the Southeastern line of the land described in the deed by A. C. Silva to Arthur M. Carden and Agnes D. Carden, dated April 30, 1940, recorded October 14, 1940, Series No. MM-53338, Alameda County Records, to the Western line of the 6.63 acre tract of land described in the deed by A. C. Silva and Mary Silva to Arthur M. Carden and Agnes D. Carden, dated June 21, 1931, recorded February 16, 1932, in Book 2728 of Official Records of Alameda County, Page 475; thence along the last named line, South 13° 00' 20" East, 151.8 feet to the Southwestern corner of the land described in said deed; thence along the Southwestern line of the land firstly described in the deed by A. C. Silva to Arthur M. Carden and Agnes D. Carden, dated January 27, 1938, recorded December 1, 1938, in Book 3710 of Official Records of Alameda County, Page 204, South 58° 05' 40" East, 383.5 feet, more or less, to the most Southern corner of said land described in said deed; thence along the Southeastern line of the land secondly described in the deed next hereinabove mentioned, Northeasterly 498 feet, more or less, to a point distant South 41° 58' East, 65 feet from the most Eastern corner of said 6.63 acre tract; thence North 41° 58' West, 65 feet to said most Eastern corner; and thence along the Eastern line of said 6.63 acre tract, North 21° West, 307.7 feet to the true point of beginning.

PARCEL TWO:

An easement or right of way for ingress and egress over a strip of land, 12 feet in width, the center line of which is described as follows:

Beginning at a point on the Western line of the 169.17 acre tract of land described in the deed by Joseph Fassler, et al, to A. C. Silva, dated July 24, 1920, recorded September 30, 1920, in Book 2992 of Deeds, Page 153, Alameda County Records, distant thereon South 29° 22' 20" East, 184.50 feet from the most Western corner of said 169.17 acre tract; running thence South 57° 52' 10" West, along the dividing line between the property conveyed to Erwin C. Easton and L. E. Silva, by deed recorded in Book 3891 of Official Records of Alameda County, Page 65, and the property conveyed to Erwin C. Easton, by deed recorded in Book 3829 of Official Records of Alameda County, Page 445, a distance of 6.005 feet to the point of commencement of the said center line herein to be described, from said point of commencement; running North 29° 22' 20" West, 185.26 feet; thence North 23° 30' 15" West, 428.30 feet; thence North 19° 17'

West, 228.67 feet; thence North 14° 04' 15" West, 278.17 feet; thence North 16° 17' 05" West,
ORDER NO. : 1117001685-JM 143.00 feet to the center line of Fairview Avenue or County
Road No. 7791, at Stations 117 x 69.10 of the Road Survey of said Fairview Avenue.

SAVING AND EXCEPTING THEREFROM: All that portion of said easement of right of way
lying within the line of the aforesaid Fairview Avenue.

Being APN 085A-6400-007

Exhibit M
Grant Deed

RECORDING REQUESTED BY
AND WHEN RECORDED, RETURN TO:

Old Republic Title Insurance Company
555-12th Street, Suite 2040
Oakland, CA 94607
Attention: _____

Mail Tax Statements to:

Toll Bros., Inc.
100 Park Place, Suite 140
San Ramon, CA  94634
Telefacsimile No.: (925) 855-9927
Attn:   James L. Meek
          H. Jon Paynter

(SPACE ABOVE LINE FOR RECORDER'S USE ONLY)

## GRANT DEED

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Stonebrae L.P., a Delaware limited partnership ("Grantor"), hereby grants to Toll Brothers, Inc., a Pennsylvania corporation ("Grantee"), the following described real property in the County of Alameda, State of California (the "Property"):

Lots _____, as shown on the map for Tract _____ filed _____ __, 200__, in Map Book ____, Pages __ through __, inclusive, Alameda County Records.

Being portions of Assessor's Parcel Numbers: _____
_____

EXCEPTING AND RESERVING UNTO Grantor, its successors and assigns, together with the right to grant and transfer all or a portion of the same from time to time to one or more parties, as follows:

A.      Any and all unprocessed oil, oil rights, minerals, mineral rights, natural gas rights and other hydrocarbons by whatsoever name known, geothermal steam and all products derived from any of the foregoing, that may be within or under the Property, together with the perpetual right of drilling, mining, exploring, and operating therefor and storing in and removing the same from the Property or any other land, including the right to whipstock or directionally drill and

mine from lands other than the Property, oil or gas wells, tunnels and shafts into, through or across the subsurface of the Property and to bottom such whipstocked or directionally drilled wells, tunnels and shafts under and beneath or beyond the exterior limits thereof, and to redrill, retunnel, equip, maintain, repair, deepen and operate any such wells or mines; but without the right to enter upon or use the surface of the Property to drill, mine, store, explore, or operate through the surface or the upper 500 feet of the subsurface of the Property.

B.    Permanent, nonexclusive easements in gross on, over and under the Property for the purposes of accepting surface runoff (including runoff of reclaimed or other water used for irrigation) from adjacent slopes; provided, however, that the use of such easement shall be subject to the requirement that the owners of such slopes shall take reasonable care to keep such slopes vegetated so as to reasonably minimize the runoff therefrom.

SUBJECT TO:

1.    General and special real property taxes and assessments and supplemental assessments, if any, for the current fiscal year.

