1  DONALD J. PUTTERMAN (State Bar No. 90822)
   E-Mail:      dputterman@sideman.com
2  RYAN J. MECKFESSEL (State Bar No. 215952)
   E-Mail:      rmeckfessel@sideman.com
3  MARGARET A. ZIEMIANEK (State Bar No. 233418)
   E-Mail:      mziemianek@sideman.com
4  SIDEMAN & BANCROFT LLP
   One Embarcadero Center, Eighth Floor
5  San Francisco, California 94111-3629
   Telephone:    (415) 392-1960
6  Facsimile:    (415) 392-0827

7  TIMOTHY J. HOBAN (State Bar No. 192461)
   E-Mail:      thoban@tollbrothersinc.com
8  REGIONAL COUNSEL FOR TOLL BROS., INC.
   725 Town & Country Road, Suite 500
9  Orange, California 92868
   Telephone:    (714) 347-1300
10 Facsimile:    (714) 835-9683

11

12 Attorneys for Defendants
   TOLL BROS., INC., a Pennsylvania corporation, and
13 TOLL BROTHERS, INC., a Delaware corporation

14

15              IN THE UNITED STATES DISTRICT COURT

16          FOR THE NORTHERN DISTRICT OF CALIFORNIA

17                    (SAN FRANCISCO DIVISION)

18

19 STONEBRAE L.P., a Delaware limited        CASE NO. C08-00221-EMC
   partnership,
20                                           **E-FILED**
                Plaintiff,
21                                           **APPENDIX OF FOREIGN AUTHORITIES**
        v.                                   **IN SUPPORT OF DEFENDANT TOLL**
22                                           **BROTHERS, INC.'S MOTION TO**
   TOLL BROS., INC., a Pennsylvania          **DISMISS FIRST AMENDED COMPLAINT**
23 corporation; TOLL BROTHERS, INC., a
   Delaware corporation; DOES 1 through 15,  Date:     March 26, 2008
24 inclusive,                                Time:     10:30 a.m.
                                             Room:     C, 15th Floor
25              Defendants.                  Judge:    Hon. Edward M. Chen

26                                           Removal Filed: January 11, 2008

27

28

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3629

Defendant submits this Appendix of Foreign Authorities in support of its Motion to Dismiss First Amended Complaint.

| **Cases** | **Exhibit** |
|---|---|
| *Boulevard Assoc. v. Sovereign Hotels, Inc.,* 72 F.3d 1029 (2d Cir. 1995) | **A** |
| *Waste Conversion Systems, Inc. v. Greenstone Industries, Inc., et al.,* 33 S.W. 3d 779 (Tenn., 2000) | **B** |
| *Winner's Circle of Las Vegas, Inc. v. SAMI Franchising, Inc.,* 916 F. Supp. 1024, (D. Nev. 1996) | **C** |

DATED:  February 20, 2008

REGIONAL COUNSEL FOR TOLL BROS., INC.
Timothy J. Hoban

SIDEMAN & BANCROFT LLP
Donald J. Putterman
Margaret A. Ziemianek
Ryan J. Meckfessel

By:    /s/ Margaret A. Ziemianek
          Margaret A. Ziemianek
Attorneys for Defendants
TOLL BROS., INC., a Pennsylvania corporation, and
TOLL BROTHERS, INC., a Delaware corporation

10644\547444v1

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

# EXHIBIT A

Westlaw.

72 F.3d 1029
72 F.3d 1029
(Cite as: 72 F.3d 1029)

Page 1

▷Boulevard Associates v. Sovereign Hotels, Inc.
C.A.2 (Conn.),1995.

United States Court of Appeals,Second Circuit.
BOULEVARD ASSOCIATES, A General
Partnership, Plaintiff-Appellee-Cross-Appellant,
v.
SOVEREIGN HOTELS, INC., Daka, Inc. and Daka
International, Inc., Defendants-Appellants-Cross-
Appellees.
Nos. 42, 257, Docket 94-9020, 94-9090.

Argued Aug. 30, 1995.
Decided Dec. 15, 1995.

Former landlord brought suit against its former tenant
for damages for breach of lease, against tenant's
parent company for tortious interference with
contract, and against both defendants for violation of
Connecticut Unfair Trade Practices Act (CUTPA).
The United States District Court for the District of
Connecticut, Constance Baker Motley, Senior
District Judge, sitting by designation, 852 F.Supp.
127, 861 F.Supp. 1132, 868 F.Supp. 70, awarded
landlord compensatory and punitive damages.
Defendants appealed and landlord cross-appealed,
arguing that district court erred in awarding reliance,
rather than expectation, damages. The Court of
Appeals, Calabresi, Circuit Judge, held that: (1)
because plaintiff did not terminate lease before
conveying away its interest, it could not sue its
former tenant for damages; (2) parent corporation did
not tortiously interfere with lease; and (3) defendants
did not violate CUTPA.

Reversed.

West Headnotes

[1] Landlord and Tenant 233 ⊂─⊃49(1)

233 Landlord and Tenant
    233II Leases and Agreements in General
        233II(B) Construction and Operation
            233k49 Liability of Lessee for Breach of
Contract
                233k49(1) k. In General. Most Cited

Cases

Landlord and Tenant 233 ⊂─⊃108(1)

233 Landlord and Tenant
    233IV Terms for Years
        233IV(F) Termination
            233k102 Breach of Covenant or Condition
                233k108 Nonpayment of Rent
                    233k108(1) k. In General. Most
Cited Cases
Under Connecticut law, when tenant fails to pay rent,
landlord may terminate lease and sue for damages
based on the contract relationship, or may maintain
the lease and, based on the property relationship,
demand back rent; the remedies are mutually
exclusive.

[2] Landlord and Tenant 233 ⊂─⊃49(2)

233 Landlord and Tenant
    233II Leases and Agreements in General
        233II(B) Construction and Operation
            233k49 Liability of Lessee for Breach of
Contract
                233k49(2) k. Actions. Most Cited Cases
Having conveyed lease to mortgagee's designee,
plaintiff was no longer landlord and had no right,
under Connecticut law, to terminate lease and sue its
former tenant for contractual damages,
notwithstanding that plaintiff, when it conveyed
lease, expressly reserved its right to sue tenant for
breach of contract.

[3] Indemnity 208 ⊂─⊃33(3)

208 Indemnity
    208II Contractual Indemnity
        208k33 Particular Cases and Issues
            208k33(3) k. Lease Agreements; Vehicle
Rental Contracts. Most Cited Cases
    (Formerly 208k8(3))
Where landlord never terminated lease, instead
conveying it to mortgagee's designee, no cause of
action for consequential damages or indemnification
had accrued against tenant and, therefore any claim
against tenant for nonpayment of rent was not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 F.3d 1029
72 F.3d 1029
**(Cite as: 72 F.3d 1029)**

reserved by indemnification clause of lease.

**[4] Landlord and Tenant 233 ⟲⟶49(3)**

233 Landlord and Tenant
    233II Leases and Agreements in General
        233II(B) Construction and Operation
            233k49 Liability of Lessee for Breach of Contract
                233k49(3) k. Damages. Most Cited Cases
Default rules allowing landlords to seek damages without terminating lease unless parties agree to the contrary do not apply to damages for unpaid rent under Connecticut law.

**[5] Torts 379 ⟲⟶212**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k212 k. Contracts. Most Cited Cases
    (Formerly 379k12)
Under Connecticut law, party tortiously interferes with another's contractual rights whenever, without justification, it knowingly interferes in plaintiff's contractual rights.

**[6] Torts 379 ⟲⟶215**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k215 k. Knowledge and Intent; Malice. Most Cited Cases
    (Formerly 379k12)

**Torts 379 ⟲⟶218**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k218 k. Improper Means; Wrongful, Tortious or Illegal Conduct. Most Cited Cases
    (Formerly 379k12)
Under Connecticut law, otherwise legitimate and commendable purpose does not excuse use of wrongful means to interfere with another's contractual rights.

**[7] Torts 379 ⟲⟶223**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k223 k. Employees and Agents; Corporate Entities. Most Cited Cases
    (Formerly 379k12)
Under Connecticut law as predicted by Federal Court of Appeals, sole shareholder of corporation cannot be considered third party capable of interfering with its own company's contracts.

**[8] Torts 379 ⟲⟶243**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)2 Particular Cases
                379k243 k. Landlord and Tenant. Most Cited Cases
    (Formerly 379k12)
Under Connecticut law as predicted by Federal Court of Appeals, parent company did not engage in tortious conduct when it directed its wholly-owned subsidiary to stop paying rent under its unprofitable lease.

**[9] Torts 379 ⟲⟶215**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k215 k. Knowledge and Intent; Malice. Most Cited Cases
    (Formerly 379k12)

**Torts 379 ⟲⟶218**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k218 k. Improper Means; Wrongful,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 F.3d 1029
72 F.3d 1029
(Cite as: 72 F.3d 1029)

Tortious or Illegal Conduct. Most Cited Cases
     (Formerly 379k12)
Generally, under Connecticut law, actions involving
fraud, misrepresentation and intimidation and
molestation or malice may give rise to claim of
tortious interference with contract; to make out such
claim, plaintiff must prove some improper motive or
improper means.


[10] Torts 379 ☞243

379 Torts
     379III Tortious Interference
          379III(B) Business or Contractual Relations
               379III(B)2 Particular Cases
                    379k243 k. Landlord and Tenant. Most
Cited Cases
     (Formerly 379k12)
There was no evidence that parent company
intimidated its wholly-owned subsidiary into
breaching lease, as required to support landlord's
tortious interference with contract claim under
Connecticut law; it was neither improper nor
unseemly for parent to inform subsidiary's landlord
that subsidiary would default on its rent payments if
parties did not amend the deal.


[11] Antitrust and Trade Regulation 29T
☞135(1)

29T Antitrust and Trade Regulation
     29TIII Statutory Unfair Trade Practices and
Consumer Protection
          29TIII(A) In General
               29Tk133 Nature and Elements
                    29Tk135 Practices Prohibited or
Required
                         29Tk135(1) k. In General;
Unfairness. Most Cited Cases
     (Formerly 92Hk11 Consumer Protection)
Under "cigarette rule" adopted by Connecticut in
determining whether given action is "unfair" under
Connecticut Unfair Trade Practices Act (CUTPA),
court must consider whether the practice, without
necessarily having been previously considered
unlawful, offends public policy as it has been
established by statutes, common law or otherwise-
whether, in other words, it is within at least the
penumbra of some common law, statutory, or other
established concept of unfairness; whether it is moral,
unethical, oppressive or unscrupulous; and whether it

causes substantial injury to consumers. C.G.S.A. §
42-110b(a).


