1  DONALD J. PUTTERMAN (State Bar No. 90822)
   E-Mail:      dputterman@sideman.com
2  RYAN J. MECKFESSEL (State Bar No. 215952)
   E-Mail:      rmeckfessel@sideman.com
3  MARGARET A. ZIEMIANEK (State Bar No. 233418)
   E-Mail:      mziemianek@sideman.com
4  SIDEMAN & BANCROFT LLP
   One Embarcadero Center, Eighth Floor
5  San Francisco, California 94111-3629
   Telephone:   (415) 392-1960
6  Facsimile:   (415) 392-0827

7  TIMOTHY J. HOBAN (State Bar No. 192461)
   E-Mail:      thoban@tollbrothersinc.com
8  REGIONAL COUNSEL FOR TOLL BROS., INC.
   725 Town & Country Road, Suite 500
9  Orange, California 92868
   Telephone:   (714) 347-1300
10 Facsimile:   (714) 835-9683

11

12 Attorneys for Defendants
   TOLL BROS., INC., a Pennsylvania corporation, and
13 TOLL BROTHERS, INC., a Delaware corporation

14

15              IN THE UNITED STATES DISTRICT COURT

16           FOR THE NORTHERN DISTRICT OF CALIFORNIA

17                      (SAN FRANCISCO DIVISION)

18

19 STONEBRAE L.P., a Delaware limited          CASE NO. C08-00221-EMC
   partnership,
20                                             **E-FILED**
            Plaintiff,
21                                             **APPENDIX OF FOREIGN AUTHORITIES
       v.                                      IN SUPPORT OF DEFENDANT TOLL
22                                             BROS., INC.'S OPPOSITION TO
   TOLL BROS., INC., a Pennsylvania            PLAINTIFF'S MOTION TO REMAND
23 corporation; TOLL BROTHERS, INC., a         ACTION TO STATE COURT**
   Delaware corporation; DOES 1 through 15,
24 inclusive,                                  Date:    March 26, 2008
                                               Time:    10:30 a.m.
25          Defendants.                         Room:    C, 15th Floor
                                               Judge:   Hon. Edward M. Chen
26
                                               Removal Filed: January 11, 2008
27

28

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3629

APPENDIX OF FOREIGN AUTHORITIES RE OPPOSITION TO MOTION TO REMAND

1   Defendant submits this Appendix of Foreign Authorities in support of its Opposition to

2   Plaintiff's Motion to Remand Action to State Court.

3   **Cases**                                                                    **Exhibit**

4   1   *Bendix Corp. v. Adams,*                                                     **A**
        610 P.2d 24 (Alaska, 1980)

5

6   2   *Boulevard Assoc. v. Sovereign Hotels, Inc.,* \*
        72 F.3d 1029 (2d Cir. 1995)

7   3   *Waste Conversion Systems, Inc. v. Greenstone Industries, Inc., et al.,* \*
        33 S.W. 3d 779 (Tenn., 2000)

8

9   4   *Winner's Circle of Las Vegas, Inc. v. SAMI Franchising, Inc.,* \*
        916 F. Supp. 1024, (D. Nev. 1996)

10

11  \* Cases 2-4 are included in Appendix of Foreign Authorities In Support of Defendant Toll

12  Brothers, Inc.'s Motion to Dismiss (docket no. 23).

13

14

15  DATED: March 5, 2008              REGIONAL COUNSEL FOR TOLL BROS., INC.
                                      Timothy J. Hoban
16

17                                    SIDEMAN & BANCROFT LLP
                                      Donald J. Putterman
18                                    Margaret A. Ziemianek
                                      Ryan J. Meckfessel
19

20                                    By:   /s/ Margaret A. Ziemianek
21                                          Margaret A. Ziemianek
                                      Attorneys for Defendants
22                                    TOLL BROS., INC., a Pennsylvania corporation, and
                                      TOLL BROTHERS, INC., a Delaware corporation
23

24  10644\560927v1

25

26

27

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8ᵀᴴ FLOOR
SAN FRANCISCO, CALIFORNIA 94111

# EXHIBIT A

Westlaw.

610 P.2d 24
610 P.2d 24
**(Cite as: 610 P.2d 24)**

▷Bendix Corp. v. Adams
Alaska, 1980.

Supreme Court of Alaska.
The BENDIX CORPORATION, Appellant and
Cross-Appellee,
v.
James S. ADAMS, d/b/a Adams Barge Company,
Appellee and Cross-Appellant.
**Nos. 3960, 3966.**

March 14, 1980.

Parent corporation appealed from judgment of the Superior Court, Third Judicial District, Eben H. Lewis, J., which held it liable to former employee of a subsidiary for tortious interference with an employment contract. The Supreme Court, Boochever, J., held that: (1) there was sufficient evidence to establish a prima facie case of tortious interference with contract; (2) parent corporation's directive to subsidiary to terminate its survey project was motivated by a legitimate concern for its investment; thus, parent was privileged to interfere in subsidiary's contract with plaintiff to render services in connection with the survey project, and (3) despite evidence establishing that project for which plaintiff's services were contracted was funded by parent corporation, evidence was insufficient to establish that subsidiary, in negotiating employment contract and later breaching such contract, was acting as agent of parent corporation so as to entitle plaintiff to maintain breach of contract claim against parent corporation.

