United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STONEBRAE, L.P., | No. C-08-0221 EMC |
| Plaintiff, | |
| v. | **ORDER CONVERTING PLAINTIFF'S MOTION TO DISMISS INTO MOTION FOR SUMMARY JUDGMENT** |
| TOLL BROS., INC., *et al.*, | |
| Defendants. | **(Docket No. 65)** |
| _____/ | |

Plaintiff Stonebrae L.P. filed suit against Defendant Toll Bros., Inc., asserting claims for, *inter alia*, breach of contract. *See* Docket No. 7 (amended complaint). In response, Toll raised various affirmative defenses and also filed counterclaims for relief. *See* Docket No. 61 (amended answer). Currently pending before the Court is Stonebrae's motion to dismiss those counterclaims and affirmative defenses that are based on the allegation that Stonebrae breached the Purchase and Sale Agreement entered into by failing to close escrow on November 1, 2007. According to Stonebrae, escrow did not *have* to close on November 1, 2007; rather, there was a window of time for the close of escrow to occur -- "the window opened on November 1, 2007, but did not close until January 31, 2008, at the earliest." Mot. at 1-2. Stonebrae also argues that the breach-of-contract counterclaims fails as a matter of law "for the independent reason that Toll was required to give Stonebrae a written Default Notice, and an opportunity to cure, but failed to do so prior to termination." Mot. at 2.

## I. FACTUAL & PROCEDURAL BACKGROUND

On or about May 1, 2006, Stonebrae and Toll entered into a Purchase and Sale Agreement ("Agreement"). *See* Docket No. 61, Ex. A (Agreement). Under the Agreement, Stonebrae was to sell and Toll to purchase 56 residential lots in Hayward, California. The purchase price for the property at issue was almost $32 million. *See* Agreement § 2.1.

Section 7.2 of the Agreement governs the close of escrow. It reads in relevant part as follows:

> 7.2 <u>Close of Escrow</u>. Provided that (y) this Agreement has not been earlier terminated pursuant to the terms and provisions hereof, and. (z) of all of the conditions set forth in <u>Sections 6.1, 6.2 and 6.3</u> which are then currently operative have been satisfied or have been waived in writing by the party benefitted thereby, THEN Close of Escrow shall occur on the earlier of either: (i) the date which is one hundred and fifty (150) days after Stonebrae receives Builder's 50th Sale Notice (the "<u>Builder Notice Closing Date</u>"), (ii) November 1, 2007 (the "<u>Date Certain Closing Date</u>"), or (iii) such later date as permitted pursuant to <u>Section 7.3(a)</u> below. Builder shall deliver to Stonebrae written notice that Builder has executed its fiftieth (50th) purchase contract with separate individual buyers for Type 3 Lots within Village A within five business days after execution of the final of such contracts (the "<u>Builder's 50th Sale Notice</u>").

Agreement § 7.2.

Section 6.2 of the Agreement describes conditions precedent to the close of escrow that are for the benefit of Toll. Section 6.2(a) states as follows:

> 6.2 <u>Builder's Conditions</u>. The following shall constitute conditions precedent to the Close of Escrow for the benefit of Builder, which conditions may be waived only by a written waiver executed by Builder and delivered to Stonebrae and Escrow Holder:
>
> a. <u>Completion of Stonebrae Pre-Closing Work</u>. Stonebrae shall have satisfactorily completed the "Stonebrae Pre-Closing Work" described on <u>Exhibit H</u> by the *Outside Closing Date* (as such term is defined below). For all purposes hereof, Stonebrae shall be deemed to have satisfactorily completed the Stonebrae Pre-Closing Work upon satisfactory completion of the Pre-Closing Walk-Through described in <u>Section 9.2</u>, satisfactory completion by Stonebrae of all items on the "Deficient Work List" described in <u>Section 9.2</u>, and Stonebrae shall have delivered or caused to be delivered to Builder the Engineers' Certificates for the Lots; . . . .

Agreement § 6.2(a) (emphasis added).