2.    That certain Declaration, recorded in the Official Records of Alameda County, California as Series No. 2006-76865, and any amendments thereto, and the covenants, conditions, restrictions, rights, reservations, benefits and burdens therein contained, each and all of which are hereby expressly incorporated herein by this reference.

3.    All other covenants, conditions, restrictions, reservations, rights, rights-of-way, dedications, offers of dedication and easements of record, apparent, or known to Grantee.

IN WITNESS WHEREOF, Grantor has executed this Grant Deed on the day and year hereafter written.

Dated: _____, 2006

"Grantor"

STONEBRAE L.P.,
a Delaware limited partnership

By:    YCS Nevada, Incorporated,
       a Nevada corporation,
       dba Stonebrae YCS, Inc.,
       its General Partner


       By: _____
       Name: Paul W. Yuen
       Its:    Authorized Representative


       By: _____
       Name: Michael J. Letchinger
       Its:    Authorized Representative.

Document No.: _____
Recorded: _____, _____

**STATEMENT OF TAX DUE AND REQUEST THAT TAX DECLARATION NOT BE MADE A PART OF THE PERMANENT RECORD IN THE OFFICE OF THE COUNTY RECORDER (PURSUANT TO SECTION 11932 OF THE REVENUE AND TAXATION CODE)**

TO: Recorder, County of Alameda

Request is hereby made in accordance with the provisions of the Documentary Transfer Act that the amount of the tax due not be shown on the original document which names:

Grantor: Stonebrae L.P., a Delaware limited partnership

Grantee: Toll Brothers, Inc., a Pennsylvania corporation

The property described in the accompanying document is located in the County of Alameda, State of California.

The amount of tax due on the accompanying document is $_____ computed on full value of the property conveyed.

_____
(Signature of Grantor or Agent)

_____
(Firm Name)

Note: After the permanent record is made, this form will be affixed to the conveying document and returned with it.

Exhibit N

<u>City Approved Plans</u>

Stonebrae, Toll Brothers, LSA Architecture Inc., Plan 6-Livingston and Plan 7-Muirkirk, each with four architectural styles (Classic, Spanish Colonial, Crafts, Monterey), 42 sheets, dated January 12, 2006;

Carrick Village, Bassenian-Lagoni Architects, Plan 2, with four architectural styles (Classic, Spanish Colonial, Crafts, Monterey), 56 sheets, no date; submitted to City February 2006.

Exhibit O

<u>Builder's Stock Plans</u>

Toll Brothers Inc., The Golf Club at Stonebrae, LSA Architecture Inc., Plans: Plan 5-Broughton; Plan 6-Livinston; Plan 7-Muirkirk; Plan 8-Stirling, with four architectural styles (Classic, Spanish Colonial, Crafts, Monterey, 37 sheets, dated November 16, 2005;

Bassenian-Lagoni Architects, Plans: Plan 1-Loudon; Plan 2-Castleton, Plan 3-Dumbarton; Plan 4-Perthshire, with four architectural styles (Classic, Spanish Colonial, Crafts, Monterey), 28 sheets, dated November 15, 2005

## FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT
## AND JOINT ESCROW INSTRUCTIONS
(Toll Bros. and Stonebrae)
(Village B Lots)

This FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (the "First Amendment") is entered into as of May 31, 2006, by and between STONEBRAE L.P., a Delaware limited partnership ("Stonebrae"), and TOLL BROS., INC., a Pennsylvania corporation ("Builder").

### RECITALS

A. Stonebrae and Builder have entered into that certain Purchase and Sale Agreement and Joint Escrow Instructions, dated as of May 1, 2006 (the "Purchase Agreement"), pursuant to which Builder has agreed to purchase, and Stonebrae has agreed to sell, the Property (as such term is defined in the Purchase Agreement).

B. Stonebrae and Builder now desire to enter into this First Amendment to extend the Due Diligence Date (as such term is defined in the Purchase Agreement).

C. All capitalized terms used but not defined herein shall have the meanings set forth in the Purchase Agreement. All references to Sections shall be to Sections of the Purchase Agreement.

### AGREEMENT

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Stonebrae and Builder agree as follows:

1. Recitals. The Recitals set forth above are true and correct and are incorporated herein by this reference.

2. Due Diligence Date. Builder and Stonebrae hereby amend the Purchase Agreement such that that the Due Diligence Date is extended to 5:00 p.m., Pacific Daylight Time on June 2, 2006.

3. Ratification and Confirmation. Stonebrae and Builder hereby acknowledge that they are not aware of any default of the other party under the Purchase Agreement and hereby ratify and confirm each and every term and provision of the Purchase Agreement, as modified by this First Amendment.

4. Miscellaneous. This First Amendment may be executed in counterparts, and all such counterparts shall constitute but one and the same document. If any court of competent jurisdiction determines any provision of this First Amendment to be invalid, illegal or unenforceable, that portion shall be deemed severed from the rest, which shall remain in full force and effect as though the invalid, illegal or unenforceable portion had never been a part of this First Amendment. This First Amendment shall be governed by the laws of the State of California.

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment as of the date first above written.

BUILDER:.