[12] Antitrust and Trade Regulation 29T ☞147

29T Antitrust and Trade Regulation
     29TIII Statutory Unfair Trade Practices and
Consumer Protection
          29TIII(A) In General
               29Tk139 Persons and Transactions
Covered Under General Statutes
                    29Tk147 k. Contractual Relationships
and Breach of Contract in General. Most Cited Cases
     (Formerly 92Hk4 Consumer Protection)
Simple contract breach is not sufficient to establish
violation of Connecticut Unfair Trade Practices Act
(CUTPA), particularly where count alleging CUTPA
violation simply incorporates by reference breach of
contract claim and does not set forth how or in what
respect defendant's activities are either immoral,
unethical, unscrupulous or offensive to public policy.
C.G.S.A. § 42-110b(a).


[13] Antitrust and Trade Regulation 29T ☞198

29T Antitrust and Trade Regulation
     29TIII Statutory Unfair Trade Practices and
Consumer Protection
          29TIII(C) Particular Subjects and Regulations
               29Tk198 k. Real Property in General. Most
Cited Cases
     (Formerly 92Hk6 Consumer Protection)
Tenant's breach of lease, and its parent company's
role in ordering the breach, were not unfair or
deceptive acts in violation of Connecticut Unfair
Trade Practices Act (CUTPA), absent any
aggravating circumstances; parent company did not
intimidate landlord by threatening to breach if parties
did not renegotiate the lease, and parent's motive for
directing tenant to stop paying rent, to back out of a
business venture that was losing money, offended no
particular public policy. C.G.S.A. § 42-110b(a).

*1031 John E. Coyne, Menard, Murphy & Walsh,
Boston, Mass. (Clifford Thau, Squadron, Ellenoff,
Pleasant, Sheinfeld & Sorkin, New York City, on the
brief), for defendants-appellants-cross-appellees.
Frederick S. Gold, Cohen & Wolf, P.C., Stamford,
Conn. (Daniel F. Wolf, Cohen & Wolf, P.C., on the
brief), for plaintiff-appellee-cross-appellant.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 F.3d 1029
72 F.3d 1029
(Cite as: 72 F.3d 1029)

Page 4

Before: CARDAMONE, MINER, and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge:

The legal relationship between landlords and tenants is a strange hybrid of contract and property law. When a tenant fails to pay rent, Connecticut law, recognizing the hybrid, allows the landlord to choose either a contract remedy or a property remedy-but does not permit both. The landlord can terminate the lease and sue for damages based on the contract relationship. Or, the landlord can opt to maintain the lease and, based on the property relationship, demand back rent.

In this case, defendant Sovereign Hotels, Inc. ("Sovereign") stopped paying rent to its landlord, plaintiff Boulevard Associates ("Boulevard"). Instead of terminating the lease, Boulevard conveyed the lease to a third party and purported to reserve its contract remedy against Sovereign-at least for consequential damages arising from the tenant's failure to pay rent. The district court held that the landlord had indeed reserved its right to seek such damages because the lease included an indemnification clause, which allowed it to sue Sovereign regardless of whether the landlord had terminated the lease. *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 852 F.Supp. 127, 132 (D.Conn.1994) (finding liability); 861 F.Supp. 1132, 1136-40 (D.Conn.1994) (awarding damages); 868 F.Supp. 70, 71-74 (S.D.N.Y.1994) (awarding attorneys' fees). Because permitting Boulevard to bring this suit does not comport with Connecticut's carefully crafted balance between property and contract remedies, we reverse.

## I. BACKGROUND

In 1985, Boulevard leased a parcel of property in Stratford, Connecticut, to Sovereign for ten years. As part of the lease, Boulevard agreed to build a hotel that would be managed by Sovereign. Boulevard subsequently obtained an $8 million mortgage from the Union Trust Company ("Union Trust") and built the hotel. Sovereign, in turn, agreed to pay rent covering, among other things, debt service on the Union Trust mortgage. Daka, Inc. ("Daka"), Sovereign's *1032 parent company, guaranteed all of Sovereign's liabilities under the lease, including the

obligation to pay rent.

Unfortunately, the hotel turned out to be a failure. Because the venture never generated enough revenue to cover its expenses, Sovereign had to draw on its own reserves to pay the rent through May 1989. At that point, when the agreement called for the monthly rent to increase by approximately $20,000 to cover principal due under the Union Trust mortgage, representatives from Daka International, Inc. ("Daka International"), the parent company of Daka, approached Boulevard in an attempt to renegotiate the lease. (According to testimony by William Baumhauer, the Chairman and CEO of Daka International, he was trying to extricate Sovereign from a number of ventures out of concern for its financial condition.) At a meeting with Boulevard representatives in May 1989, Baumhauer stated that Sovereign would stop paying rent unless Boulevard agreed to reduce Sovereign's payments under the lease. Baumhauer subsequently memorialized his position in a letter to Boulevard. When Boulevard was unable to refinance the mortgage with Union Trust, these efforts to renegotiate the lease fell through and Sovereign stopped paying rent.

In August 1989, Union Trust informed Boulevard that unless the property was deeded over to the bank, Union Trust would start foreclosure proceedings. On September 5, 1989, Boulevard conveyed the hotel, land, and lease to Union Trust's designee. Although the deed provided that it was "an absolute conveyance of all of [Boulevard's] right, title, and interest in and to the Property, including but not limited to any lease or leases in respect of the Property," Boulevard stated in an accompanying letter that it reserved all rights and causes of action against Sovereign *that had already arisen.* In return for these conveyances, Union Trust released Boulevard from its obligation to repay the $8 million mortgage. But, consonant with Boulevard's letter, the release also stated that Boulevard's existing rights against Sovereign were to be unaffected by the release.

Union Trust's designee subsequently terminated the lease and entered into a new lease with Sovereign. The designee later sued Sovereign in contract for damages measured by the unpaid pre-assignment rent.[FN1] This suit was eventually settled by the parties out of court.

FN1. It is not entirely clear from the record whether Union Trust's designee in fact terminated the lease and accordingly sought contract damages, or whether instead it sued Sovereign for unpaid rent under the lease. Although we assume for the purposes of this appeal that Union Trust terminated the lease-because this assumption is the one most favorable to Boulevard-it is not critical to our ruling. If Union Trust's designee never terminated the lease, then, under Connecticut law, no damages claims could be made either by the designee or by Boulevard.

In July 1990, Boulevard brought this action against Sovereign, Daka, and Daka International in the United States District Court for the District of Connecticut (Constance Baker Motley, *Senior District Judge, sitting by designation* ). The district court held a bench trial in two phases, the first dealing with liability, the second with damages. In the first phase the court found that Sovereign had breached the lease and was liable for contract damages, 852 F.Supp. at 131-32; that Daka was jointly and severally liable for those damages as the guarantor of Sovereign's obligations under the lease, *id.* at 132; that Daka International had tortiously interfered with the lease by directing Sovereign to stop paying rent, *id.* at 132-34; and that all of the defendants had violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. §§ 42-110a to 42-110q, by willfully breaching the lease, 852 F.Supp. at 134-35.

In the damages phase of the trial, the court found that there was insufficient evidence about the current value of the hotel to calculate expectation damages under Connecticut law. 861 F.Supp. at 1138. It did, however, award reliance damages of $1,134,497, plus interest, jointly and severally against the defendants, based on the amount of money Boulevard had invested in the hotel minus the $8 million in debt relief it received by conveying the property to Union Trust's designee. *Id.* at 1138-39 (reliance damages), 1140-41 (interest). Finally, the court awarded**1033 $300,000 in punitive damages, plus attorneys' fees, against Daka International for tortiously interfering with the lease and for violating CUTPA. *Id.* at 1139-40;868 F.Supp. at 71-74 (fixing amount of attorneys'

fees jointly and severally against all defendants).

The defendants raise four issues on appeal. First, they argue that Boulevard is not entitled to maintain a breach of contract claim because it did not terminate the lease, but instead conveyed it to a third party. In this regard, they also contend that the indemnification clause in the lease was only meant to protect Boulevard from claims asserted by third parties, and not from consequential damages arising from Sovereign's failure to pay rent. Second, they argue that Daka International did not tortiously interfere with the lease because, as Sovereign's parent company, it was entitled to direct its subsidiary to stop paying rent. And in any event, they claim that Daka International did not engage in intimidating or otherwise improper behavior. Third, they maintain that Boulevard has failed to allege that the defendants engaged in aggravating conduct, beyond breaching the lease, that would constitute an unfair action in violation of CUTPA. And finally, they challenge the court's award of reliance damages.

Boulevard cross-appeals, arguing that the district court erred in awarding reliance damages rather than expectation damages.

## II. DISCUSSION

### A. *Breach of the Lease*

Sovereign argues that Boulevard is not permitted to bring a breach of contract action because, instead of terminating the lease, it conveyed the lease to a third party. The district court rejected this argument on two grounds. The court noted that when Boulevard conveyed the lease to Union Trust's designee, it expressly reserved its contractual right to sue Sovereign for "any and all consequential and incidental damages" arising from breach of the lease. 861 F.Supp. at 1136. The court, moreover, held that Boulevard had in fact "manifest[ed] an intention to terminate the lease" by filing the present lawsuit; and that this sufficed to permit an action to be brought for damages. *Id.* (citing *Danpar Assocs. v. Somersville Mills Sales Room, Inc.,* 182 Conn. 444, 445-46, 438 A.2d 708, 709-10 (1980) (where "the plaintiff [chooses] to bring an action for damages for breach of the lease, [such action] manifest[s] an intention to terminate the lease")).

72 F.3d 1029
72 F.3d 1029
**(Cite as: 72 F.3d 1029)**

Page 6

[1][2] We disagree with both of the district court's conclusions. Connecticut has expressly chosen to give a landlord two mutually exclusive remedies when a tenant fails to pay rent: the landlord can either terminate the lease and sue for contractual damages, or continue the lease and sue for back rent. *Rokalor, Inc. v. Connecticut Eating Enters.,* 18 Conn.App. 384, 388-89, 558 A.2d 265, 268 (1989). The district court correctly observed that under Connecticut law, a landlord can manifest an intention to terminate the lease by filing a lawsuit seeking damages for the tenant's breach of the lease. 861 F.Supp. at 1136. But Boulevard was no longer the landlord when it filed the present lawsuit in July 1990; it had conveyed the lease to Union Trust's designee more than ten months earlier. Accordingly, Boulevard no longer had any right to terminate the lease-and never having terminated the lease, it cannot now maintain an action for contractual damages against its former tenant.

Boulevard contends, however, that when it conveyed the lease to Union Trust's designee it expressly reserved its right to sue Sovereign for breach of contract. That may be. It may also be that any contract damages that might have accrued to Union Trust's designee on account of Sovereign's failure to pay pre-assignment rent could ultimately be owing to Boulevard. Thus, when the designee terminated the lease, any pre-assignment damages that became available to the designee under Connecticut law might properly be Boulevard's. In that event, Boulevard could sue the assignee for such damages. Though we obviously take no position on what might be the result of such a hypothetical action, which is not before us, it is enough for us to note that any such agreement between Boulevard and its assignee could not increase Sovereign's liability under Connecticut law. *1034 Specifically, it cannot give rise to this action by Boulevard against Sovereign for damages, based on a lease that Boulevard did not terminate. To hold otherwise would be to permit Boulevard and its assignee, by writing such a clause into a contract between them, to preserve Sovereign's liability for back rent under the lease,[FN2] while making Sovereign liable to Boulevard for damages arising from those same unpaid rents. It is precisely this double exposure that Connecticut law does not allow.