Judgment against parent corporation reversed and cause against it dismissed.

West Headnotes

**[1] Torts 379 ☞212**

379 Torts
  379III Tortious Interference
    379III(B) Business or Contractual Relations
      379III(B)1 In General
        379k212 k. Contracts. Most Cited
Cases
    (Formerly 379k27)
Prima facie case of tortious interference with contract is established by showing: (1) valid contract existing between plaintiff and another person; (2) defendant had knowledge of the contract and intended to induce a breach thereof; (3) contract was breached by other party thereto; (4) breach was caused by defendant's wrongful or unjustified conduct; and (5) plaintiff suffered damage as result of breach.

**[2] Appeal and Error 30 ☞863**

30 Appeal and Error
  30XVI Review
    30XVI(A) Scope, Standards, and Extent, in General
      30k862 Extent of Review Dependent on Nature of Decision Appealed from
        30k863 k. In General. Most Cited Cases

**Appeal and Error 30 ☞866(3)**

30 Appeal and Error
  30XVI Review
    30XVI(A) Scope, Standards, and Extent, in General
      30k862 Extent of Review Dependent on Nature of Decision Appealed from
        30k866 On Appeal from Decision on Motion for Dismissal or Nonsuit or Direction of Verdict
          30k866(3) k. Appeal from Ruling on Motion to Direct Verdict. Most Cited Cases
Standard of review for motions for directed verdict and judgment n. o. v. is to determine whether evidence, when viewed in light most favorable to nonmoving party, is such that reasonable men could not differ in their judgment; test is objective and, if there is room for diversity of opinion among reasonable people, question is one for the jury.

**[3] Corporations 101 ☞428(2)**

101 Corporations
  101XI Corporate Powers and Liabilities
    101XI(B) Representation of Corporation by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

610 P.2d 24
610 P.2d 24
(Cite as: 610 P.2d 24)

Officers and Agents
    101k428 Notice to Officer or Agent as Affecting Corporation
        101k428(2) k. Tortious Acts. Most Cited Cases
Knowledge of chairman of board of two subsidiaries as to plaintiff's employment contract would be imputed to parent corporation for purposes of claim for tortious interference with contract if board chairman, who had management contract with parent, was agent of parent; even if board chairman was not agent, evidence was nevertheless sufficient to present jury question as to parent's knowledge of subsidiary's arrangements with plaintiff.

[4] Torts 379 ☜272

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)5 Questions of Law or Fact
                379k272 k. Contracts in General. Most Cited Cases
    (Formerly 379k28)
Evidence, which indicated that parent corporation issued a directive preventing subsidiary from carrying out its survey project, was sufficient to present jury question as to whether parent's conduct with respect to cessation of such project was material and substantial cause of breach of subsidiary's employment contract with plaintiff so as to establish an essential element of claim for tortious interference with contract.

[5] Torts 379 ☜258

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)4 Evidence
                379k258 k. Burden of Proof. Most Cited Cases
    (Formerly 379k27)
Parent corporation, against whom prima facie case of tortious interference with contract was established, had burden of proving that its conduct was privileged or justified.

[6] Torts 379 ☜220

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k220 k. Defense, Justification or Privilege in General. Most Cited Cases
    (Formerly 379k10(1))
Person may be privileged to interfere in certain business relations in order to protect an investment.

[7] Torts 379 ☜223

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k223 k. Employees and Agents; Corporate Entities. Most Cited Cases
    (Formerly 379k10(1))
Corporate shareholder, such as a parent corporation, has a sufficient economic interest in a subsidiary corporation to interfere in some of the subsidiary's business relationships.

[8] Torts 379 ☜220

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k220 k. Defense, Justification or Privilege in General. Most Cited Cases
    (Formerly 379k10(1))
Privilege to interfere in business relations in order to protect an investment applies to existing contracts under appropriate circumstances.

[9] Torts 379 ☜220

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k220 k. Defense, Justification or Privilege in General. Most Cited Cases
    (Formerly 379k12)
Where there is a direct financial interest in a contract, essential question in determining if interference is justified is whether person's conduct is motivated by a desire to protect his economic interests, or whether

610 P.2d 24
610 P.2d 24
(Cite as: 610 P.2d 24)

Page 3

it is motivated by spite, malice, or some improper objective.

**[10] Torts 379 ☞242**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)2 Particular Cases
                379k242 k. Contracts in General. Most
Cited Cases
    (Formerly 379k12)
Parent corporation's directive to subsidiary to terminate its survey project was motivated by a legitimate concern for its investment; thus, parent was privileged to interfere in subsidiary's contract with plaintiff to render services in connection with the survey project.

**[11] Principal and Agent 308 ☞23(1)**

308 Principal and Agent
    308I The Relation
        308I(A) Creation and Existence
            308k18 Evidence of Agency
                308k23 Weight and Sufficiency
                    308k23(1) k. In General. Most Cited
Cases
Despite evidence establishing that project for which plaintiff's services were contracted was funded by parent corporation, evidence was insufficient to establish that subsidiary, in negotiating employment contract and in later breaching such contract, was acting as agent of parent corporation so as to entitle plaintiff to maintain breach of contract claim against parent corporation.