Outside *Closing* Date, as referred to in § 6.2(a), is never specifically defined in the Agreement, but is denominated as the title for the entirety of § 7.3. Outside *Completion* Date, however, is specifically defined in § 7.3(a).[1] Section 7.3(a) states in relevant part:

> 7.3 <u>Outside Closing Date</u>.
>
> a. <u>Outside Completion Date</u>. If, on or before January 31, 2008 (the "Outside Completion Date"), Stonebrae has not completed the Stonebrae Pre-Closing Work, Builder shall have the right to instruct the Escrow Holder, in writing the a copy to Stonebrae, to proceed with the Close of Escrow (the "Builder's Closing Demand") and the Close of Escrow shall occur on the date which is thirty (30) days after the Outside Completion Date as extended due to Force Majeure. Notwithstanding the foregoing, if Stonebrae is delayed in the completion of the Stonebrae Pre-Closing Work due to Force Majeure (as that term is defined in <u>Exhibit H</u>), the Date Certain Closing Date, the Builder's Notice Closing Date and the Outside Completion Date shall be extended by the length of such delay, provided, however, that in no event shall the Outside Completion Date be extended beyond June 1, 2008. . . .

Agreement § 7.3(a). Arguably, Outside Closing Date is the date escrow is to close following the Builder's Closing Demand (*i.e.*, 30 days after the Outside Completion Date where there is a Builder's Closing Demand).

Finally, § 17.2 addresses defaults by Stonebrae specifically. It provides in relevant part:

> Section 17.2 <u>Stonebrae Defaults and Builder Remedies</u>
>
> a. <u>Stonebrae Defaults</u>. It shall be a "Stonebrae Default" ("<u>Stonebrae Default</u>") if Stonebrae fails to perform any material act to be performed by Stonebrae, or diligently pursue such cure to completion not later than sixty (60) days following receipt of the Default Notice. The cure period specified in this <u>Section 17.1(b)</u> shall not apply to the Builder Defaults specified in <u>Section 17.1(a)(iii)</u> or (iv) or any default under <u>Section 17.1(a)(ii)</u> that is not susceptible of cure.

Agreement § 17.2(a).

---

[1] Although § 6.2 refers to the Outside *Closing* Date (*i.e.*, § 7.3 generally) as the date for completion of Stonebrae's Pre-Closing Work, § 9.1 seems to refer to the Outside *Completion* Date (*i.e.*, § 7.3(a) specifically) as the date for completion. *See* Agreement § 9.1 ("Stonebrae shall complete all Stonebrae Work [including the Pre-Closing Work] in compliance with the respective completion dates in Section 7.3(a) and <u>Exhibit H</u> subject to Force Majeure . . . .").

## II. DISCUSSION

A. Legal Standard

Stonebrae is seeking dismissal of certain of Toll's counterclaims and affirmative defenses pursuant to Federal Rule of Civil Procedure 12(b)(6).[2]  "To avoid a Rule 12(b)(6) dismissal, a complaint [or counterclaim] need not contain detailed factual allegations; rather, it must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *Weber v. Department of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir. 2008).

As noted above, the counterclaims and affirmative defenses at issue are all related to the question of when was the close of escrow -- *i.e.*, on November 1, 2007, as argued by Toll, or on a later date, as argued by Stonebrae.  "Stonebrae submits that the Court can discern the parties' intent and need not consider extrinsic evidence on the issue presented by this motion, *i.e.*, whether the Close of Escrow must have occurred on November 1, 2007, and no later date."  Mot. at 7.

Whether close of escrow should have closed on November 1, 2007, or at a later date, is a matter of contract interpretation.  Under California law,

> [t]he interpretation of a contract involves a two-step process: First the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine ambiguity, *i.e.*, whether the language is "reasonably susceptible" to the interpretation urged by a party.  If in light of the extrinsic evidence the court decides the language is reasonably susceptible to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step -- interpreting the contract.

*Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1351 (2004) (internal quotation marks omitted).

Moreover,

> the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning.  Indeed, it is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face.  Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible.

---

[2] Technically, the motion with respect to the affirmative defenses should be a motion to strike, not a motion to dismiss.

*Wolf*, 114 Cal. App. 4th at 1350-51.

The Ninth Circuit has likewise held that

> [a] court[] may not dismiss on the pleadings when one party claims that extrinsic evidence renders the contract ambiguous. The case must proceed beyond the pleadings so that the court may consider the evidence. If, after considering the evidence, the court determines that the contract is not reasonably susceptible to the interpretation advanced, the parol evidence rule operates to exclude the evidence. The court may then decide the case on a motion for summary judgment.