TOLL BROS., INC.,
a Pennsylvania corporation

By:      _____
Name: _____
Title:    _____

By:      _____
Name: _____
Title:    _____

STONEBRAE:

STONEBRAE L.P.,
a Delaware limited partnership

By:      YCS Nevada, Incorporated,
         a Nevada corporation,
         its General Partner

By        _Paul W. Yuen_
Name:  Paul W. Yuen
Title:    Authorized Representative

By        _____
Name:  Michael J. Letchinger
Title:    Authorized Representative

ACKNOWLEDGED AND AGREED:

OLD REPUBLIC TITLE COMPANY

By:      _____
Name: _____
Title:    _____

## SECOND AMENDMENT TO PURCHASE AND SALE AGREEMENT
## AND JOINT ESCROW INSTRUCTIONS
### (Toll Bros. and Stonebrae)
### (Village B Lots)

This SECOND AMENDMENT TO PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (the "Second Amendment") is entered into as of June 2, 2006, by and between STONEBRAE L.P., a Delaware limited partnership ("Stonebrae"), and TOLL BROS., INC., a Pennsylvania corporation ("Builder").

### RECITALS

A. Stonebrae and Builder have entered into that certain Purchase and Sale Agreement and Joint Escrow Instructions, dated as of May 1, 2006 (the "Purchase Agreement"), pursuant to which Builder has agreed to purchase, and Stonebrae has agreed to sell, the Property (as such term is defined in the Purchase Agreement).

B. Stonebrae and Builder now desire to enter into this Second Amendment to include in the Purchase Agreement an additional condition precedent to the Close of Escrow.

C. All capitalized terms used but not defined herein shall have the meanings set forth in the Purchase Agreement. All references to Sections shall be to Sections of the Purchase Agreement.

### AGREEMENT

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Stonebrae and Builder agree as follows:

1. Recitals. The Recitals set forth above are true and correct and are incorporated herein by this reference.

2. Condition Precedent. The following shall be inserted into the Purchase Agreement in its entirety as Section 6.2(f):

> Park Conditions. Stonebrae and the City shall have amended the Tentative Map Conditions relating to recreational parks (the "Park Conditions") in a manner that does not directly, or indirectly impose upon Builder any additional Tentative Map Conditions, or other obligations with respect to Builder's construction of the Residences, and does not impact the timing, size, location, type or number of Residences Builder may construct on the Property. The condition precedent provided in this Section 6.2(f) shall be deemed satisfied if either (i) the Approved Final Map does not require Stonebrae or Builder to construct any recreational parks; or (ii) Stonebrae causes the City to deliver to Builder a letter assuring Builder that Stonebrae and not Builder is obligated to satisfy all Park Conditions and Stonebrae's failure to timely satisfy the Park Conditions will not condition, hinder or delay City's issuance of

Building Permits to Buyer. Builder shall have the right to approve City's letter, which approval shall not be unreasonably withheld.

3. <u>Ratification and Confirmation</u>. Stonebrae and Builder hereby acknowledge that they are not aware of any default of the other party under the Purchase Agreement and hereby ratify and confirm each and every term and provision of the Purchase Agreement, as modified by this Second Amendment.

4. <u>Miscellaneous</u>. This Second Amendment may be executed in counterparts, and all such counterparts shall constitute but one and the same document. If any court of competent jurisdiction determines any provision of this Second Amendment to be invalid, illegal or unenforceable, that portion shall be deemed severed from the rest, which shall remain in full force and effect as though the invalid, illegal or unenforceable portion had never been a part of this Second Amendment. This Second Amendment shall be governed by the laws of the State of California.

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment as of the date first above written.

BUILDER:

TOLL BROS., INC.,
a Pennsylvania corporation

By: _____
Name: _H. Jon Paynter_
Title: _Group President_

By: _____
Name: _____
Title: _____

STONEBRAE:

STONEBRAE L.P.,
a Delaware limited partnership

By:    YCS Nevada, Incorporated,
       a Nevada corporation,
       its General Partner

By _____
Name: Paul W. Yuen
Title: Authorized Representative

By _____
Name: Michael J. Letchinger
Title: Authorized Representative

ACKNOWLEDGED AND AGREED:

OLD REPUBLIC TITLE COMPANY

# EXHIBIT "2"



**S T O N E B R A E**

November 28, 2007

James W. Boyd
Regional President
Toll Bros., Inc.
725 Town and Country Road, Suite 500
Orange, CA 92868

Re: May 1, 2006 Purchase and Sale Agreement and Joint Escrow Instruction ("Agreement") by and between Stonebrae L.P. ("Seller") and Toll Bros., Inc. ("Toll")

Dear Mr. Boyd:

Seller is in possession of your November 20, 2007 letter purporting to terminate the Agreement and demanding that the Escrow Holder release the Deposit to Toll. As you know, our counsel has instructed the Escrow Holder that a dispute exists with respect to termination of the Agreement and has further instructed the Escrow Holder not to release the Deposit. It is Seller's position that, while your letter of November 2, 2007 might be construed as a Default Notice under Section 17.2 of the Agreement, neither that letter nor any of your subsequent correspondence recognize or provide for the opportunity to cure specifically set forth in Section 17.2 of the Agreement.

Toll's attempted termination of the Agreement without regard to the cure period expressly built into the Agreement is, in and of itself, a default by Toll under the Agreement. This letter constitutes a formal Default Notice pursuant to Section 17.1 of the Agreement. You therefor have ten days in which to retract your notice of termination and to proceed with all due diligence to closing, including without limitation providing your proposed Deficient Work List and advising whether you intend to take title in the name of an entity other than Toll Bros., Inc.