FN2. It appears from the record that after conveying the lease, Boulevard initially

sought to recover the pre-assignment rent from Sovereign. Boulevard later disclaimed those rents in favor of its assignee.

The district court nevertheless held that Boulevard had retained an independent right to sue Sovereign for breach of contract, despite having transferred away its interest in the lease. The court focused on the lease's indemnification clause, Article 9, which reads as follows:

The Tenant shall indemnify and hold harmless the Landlord against all liabilities, damages and other expenses, including reasonable attorneys' fees, which may be imposed upon, incurred by, or asserted against the Landlord by reason of any of the following occurring during the term of this Lease:

....

(b) Any failure on the part of the Tenant to perform or comply with any covenant required to be performed or complied with by the Tenant hereunder.

According to Boulevard and the district court, Sovereign's failure to pay the rent forced Boulevard to convey away its interest in the Stratford property, and thereby to lose its initial investment of over $1 million in the property. This loss, Boulevard contends, was an expense that it incurred as a result of Sovereign's failure to comply with a covenant of the lease. The loss thus gave rise to a contract action against Sovereign under the indemnification clause, an action that according to Boulevard was separate and independent of any contract action that would arise on termination of the lease. It was, moreover, an action that had accrued before the assignment and was therefore retained by Boulevard.

[3] Article 9 cannot, however, bear the weight plaintiff places on it. Even if we were to accept Boulevard's argument that this otherwise unremarkable indemnification clause was actually intended to create a right to consequential damages stemming from a tenant's failure to pay rent, Boulevard's claim would fail. Such a claim would still be based on Sovereign's failure to pay rent, and, as we have already noted, Connecticut law permits damages claims resulting from nonpayment of rent only *after the lease has been terminated.* In the present case, Boulevard never terminated the lease, so no cause of action-whether labelled a claim for consequential damages or for indemnification-had accrued against Sovereign when Boulevard

transferred the lease to Union Trust's designee. Since no claim against Sovereign "had already arisen" at the time it transferred the lease, Boulevard did not, by the terms of the transfer, reserve the claim.

[4] Boulevard further argues, however, and the district court agreed, that the indemnification clause imposed on Sovereign a separate and independently enforceable covenant to pay rent. There doubtless exist lease covenants that may be enforced without terminating the lease. Usually, these covenants include a tenant's duty to perform, or refrain from performing, some action on the leased premises. See RESTATEMENT OF PROPERTY (SECOND), LANDLORD & TENANT § 13.1 (1976) ("Except to the extent the parties to a lease validly agree otherwise, if the tenant fails to perform a valid promise contained in the lease to do, or to refrain from doing, something on the leased property or elsewhere ... the landlord may: (1) terminate the lease and recover damages; or (2) continue the lease and obtain appropriate equitable and legal relief, including ... recovery of damages...."). But these default rules, allowing landlords to seek damages without terminating a lease unless the parties agree to the contrary, may well be different from the default rules governing breaches of covenants to pay rent. See *1035 RESTATEMENT OF PROPERTY (SECOND), LANDLORD & TENANT § 12.1 (stating that, if the tenant fails to pay rent, the landlord may either recover the unpaid rent or terminate the lease, absent agreement to the contrary). And they certainly do not apply to damages for unpaid rent under Connecticut law. See Rokalor, 18 Conn.App. at 388-89, 558 A.2d 265.

Since these are no more than default rules, the parties will in general be free to contract around them-by agreeing, for example, that the landlord can sue the tenant for damages, upon nonpayment of rent, without first terminating the lease. But the parties must clearly indicate their intention to deviate from the default rule. And we will not lightly infer that the parties intended such a deviation if they did no more than adopt a run-of-the-mill indemnification clause. We have previously noted that "[i]ndemnity agreements are generally designed only to protect against liability for damage to third parties." Atlantic Richfield Co. v. Interstate Oil Transp. Co., 784 F.2d 106, 115 (2d Cir.), cert. denied, 479 U.S. 817, 107 S.Ct. 75, 93 L.Ed.2d 31 (1986). The clause in the

case before us fails to demonstrate an intent to give Boulevard a claim for consequential damages against Sovereign, and fails also to permit Boulevard to convert claims based on nonpayment of rent-which it would possess by virtue of the common law only after terminating the lease-into claims that it could assert during the pendency of the lease.

In sum, we hold that Boulevard's failure to terminate the lease left them without a common law right to damages, and that the indemnification clause cannot serve as a substitute for that common law right. Accordingly, the district court erred in awarding damages for Sovereign's breach of the contract.

**B. Tortious Interference with Contract**

The district court also found that Daka International "interfered with the Boulevard-Sovereign lease agreement solely to protect the financial health of Daka International's consolidated corporate group," 852 F.Supp. at 133, and that the CEO of Daka International "intentionally intimidated" Boulevard by threatening to breach the lease unless Boulevard agreed to lower Sovereign's rent, id. at 134. The court therefore found Daka International jointly and severally liable with Sovereign and Daka for the general contract damages, and solely liable for an additional $300,000 in punitive damages.

We do not doubt that the management of Daka International directed Sovereign to stop paying rent, and thereby to breach its lease with Boulevard. Daka International, however, gives two reasons why its action was not tortious. First, it contends that a parent corporation is privileged to protect its subsidiary's economic interests by directing it to breach an unprofitable contract. Second, it argues that there is no evidence that it employed improper methods to induce Sovereign to breach the lease. Specifically, Daka International denies that there is any evidence whatever that it engaged in intimidating conduct toward any party, and points out additionally that the only intimidation even alleged was towards Boulevard, not towards Sovereign, the party that it supposedly induced to breach the lease.

[5][6] As the district court noted, a party tortiously interferes with another's contractual rights

72 F.3d 1029
72 F.3d 1029
(Cite as: 72 F.3d 1029)

Page 8

whenever, "without justification," it knowingly interferes in the plaintiff's contractual rights. 852 F.Supp. at 133. Although the district court correctly observed that an otherwise " 'legitimate and commendable' " purpose does not excuse the use of wrongful means to interfere with another's contractual rights, id.(quoting *R & W Hat Shop v. Sculley*, 98 Conn. 1, 118 A. 55, 59 (1922)), it erred in failing to consider whether Daka International's actions were wrongful in the first place.

The Connecticut Supreme Court has not squarely addressed the issue we face today. But the lower courts are in agreement that generally "there can be no tortious interference of contract by someone who is directly or indirectly a party to the contract." *Baum v. United Cable Television Corp. of E. Conn.*, 1992 WL 175119, at *4 (Conn.Super.Ct. July 20, 1992) (citing *Multi-Service Contractors, Inc. v. Town of Vernon*, 193 Conn. 446, 451-52, 477 A.2d 653, 655-56 (1984) (dismissing claim of tortious interference against town officials by a company that contracted with *1036 the town because, as the town's agents, they could not be held liable absent allegations of willful misconduct or lack of good faith)); *see, e.g., Walsky v. Gastaldi*, 1990 WL 269143, at *2 (Conn.Super.Ct. July 26, 1990). As one court has explained:

An agent acting legitimately within the scope of his authority cannot be held liable for interfering with or inducing his principal to breach a contract between his principal and a third party, because to hold him liable would be, in effect, to hold the corporation liable in tort for breaching its own contract. An agent, however, can be held liable for such interference or inducement if he did not act legitimately within his scope of duty but used the corporate power improperly for personal gain.

*Murray v. Bridgeport Hosp.*, 40 Conn.Supp. 56, 60-61, 480 A.2d 610, 613 (1984) (citation omitted); *see also Espinosa v. Connecticut College*, 1994 WL 320222, at *5-*6 (Conn.Super.Ct. June 27, 1994) ("In order to deprive a corporate employee of his immunity, the plaintiff must establish that he acted solely for his own benefit and benefit to the corporation played no role therein."); *Smith v. Brown*, 1992 WL 219300, at *2 (Conn.Super.Ct. Aug. 28, 1992) (requiring an allegation, to state a claim for tortious interference, that "plaintiff engaged in some fraud, misrepresentation, intimidation or molestation,

'beyond the fact of the interference itself' "); *cf. Multi-Service Contractors*, 193 Conn. at 451, 477 A.2d 653.

[7] In the only Connecticut case which, to our knowledge, involved a claim of tortious interference brought against a shareholder for inducing a breach of contract by a corporation, the Superior Court applied the same rule. *Baum*, 1992 WL 175119, at *4 (holding that a majority shareholder was "at least an indirect party to the contract and therefore no cause of action can be sustained against it for tortious interference of contract"). Because there is a significant unity of interest between a corporation and its sole shareholder-indeed, an even greater unity than that which exists between a corporation and its agents or officers-we do not believe that such a shareholder can be considered a third party capable of "interfering" with its own company's contracts. Certainly, this unity of interest is not called into question when the shareholder's actions are taken to safeguard the interests of its company.

Courts in other states have uniformly found that a parent company does not engage in tortious conduct when it directs its wholly-owned subsidiary to breach a contract that is no longer in the subsidiary's economic interest to perform.[FN3] And a similar rule insulating the actions of corporate officers is equally well established.[FN4] We believe that the same rules apply in Connecticut.

FN3.*E.g., Phil Crowley Steel Corp. v. Sharon Steel Corp.*, 782 F.2d 781, 783-85 (8th Cir.1986) (holding that, under Missouri law, a parent corporation may interfere with its subsidiary's contractual relations when the contract threatens a present, existing economic or reputational interest of the subsidiary, but may not interfere solely to protect the parent's economic interest); *Bendix Corp. v. Adams*, 610 P.2d 24, 29 (Alaska 1980) ("[T]here is general agreement that a corporate shareholder ... would have a sufficient economic interest in a subsidiary corporation to interfere in some of the subsidiary's business relationships."); *T.P. Leasing Corp. v. Baker Leasing Corp.*, 293 Ark. 166, 171, 732 S.W.2d 480, 483 (1987) ("[A] parent corporation's privilege permits it to interfere with another's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

72 F.3d 1029
72 F.3d 1029
(Cite as: 72 F.3d 1029)

contractual relations when the contract threatens a present economic interest of its wholly owned subsidiary, absent clear evidence that the parent employed wrongful means or acted with an improper purpose."); _S.F.P. Realty Corp. v. G.S. Rockaway Dev., Inc._, 206 A.D.2d 417, 417, 614 N.Y.S.2d 443, 444 (2d Dep't 1994) (dismissing claims of tortious interference with contract against a shareholder, director, and officer of a corporation for ordering the corporation to breach its contract with the plaintiff, where the defendant's actions were clearly taken in his corporate capacity); _Giblin v. Murphy_, 97 A.D.2d 668, 670, 469 N.Y.S.2d 211, 214-15 (3d Dep't 1983) (holding that once a court pierces the corporate veil, a corporation's shareholders cannot be held liable for tortiously interfering with contracts of the company), _appeal dismissed_, 62 N.Y.2d 605, 479 N.Y.S.2d 1025, 468 N.E.2d 57 (1984); _Holloway v. Skinner_, 898 S.W.2d 793, 797 (Tex.1995) ("When there is a complete identity of interests [between the party to the contract and the alleged tortfeasor], there can be no interference as a matter of law."); _Schoellkopf v. Pledger_, 778 S.W.2d 897, 902-04 (Tex.Ct.App.1989) (holding that "individuals who own, control, and dominate a closely held corporation" cannot tortiously interfere with their corporation's contracts).