**[12] Corporations 101 ☞432(1)**

101 Corporations
    101XI Corporate Powers and Liabilities
        101XI(B) Representation of Corporation by
Officers and Agents
            101k432 Evidence as to Authority
                101k432(1) k. Presumptions as to
Authority in General. Most Cited Cases
A subsidiary is not presumed to be agent of its parent corporation.

**\*25** Kenneth P. Eggers, Groh, Eggers, Robinson,

Price & Johnson, Anchorage, for appellant and cross-appellee.
Douglas J. Serdahely, Birch, Horton, Bittner & Monroe, and Robert Libbey, Daniel Westerburg, Anchorage, for appellee and cross-appellant.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

BOOCHEVER, Justice.
    The essential question in this case is whether the Bendix Corporation can be held liable for tortiously interfering with a contract between one of its former subsidiary companies, Marine Advisers, Inc. and James S. Adams, d/b/a Adams Barge Company. After trial by jury, Marine and Bendix were held jointly liable to Adams. In this appeal by Bendix, Marine's liability is not disputed, nor is the validity of the contract between Marine and Adams. In a cross-appeal by Adams, Adams contends that Bendix can be found liable in contract if not liable in tort.

    Our conclusion is that Bendix was privileged to interfere in the Marine Advisors-Adams contract because it had a direct financial interest in the contract. There was insufficient evidence to establish that Bendix was a contracting party with Adams. Consequently, the judgment of the superior court must be reversed in part, and Bendix must be dismissed from the case.

    Marine Advisors was formed in 1956 and incorporated in 1961. In 1966, the Bendix Corporation purchased all the outstanding stock in Marine. From 1966 until 1971, during the events of this case, Marine was a wholly-owned Bendix subsidiary. In 1971, Bendix transferred Marine's functions that related to the manufacture of marine instruments to the East Coast. Stock in the remainder of the company, which consisted of an oceanographic consulting business, was sold to Intersea Research in 1971. Since then, Marine has been an inactive company.

    During the latter portion of 1969, there was a frenzy of activity on Alaska's North Slope related to the Prudhoe Bay oil lease sale by the state. Marine Advisers apparently considered that marine survey data would be in great demand by the oil companies. In the summer of 1969, it planned a **\*26** project to collect and compile data about oceanographic

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

610 P.2d 24
610 P.2d 24
**(Cite as: 610 P.2d 24)**

Page 4

conditions in Prudhoe Bay without any commitment or contract from a potential purchaser to pay for the results. The record shows that sometime in August, 1969, Bendix approved funding for the North Slope project on the speculative basis proposed by Marine.[FN1]

> FN1. In his testimony, Marine's vice president, Charles Rambo, described the disbursement of funds from Bendix as follows:
> A. (Rambo) Bendix operated with its divisions or subsidiaries more or less as the bank account. You went to the Bendix management with a request with the rationale or whatever, and something was approved on that basis.
> Q. And did you pay interest on those funds?
> A. Yes, we did.

When funding was approved, Paul Horrer, Marine's president and a member of its Board of Directors, contacted Adams to arrange a vessel charter for Marine's survey work during the remainder of the 1969 summer navigation season. Charles Rambo, Marine's vice president and project manager, met with Adams in Barrow, Alaska, in early September to negotiate a final contract. The contract called for two barges and two LCMs (a military-type landing vehicle). Shortly after they signed a contract, Adams left Barrow for Prudhoe Bay.

Rambo, who had not accompanied the charter party, flew out to one of Adams' barges on September 13 to discuss the survey with Marine's party chief. Adams claims that during this visit by Rambo, modifications were made to the original 1969 charter to cover the 1970 season. Rambo testified that he never had any such discussions with Adams, never made any oral modifications, and may never have even seen Adams while he was on the barges. Despite this contradictory testimony concerning the existence of a contract for the 1970 season, it is undisputed that Adams beached his vessels near Prudhoe Bay during the winter of 1969-70, and Marine left its equipment on board. A memorandum circulated by Marine showed that Marine thought it would give it a competitive advantage for contracts in the area during the following summer to have its equipment on board Adams' barges in Prudhoe Bay during the winter of 1969-70.

In the late fall of 1969, the North Slope boom ended. The Trans-Alaska Pipeline became embroiled in controversy surrounding Native land claims and possible environmental damage. The voyage of the ice breaking tanker Manhattan demonstrated that carrying oil to the East Coast of the United States was impractical. With the exception of one sale of $1,000.00, Marine, after spending approximately $300,000, was unable to find a customer for the data it had gathered during 1969. In January, 1970, Marine lost a bid on a million-dollar contract with Humble Oil. As discussed in more detail below, at some point in late 1969 or early 1970, Bendix management apparently concluded that Marine would not be permitted to conduct any further survey work in the Arctic unless Marine could negotiate a firm contract for its work. Marine continued looking for a customer until the spring of 1970, but was unsuccessful. The Prudhoe Bay project was then abandoned. Marine never paid Adams for the 1970 season, and in fact it did not offload its equipment until 1971.[FN2]

> FN2. The large amount of Marine's equipment would have apparently prevented Adams from using his barges for any other purpose during the 1970 season. Among other things, Marine's equipment included a drill rig, drill casings, drilling mud, a 27-foot trailer, a house, lumber and electronic equipment. A hole was cut through the bottom of one of the barges to accommodate the drill rig and various items were welded to the vessels.