*A. Kemp Fisheries, Inc. v. Castle & Cooke, Inc., Bumble Bee Seafoods Div.*, 852 F.2d 493, 497 n.2. (9th Cir. 1988). *See also In re Yahoo! Litig.*, 251 F.R.D. 459, 472 n.8 (C.D. Cal. 2008) (stating that parties are not "required to set forth extrinsic evidence in support of their alternative interpretation of contract terms prior to the commencement of discovery"; rather, "in order to make their case that a contract is susceptible to varying interpretations, parties should be afforded the opportunity to obtain extrinsic evidence through discovery"); *cf. Beck v. Am. Health Group Internat'l*, 211 Cal. App. 3d 1555, 1560-62 (1989) (indicating that, where a plaintiff alleges in his complaint the meaning which he ascribes to an ambiguous contract, then it is error for the trial court to construe the contract upon demurrer because the parties should be given the opportunity to present extrinsic evidence regarding intent).

B.  <u>Date for Close of Escrow</u>

As indicated above, Toll's position is that the date for close of escrow was November 1, 2007. In contrast, Stonebrae contends that there was a window of time for the close of escrow to occur -- "the window opened on November 1, 2007, but did not close until January 31, 2008, at the earliest." Mot. at 1-2.

Although Stonebrae seems to have the more reasonable interpretation based on the literal reading of the relevant provisions of the Agreement and the canon of construction that all provisions of a contract should be given effect and harmonized when possible, it is not appropriate to dismiss the counterclaims and affirmative defenses at issue (*i.e.*, those based on the allegation that Stonebrae breached the Purchase and Sale Agreement entered into by failing to close escrow on November 1, 2007). As noted above, the Ninth Circuit has held that "[a] court[] may not dismiss on the pleadings

5

when one party claims that extrinsic evidence renders the contract ambiguous." *A. Kemp Fisheries*, 852 F.2d at 497 n.2.  In fact, in *Trident Center v. Connecticut General Life Insurance*, 847 F.2d 564 (9th Cir. 1988), the Ninth Circuit reversed the district court's order granting the defendant's motion to dismiss because, even though the contract was seemingly unambiguous, the plaintiff was entitled to present evidence as to the intention of the parties in drafting the contract.  *See id.* at 568-70.

Given the Ninth Circuit case law, it is not possible for the Court to grant Stonebrae's motion to dismiss on the basis that the close of escrow did not have to take place on November 1, 2007, because Toll seeks to develop and proffer evidence to establish the Agreement is ambiguous and that that ambiguity should, in light of additional evidence, be resolve in its favor.  Notably, Stonebrae conceded as much at the hearing on the motion, focusing its motion instead on whether Toll had properly gave Stonebrae a written Default Notice and an opportunity to cure as required by § 17.2 of the Agreement.  The Court therefore turns to that issue.

C.      <u>Notice of Default and Opportunity to Cure</u>

Stonebrae argues that, regardless of how the Court analyzes the issue above, its motion to dismiss as to the breach-of-contract counterclaim must be dismissed because, under the Agreement, "Toll was required to give Stonebrae a written Default Notice, and an opportunity to cure, but failed to do so prior to termination."  Mot. at 2.  Stonebrae argues that ¶ 8(f) of the counterclaim is not a sufficient allegation of notice and opportunity to cure -- (1) because it does not specifically refer to *written* notice and (2) because it uses the phrase "to the extent Stonebrae had an opportunity to cure said breaches."  *See* Countercl. ¶ 8(f) ("Stonebrae was placed on notice of the breaches identified herein, and each of them.  Despite this notice, and to the extent Stonebrae had an opportunity to cure said breaches, Stonebrae did not, and to date has not, cured any of its breaches of the Village B Purchase Agreement").  In turn, Toll argued that its allegation was sufficient for purposes of Federal Rule of Civil Procedure 8.

At the hearing, the Court proposed that the most effective way to deal with this issue was to convert the motion to dismiss into a motion for summary judgment.  Both parties were amenable to this proposal.  Accordingly, the Court shall give Toll until February 18, 2009, to file an opposition to the motion for summary judgment -- *i.e.*, Toll must establish that there is a genuine dispute of

material fact as to whether it complied with § 17.2 of the Agreement.[3]  Stonebrae shall then have until February 25, 2009, to file a reply.  The Court shall then make a ruling on the papers or, if necessary, conduct a further hearing.

This order disposes of Docket No. 65.

IT IS SO ORDERED.

Dated: January 30, 2009

_____
EDWARD M. CHEN
United States Magistrate Judge

---

[3] At the hearing, Toll conceded that, if were not able to establish a genuine dispute of material fact that it had complied with § 17.2 and §19.2, then dismissal of the relevant counterclaims and striking of the relevant affirmative defenses would be appropriate.