In the interest of moving forward resolution of the Deficient Work List items, I have attached as an exhibit a list of those items from the handwritten notes taken by Mr. Martin at the Pre-Closing Walk Through that we will accept as requiring completion prior to closing. We would appreciate receipt of your approval or proposed additions, if any, as soon as possible since we are rapidly reaching completion of all of the noted items. To the extent that either of the previously delivered certifications by RJA and ENGEO are impacted by the Deficient Work

James W. Boyd
November 28, 2007
Page 2

List items, we will also be providing a recertification by the engineers at or before closing, as required by the Agreement.

This letter should not be construed as a concession with respect to any of Toll's claims of default by Seller. Each is clearly a manufactured attempt to avoid a legitimate contractual obligation in the face of a rapidly deteriorating residential real estate market and will be addressed in a separate communication.

Very truly yours,

Stonebrae L.P.

By:    YCS Nevada, Incorporated,
       its general partner

By:    *Michael J. Letchinger/wsc*
       Michael J. Letchinger
       Authorized Representative

cc:    James L. Meek
       H. Jon Paynter
       Mark Foster
       Edward S. Merrill, Esq.

**EXHIBIT**
(Letter to James Boyd dated November 28, 2007)

Based upon the Toll Inspection Notes, Stonebrae will accept a Deficient Work List incorporating the following Items:

1.  Install secondary utility box covers on cable tv junctions behind curb as necessary for all lots under the Village B sale agreement with Toll.

2.  Correct side-yard steps as damaged or disrupted from installation of utilities on lots:

    i.   102/103
    ii.  103/104
    iii. 85/64
    iv.  90/89
    v.   91/92
    vi.  92/93
    vii. 93/94
    viii. 65/66
    ix.  69/70
    x.   75/76
    xi.  77/78
    xii. 78/79
    xiii. 11/115

3.  Correct rear yard erosion and/or ramp damage on lots:
    i.   84
    ii.  106
    iii. 116
    iv.  103
    v.   109

4.  Remove excess material and/or gravel from Lots:
    i.   97
    ii.  73
    iii. 76
    iv.  77

5.  Install retaining wall at rear of Lot 82 and as extended per plan onto part of Lot 83 adjacent to Lot 117 as per approved finished grading plan.

Although we dispute any obligation to include in the Pre-Closing Work we shall in addition:

6.  Repair concrete damage at Drain Inlet outside of Lots 66/67.

7.  Complete striping on street as adjacent to Stops signs near Lots.

Sheppard, Mullin, Richter & Hampton
LLP
Attn: Atkins-Patterson, Philip F
Four Embarcadero Center
17 Th Floor
San Francisco, CA  94111

## Superior Court of California, County of Alameda

| | |
|---|---|
| Stonebrae L.P., a Delaware li **Plaintiff/Petitioner(s)** | No. RG07358685 |
| VS. | NOTICE OF CASE MANAGEMENT CONFERENCE AND ORDER |
| Toll Bros., Inc., a Pennsyl **Defendant/Respondent(s)** **(Abbreviated Title)** | Unlimited Jurisdiction |

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD.

Notice is given that a Case Management Conference has been scheduled as follows:

| | | |
|---|---|---|
| Date: 04/15/2008<br>Time: 09:00 AM | Department: 520<br>Location: Hayward Hall of Justice<br>3rd Floor<br>24405 Amador Street, Hayward  CA 94544<br><br>Internet: http://www.alameda.courts.ca.gov | Judge: David Hunter<br>Clerk: Lindnell Williams<br>Clerk telephone: (510) 690-2729<br>E-mail:<br>Dept.520@alameda.courts.ca.gov<br>Fax: (510) 267-1531 |

### ORDERS

1.  You must:
    a.  Serve all named defendants and file proofs of service on those defendants with the court within 60 days of the filing of the complaint (CRC 3.110(b));
    b.  Give notice of this conference to any party not included in this notice and file proof of service;
    c.  Meet and confer, in person or by telephone, to consider each of the issues identified in CRC 3.724 no later than 30 calendar days before the date set for the Case Management Conference;
    d.  File and serve a completed Case Management Conference Statement (use of Judicial Council Form CM 110 is mandatory) at least 15 days before the Case Management Conference (CRC 3.725)

2.  If you do not follow the orders above, you are hereby ordered to show cause why you should not be sanctioned under CRC 2.30. The hearing on the Order to Show Cause re: Sanctions will be at the same time as the Case Management Conference. Sanctions may include monetary sanctions and any other sanction permitted by law, including striking pleadings or dismissing the action.

3.  You are further ordered to appear in person* (or through your attorney of record) at the Case Management Conference noticed above. You must be thoroughly familiar with the case and fully authorized to proceed.

4.  The Direct Calendar Judge will issue orders at the conclusion of the conference that should include:
    a.  Referring to ADR and setting an ADR completion date
    b.  Dismissing or severing claims or parties
    c.  Setting a trial date.

*Telephonic appearances at Case Management Conferences may be available by contacting CourtCall, an independent vendor, at least 3 business days prior to the scheduled conference. Parties may make arrangements by calling 1-888-882-6878, or faxing a service request to 1-888-882-2946. This service is subject to charges by the vendor.

### CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served this Notice of Hearing by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 12/03/2007.