FN4. _Republic of Italy v. De Angelis_, 206 F.2d 121, 131 (2d Cir.1953) (Clark, J., concurring) ("[D]irectors, officers, and others interested in a corporation and acting in good faith _in the corporate interest_ are not to be held [liable] for corporate actions which may constitute breaches of contract."); _Morast v. Lance_, 631 F.Supp. 474, 482 (N.D.Ga.1986) (holding that, under Georgia law, directors who ordered their corporate subsidiary to fire plaintiff could not be held liable for tortious interference with his employment rights, because they were not "third parties" in relation to the employment relationship), _aff'd_, 807 F.2d 926 (11th Cir.1987); _Swager v. Couri_, 77 Ill.2d 173, 187-91, 32 Ill.Dec. 540, 545-47, 395 N.E.2d 921, 926-28 (1979) (explaining

that "corporate officers who, 'in accordance with their business judgment and discretion,' interfere with their corporation's contractual relations lack the requisite 'malice' and therefore are not liable in tort") (citation omitted); _King v. Driscoll_, 418 Mass. 576, 587, 638 N.E.2d 488, 494-95 (1994) (rejecting a claim of tortious interference with contract against a corporate officer, for failure to show that his actions were prompted by "a spiteful, malignant purpose, unrelated to the legitimate corporate interest") (citation omitted); _Murray v. Ray_, 862 S.W.2d 931, 934-35 (Mo.Ct.App.1993) (holding that a person with an economic interest in a contract cannot be held liable for inducing a breach of the contract even though motivated by self-interest, in the absence of proof that the breach was accomplished through improper means such as misrepresentation of fact, threats, violence, defamation, or restraint of trade); _Kaplan v. Heinfling_, 136 A.D.2d 34, 41, 526 N.Y.S.2d 73, 77 (1st Dep't) (dismissing a claim of tortious interference with employment brought by a fired attorney against the president of his former employer), _appeal denied_, 72 N.Y.2d 810, 534 N.Y.S.2d 938, 531 N.E.2d 658 (1988); _Embree Constr. Group, Inc. v. Rafcor, Inc._, 330 N.C. 487, 498-501, 411 S.E.2d 916, 924-26 (1992) (holding that if the acts of a corporate officer in inducing his company to breach a contract have been done in the interest of the corporation, then the officer is not liable for tortious interference with contract); _Eads v. American Bank, N.A._, 843 S.W.2d 208, 210-11 (Tex.Ct.App.1992) (holding that, when acting in what they believed to be the best interests of the bank, officers and directors of the bank were privileged to interfere with the employment contract of a bank employee because they had a "right in the subject matter" that was "equal or superior" to that of the fired employee).

**\*1037** [8] We take care to explain what we do not hold today. We do not hold that a sole shareholder is privileged to employ _any_ means, no matter how improper, to induce a breach of a contract involving its own company. Most states affording a privilege to

sole shareholders have recognized that certain behavior may be sufficiently egregious to cross the line and become tortious. For example, one might imagine a sole shareholder who orders the president of his or her company, at gunpoint, to breach a contract with a third party. Or one might imagine a sole shareholder who, using fraudulent misrepresentations, deceives a third party into breaching its contract with the shareholder's own company. *Cf. WKG-TV Video Elec. College, Inc. v. Reynolds,* 618 So.2d 1023, 1027 (La.Ct.App.1993) (finding a corporate officer liable for inducing his corporation to breach its contract with a third party, where the officer sought to fraudulently retain a deposit from the third party). Accordingly, only a limited and qualified privilege to sole shareholders comports with the general rule under Connecticut law that actions involving "fraud, misrepresentation, intimidation or molestation" or "malic[e]" may give rise to a claim of tortious interference with contract, *Kecko Piping Co. v. Town of Monroe,* 172 Conn. 197, 201, 374 A.2d 179, 182 (1977) (citations omitted), and that to make out such a claim the plaintiff must prove "some improper motive or improper means," *Blake v. Levy,* 191 Conn. 257, 262, 464 A.2d 52, 55 (1983).

[9] We need not demarcate with precision what sort of behavior on the part of a sole shareholder would be unacceptable, because we disagree with the district court's finding that Daka International, by informing Boulevard that Sovereign would cease rent payments if the amount due was not immediately reduced, engaged in the kind of conduct that could possibly have constituted tortious interference with the contract. As we noted earlier, the court found Daka International to have intentionally tried to intimidate Boulevard-not Sovereign, which ultimately breached the lease. 852 F.Supp. at 134. Tortious interference with contract requires the use of improper means to induce a party to breach the agreement; thus, Daka International's actions had to intimidate *Sovereign* rather than Boulevard. And there is no evidence whatever that Daka International intimidated Sovereign into breaching the agreement. Daka International simply directed its subsidiary, as it could do through the appropriate channels of corporate command, to stop paying the rent.

**\*1038**[10] In fact, the record does not support the district court's findings that Daka International,

by seeking to renegotiate the lease, "intentionally intimidated" Boulevard or anyone else. Daka International did not threaten to take any illicit action; it merely informed Boulevard that it would default on its rent payments if the parties did not amend the deal. This is neither improper nor unseemly. Under the circumstances, it was clear error to find that Daka International's actions rose to the level of "intimidating" conduct.

Nor is any of this altered by the district court's finding that Daka International was motivated by a desire to protect the financial interests of its "consolidated corporate group." It is unclear whether the district court meant that Daka International was not motivated by a desire to protect Sovereign's economic position as well as that of the parent group. But three observations are useful in this regard. First, the unrebutted testimony of William Baumhauer, Daka International's CEO, was that he ordered Sovereign to breach the contract to limit Sovereign's losses. Second, the plaintiff itself concedes that Sovereign was losing money under the lease. Third, there is no evidence that the economic interests of Sovereign and those of the Daka International "consolidated corporate group" diverged with regard to the lease.

There can be no doubt that it was in the economic interest of Sovereign to breach the lease. And so we have no occasion to consider whether a sole shareholder, motivated purely by self-interest, where that self-interest is contrary to the interests of its subsidiary, could in some circumstances be held liable for tortious interference when it directs its subsidiary to breach a contract. Nor need we decide whether or under what conditions a sole shareholder's use of improper methods would make tortious its interference in the contracts of a subsidiary. We conclude that Daka International committed no tort when it directed its wholly-owned subsidiary, Sovereign, to stop paying rent under its unprofitable lease with Boulevard.

### C. CUTPA Violations

[11] The defendants finally challenge the district court's finding that they violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. §§ 42-110a to 42-110q. The central prohibition of CUTPA is contained in § 42-110b(a),

which provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." In determining whether a given action is "unfair," the Connecticut Supreme Court has adopted the so-called "cigarette rule" developed by the Federal Trade Commission in the context of section 5(a)(1) of the Federal Trade Commission Act. According to the cigarette rule, a court must consider:

(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [ (competitors or other businessmen) ].

*Atlantic Richfield Co. v. Canaan Oil Co.*, 202 Conn. 234, 239, 520 A.2d 1008, 1012 (1987) (alterations in original); *see also FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n. 5, 92 S.Ct. 898, 905 n. 5, 31 L.Ed.2d 170 (1972) (quoting Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed.Reg. 8355 (1964)).

[12] The district court found that Sovereign's breach (and Daka International's role in ordering the breach) offended public policy because it was willful and done exclusively to protect the breaching party's financial security. The defendants maintain, instead, that a simple breach of contract does not offend traditional notions of fairness, and that their actions therefore did not violate CUTPA. We agree with the defendants and the vast majority of courts in Connecticut that a

**\*1039** simple contract breach is not sufficient to establish a violation of CUTPA, particularly where the count alleging CUTPA simply incorporates by reference the breach of contract claim and does not set forth how or in what respect the defendant's activities are either immoral, unethical, unscrupulous or offensive to public policy.

*Chaspek Mfg. Corp. v. Tandet*, 1995 WL 447948, at *12 (Conn.Super.Ct. June 16, 1995) (quoting *Aussenhandel v. Grant AirMass Corp.*, 2

Conn.L.Rptr. 590, 1990 WL 283750 (Conn.Super.Ct.1990) (Lewis, J.)); *see Emlee Equip. Leasing Corp. v. Waterbury Transmission, Inc.*, 41 Conn.Supp. 575, 580, 595 A.2d 951, 954 (1991) (" 'A simple breach of contract, even if intentional, does not amount to a violation of the Act; a [claimant] must show substantial aggravating circumstances attending the breach to recover under the Act....' ") (alteration in original) (quoting *Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 535 (4th Cir.1989) (discussing similar North Carolina unfair trade practices act)); *see also, e.g., Troxler Elec. Labs. v. Palilla*, 1995 WL 299599, at *3 (Conn.Super.Ct. May 10, 1995); *A. Secondino & Son, Inc. v. L.D. Land Co.*, 1994 WL 728775, at *2-*3 (Conn.Super.Ct. Dec. 29, 1994) (recognizing this rule as the majority position in Connecticut); *Set to Fit Realty v. First Stamford Corp.*, 1994 WL 161346, at *6 (Conn.Super.Ct. Apr. 19, 1994); *cf. NLRB v. M & M Oldsmobile, Inc.*, 377 F.2d 712, 715 (2d Cir.1967) (stating that, in context of National Labor Relations Act, breach of contract is "not *ipso facto* an unfair labor practice").

[13] A rule to the contrary-that a company violates CUTPA whenever it breaks an unprofitable deal-would convert every contract dispute into a CUTPA violation. We cannot assume that the Connecticut legislature, in enacting CUTPA, intended such an extraordinary alteration of the common law.[FN5]

> FN5. Boulevard cites *Lester v. Resort Camplands International, Inc.*, 27 Conn.App. 59, 605 A.2d 550 (1992), for the proposition that a simple breach of contract is actionable under CUTPA. But as a subsequent Connecticut decision has explained, *Lester* involved a defendant who lied to entice the plaintiffs to enter into a contract. *A. Secondino & Son*, 1994 WL 728775, at *3 n. 1 (distinguishing *Lester* from a case involving simple breach of contract). We note further that the defendant in *Lester* defrauded individual consumers-a constituency entitled to special solicitude under CUTPA.