In an amended complaint filed on June 30, 1976, Adams sued Marine and Bendix for breach of contract for the 1970 season and also sued Bendix for tortious interference with contract.[FN3] After trial, the jury held both Marine and Bendix jointly liable for $67,400.00. The court entered judgment *27 on January 25, 1978, awarding damages to Adams. Included in the total judgment of $134,265.91 was an award of prejudgment interest of $38,586.04 calculated at eight per cent from October 30, 1970, to January 25, 1978.[FN4]

> FN3. A theory of recovery against Bendix based upon tortious interference with contract may have been barred by the two-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

year tort statute of limitations, AS 09.10.070, but Bendix never raised this point at trial or on appeal so it is not considered in this opinion.

FN4. In addition to damages and interest, the total award also included $4,279.87 in costs and $24,000.00 in attorney's fees to bring the total to $134,265.91.

I. Elements of a Prima Facie Case of Interference with Contract

[1] Alaska recognized the theory of tortious interference with contract in Long v. Newby, 488 P.2d 719 (Alaska 1971). In Weiss v. Marcus, 51 Cal.App.3d 590, 124 Cal.Rptr. 297 (1975), a California Court of Appeal listed the following five elements of a prima facie case:
(1) a valid contract existing between plaintiff and another person; (2) defendant had knowledge of the contract and intended to induce a breach thereof; (3) the contract was breached by the other party thereto; (4) the breach was caused by defendant's wrongful or unjustified conduct; (5) plaintiff suffered damage as a result of the breach.

Id., 124 Cal.Rptr. at 304.[FN5]

FN5. For other cases listing these elements, see Harber v. Ohio National Life Ins. Co., 390 F.Supp. 678, 683 (D.C.Mo.1974), aff'd, 512 F.2d 170 (8th Cir. 1975); Childress v. Abeles, 240 N.C. 667, 84 S.E.2d 176, 181-82 (1954). See generally W. Prosser, The Law of Torts, s 130 at 949-69 (4th ed. 1971); 1 F. Harper and F. James, The Law of Torts ss 6.5-6.12 at 489-517 (1956); Note, Developments in the Law Competitive Torts, 77 Harv.L.Rev. 888, 959-68 (1964).

Bendix argues that Adams presented insufficient evidence to show that Bendix knew of the contract between Adams and Marine, or that its conduct caused the breach. Bendix claims the trial judge erroneously denied its motion for a directed verdict and judgment n. o. v.

[2] The standard of review for motions for directed verdict and judgment n. o. v. is "to

determine whether the evidence, when viewed in the light most favorable to the nonmoving party, is such that reasonable men could not differ in their judgment."Holiday Inns of America, Inc. v. Peck, 520 P.2d 87, 92 (Alaska 1974)."The test is objective; and, if there is room for diversity of opinion among reasonable people, the question is one for the jury."City of Whittier v. Whittier Fuel & Marine Corp., 577 P.2d 216, 220 (Alaska 1978).

[3] At trial there was introduced sufficient evidence of Bendix's knowledge of the Marine-Adams contract to make the question properly one for the jury.

Hugh Thralls was chairman of the board of both Marine and United Geophysical, another wholly-owned subsidiary of Bendix. From 1968 to 1972, he had a "4-year contract with the Bendix Corporation to manage their engineering resources area."In particular, Thralls testified that he was "very familiar" with Marine's individual projects, and that he knew about Adams. Paul Horrer, president of Marine, testified that Thralls knew Marine's equipment was on board Adams' barges in 1970. A memorandum addressed to Thralls from Horrer on September 26, 1969, discusses the fact that in 1970 Marine would have its equipment in the Prudhoe Bay area before its competitors.

Bendix argues that knowledge of Hugh Thralls cannot be imputed to the Bendix Corporation, citing the Restatement (Second) of Agency s 14C (1958), which states:
Neither the board of directors nor an individual director of a business is, as such, an agent of the corporation or of its members.

Bendix's argument misses the point. The Restatement section would apply in a situation where one might attempt to prove that Thralls was the agent of Marine Advisors. The fact that Thralls was a member of Marine's board is irrelevant to the question of whether he was an agent of the Bendix Corporation. The appropriate rule is the Restatement (Second) of Agency s 272 (1958) and Comment a to that section, which states:*28 (T)he liability of a principal is affected by the knowledge of an agent concerning a matter as to which he acts within his power to bind the principal or upon which it is his duty to give the principal information.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Comment a. . . . The principal is affected by the agent's knowledge whenever the knowledge is of importance in the act which the agent is authorized to perform. The knowledge may be of importance where:

(2) the conduct of an agent or principal interferes with the protected interest of another and thereby may constitute a tort against such other . . . .

Thralls' management contract with Bendix would support an inference that he was an agent of Bendix. Although there may have been some dispute over the existence of a valid contract between Adams and Marine, there was enough evidence in the record, given the fact that Marine stored its equipment aboard Adams' barges in 1970, to find that Thralls knew of some arrangement with Adams. Under the Restatement view, Adams would not need to prove that Thralls knew of an actual legal contract in any event, so long as he knew of underlying facts which would give rise to contractual liability. Restatement (Second) of Torts s 766, Comment g (1979).