By _____

Deputy Clerk

## Superior Court of California, County of Alameda



## Notice of Judicial Assignment for All Purposes

Case Number: RG07358685
Case Title:    Stonebrae L.P., a Delaware li VS Toll Bros., Inc., a Pennsyl
Date of Filing: 11/29/2007

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

This case is hereby assigned for all purposes to:

| | |
|---|---|
| Judge: | David Hunter |
| Department: | 520 |
| Address: | Hayward Hall of Justice |
| | 24405 Amador Street |
| | Hayward  CA  94544 |
| Phone Number: | (510) 690-2729 |
| Fax Number: | (510) 267-1531 |
| Email Address: | Dept.520@alameda.courts.ca.gov |

Under direct calendaring, this case is assigned to a single judge for all purposes including trial.

Please note: In this case, any challenge pursuant to Code of Civil Procedure §170.6 must be exercised within the time period provided by law.  (See Govt. Code 68616(i); Motion Picture and Television Fund Hosp. v. Superior Court (2001) 88 Cal.App.4th 488, 494; and Code Civ. Proc. §1013.)

IT IS THE DUTY OF EACH PLAINTIFF AND CROSS COMPLAINANT TO SERVE A COPY OF THIS NOTICE IN ACCORDANCE WITH LOCAL RULES.

### General Procedures

All pleadings and other documents must be filed in the clerk's office at any court location except when the Court permits the lodging of material directly in the assigned department. All documents, with the exception of the original summons and the original civil complaint, shall have clearly typed on the face page of each document, under the case number, the following:

ASSIGNED FOR ALL PURPOSES TO

JUDGE David Hunter

DEPARTMENT 520

Counsel are expected to know and comply with the Local Rules of this Court, which are available on the Court's website at: http://www.alameda.courts.ca.gov/courts/rules/index.shtml and with the California Rules of Court, which are available at www.courtinfo.ca.gov.

The parties are always encouraged to consider using various alternatives to litigation, including mediation and arbitration, prior to the Initial Case Management Conference. The Court may refer parties to alternative dispute resolution resources.

If all parties agree to change a scheduled court date, the parties must first send a fax letter to Department 520 outlining the requested schedule change and then contact the Courtroom Clerk to schedule a telephone conference with the Court.

Please submit a courtesy copy of all filed documents directly to Department 520.

### Schedule for Department 520

The following scheduling information is subject to change at any time, without notice. Please contact the department at the phone number or email address noted above if you have questions.

- Trials generally are held: Mondays, Tuesdays and Thursdays from 10:00 a.m. to 4:30 p.m. and Wednesdays from 10:00 a.m. to 4:00 p.m.
- Case Management Conferences are held: Mondays through Thursdays at 9:00 a.m.
- Law and Motion matters are heard: Fridays at 9:30 a.m.
- Settlement Conferences are heard: Fridays at 1:30 p.m.
- Ex Parte matters are heard: Mondays and Wednesdays at 9:30 a.m.

### Law and Motion Procedures

To obtain a hearing date for a Law and Motion or ex parte matter, parties must contact the department as follows:

- Motion Reservations
  Phone:        (510) 690-2729


- Ex Parte Matters
  Phone:        (510) 690-2729


### Tentative Rulings

The court will issue tentative rulings in accordance with the Local Rules. Tentative rulings will become the Court's order unless contested in accordance with the Local Rules. Tentative rulings will be available at:

- Website: www.alameda.courts.ca.gov/domainweb, Calendar Information for Dept. 520
- Phone: 1-866-223-2244

Dated: 11/30/2007

Executive Officer / Clerk of the Superior Court

By     _/s/ digital_ _____

Deputy Clerk

---

### CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served this Notice by placing copies in envelopes addressed as shown on the attached Notice of Initial Case Management Conference and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 12/03/2007

By     _/s/ digital_ _____

Deputy Clerk

ALTERNATIVE DISPUTE RESOLUTION
INFORMATION PACKAGE
Effective April 15, 2005

**Instructions to Plaintiff / Cross-Complainant**

> In all general civil cases filed in the trial courts after June 30, 2001, the plaintiff is required to serve a copy of this ADR information package on each defendant.

California Rules of Court, Rule 201.9 (Excerpt)

(a) Each court must make available to the plaintiff, at the time of filing of the complaint, an Alternative Dispute Resolution (ADR) information package that includes, at a minimum, all of the following:

(1) General information about the potential advantages and disadvantages of ADR and descriptions of the principal ADR processes . . .

(2) Information about the ADR programs available in that court . . .

(3) In counties that are participating in the Dispute Resolution Programs Act (DRPA), information about the availability of local dispute resolution programs funded under the DRPA . . .

(4) An ADR stipulation form that parties may use to stipulate to the use of an ADR process.

(b) Court may make package available on Web site . . .

**(c) The plaintiff must serve a copy of the ADR information package on each defendant along with the complaint. Cross-complainants must serve a copy of the ADR information package on any new parties to the action along with the cross-complaint.**

## GENERAL INFORMATION ABOUT ADR

## Introduction to Alternative Dispute Resolution

Did you know that most civil lawsuits settle without a trial? And did you know that there are a number of ways to resolve civil disputes without having to sue somebody? These alternatives to a lawsuit are known as alternative dispute resolution (also called ADR). The most common forms of ADR are mediation, arbitration, and neutral evaluation. There are a number of other kinds of ADR as well.