Because a breach of contract standing alone does not offend public policy, to invoke CUTPA, Boulevard was required to show that the defendants

engaged in some conduct that was more offensive than simply not paying the rent. We have already rejected the notion that Daka International "intimidated" Boulevard by threatening to breach if the parties did not renegotiate the lease. Furthermore, Daka International's motive for directing Sovereign to stop paying rent-to back out of a business venture that was losing money-is precisely the standard reason for a breach and offends no particular public policy. Boulevard has therefore failed to allege, much less prove, any aggravating circumstances surrounding the breach of the lease, and so we hold that none of the defendants committed an "unfair" or "deceptive" act in violation of CUTPA.

### III. CONCLUSION

Under Connecticut law, a landlord may pursue one of two mutually exclusive remedies against a tenant who has defaulted on the rent: (1) terminate the lease and sue for contractual damages; or (2) continue the lease and sue for back rent. Because Boulevard did not terminate the lease before conveying away its interest, it cannot now sue its former tenant for damages. Nor does the general indemnification clause in the lease provide an independent basis for Boulevard to sue Sovereign for damages resulting from the tenant's nonpayment of rent.

Generally, a parent corporation does not, under Connecticut law, "tortiously" interfere with a contract when it directs its wholly owned subsidiary to breach a contract that threatens a present economic interest of the subsidiary. Even if this general rule were not to apply when the parent employed wrongful means, the record in this case does not support the district court's finding that Daka International used intimidating methods to induce a breach of the contract. We *1040 therefore conclude that Daka International did not tortiously interfere with the lease.

A simple breach of contract cannot constitute a violation of the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. §§ 42-110a to 42-110q. There must be significant aggravating circumstances. Because Boulevard has failed to prove aggravating circumstances, it has not established that any of the defendants violated CUTPA.

Since we conclude that none of the defendants

should have been held liable, we need not decide whether the district court used the correct measure of damages.

For all of the above reasons, we reverse the judgment of the district court.

C.A.2 (Conn.),1995.
Boulevard Associates v. Sovereign Hotels, Inc.
72 F.3d 1029

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

33 S.W.3d 779                                           Page 1
33 S.W.3d 779
**(Cite as: 33 S.W.3d 779)**

▷Waste Conversion Systems, Inc. v. Greenstone
Industries, Inc.
Tenn.,2000.

Supreme Court of Tennessee,at Nashville.
WASTE CONVERSION SYSTEMS, INC.
v.
GREENSTONE INDUSTRIES, INC., et al.
Dec. 20, 2000.

Waste paper seller brought federal-court action
against buyer's parent corporation to recover for
tortious interference with contract. The United States
District Court for the Eastern District of Tennessee,
Leon Jordan, J., certified questions. The Supreme
Court, Holder, J., held as a matter of first impression
that: (1) a parent corporation has a privilege to cause
a wholly-owned subsidiary to breach a contract; (2)
the parent loses its privilege if it acts contrary to its
subsidiary's economic interests or employs wrongful
means; and (3) the seller had the burden of proof.

Questions answered.
West Headnotes
**[1] Torts 379 ☞223**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k223 k. Employees and Agents;
Corporate Entities. Most Cited Cases
    (Formerly 379k16)
A parent corporation has a privilege to cause a
wholly-owned subsidiary to breach a contract without
becoming liable for tortiously interfering with a
contractual relationship.

**[2] Torts 379 ☞228**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k227 Persons Liable
                    379k228 k. In General. Most Cited
Cases
    (Formerly 379k21)
A parent corporation and a subsidiary are so closely
aligned in business interests as to render them, for
tortious interference purposes, the same entity.

**[3] Torts 379 ☞242**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)2 Particular Cases
                379k242 k. Contracts in General. Most
Cited Cases
    (Formerly 379k12)
A parent corporation acting contrary to its wholly-
owned subsidiary's economic interests can be
considered a third party to its subsidiary's contractual
relationship and can be held liable for tortiously
interfering with that relationship.

**[4] Torts 379 ☞258**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)4 Evidence
                379k258 k. Burden of Proof. Most
Cited Cases
    (Formerly 379k27)
Seller claiming tortious interference with contract by
buyer's parent corporation bore the burden of proof to
show that the parent acted detrimentally to the
wholly-owned subsidiary's economic interests and
was not entitled to a privilege to cause a breach.

**[5] Evidence 157 ☞91**

157 Evidence
    157III Burden of Proof
        157k91 k. Party Asserting or Denying
Existence of Facts. Most Cited Cases
The burden of proof generally rests on the party who
affirms, not on the party who denies.

**[6] Torts 379 ☞223**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General

379k223 k. Employees and Agents; Corporate Entities. Most Cited Cases
(Formerly 379k16)
A corporate parent loses its privilege to interfere in its wholly-owned subsidiary's contractual relations if it employs wrongful means, even if the parent does not act contrary to the subsidiary's best interests.

[7] Torts 379 ☞255

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)3 Actions in General
                379k255 k. Pleading. Most Cited Cases
(Formerly 379k27, 379k26(1))

Torts 379 ☞258

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)4 Evidence
                379k258 k. Burden of Proof. Most Cited Cases
(Formerly 379k27)
The burden of pleading and proving that a defendant parent corporation acted with wrongful means in causing its wholly-owned subsidiary to breach a contract and can be liable for tortious interference with contract should be on the plaintiff, once it is established that the defendant corporation owns 100 percent of the stock of the subsidiary in question.

*780 John Allen Lucas, Knoxville, TN, for the petitioners, Greenstone Industries, Inc. and Greenstone Industries-Atlanta, Inc.
Kelli Lynne Thompson and Steven G. Anderson, Knoxville, TN, for the respondent, Waste Conversion Systems, Inc.

OPINION

HOLDER, J., delivered the opinion of the court, in which ANDERSON, C.J., and DROWOTA, BIRCH, and BARKER, JJ., joined.
Pursuant to Rule 23 of the Rules of the Supreme Court of Tennessee, FN1 this Court accepted certification of the following questions from the United States District Court for the Eastern District of Tennessee:

FN1. "The Supreme Court may, at its discretion, answer questions of law certified to it by the Supreme Court of the United States, a Court of Appeals of the United States, a District Court of the United States in Tennessee, or a United States Bankruptcy Court in Tennessee. This rule may be invoked when the certifying court determines that, in a proceeding before it, there are questions of law of this state which will be determinative of the cause and as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court of Tennessee." Tenn.Sup.Ct.R. 23

(1) Can a parent corporation be held liable under Tenn.Code Ann. § 47-50-109 or under Tennessee law for inducing a subsidiary to breach a contract with another party?
(2) Can a parent corporation be held liable for inducing its subsidiary to breach a contract when the parent was acting on behalf of the subsidiary or acting to further the subsidiary's interests? If so, which party bears the burden of pleading and proving whether the parent was acting on behalf of, or to further the interests of, the subsidiary?
(3) For a parent corporation to be held liable for inducing its subsidiary to breach a contract, must the parent induce the breach by wrongful means? If so, what constitutes wrongful means, and which party has the burden of pleading and proving existence of wrongful means?

We hold that a parent corporation has a privilege pursuant to which it can cause a wholly-owned subsidiary to breach a contract without becoming liable for tortiously interfering with a contractual relationship. This privilege, however, is not absolute and may be lost if the parent company acts contrary to the subsidiary's economic interests or if the parent corporation employs wrongful means in such situations. The burden of proof in both instances is on the plaintiff to prove the defendant parent corporation acted in such a way that its privilege was lost.

Waste Conversion Systems, Inc. ("WCS") alleges that it entered into a long-term contract to sell waste paper and similar fiber materials to Greenstone Industries-Atlanta, Inc. ("GSI-A"), the wholly-owned subsidiary of Greenstone Industries, Inc. ("GSI"). It also alleged that the contract specified that GSI-A would purchase a minimum quantity of fiber per month at a fixed price. Had the market price of fiber

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

moved higher during the course of the contract, GSI-A would have benefitted by having a guaranteed source of supply at a low fixed price. However, the market price of fiber fell. It is WCS's contention that, without any legal justification whatsoever, GSI-A refused to accept *781 fiber from WCS so that GSI-A could purchase fiber on the open market at a lower price. The claim against GSI is that it willfully and maliciously induced GSI-A to breach this same contract.

## ANALYSIS

The certified questions presented to this Court are ones of first impression. Our answers to these questions are limited to the relationship between a parent corporation and a wholly-owned subsidiary. The extent to which such answers would apply to situations in which a parent corporation owns less than 100 percent of the stock in a subsidiary is a question not presented in this case.

### I

[1] The first question certified to this Court is whether a parent corporation can be held liable for inducing a wholly-owned subsidiary to breach a contract. Courts from other jurisdictions hold that a parent corporation has a privilege pursuant to which it can cause a wholly-owned subsidiary corporation to breach a contract without becoming liable for inducement of breach of contract. However, the courts do not portray the privilege as an unqualified one, indicating that it can be lost in one of two ways. In *T.P. Leasing Corp. v. Baker Leasing Corp.*, 293 Ark. 166, 732 S.W.2d 480 (1987), the Supreme Court of Arkansas provided an insightful description of the privilege:

We think the correct rule is that a parent corporation's privilege permits it to interfere with another's contractual relations when the contract threatens a present economic interest of its wholly owned subsidiary, absent clear evidence that the parent employed wrongful means or acted with an improper purpose.

*Id.* at 483.

Other jurisdictions have adopted similar rules. See *Oxford Furniture Cos. v. Drexel Heritage Furnishings, Inc.*, 984 F.2d 1118 (11th Cir.1993) (applying Alabama law); *Phil Crowley Steel Corp. v.*

*Sharon Steel Corp.*, 782 F.2d 781, 783-85 (8th Cir.1986) (applying Missouri law; holding that a parent corporation may interfere with its subsidiary's contractual relations when the contract threatens a present, existing economic or reputational interest of the subsidiary); *Green v. Interstate United Mgmt. Servs. Corp.*, 748 F.2d 827 (3d Cir.1984) (applying Pennsylvania law); *James M. King & Assocs., Inc. v. G.D. Van Wagenen Co.*, 717 F.Supp. 667 (D.Minn.1989); *Bendix Corp. v. Adams*, 610 P.2d 24, 29 (Alaska 1980) ("[T]here is general agreement that a corporate shareholder ... would have a sufficient economic interest in a subsidiary corporation to interfere in some of the subsidiary's business relationships."); *Lachenmaier v. First Bank Sys., Inc.*, 246 Mont. 26, 803 P.2d 614 (1990); *Holloway v. Skinner*, 898 S.W.2d 793, 797 (Tex.1995) ("When there is a complete identity of interests [between the party to the contract and the alleged tortfeasor], there can be no interference as a matter of law."). Summarizing the law in this area, the Court of Appeals for the Second Circuit, in *Boulevard Associates v. Sovereign Hotels, Inc.*, 72 F.3d 1029 (2d Cir.1995), stated that "[c]ourts in other states have uniformly found that a parent company does not engage in tortious conduct when it directs its wholly-owned subsidiary to breach a contract that is no longer in the subsidiary's economic interest to perform." *Id.* at 1036 (applying Connecticut law).