In addition to Thralls, two Bendix employees sat on Marine's board. One was R. J. Shaffer, Bendix's West Coast legal advisor. Shaffer was an addressee on Horrer's September 26 memorandum. Horrer apparently intended to keep Shaffer informed of Marine's operations. C. E. Heitman, a Bendix vice-president, also sat on Marine's board. Even if Thralls were not an agent of Bendix, there was sufficient evidence to support an inference that the two Bendix employees on Marine's board would have had some knowledge of Marine's arrangements with Adams.

[4] Bendix's second contention, that a decision to cease speculative activity on the North Slope was not a "material and substantial" cause of a breach of Adams' contract, was also a question for the jury. W. Prosser, The Law of Torts s 129 at 934 (4th ed. 1971); Restatement (Second) of Torts s 766, Comment o (1979). Because of the general uncertainty of business conditions on the North Slope in 1970, and Marine's inability to obtain work on contract, it would be reasonable to assume that by ordering a cessation in speculative work, Marine might be forced to breach its contract with Adams.

Contrary to Bendix's contention, there was sufficient evidence in the record to infer that Bendix management issued a directive preventing Marine

from carrying out its proposed plan to continue speculative survey work in the Arctic. In a portion of a pretrial deposition read at trial, Marine's vice president, Charles Rambo, described the decision as follows:

A. (Rambo) We were directed by Bendix, and I'm not sure of the date, time, context, here that we were that we would not pursue anything of a speculative nature from that point on.

Q. And this project (Prudhoe Bay) included?

A. That's right.

Paul Horrer, Marine's president and a board member, also testified concerning the decision in his deposition. Q. In addition, by that time you had received a binding directive from Bendix not to proceed on your own with it.

A. (Horrer) Yes.

Q. Does the board of directors institute such a restriction? I mean, is there one man that can do so or is it a board decision that then becomes a binding decision?

A. As I recall, it was a board decision, but one man issued the directive.

Q. Who would that man would have been that man?

A. That man was Hugh Thralls, who was the group executive to whom I reported.

Q. Group executive that actually controls the various subsidiary operations?

*29 A. Yes, 2 subsidiaries reported to him, one was United Geophysical and the other Marine Advisors.

Q. His directive is sufficient, he does not he doesn't need any further authority, is that correct? Or did not.

A. That is correct.

Although Bendix introduced contradictory testimony at trial in an attempt to prove that Marine made an independent decision to cease speculative activity, the question was one for the jury, and the jury resolved the conflict in favor of Adams. In summary, there was sufficient evidence to establish a prima facie case.

II. Privilege to Interfere with Contract

[5] The burden of proving that Bendix's conduct was privileged or justified was on the defendants. Alyeska Pipeline Service Co. v. Aurora

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

610 P.2d 24
610 P.2d 24
**(Cite as: 610 P.2d 24)**

Air Service, Inc., 604 P.2d 1090, 1095, (Alaska 1979)Griswold v. Heat, Inc., 108 N.H. 119, 229 A.2d 183, 188 (1967).

[6][7] The authorities are in agreement that a person may be privileged to interfere in certain business relations in order to protect an investment.[FN6] Furthermore, there is general agreement that a corporate shareholder, such as Bendix, would have a sufficient economic interest in a subsidiary corporation to interfere in some of the subsidiary's business relationships.[FN7]

> FN6.Babson Brothers Co. v. Allison, 337 So.2d 848, 850 (Fla.App.1976); Griswold v. Heat, Inc., 108 N.H. 119, 229 A.2d 183, 187-88 (1967); W. Prosser, The Law of Torts s 129 at 944-45 (4th ed. 1971); Restatement (Second) of Torts s 769 (1979).

> FN7.Babson Brothers Co. v. Allison, 337 So.2d 848, 850 (Fla.App.1976); Felsen v. Sol Cafe Mfg. Corp., 24 N.Y.2d 682, 686, 301 N.Y.S.2d 610, 613, 249 N.E.2d 459, 461 (1969); Restatement (Second) of Torts s 769, Comment c (1979).

Adams argues, however, that this shareholder's privilege does not extend to existing contracts, but only to prospective contracts. For this distinction, Adams relies principally upon language in s 769 and Comment d to that section as it appeared in the original 1939 version of the Restatement of Torts.[FN8] In the original Restatement, Comment d read as follows:

> FN8. In the original 1939 Restatement of Torts, s 769 read:

One who has a financial interest in the business of another is privileged purposely to cause him not to enter into or continue a relation with a third person in that business if the actor

(a) does not employ improper means, and

(b) acts to protect his interest from being prejudiced by the relation.

The rule stated in this section (allowing one to interfere in a business relationship) does not apply to the causing of a breach of contract (see Scope Note to this Topic and section 767).

The superior court judge apparently accepted

Adams' argument, and submitted the following instruction to the jury over Bendix's objection:

A stockholder having controlling financial interest in the business of another is privileged purposely to cause him not to enter into or continue a relation with a third person in that business if the stockholder:

(1) does not employ improper means; and

(2) acts to protect his interest from being prejudiced by the relation.

The rule thus stated does not apply to the causing of a breach of contract. (Emphasis added.)