In ADR, trained, impartial persons decide disputes or help parties decide disputes themselves. These persons are called neutrals. In mediation, for example, the neutral is the mediator. Neutrals normally are chosen by the disputing parties or by the court. Neutrals can help parties resolve disputes without having to go to court.

ADR is not new. ADR is available in many communities through court-connected and community dispute resolution programs and private neutrals.

## Advantages of Alternative Dispute Resolution

ADR can have a number of advantages over a lawsuit:

- **ADR can be speedier.** A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.

- **ADR can save money.** Court costs, attorney fees, and expert witness fees can be saved.

- **ADR can permit more participation.** With ADR, the parties may have more chances to tell their side of the story than in court and may have more control over the outcome.

- **ADR can be flexible.** The parties can choose the ADR process that is best for them.

- **ADR can be cooperative.** In mediation, for example, the parties having a dispute may work together with the neutral to resolve the dispute and agree to a remedy that makes sense to them, rather than work against each other.

- **ADR can reduce stress.** There are fewer, if any, court appearances. And because ADR can be speedier, cheaper, and can create an atmosphere in which the parties are normally cooperative, ADR is easier on the nerves. The parties don't have a lawsuit hanging over their heads. For all the above reasons, many people have reported a high degree of satisfaction with ADR.

Because of these advantages, many parties choose ADR to resolve a dispute instead of filing a lawsuit. Even when a lawsuit has been filed, ADR can be used before the parties' positions harden and the lawsuit becomes costly. ADR has been used to resolve disputes even after a trial, when the result is appealed.

## Disadvantages of Alternative Dispute Resolution

ADR may not be suitable for every dispute.

If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure and review for legal error by an appellate court.

There generally is less opportunity to find out about the other side's case with ADR than with litigation. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

The neutral may charge a fee for his or her services.

If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

Lawsuits must be brought within specified periods of time, known as statutes of limitations. Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

## Three Common Types of Alternative Dispute Resolution

This section describes the forms of ADR most often found in the California state courts and discusses when each may be right for a dispute.

### Mediation

In mediation, a neutral (the mediator) assists the parties in reaching a mutually acceptable resolution of their dispute. Unlike lawsuits or some other types of ADR, the mediator does not decide how the dispute is to be resolved; the parties do.

Mediation is a cooperative process in which the parties work together toward a resolution that tries to meet everyone's interests, instead of working against each other where at least one party loses. Mediation normally leads to better relations between the parties and to resolutions that hold up. For example, mediation has been very successful in family disputes, particularly with child custody and visitation.

Mediation is particularly effective when the parties have a continuing relationship, like neighbors or business people. Mediation also is very effective where personal feelings are getting in the way of a resolution. This is because mediation normally gives the parties a chance to let out their feelings and find out how they each see things.

Mediation may not be a good idea when one party is unwilling to discuss a resolution or when one party has been a victim of the other or has unequal bargaining power in the mediation. However, mediation can be successful for victims seeking restitution from offenders. A mediator can meet with the parties separately when there has been violence between them.

### Arbitration

In arbitration, a neutral (the arbitrator) reviews evidence, hears arguments, and makes a decision (award) to resolve the dispute. Arbitration normally is more informal and much speedier and less expensive than a lawsuit. Often a case that may take a week to try in court can be heard by an arbitrator in a matter of hours, because evidence can be submitted by documents (like medical reports and bills and business records) rather than by testimony.

There are two kinds of arbitration in California: (1) Private arbitration, by agreement of the parties involved in the dispute, takes place outside of the courts and is normally binding. In most cases "binding" means that the arbitrator's decision (award) is final and there will not be a trial or an appeal of that decision. (2) "Judicial arbitration" takes place within the court process and is not binding unless the parties agree at the outset to be bound. A party to this kind of arbitration who does not like a judicial arbitration award may file a request for trial with the court within a specified time. However, if that party does not do better in the trial than in arbitration, he or she may have to pay a penalty.

Arbitration is best for cases where the parties want a decision without the expense of a trial. Arbitration may be better than mediation when the parties have no relationship except for the dispute.

Arbitration may not be a good idea when the parties want to decide on the outcome of their dispute themselves.

### Neutral Evaluation

In evaluation, a neutral (the evaluator) gives an opinion on the strengths and weaknesses of each party's evidence and arguments and makes an evaluation of the case. Each party gets a chance to present his or her side and hear the other side. This may lead to a settlement or at least help the parties prepare to resolve the dispute later on. If the neutral evaluation does not resolve the dispute, the parties may go to court or try another form of ADR.

Neutral evaluation, like mediation, can come early in the dispute and save time and money.

Neutral evaluation is most effective when a party has an unrealistic view of the dispute, when the only real issue is what the case is worth, or when there are technical or scientific questions to be worked out.

Neutral evaluation may not be a good idea when it is too soon to tell what the case is worth or if the dispute is about something besides money, like a neighbor playing loud music late at night.

## Other Types of Alternative Dispute Resolution

There are several other types of ADR besides mediation, arbitration, and neutral evaluation. Some of these are conciliation, settlement conferences, fact-finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR methods. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute.

The selection of a neutral is an important decision. There is no legal requirement that the neutral be licensed or hold any particular certificate. However, some programs have established qualification requirements for neutrals. You may wish to inquire about the qualifications of any neutral you are considering.