[2] The reason for acknowledging the privilege of a parent corporation to interfere in its wholly-owned subsidiary's contractual relations is the usual identity of interests between the subsidiary and its parent. This relationship between the parent and the subsidiary corporation is illustrated in *American Medical International, Inc. v. Giurintano*, 821 S.W.2d 331 (Tex.Ct.App.1991), as follows:

[A] parent and a subsidiary are so closely aligned in business interests as *782 to render them, for tortious interference purposes, the same entity. The court thus ignored the fact that the two were separate entities and held that neither could tortiously interfere with the other because their financial interests were identical, since the parent controlled the subsidiary and its profits.

*Id.* at 336. This illustration corresponds to the analysis by the United States Supreme Court. In *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the Court analyzed the relationship between a parent and subsidiary corporation: A parent and its wholly owned

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

33 S.W.3d 779
33 S.W.3d 779
(Cite as: 33 S.W.3d 779)

subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder.... [I]n reality a parent and a wholly owned subsidiary always have a "unity of purpose or a common design." They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests.

467 U.S. at 771-72, 104 S.Ct. at 2741-42. Even though the Court provided this reasoning in the context of an antitrust case, we believe the underlying relationship between the two corporations would be no different in a tortious interference of contract case.

Courts in Tennessee have not addressed this issue directly, but, in an earlier case, we suggested the direction we are now taking. In _Forrester v. Stockstill_, 869 S.W.2d 328 (Tenn.1994), this Court dealt with the issue of whether an officer, director, or employee of a corporation could be held liable for wrongfully interfering with an at-will employee's employment relationship with such corporation. _Id._ at 330-31. In deciding that issue, we adopted principles analogous to the notion that a corporate parent usually has a unity of interest with its wholly-owned subsidiary. _Id._ at 334-35. In that case, we stated that the wrongful interference with the at-will employment by a third person is actionable only if that person stood as a third party to the employment relationship at the time. _Id._ at 331. Since a corporation can act only upon the advice of its officers and agents and since important societal interests are served by corporations receiving candid advice from these persons, we held that officers, directors, and employees were immune from claims of intentional interference with employment if they act within the general range of their authority and their actions were substantially motivated by an intent to further the interest of the corporation. _Id._ at 334-35. The case, in the end, was decided in favor of the officers because there was insufficient proof that the officers were not acting in furtherance of the corporation's interest. _Id._ at 335;see also _Schlater v. Haynie_, 833 S.W.2d 919, 927 (Tenn.Ct.App.1991). _Forrester_ indicates that Tennessee has recognized a privilege against an interference of contract claim when there is unity of interest between the interfering party and the breaching party. _Forrester_ also shows that the claim can be alleged successfully only when the interfering party is a third party not closely tied to the operations of the breaching corporation.

## II

[3] The second certified question calls upon us to decide whether a parent corporation can lose immunity for acting contrary to its wholly-owned subsidiary's interest and where the burden of proof should lie. Courts in other jurisdictions generally acknowledge that acting contrary*783 to the subsidiary's interest is one of the ways in which a corporate parent loses its privilege to interfere in its subsidiary's contractual relationship. In _Phil Crowley Steel Corp.,_ the Eighth Circuit held that the parent's privilege was lost because it "interfered with the [subsidiary's] contracts for an improper purpose when [it] knowingly acted to the detriment of [the subsidiary] and [its] interest[ ] therein." 782 F.2d at 784. The Second Circuit, in _Boulevard Associates,_ stated that the privilege existed only when the parent directed "the wholly-owned subsidiary to breach a contract that is no longer in the subsidiary's economic interest to perform." 72 F.3d at 1036;see also _James M. King & Assocs.,_ 717 F.Supp. at 681 (defining the privilege as existing only when the parent acts to protect the subsidiary's economic interests); _T.P. Leasing Corp.,_ 732 S.W.2d at 483 (upholding the parent's immunity when the contract threatens the present economic interest of its wholly-owned subsidiary). We believe that the same rule should apply in Tennessee. A parent corporation acting contrary to its wholly-owned subsidiary's economic interests can be considered a third party to its subsidiary's contractual relationship and can be held liable for tortiously interfering with that relationship.

[4][5] With respect to the question of who bears the burden of proof, it is a general principle in Tennessee that the burden rests on the party who affirms, not on the party who denies. In _Donaldson v. Donaldson,_ 557 S.W.2d 60 (Tenn.1977), this Court noted that "[w]hile a complaint in a tort action need not contain in minute detail the facts that give rise to the claim, it either must contain 'direct allegations on every material point necessary to sustain a recovery on any legal theory ... or contain allegations from which an inference may fairly be drawn that evidence on these material points will be introduced at trial.' " _Id._ at 61

(citations omitted). Following the same line of thought, the Court of Appeals commented that "[t]he burden of proof is on the party having the affirmative of the issue, and the burden of proof never shifts. The plaintiff had the burden of proving the elements of her theory of recovery and the facts which she alleged in her complaint." *Winford v. Hawissee Apartment Complex,* 812 S.W.2d 293, 295 (Tenn.Ct.App.1991).

In the case before us, the plaintiff, WCS, is the party attempting to recover from a parent corporation that was not a participant in the contract. The plaintiff is the party affirming the facts regarding the parent's interference with the contract as well as its unlawfulness in doing so. Therefore, once it is established that the subsidiary is wholly-owned by the defendant parent corporation (either as conceded in the plaintiff's complaint or as demonstrated by the defendant), the plaintiff should bear the burden of proof to show that the parent acted detrimentally to the subsidiary's economic interests. This fact should be demonstrated by the plaintiff in addition to the elements of the cause of action. The majority of our sister jurisdictions also place the burden on plaintiffs in this situation. *See, e.g., Advent Sys. Ltd. v. Unisys Corp.,* 925 F.2d 670, 673 (3d Cir.1991) (applying Pennsylvania law); *Phil Crowley Steel Corp.,* 782 F.2d at 783; *American Med. Int'l,* 821 S.W.2d at 337; *Holloway v. Skinner,* 898 S.W.2d 793, 796 (Tex.1995). *But see Bendix Corp.,* 610 P.2d at 29 (Alaska 1980).

### III

[6] The third certified question asks us to decide whether the loss of the parent corporation's privilege can be caused by its use of wrongful means and what constitutes wrongful means. Cases from other jurisdictions indicate that a corporate parent loses its privilege to interfere in its wholly-owned subsidiary's contractual relations if it employs "wrongful means." The privilege can be lost even if the parent does not act contrary to the subsidiary's best interests. In *784Paglin v. Saztec International, Inc.,* 834 F.Supp. 1184 (W.D.Mo.1993) , the court stated that the privilege exists "so long as the parent *does not employ wrongful means* or interfere for an improper purpose." *Id.* at 1196 (emphasis added). The court in *James M. King & Associates,* stated that the privilege exists for a corporate parent "provided it *does not use wrongful means* and acts to protect [its subsidiary's] economic interests." 717 F.Supp. at 681 (emphasis

added).

[7] In defining the meaning of "wrongful means," the court in *Paglin* stated as follows:
In the context of interference with contractual relations, "wrongful means" is defined to include acts which are wrongful in and of themselves, such as "misrepresentations of facts, threats, violence, defamation, trespass, restraint of trade, or any other wrongful act recognized by statute or common law."

834 F.Supp. at 1196. The Second Circuit in *Boulevard Associates* also characterized the term in a narrow manner to include "fraud, misrepresentation, intimidation or molestation." [FN2]72 F.3d at 1037. We find the holdings of both of these cases persuasive and believe that a broad definition encompassing both rules should apply in Tennessee. We also believe that the burden of pleading and proving that the defendant parent corporation acted with wrongful means in causing its wholly-owned subsidiary to breach a contract should be on the plaintiff, once it is established that the defendant corporation owns 100 percent of the stock of the subsidiary in question. Such a holding accords with the Tennessee principles discussed above regarding the burden of proof as well as with the majority view of our sister jurisdictions. *See Advent Sys. Ltd.,* 925 F.2d at 673; *Phil Crowley Steel Corp.,* 782 F.2d at 783; *American Med. Int'l,* 821 S.W.2d at 337; *Holloway,* 898 S.W.2d at 796. *But see Bendix Corp.,* 610 P.2d at 29.

> FN2. The decision in *Boulevard Associates* indicates that the privilege can be lost upon the showing of malice. 72 F.3d at 1037. In Connecticut, unlike the case in Tennessee, malice is not part of the element for procurement of breach of contract. It would not be appropriate in Tennessee to permit the privilege to be lost merely upon a showing of malice because malice is part of the general cause of action and must be shown in all cases. *Testerman v. Tragesser,* 789 S.W.2d 553, 556-57 (Tenn.Ct.App.1989). If the parent corporation's privilege were lost upon a showing of malice, the privilege would be illusory.

### CONCLUSION

33 S.W.3d 779
33 S.W.3d 779
**(Cite as: 33 S.W.3d 779)**

Based on the certified questions posed to this Court, we hold that a parent corporation is privileged to interfere in the contractual relations of a wholly-owned subsidiary and that it is immune from liability for inducing to breach a contract with another party. This privilege, however, can be lost either by acting contrary to such subsidiary's economic interests or by using wrongful means. For this purpose, the definition of wrongful means includes fraud, misrepresentation, threats, violence, defamation, trespass, restraint of trade, intimidation, molestation, or any other wrongful act recognized by statute or common law. Once it is established that the defendant corporation owns 100 percent of the stock of the subsidiary in question, the plaintiff bears the burden of proof to demonstrate that the defendant has lost its privilege by acting contrary to its wholly-owned subsidiary's economic interests or by employing wrongful means in inducing its wholly-owned subsidiary to breach a contract. The clerk will transmit a copy of this opinion in accordance with Tenn.Sup.Ct.R. 23(8). The costs in this Court will be taxed to the respondents, Waste Conversion Systems, Inc.

Tenn.,2000.
Waste Conversion Systems, Inc. v. Greenstone Industries, Inc.
33 S.W.3d 779

END OF DOCUMENT

# EXHIBIT C

Westlaw.

916 F.Supp. 1024                                                    Page 1
916 F.Supp. 1024
**(Cite as: 916 F.Supp. 1024)**

▷Winner's Circle of Las Vegas, Inc. v. AMI
Franchising, Inc.
D.Nev.,1996.

United States District Court,D. Nevada.
WINNER'S CIRCLE OF LAS VEGAS, INC., A
Nevada Corporation, Plaintiff,
v.
AMI FRANCHISING, INC., a Texas Corporation, L
& H Development, Inc., a Nevada Corporation, Does
I through XX, and Roe Corporations, I Through XX,
Inclusive, Defendants.
**No. CV-S-95-1191-PMP (RLH).**

Feb. 15, 1996.