The defendants objected to this instruction because it would prevent the jury from finding that Bendix's conduct was privileged if it determined that Marine and Adams had an existing contract. Bendix correctly notes that the proper interpretation of comment d is that when an existing contract is involved, the reader is directed to s 767. Comment d does not preclude a privilege to interfere in an existing contract, it does not deal with the subject.

Any ambiguity that may have existed in the 1939 edition of the Restatement has been conclusively removed by recent revisions in the Restatement (Second) of Torts (1979).[FN9] Comment d to s 769 has now been **\*30** replaced by comment b to that section, which reads:

> FN9. The volume which contains these revisions was published after trial.

The rule stated in this section does not apply to the causing of a breach of contract. (See s 766.) This does not imply, however, that the actor's interference is necessarily improper in such a case under the general principles stated in s 767.

[8] Consequently, the instruction was based on an erroneous construction of the provisions of the Restatement. We hold that the privilege to interfere in business relations in order to protect an investment does apply to existing contracts under appropriate circumstances and, accordingly, it was error to give the instruction.

To determine under what circumstances there is a privilege to interfere in a presently-existing contract, we must decide whether to adopt the criteria suggested in s 767 of the Restatement or some other

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

standard.[FN10] Unfortunately, the comments and bulk of cases citing s 767 deal with torts by competitors and are of little help here. A typical case involves a situation where one competitor attempts to lure a valuable employee or customer into breaching a contract with another competitor.[FN11] Where the means used are improper, such as where a defendant tears down his competitor's sign, or converts a carload of his goods and causes the post office to misdeliver his mail, the results are obvious.[FN12] It is more difficult to predict a result where proper means are used. The courts ordinarily balance the need for free competition with the undesirable effect of disrupting contractual stability. The decisions have not been entirely harmonious.[FN13]

FN10. As revised by the Restatement (Second), s 767 now reads:
In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
(a) the nature of the actor's conduct,
(b) the actor's motive,
(c) the interests of the other with which the actor's conduct interferes,
(d) the interests sought to be advanced by the actor,
(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
(f) the proximity or remoteness of the actor's conduct to the interference and
(g) the relations between the parties.
Besides some reordering in the subsections, the new version of s 767 added subsections (b) and (f). See Restatement of Torts s 767 (1939).

FN11. National Oil Co. v. Phillips Petroleum Co., 265 F.Supp. 320 (W.D.Wis.1966) (defendant lured away oil jobber); Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 482 Pa. 416, 393 A.2d 1175 (1978) (splinter group of associates leaves law firm and attempts to take away clients from old firm).

FN12. Twin Falls Farm and City Distributing, Inc. v. D. & B. Supply Co., 96 Idaho 351, 528 P.2d 1286, 1294 (1974);

Kelite Products v. Binzel, 224 F.2d 131 (5th Cir. 1955).

FN13. In a case frequently quoted by California courts, Imperial Ice Co. v. Rossier, 18 Cal.2d 33, 112 P.2d 631, 633 (1941), Justice Traynor concluded that "contractual stability is generally accepted as of greater importance than competitive freedom."

There appears to be a significant distinction, however, between the interests of a person in his competitor's contracts and those contracts in which he has some direct financial interest. One who interferes with a competitor's contracts ordinarily has little to lose and much to gain by successfully causing a breach of contract. Encouraging contractual stability may require imposing legal liability to stop such behavior when it steps beyond limits acceptable to society. But in a case where a person has some direct financial stake in a contract, it appears logical that a person's own economic self-interest would discourage causing a breach of contract because there would be some personal loss. For example, it seems that a stockholder in a closely held corporation would not ordinarily want to interfere in the corporation's contracts because the corporation would become liable for breach of contract, jeopardizing the value of the stockholder's own investment. Accordingly, where a direct interest in a contract is involved, there is reason to be more liberal in granting the privilege to interfere with an existing contract.

*31 Case law has been fairly consistent in recognizing a privilege when a direct financial interest with a contract is involved. At least two cases have involved interference with contracts by corporations with common groups of stockholders. In Felsen v. Sol Cafe Manufacturing Corp., 24 N.Y.2d 682, 301 N.Y.S.2d 610, 249 N.E.2d 459 (1969), the New York Court of Appeals concluded that a parent corporation was entitled to cause the breach of an employment contract between a subsidiary corporation and its treasurer absent "malice" toward the employee, or "illegal" conduct. The court concluded that the parent was concerned with the internal management of its subsidiary, a legitimate economic concern.

In Babson Brothers Co. v. Allison, 337 So.2d

610 P.2d 24
610 P.2d 24
(Cite as: 610 P.2d 24)

848 (Fla.App.1976), a Florida Court of Appeal concluded that an Illinois corporation could interfere in a dealership arrangement between a Florida corporation and a dealer in that state where the same two families held a controlling interest in both corporations. The court focused on the "clear financial interest" of the stockholders in the two corporations.

Several cases have held that a corporate officer or shareholder is justified in causing the breach of an employment contract with the corporation so long as the breach was procured "in good faith" and not "contrary to those (interests) of the corporation."Griswold v. Heat, Inc., 108 N.H. 119, 229 A.2d 183, 188 (1967); Worrick v. Flora, 133 Ill.App.2d 755, 272 N.E.2d 708, 711 (1971).