Agreements reached through ADR normally are put in writing by the neutral and, if the parties wish, may become binding contracts that can be enforced by a judge.

You may wish to seek the advice of an attorney about your legal rights and other matters relating to the dispute.

## Help Finding an Alternative Dispute Resolution Provider in Your Community

To locate a dispute resolution program or private neutral in your community:

- **Visit the Court's Web site.** The Alameda County Superior Court maintains a list of court-connected mediators, neutral evaluators, and private arbitrators at http://www.co.alameda.ca.us/courts/adr.htm.

- **Contact the Small Claims Court Legal Advisor.** The small claims legal advisor for Alameda County is located at the Wiley W. Manuel Courthouse, Self-Help Center. The phone number is 510-268-7665.

- **Visit the California Department of Consumer Affairs' Web site.** The Department of Consumer Affairs (also called the DCA) has posted a list of conflict resolution programs throughout the state. The list can be found at http://www.dca.ca.gov/r_r/mediati1.htm

  You can also call the Department of Consumer Affairs, Consumer Information Center, at 800-952-5210.

- **Contact your local bar association.** You can find a list of local bar associations in California on the State Bar Web site at http://www.calbar.org/2lin/2bar.htm.

  If you cannot find a bar association for your area on the State Bar Web site, check the yellow pages of your telephone book under "Associations."

- **Look in the yellow pages of your telephone book under "Arbitrators" or "Mediators."**

- **Automotive Repair, Smog Check:** The California Bureau of Automotive Repair (also known as BAR) offers a free mediation service for consumers who are dissatisfied with an auto repair or a smog check, or who dispute an invoice for such services. BAR registers and regulates California automotive repair facilities and licenses smog, lamp, and brake inspection stations. Learn more at http://smogcheck.ca.gov/smogweb/geninfo/otherinfo/mediation.htm or call 800-952-5210.

- **Attorney Fees:** The State Bar of California administers a mandatory fee arbitration program to resolve attorney fee disputes between lawyers and their clients. The program is an informal, low-cost forum and is mandatory for a lawyer if a client requests it. Mediation of attorney fees disputes may also be available in some areas of California. Learn more at http://www.calbar.org/2bar/3arb/3arbndx.htm or call 415-538-2020.

## DISPUTE RESOLUTION PROGRAMS IN ALAMEDA COUNTY

**Mediation Services**
**222278 Redwood Road, Castro Valley, CA 94546**
Phone: (510) 733-4940  fax: (510) 733-4945
Provides a panel of mediators to assist in the process of reaching an agreement in the areas of Neighborhood Disputes, Child Custody, Divorce, Parent/Teel Conflicts, Home Owners Association, Business, Real Estate, Employer/Employee, and Fremont Rent Increases.

**East Bay Community Mediation**
**1968 San Pablo Avenue, Berkeley, CA 94702-1612**
Phone: (510) 548-2377   fax: (510) 548-4051
EBCM is a community-based mediation program created by the union of Berkeley Dispute Resolution Service and Conciliation Forums of Oakland.  EBCM offers counseling on options and approaches to resolving a dispute, mediation, large-group conflict facilitation, and conflict resolution skills workshops.

**Catholic Charities of the East Bay: Oakland – Main Office**
**433 Jefferson Street, Oakland, CA 94607**
Phone: (510) 768-3100  fax: (510) 451-6998
Mediators are responsible for mediation sessions involving the youth, victim and family members to work towards a mutually agreeable restitution agreement.  Also provide free workshops in anger management and mediation.

**Center for Community Dispute Settlement**
**1789 Barcelona Street, Livermore, CA 94550**
Phone: (925) 373-1035
Provides services in Tri-Valley for all of Alameda County.  Program goals are to increase the number of court cases resolved, mediating small claims cases four days per week, and training youth in listening and conflict resolution skills.

**California Lawyers for the Arts: Oakland Office**
**1212 Broadway Street, Suite 837, Oakland, CA  94612**
Phone: (510) 444-6351  fax: (510) 444-6352
This program increases the resolution of arts related disputes such as artistic control, ownership of intellectual property, credit for work performed or produced and contract issues, through the use of alternative dispute resolution.  It also increases the capacity to provide services for counseling, conciliation and administration of mediation, arbitration and meeting facilitation.

## ALAMEDA COUNTY SUPERIOR COURT
## ADR PROGRAM

### ADR Program Administrator

Pursuant to California Rule of Court 1580.3, the presiding judge of the Superior Court of California, County of Alameda has designated Benjamin D. Stough, Berkeley Trial Court Administrator, to serve as ADR program administrator.

A Plaintiff may elect, the parties may stipulate or a judge may refer a case to Judicial Arbitration. The Judicial Arbitration Program Coordinator may be contacted at (510) 670-6646.

### The Judicial Arbitration Process

#### Appointment of Arbitrator (must be appointed within 30 days after referral per *CRC 1605*).
⇒ Parties mailed list of five names from which to select. (List mailed within 5-10 business days after receipt of referral).

⇒ Each party may reject one of the names listed (10 calendar days per *CRC 1605a*)

⇒ The administrator randomly appoints the arbitrators from the names remaining on the list. If only one remains then is deemed appointed.