Window tinting franchisee brought state court action
against franchisor for breach of contract and fraud.
After action was removed to federal court on basis of
diversity jurisdiction, and before franchisor filed
answer, franchisee filed amended complaint adding
nondiverse defendant, and filed motion to remand.
The District Court, Pro, J., held that franchisee's
amended complaint adding claim for fraud and
conversion against nondiverse defendant that had
allegedly converted $3,000 at direction of franchisor
was proper, requiring remand due to lack of diversity
jurisdiction.

Motion granted.

West Headnotes

**[1] Removal of Cases 334 🔑118**

334 Removal of Cases
    334VIII Proceedings in Case After Removal
        334k118 k. Amendment of Pleading and
Process, and Repleading. Most Cited Cases
Rule permitting one amendment as of right before
responsive pleading is served cannot be used to
deprive court of jurisdiction over removed action.
Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[2] Removal of Cases 334 🔑102**

334 Removal of Cases
    334VII Remand or Dismissal of Case

        334k101 Grounds for Remand
            334k102 k. Want of Jurisdiction or of
Cause for Removal. Most Cited Cases

**Removal of Cases 334 🔑118**

334 Removal of Cases
    334VIII Proceedings in Case After Removal
        334k118 k. Amendment of Pleading and
Process, and Repleading. Most Cited Cases
Statute permitting court to deny joinder, permit
joinder or remand action to state court if plaintiff
seeks to join additional defendants whose joinder
would have destroyed subject matter jurisdiction over
removal applied in determining whether to remand
breach of contract action that had been removed to
federal court on basis of diversity jurisdiction after
plaintiff attempted to join nondiverse defendant
before original defendant served responsive pleading.
28 U.S.C.A. § 1447(e).

**[3] Removal of Cases 334 🔑102**

334 Removal of Cases
    334VII Remand or Dismissal of Case
        334k101 Grounds for Remand
            334k102 k. Want of Jurisdiction or of
Cause for Removal. Most Cited Cases

**Removal of Cases 334 🔑118**

334 Removal of Cases
    334VIII Proceedings in Case After Removal
        334k118 k. Amendment of Pleading and
Process, and Repleading. Most Cited Cases
In window tinting franchisee's breach of contract and
fraud action against franchisor, franchisee's amended
complaint adding claim for fraud and conversion
against nondiverse defendant that had allegedly
converted $3,000 at direction of franchisor was
proper, requiring remand due to lack of diversity
jurisdiction; facts underlying claim for fraud and
conversion against nondiverse defendant were pled in
original complaint, and amendment merely added
new claim based on those facts. 28 U.S.C.A. §
1447(e); Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[4] Federal Courts 170B 🔑345**

170B Federal Courts
    170BV Amount or Value in Controversy Affecting Jurisdiction
        170Bk344 Aggregation or Joinder of Claims or Demands
           170Bk345 k. Multiple Parties, Claims by or Against. Most Cited Cases
Unrelated claims against multiple defendants may not be aggregated to reach amount in controversy requirement for diversity jurisdiction. 28 U.S.C.A. §§ 1332, 1441(b).

**[5] Federal Courts 170B ☞347**

170B Federal Courts
    170BV Amount or Value in Controversy Affecting Jurisdiction
        170Bk344 Aggregation or Joinder of Claims or Demands
           170Bk347 k. Particular Claims or Demands. Most Cited Cases
Fraud and conversion claim against defendants who allegedly acted in concert was common and undivided, permitting aggregation of claim to satisfy amount in controversy requirement in diversity case. 28 U.S.C.A. §§ 1332, 1441(b).

**[6] Federal Civil Procedure 170A ☞387.1**

170A Federal Civil Procedure
    170AII Parties
        170AII(J) Defects, Objections and Amendments
           170Ak387 Misjoinder
               170Ak387.1 k. In General. Most Cited Cases
Parties are "misjoined" for purposes of rule permitting change in parties due to misjoinder when they fail to satisfy either of preconditions for permissive joinder of parties set forth in rule governing such joinder. Fed.Rules Civ.Proc.Rules 20(a), 21, 28 U.S.C.A.

**[7] Federal Civil Procedure 170A ☞387.1**

170A Federal Civil Procedure
    170AII Parties
        170AII(J) Defects, Objections and Amendments
           170Ak387 Misjoinder
               170Ak387.1 k. In General. Most Cited Cases
Rule permitting change in parties due to misjoinder applies when either claims asserted by or against joint parties do not arise out of same transaction or occurrence or do not present some common question of law or fact. Fed.Rules Civ.Proc.Rule 21, 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ☞387.1**

170A Federal Civil Procedure
    170AII Parties
        170AII(J) Defects, Objections and Amendments
           170Ak387 Misjoinder
               170Ak387.1 k. In General. Most Cited Cases
Franchisor and party allegedly acting at franchisor's direction were not misjoined in franchisee's action, where franchisee's fraud and conversion claim arose out of same transaction or occurrence and presented common questions of law or fact. Fed.Rules Civ.Proc.Rule 21, 28 U.S.C.A.

**[9] Removal of Cases 334 ☞102**

334 Removal of Cases
    334VII Remand or Dismissal of Case
        334k101 Grounds for Remand
           334k102 k. Want of Jurisdiction or of Cause for Removal. Most Cited Cases
Once court has permitted joinder of nondiverse party, statute governing amendments adding additional parties whose presence would destroy diversity permits court only to remand case to state court. 28 U.S.C.A. § 1447(e).

*1025 Erven T. Nelson, Victoria L. Nelson, Daniel D. Heaton, Alverson, Taylor, Mortensen, Nelson & Sanders, Las Vegas, NV, for plaintiff.
Lance P. Maiss, Beckley, Singleton, Jemison & List, Reno, NV, for AMI Franchising.
Dean Y. Kajioka, Kajioka & Christiansen, Las Vegas, NV, for defendants.

*ORDER*

PRO, District Judge.
    There are several motions pending before the Court. Plaintiff Winner's Circle of Las Vegas, Inc. ("Winner's") filed its Motion to Remand; Motion to Strike Defendant AMI's Motion to Dismiss or in the

916 F.Supp. 1024
916 F.Supp. 1024
(Cite as: 916 F.Supp. 1024)

Alternative, to Change Venue (# 4A) on December 22, 1995. Defendant AMI Franchising, Inc. ("AMI") filed its Opposition to Motion to Remand and Motion to Strike (# 8) on January 4, 1996. Winner's filed its Reply (# 14) on January 16, 1996.

Also before the Court is Defendant AMI's Motion to Dismiss or in the Alternative, to Change Venue (# 2), filed December 11, 1995. Winner's filed its Opposition (# 4A) on December 22, 1995. AMI filed a Reply (# 10) on January 5, 1996.

Also before the Court is Defendant L & H Development, Inc.'s ("L & H") Motion to Dismiss (# 13), filed January 12, 1996. Winner's filed its Opposition (# 18) on January 29, 1996. L & H filed its Reply (# 20) on February 8, 1996.

## I. Background

Defendant AMI Franchising, Inc. ("AMI") is a Texas corporation with its principal place of business in Texas. AMI licenses the service mark "Alta Mere" in conjunction with its retail concept known as "Alta Mere Window Tinting and Auto Alarms" stores. On May 22, 1995, AMI and Plaintiff Winner's Circle of Las Vegas, Inc. ("Winner's"), a Nevada corporation with its principal place of business in Nevada, entered into an AMI Franchising, Inc. Franchise Agreement ("Franchise Agreement") in which AMI agreed to provide training and support relating to the opening of a franchise. In August 1995, a dispute arose between the parties whereby each party claimed that the other breached the Franchise Agreement.

On November 8, 1995, Plaintiff Winner's filed its Complaint in Nevada state court against Defendant AMI alleging various causes of action including breach of the Agreement and fraud. That Complaint listed fictitious Defendants in addition to AMI.

On December 7, 1995, AMI filed its Notice of Removal (# 1) on the basis of the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1441(b) and 28 U.S.C. § 1332.

On December 15, 1995, before AMI filed an answer, Winner's filed its First Amended Complaint (# 3), adding a Defendant, L & H Development ("L & H"), a Nevada corporation. Winner's then filed its Motion to Remand on December 22, 1995.

## II. Motion to Remand

AMI properly removed this case as at the time of the removal the lawsuit was between citizens of different states, the amount in controversy exceeded the jurisdictional requirement, and AMI, as the Defendant, was not a citizen of the State of Nevada. 28 U.S.C. § 1332; 28 U.S.C. § 1441. It is undisputed, however, that the presence of L & H as a named Defendant in this lawsuit would divest the Court of jurisdiction over this matter. *Yniques v. Cabral,* 985 F.2d 1031, 1034 n. 1 (9th Cir.1993); *see* 28 U.S.C. § 1332. However, the parties disagree as to the way the Court should cure this defect; Winner's requests the Court remand this *1026 action, and AMI requests the Court (1) "deny" joinder and allow the action to continue, or (2) dismiss the claims against L & H.

[1] Under Rule 15(a), "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served." However, although Winner's may have thought its amendment proper since it was filed "as of right," Rule 15(a) cannot be used to deprive the Court of jurisdiction over a removed action.[FN1] 6 Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice & Procedure: Civil § 1477 (2d ed. 1990); *see also Lyster v. First Nationwide Bank Financial Corp.,* 829 F.Supp. 1163, 1165 (N.D.Cal.1993).

FN1. Moreover, there is a split of authority as to whether an amendment naming a new defendant may only be filed with leave of Court before an answer is filed despite the first sentence of Rule 15(a). *See, e.g., McLellan v. Mississippi Power & Light Co.,* 526 F.2d 870, 872-73 (5th Cir.1976) (Rule 15(a) allows amendment of pleading to add a party as a matter of course before responsive pleading is filed), modified on other grounds, 545 F.2d 919 (5th Cir.1977); *United States ex rel Precision Co., v. Koch Indus., Inc.,* 31 F.3d 1015, 1018 (10th Cir.1994) (same); *but see LaBatt v. Twomey,* 513 F.2d 641, 651 n. 9 (7th Cir.1975) (party must obtain order of court before amending a complaint to add a party, even before a responsive pleading is filed); *Springer-Penguin, Inc. v. Jugoexport,* 648 F.Supp. 468, 470 (D.N.Y.1986) (same). The Ninth Circuit has not ruled on the issue. However, because the Court will use the discretionary

916 F.Supp. 1024
916 F.Supp. 1024
(Cite as: 916 F.Supp. 1024)

review standard of 28 U.S.C. § 1447(e), the Court need not decide this issue now.

[2] Both parties assert that 28 U.S.C. § 1447(e) applies to the Court's analysis in its disposal of the pending motion. That section states as follows:

If after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court.

28 U.S.C. § 1447(e). In this statute Congress has chosen to provide several remedies when a Plaintiff requests leave to amend his complaint to add additional parties whose presence would destroy diversity.