The courts have recognized a variety of other economic interests as supporting the privilege. In Bergfeld v. Stork, 7 Ill.App.3d 486, 288 N.E.2d 15 (1972), the court concluded that a lessor had a sufficient economic interest in his property to interfere in a sublease that caused a potential purchaser not to buy a tenant's business. The court noted that it was "not inconsistent with a good faith purpose."Id. 288 N.E.2d at 18. In Nitzberg v. Zalesky, 370 So.2d 389 (Fla.App.1979), the court concluded that a lending institution could condition a loan of additional funds to a corporation on the requirement that plaintiff, a corporate employee, be paid less. Two cases have recognized that taxpayers (corporate and individual) are privileged to cause the breach of a contract between a municipal government and a third party.Bledsoe v. Watson, 30 Cal.App.3d 105, 106 Cal.Rptr. 197, 198-99 (1973); Middlesex Concrete Products and Excavating Corp. v. Carteret Industrial Association, 37 N.J. 507, 181 A.2d 774, 781 (1962). Finally, our opinion in Alyeska Pipeline Service Co. v. Aurora Air Service, Inc., 604 P.2d 1090, 1093 (Alaska 1979), adopted a "good faith" test to determine if Alyeska could interfere in the performance of a contract between one of its subcontractors and Aurora Air Service, where Alyeska alleged that it was concerned with air safety.

[9] Our conclusion is that, where there is a direct financial interest in a contract, the essential question in determining if interference is justified is whether the person's conduct is motivated by a desire to protect his economic interest, or whether it is motivated by spite, malice, or some other improper objective.

[10] In applying this test to the present case, we are convinced that any Bendix directive that may have prevented Marine from fulfilling its contract obligations to Adams was motivated by a legitimate concern for Bendix's investment.

Adams does not appear to allege anywhere that the Bendix directive was the product of ill will or maliciousness. In fact, the directive was apparently not aimed at Adams at all. Marine might have continued to do business with Adams had it been able to find someone willing to purchase its survey data on a contractual basis. In his opening argument, Adams' lawyer argued that Marine "turned on Mr. Adams and deliberately undercut his own effectiveness."The charge was raised in connection with Adams' attempt to offload the equipment from the barges during 1970, and does not seem to involve Bendix. The only direct contact Adams had with a Bendix employee seems to have occurred at a meeting in 1971, well after the contract was breached,*32 when Adams demanded payment for the 1970 season from Marine. Bendix's regional counsel, Shaffer, attended the meeting.

This case is distinguishable from our opinion in Alyeska. In that case, there was evidence from which a jury might conclude that Alyeska was motivated to interfere in a contract between its subcontractor, RCA, and Aurora Air Service, to retaliate for a payment dispute between Aurora and Alyeska. There is no element of retaliation here.

The evidence demonstrates that Marine's inability to sell its survey data, combined with poor business conditions on the North Slope generally, called for prudence in investing additional funds in speculative survey work. Under the circumstances, Bendix was justified in making a decision that would ultimately cause one of its subsidiaries to become liable for breach of contract. Bendix's motion for judgment n. o. v. should have been granted.

III. Bendix's Liability as a Contracting Party

At the conclusion of Adams' case-in-chief, Bendix moved for a directed verdict against Adams. The court denied the motion on the tortious

interference claim, but granted Bendix's motion on Adams' claim for breach of contract. Adams' theory is that Bendix was a party to the contract either because Marine was the instrumentality of Bendix, or it was acting as the agent of Bendix.

[11] There was insufficient evidence to support Adams' claim that Marine, in negotiating and later breaching its contract, "was merely serving as a department or an 'instrumentality' of the parent corporation." We considered a similar claim in Jackson v. General Electric Co., 514 P.2d 1170 (Alaska 1973). In Jackson, the plaintiff brought a defamation action against General Electric and its wholly-owned subsidiary, the General Electric Credit Corporation (GECC). The evidence showed that GECC financed a substantial portion of General Electric's credit sales. The two companies filed consolidated income tax returns. The directors and officers of GECC were all officers or employees of General Electric. Despite these facts, we affirmed the trial court's dismissal of General Electric because it was not responsible for GECC's conduct. We noted that appellant "offered no evidence to show that GECC was underfinanced, or that GE used the property of GECC as its own, or paid the salaries, losses or expenses of GECC." 514 P.2d at 1174.

Adams notes that a number of the criteria that might be used to evaluate the relationship between two corporations that were suggested in Jackson apply to the relationship between Marine and Bendix. Although this may be so, more important than the quantitative approach urged by Adams is the fact that there is no suggestion anywhere in the record that Marine was created to "defeat public convenience, justify wrong, commit fraud, or defend crime." 514 P.2d at 1172-73. Furthermore, as one authority has noted:

It is to be expected that a subsidiary will be controlled by its parent, otherwise the latter would have little reason for creating it.

6 Z. Cavitch, Business Organizations s 120.05(2)(b) (1979).

In Elliott v. Brown, 569 P.2d 1323 (Alaska 1977), we stated that piercing the corporate veil "requires considerably more than mere control; it exists to prevent a party from obtaining an advantage through deceptive or manipulative conduct."