#### Assignment of Case *(CRC 1605a(4))*
⇒ Within 15 days of notice of the appointment, the arbitrator shall contact parties in writing about time, date, and place of the hearing. The parties shall receive at least 30 days notice prior to the hearing.

#### Hearings *(CRC 1611)*
⇒ Shall be scheduled so as to be completed not less than 35 days nor more than 90 days from the date the arbitrator was assigned. For good cause shown, the case may be continued an additional 90 days by the Case Management Judge.

#### Award of Arbitrator *(CRC 1615b & c)*
⇒ Arbitrator must file an award within 10 days after conclusion of the arbitration hearing. The court may allow 20 additional days upon application of arbitrator is cases of unusual length or complexity.

⇒ Within 30 days of the filing of the award the parties may file a Request for Trial de Novo. The clerk shall enter the award as a judgment after 30 days provided a Trial de Novo has not been filed.

#### Return of Case to Court
⇒ Upon Filing of Trial de Novo the action is returned to Case Management Judge for further proceedings. *(CRC 1616 & Local Rule 6.4)*

⇒ If Trial de Novo is not filed then judgment is entered and the Case Management Judge is notified *(CRC 1615c & Local Rule 6.6)*

⇒ If parties indicate a settlement then case is returned to Case Management Judge and case is continued 45 days for an Order to Show Cause RE filing a dismissal. *(Local Rule 6.6)*

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA

| Allen E. Broussard Justice Center<br>600 Washington Street, Oakland, CA 94707 | Berkeley Courthouse<br>2000 Center Street, 2nd Fl., Berkeley, CA 94704 | George E. McDonald Hall of Justice<br>2233 Shoreline Drive, Alameda, CA 94501 |
| --- | --- | --- |
| Fremont Hall of Justice<br>39439 Paseo Padre Parkway, Fremont, CA 94538 | Gale/Schenone Hall of Justice<br>5672 Stoneridge Drive, Pleasanton, CA 94588 | Wiley W. Manuel Courthouse<br>661 Washington Street, Oakland, CA 94607 |
| Hayward Hall of Justice<br>24405 Amador Street, Hayward, CA 94544 | René C. Davidson Courthouse<br>1225 Fallon Street, Oakland, CA 94612 | |

Case No.: _____

_____ Plaintiff

vs.

**STIPULATION FOR ALTERNATIVE DISPUTE RESOLUTION (ADR)**

_____ Defendant

The parties by and through their attorneys of record hereby stipulate to submit the within

controversy to the following Alternative Dispute Resolution process:

_____

_____

_____

### ORDER

The foregoing stipulation having been read and considered, and good cause appearing, now therefore,

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the matter be set for Order to Show Cause Hearing RE:

Dismissal on _____ at _____ a.m./p.m. in Department _____

Dated: _____

_____
JUDGE OF THE SUPERIOR COURT

(SEAL)

Rev 4/05

# EXHIBIT B

1  DONALD J. PUTTERMAN (State Bar No. 90822)
    RYAN J. MECKFESSEL (State Bar No. 215952)
2  MARGARET A. ZIEMIANEK (State Bar No. 233418)
    SIDEMAN & BANCROFT LLP
3  One Embarcadero Center, Eighth Floor
    San Francisco, California 94111-3629
4  Telephone:    (415) 392-1960
    Facsimile:    (415) 392-0827
5
    TIMOTHY J. HOBAN (State Bar No. 192461)
6  REGIONAL COUNSEL FOR TOLL BROS., INC.
    725 Town & Country Rd, Suite 500
7  Orange, California 92868
    Telephone: (714) 347-1300
8  Facsimile: (714) 835-9683
9
    Attorneys for Defendants
10  TOLL BROS., INC., a Pennsylvania corporation, and
    TOLL BROTHERS, INC., a Delaware corporation

11          **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12                **FOR THE COUNTY OF ALAMEDA**

13                  **UNLIMITED JURISDICTION**

| | |
|---|---|
| 14  STONEBRAE L.P., a Delaware limited | CASE NO. RG07358685 |
| 15  partnership, | |
| | **NOTICE TO ADVERSE PARTY OF** |
| 16        Plaintiff, | **REMOVAL TO FEDERAL COURT** |
| 17      v. | ASSIGNED FOR ALL PURPOSES TO |
| 18  TOLL BROS., INC., a Pennsylvania | JUDGE David Hunter |
|     corporation; TOLL BROTHERS, INC., a | DEPARTMENT 520 |
| 19  Pennsylvania corporation; DOES 1 through 15, | |
|     inclusive, | |
| 20 | |
|         Defendants. | Action Filed:    November 29, 2007 |
| 21 | |

22

23

24

25

26

27

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

1    TO PLAINTIFF and ITS ATTORNEYS OF RECORD:

2    PLEASE TAKE NOTICE THAT a Notice of Removal of this action was filed in the

3    United States District Court for the Northern District of California on January 11, 2008.  A copy

4    of said Notice of Removal is attached as **Exhibit A**, and is served and filed herewith.

5

6

7    DATED: January __, 2008              SIDEMAN & BANCROFT LLP

8

9                                        By: _____

10                                           Donald J. Putterman
                                          Attorneys for Defendants
11                                        TOLL BROS., INC., a Pennsylvania corporation, and
                                          TOLL BROTHERS, INC., a Delaware corporation
12   0841s\528122v1

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111