There are several unreported district court cases that apply § 1447(e) as a standard for discretionary review after the party amends the complaint to join a party before the defendant serves a responsive pleading when a plaintiff's motion to remand is pending. See *Lehigh Mechanical, Inc. v. Bell Atlantic Tricon Leasing Corp.*, 1993 WL 298439 (E.D.Pa.1993); *Musick v. John Hancock Distributors, Inc.*,1994 U.S.Dist. LEXIS 10262 (W.D.Mich.1994). In disposing of the motion to remand, the courts in both cases determined that joinder would have been proper under § 1447 and therefore that remand should be allowed. See *Lehigh Mechanical, Inc. v. Bell Atlantic Tricon Leasing Corp.*, 1993 WL 298439;*Musick v. John Hancock Distributors, Inc.*,1994 U.S.Dist. LEXIS 10262 (W.D.Mich.1994). The Court finds these cases persuasive in disposing of the present motion to remand and will use § 1447(e) as a standard for the review of the attempted joinder in disposing of Winner's Motion to Remand (# 4A). This is necessary to avoid a party's manipulation of the lawsuit in order to divest the Court of subject matter jurisdiction. See, e.g., *Jacks v. Torrington Co.*, 256 F.Supp. 282, 287 (D.S.C.1966) ("the continued jurisdiction of a federal court after proper removal will not be allowed to be determined at the whim and caprice of the plaintiff").

The Ninth Circuit has looked to the language of § 1447(e) and reasoned that the language indicates that Congress, when it enacted the section in 1989, intended district courts to have a choice between the options enumerated in § 1447(e) and the options already existing under Fed.R.Civ.P. 19. *Yniques*, 985 F.2d at 1035 (citing *Sweeney v. Westvaco Co.*, 926 F.2d 29, 42 (1st Cir.1991), *cert. denied,*502 U.S. 899, 112 S.Ct. 274, 116 L.Ed.2d 226 (1991)). As the Ninth Circuit explains:

Section 1447(e) and Rule 19*in combination* expand the district court's options for dealing with an attempt to join a necessary, non-diverse party where the case has been removed to federal court. The court may: (1) deem the party "indispensable" and dismiss the case; (2) deem the party *not* indispensable and continue its jurisdiction over the lawsuit without joinder; or (3) allow joinder and remand the case to state court.

*1027Id.* (emphasis in original). The Ninth Circuit then went on to hold that section 1447(e)"allows a district court, once it has permitted the joinder of a non-diverse party, only to remand the case to state court." *Id.* at 1036.

In considering whether to allow joinder under § 1447(e), the Court should consider the following factors:

(1) the extent to which the joinder of a nondiverse party is sought merely to defeat federal jurisdiction; (2) whether plaintiff has been dilatory in asking for amendment; (3) whether plaintiff will be significantly injured if amendment is not allowed; (4) any other factors bearing on the equities.

*Tillman v. CSX Transportation, Inc.*, 929 F.2d 1023, 1029 (5th Cir.1991), *cert. denied,*502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 139 (1991); *see also Desert Empire Bank v. Ins. Co. of North America*, 623 F.2d 1371, 1375-76 (9th Cir.1980) (setting forth similar factors the Court should consider in deciding whether to permit joinder, and noting that the plaintiff's motive in joining nondiverse defendants is important when evaluating removal cases).

**A. Purpose or Motive**

[3] Winner's original Complaint alleged various claims for relief including a claim for relief for fraud, and a claim for relief for breach of contract (the Franchise Agreement). Winner's alleged the following in its original Complaint:

27. Upon the further advice of AMI, Winner's processed VISA and Master Card receipts totalling approximately Three Thousand Dollars ($3000.00) through the Sahara outlet. To date, the Sahara outlet has retained and refused to turn over the Three Thousand Dollars ($3000.00), despite repeated

requests and demands.

28. Upon information and belief, and thereon alleged, the Sahara outlet is owned and operated by AMI.

Complaint (# 1). Winner's does not mention this transaction in its claim for relief based on fraud. *See* Complaint (# 1), ¶¶ 54-61.

In its Amended Complaint (# 3), Winner's alleges the following in its general allegations:

28. Upon the further advice of AMI, Winner's processed VISA and Master Card receipts totalling approximately Three Thousand Dollars ($3000.00) through the Sahara outlet, which is owned by Defendant L & H Development, Inc. To date, the Sahara outlet has retained and refused to turn over the Three Thousand Dollars ($3000.00), despite repeated requests and demands.

Amended Complaint (# 3). Winner's then states a claim for relief for fraud/conversion ("Fourth Claim for Relief"), and further alleges the following:55. AMI and certain unknown Does entered into the Agreement with Winner's, assuring Winner's that Defendants would perform their duties as set forth in the Agreement. Furthermore, at AMI's direction, L & H and certain unknown Does obtained possession of $3,000.00 in credit card slips from Winners, assuring Winner's that the slips would be processed and the money turned over to Winners.

56. The assurances made by Defendants were, in fact, false. In truth, AMI and certain unknown Does intended from the outset to fail to perform their duties under the Agreement so as to cause Winner's franchise to fail, whereupon Defendants would take over the operations of the franchise, which had been established at Winner's expense. Moreover, AMI, L & H, and certain unknown Does intended from the outset to retain the $3,000.00 in credit slips without turning over $3,000.00 cash to Winners.

Amended Complaint (# 3). Thus, Winner's added a claim for fraud and conversion in the amount of $3,000.00, and named both AMI and L & H, alleging that L & H obtained the credit slips at the direction of AMI.

AMI asserts that Winners' motivation in adding L & H as a party is less than exemplary in light of the "minimal claim" alleged against L & H. Specifically, AMI asserts that Winners' fraud/conversion claim

against L & H is unrelated to the parties' conduct with respect to and performance under the Franchise Agreement, the subject of the lawsuit.

**\*1028** Indeed, the claim against L & H relates only to the alleged conversion of $3,000.00. L & H was not a party to the Franchise Agreement at issue in this action, and there are no further claims against L & H relating to the fraud alleged in conjunction with AMI's performance under the Franchise Agreement.

However, the facts which underlie the claim for fraud/conversion were pled in the original Complaint. To the extent that Winner's added a new claim based on these facts, that amendment was proper under Rule 15(a).

[4][5] Furthermore, to the extent that AMI asserts that Winner's claim against L & H is too small for the amount in controversy requirement of the district courts and further evidences Winner's motive to add L & H solely to defeat federal jurisdiction, the Court finds this assertion meritless. It is true that unrelated claims against multiple defendants may not be aggregated to reach the amount in controversy requirement. *Libby, McNeill & Libby v. City Nat. Bank,* 592 F.2d 504, 510 (9th Cir.1978) (court does not have jurisdiction over unrelated claims against separate defendants). However, as the Ninth Circuit has stated:

[T]he tests for aggregating claims of one plaintiff against claims of multiple defendants and of multiple plaintiffs against one defendant are essentially the same: the plaintiff's claims against the defendants must be common and undivided so that the defendants' liability is joint and not several.

*Libby, McNeill & Libby,* 592 F.2d at 510 (quoting *United States v. So. Pac. Transp. Co.,* 543 F.2d 676, 683 n. 9 (9th Cir.1976)) (internal quotations omitted). Winner's alleges a fraud/conversion claim against both AMI and L & H, acting in concert, so that Winner's claim against AMI and L & H is common and undivided.

Finally, Winner's represents that it only added L & H as a Defendant when it determined that L & H, and not AMI, actually owned the Sahara outlet. AMI does not counter this assertion, and clearly does not meet its heavy burden in establishing that Winner's fraudulently joined L & H. *See Ford v. Elsbury,* 32

F.3d 931, 935 (5th Cir.1994); *Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 111 (3d Cir.1990), *cert. denied,*498 U.S. 1085, 111 S.Ct. 959, 112 L.Ed.2d 1046 (1991). The Court therefore finds that this factor weighs in favor of Winner's.

**B. Other factors**

AMI does not assert that Winner's was dilatory in filing the Amended Complaint. Indeed, Winner's filed its Amended Complaint less than six weeks after it filed its original Complaint, and before Defendant AMI answered the Complaint. The Court finds that consideration of this factor weighs in favor of Winner's.

Furthermore, Winner's asserts that it will pursue its claims against L & H should that party be dismissed from the lawsuit. This would result in an inconvenience to Winner's by litigating its claims against L & H in a separate forum. The only prejudice AMI would suffer if the joinder of L & H is approved by the Court is the remand of the case to state court, away from AMI's preferred forum. The Court finds that this factor weighs in favor of Winner's.

Moreover, even were the Court to analyze this problem under Fed.R.Civ.P. 21, the result would be the same. Rule 21 permits a change in the parties due to misjoinder "at any stage in the action." [FN2]Fed.R.Civ.P. 21. Rule 21 applies in actions removed to the federal court. *See*Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure, Civil § 1682 (2d ed. 1986 and 1995 Supp.).

FN2.Rule 21 states as follows:
Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately.
Fed.R.Civ.P. 21.

[6][7][8] Parties are misjoined when they fail to satisfy either of the preconditions for permissive joinder of parties set forth in Rule 20(a). *See* *1029Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 682 (6th Cir.1988); *Jonas v. Conrath*, 149 F.R.D. 520, 523 (S.D.W.Va.1993). In other words,

Rule 21 applies when either (1) the claims asserted by or against the joined parties do not arise out of the same transaction or occurrence or (2) do not present some common question of law or fact. *Michaels Bldg. Co.*, 848 F.2d at 682;*Jonas,* 149 F.R.D. at 523. Because the fraud/conversion claim asserted against AMI and L & H arise out of the same transaction or occurrence and present common questions of law or fact, the parties were not misjoined.

[9] The Ninth Circuit has determined that once the Court has permitted the joinder of a non-diverse party, § 1447(e) permits the Court only to remand the case to state court. *Yniques,* 985 F.2d at 1036. Accordingly, as the Court has determined that joinder was proper in this instance, pursuant to § 1447(e) the Court will remand the case to state court.

IT IS THEREFORE ORDERED THAT Plaintiff Winner's Circle of Las Vegas, Inc.'s Motion to Remand; Motion to Strike Defendant AMI's Motion to Dismiss or in the Alternative, to Change Venue (# 4A) is GRANTED to the extent that it requests remand and DENIED in all other respects;

IT IS FURTHER ORDERED THAT Defendant AMI Franchising, Inc.'s Motion to Dismiss or in the Alternative, to Change Venue (# 2) is DENIED as moot;

IT IS FURTHER ORDERED THAT Defendant L & H Development, Inc.'s Motion to Dismiss (# 13) is DENIED as moot;

IT IS FURTHER ORDERED THAT this matter is remanded to the Eighth Judicial District Court for Clark County, State of Nevada, and that the Clerk shall forthwith mail a certified copy of this Order to the Clerk of the District Court of Clark County, State of Nevada.

D.Nev.,1996.
Winner's Circle of Las Vegas, Inc. v. AMI Franchising, Inc.
916 F.Supp. 1024

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.