[12] Adams has also failed to prove that Marine was acting as the agent of Bendix when Marine negotiated and breached the contract for the 1970 season with Adams.[FN14] A subsidiary is not presumed to be the *33 agent of its parent corporation. As noted in Restatement (Second) of Agency s 14M (1958):

FN14. Bendix asserts that an agency theory is a distinct theory of recovery from an "instrumentality" theory and claims that Adams failed to argue the issue of agency at trial, or include it in its points on cross-appeal. Bendix urges that the issue should not be considered on appeal. Here, however, the "instrumentality" theory and agency theory are so closely allied that the distinction is largely one of form rather than substance. It seems highly doubtful that the trial judge would have ruled differently on Bendix's motion for a directed verdict had Adams specifically argued the agency issue. In Lewis v. Anchorage Asphalt Paving Co., 535 P.2d 1188, 1195 (Alaska 1975), the court interpreted Appellate Rule 9(e) not to require an "elaboration of the legal theories on which the appeal is based."

A corporation does not become an agent of another corporation merely because a majority of its voting shares is held by the other.[FN15]

FN15. See also Annot. 38 A.L.R.3d 1103, 1114-19 (1971).

To establish an agency relationship between Bendix and Marine, Adams must show that Marine negotiated and signed its contract with him on behalf of the Bendix Corporation, and not as a separate corporate entity.[FN16]

FN16. See Nicholas v. Moore, 570 P.2d 174 (Alaska 1977); Bruton v. Automatic Welding & Supply Corp., 513 P.2d 1122, 1126 (Alaska 1973); H. Reuschlein and W. Gregory, Agency and Partnership s 12 (1979).

Adams cites essentially two items of evidence to

610 P.2d 24
610 P.2d 24
(Cite as: 610 P.2d 24)

establish an agency relationship. The first is a press release issued by Rambo which states that an Arctic survey is "being conducted by Bendix." Adams introduced no evidence to show that Bendix ever saw or approved this statement. Rambo was an employee of Marine, not Bendix. Second, Adams argues that the project was funded by the Bendix Corporation and required its approval. The only evidence introduced on the question shows that the funding and approval was in the nature of an interest-bearing loan from Bendix to Marine.[FN17] Such evidence is not any more supportive to the creation of an agency relationship than an ordinary bank loan.

FN17. See note 1 supra.

There is no suggestion that Adams thought he was contracting directly with the Bendix Corporation.Evalsons v. Industrial Covers, Inc., 269 Or. 441, 525 P.2d 105 (1974), a case cited by Adams, is distinguishable. In Evalsons, the Oregon Supreme Court found an agency relationship between a parent and a subsidiary, where employees' salaries of the subsidiary were paid directly by the parent. The parent and subsidiary had the same address and telephone number. Employees of the parent communicated directly with the plaintiff. The subsidiary used the parent's letterhead. The facts of the case, unlike here, were such that the plaintiff might well have been led into believing that he was dealing directly with the parent. In short, the evidence was insufficient to establish that Marine was acting on Bendix's behalf in contracting with Adams, nor did Bendix or Marine create the impression that this was the case.

Finally, Adams argues that the Bendix directive to terminate speculative projects establishes that Marine was acting as Bendix's agent. We have previously indicated that the Bendix directive was apparently issued to protect its interests as a shareholder in Marine and as its creditor. The directive is, nevertheless, some evidence of the exercise of control over Marine, one factor to be considered in determining the existence of an agency relationship.[FN18] We do not believe that this one item of evidence, by itself, establishes an agency relationship, and, in any event, it would not be sufficient to establish that Marine was acting on behalf of Bendix at the time when the contract was formed. Because Adams failed to show that Bendix

was a party to the original contract, even if an agency relation were created later between Bendix and Marine as a result of the directive, this would not make Bendix a party to the earlier contract on an agency theory so as to be liable for a breach of that contract.[FN19]*34 Adams would have to prove that Bendix became a party to the contract through the assignment of rights and the delegation of duties.[FN20] This Adams failed to prove. Consequently, Bendix cannot be held liable on a contract theory.

FN18. See note 16 supra.

FN19. The only agency theory that Adams might advance to prove that Bendix became liable for the contract between Adams and Marine is that Bendix subsequently ratified the contract. To prove this, Adams must still show that Marine initially entered into the contract for the benefit of Bendix even if at the time Marine did not have the requisite authority from Bendix. As discussed in the text, Adams failed to show that Marine was acting on Bendix's behalf. H. Reuschlein and W. Gregory, Agency and Partnership s 32 at 76 (1979).

FN20. To hold both Marine and Bendix liable, Adams would need to show that there was a delegation of duties from Marine to Bendix. See Restatement of Contracts s 160 (1932). The theory is similar to that of third party beneficiary contracts.

Given our disposition of this case, it is not necessary to consider other issues raised by the parties.[FN21]

FN21. Both sides contested the rate of prejudgment interest awarded. Our holding that Bendix is not liable renders the issue moot. In any event, the question has recently been decided in City and Borough of Juneau v. Commercial Union Ins. Co., 598 P.2d 957 (Alaska 1979). Our finding in Section II, that Bendix did not act out of an improper motive in causing a breach of the Marine-Adams contract, necessarily precludes an award of punitive damages.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

610 P.2d 24
610 P.2d 24
**(Cite as: 610 P.2d 24)**

The judgment against the Bendix Corporation is
REVERSED, and the cause against it is dismissed.

Alaska, 1980.
Bendix Corp. v. Adams
610 P.2d 24

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.