UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STONEBRAE, L.P.,

    Plaintiff,

v.

TOLL BROS., INC., *et al.*,

    Defendants.
_____/

No. C-08-0221 EMC

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; AND DENYING DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

**(Docket Nos. 65, 91)**

        Previously, the Court issued an order converting Plaintiff Stonebrae L.P.'s motion to dismiss the breach-of-contract counterclaim into a motion for summary judgment. *See* Docket No. 90 (order, filed on 1/30/09). Defendant Toll Bros., Inc. designated its opposition to the motion as a cross-motion for summary judgment. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **DENIES** both motions.

## I.   FACTUAL & PROCEDURAL BACKGROUND

        After being sued, Toll filed several counterclaims against Stonebrae, including a counterclaim for breach of contract. *See* Docket No. 61 (answer and counterclaims). According to Toll, Stonebrae breached the Purchase Agreement between the parties by, *inter alia*, failing to complete its Pre-Closing Work prior to November 1, 2007. Toll alleged that "Stonebrae was placed on notice of the breach[]" and that, "[d]espite this notice, and to the extent Stonebrae had an opportunity to cure said breach[], Stonebrae did not, and to date has not, cured [the breach]." Docket No. 61 (Countercl. ¶ 8(f)).

        Section 17.2 of the Purchase Agreement addresses breach by Stonebrae. It provides that

> [i]t shall be a "Stonebrae Default" ("Stonebrae Default") if Stonebrae fails to perform any material act to be performed by Stonebrae, or to refrain from performing any material prohibited act prior to the Close of Escrow under any of the Development Documents, where such failure is not cured by Stonebrae within ten (10) days after receipt by Stonebrae of a Default Notice from Builder; provided, however, that if such failure is of such a nature that it cannot be cured within such ten (10) days period, then a Stonebrae Default shall not occur if Stonebrae shall commence a cure within such ten (10) days period and shall diligently pursue such cure to completion not later than sixty (60) days following receipt of the Default Notice.

Agreement § 17.2(a). The phrase "Default Notice" is first used in § 17.1(b) of the Agreement. It is defined only as "written notice." Agreement § 17.1(b) provides:

> Builder shall not be in default of any other obligations hereunder unless the default continues for a period of ten (10) days after receipt of written notice (the 'Default Notice') from Stonebrae; provided, however, that if such failure if of such a nature that it cannot be cured within such ten (10) days period, then Builder shall commence a cure within such ten (10) day period and shall diligently pursue such cure to completion not later than sixty (60) days following receipt of the Default Notice.

The Agreement provides no further definition.

As stated in the Court's previous order, Stonebrae argued in its motion to dismiss the breach-of-contract counterclaim that the

> counterclaim must be dismissed because, under the Agreement, "Toll was required to give Stonebrae a written Default Notice, and an opportunity to cure, but failed to do so prior to termination." Mot. at 2. Stonebrae argues that ¶ 8(f) of the counterclaim is not a sufficient allegation of notice and opportunity to cure – (1) because it does not specifically refer to *written* notice and (2) because it uses the phrase "to the extent Stonebrae had an opportunity to cure said breaches." *See* Countercl. ¶ 8(f) ("Stonebrae was placed on notice of the breaches identified herein, and each of them. Despite this notice, and to the extent Stonebrae had an opportunity to cure said breaches, Stonebrae did not, and to date has not, cured any of its breaches of the Village B Purchase Agreement"). In turn, Toll argued that its allegation was sufficient for purposes of Federal Rule of Civil Procedure 8.
>
> At the hearing, the Court proposed that the most effective way to deal with this issue was to convert the motion to dismiss into a motion for summary judgment. Both parties were amenable to this proposal. Accordingly, the Court shall give Toll until February 18, 2009, to file an opposition to the motion for summary judgment -- *i.e.*, Toll must establish that there is a genuine dispute of material fact as to whether it complied with § 17.2 of the Agreement. Stonebrae shall then have until February 25, 2009, to file a reply. The Court shall then make a ruling on the papers or, if necessary, conduct a further hearing.

2

1  Docket No. 90 (Order at 6-7) (footnote omitted).

2  As part of its opposition to the converted motion for summary judgment, Toll offered as
3  evidence several letters exchanged between Toll and Stonebrae.

4  (1) Letter, dated November 2, 2007, from James W. Boyd of Toll to Paul Yuen of Stonebrae,
5  with copy to Stonebrae's counsel Rebecca V. Hlebasko. *See* Boyd Decl., Ex. A (letter). In
6  the letter, Mr. Boyd states: "Please accept this letter as notice that Seller has failed to satisfy
7  several conditions to close under that Agreement and is in material default." For example:
8  "Pursuant to the Section 7 of the Agreement, the Date Certain Closing Date is November 1,
9  2007, unless Seller's completion of the Pre-Closing Work, which is a condition to Toll's
10  obligation to close, is delayed as a result of Force Majeure. As of today's date, we
11  understand that the Pre-Closing Work is not complete. For example, among other things, it
12  appears that the lots have not been finished in substantial conformance with grading
13  elevations as shown on the mass-grading plan, nor are the streets ready for City acceptance."
14  Mr. Boyd also claims that there are other conditions to closing that Stonebrae has not
15  satisfied – *e.g.*, a failure to satisfy all of the conditions of approval required prior to issuance
16  of the City building permits, a unilateral modification of the conditions of approval without
17  the consent of Toll, and a failure to make any substantive progress on recreation facilities.
18  Mr. Boyd states: "Based on the foregoing failed conditions . . . , Toll is under no obligation
19  to go forward with this transaction and is instead entitled to terminate the Agreement. If you
20  disagree or believe I am mistaken, please advise immediately. Otherwise, it is our intention
21  to proceed with termination of the Agreement."

22  (2) Letter, dated November 5, 2007, from Michael J. Letchinger of Stonebrae to Mr. Boyd of
23  Toll. *See* Boyd Decl., Ex. B (letter). In response to the above letter, Mr. Letchinger stated:
24  "Seller is not in default under the Agreement. Seller is fully prepared to proceed to closing
25  as required under the terms of the Agreement and expects Toll to do so as well. [¶] First,
26  please consider this letter Seller's formal written notice of substantial completion of the

Stonebrae Pre-Closing Work, as provided in Section 9.2 of the Agreement.[1] . . . . [¶] Any concerns you may have about whether or not the Stonebrae Pre-Closing Work is complete can be addressed at the Pre-Closing Walk-Through." Mr. Letchinger also disputed Mr. Boyd's contention that the date for close of escrow was November 1, 2007.

(3) Letter, dated November 13, 2007, from Mr. Boyd of Toll to Mr. Letchinger of Stonebrae. *See* Boyd Decl., Ex. C (letter). In response to the above letter, Mr. Boyd reiterated that "Toll is under no obligation to go forward with this transaction and is entitled to terminate the agreement. As also explained in [the November 2] letter, we believe that Seller has failed to complete the Seller Pre-Closing work within the time provided in that Agreement. Your purported notice pursuant to Section 9.2 does not cure Seller's failed performance." Mr. Boyd agreed to participate in the walk-through proposed by Mr. Letchinger but reserved Toll's right to terminate the transaction.

(4) Letter, dated November 19, 2007, from Mr. Letchinger of Stonebrae to Mr. Boyd of Toll. *See* Boyd Decl., Ex. D (letter). Mr. Letchinger indicated that the walk-through had taken place on November 14, 2007, and indicated that he expected the number of items to be on the Deficient Work List to be small. Accordingly, he asked for a closing date of December 6, 2007. Mr. Letchinger added: "While you continue to maintain in your November 13, 2007 letter that you are under no obligation to go forward with the transaction, you have yet to

---

[1] Section 9 of the Purchase Agreement covers the work to be performed by Stonebrae, including both Pre-Closing Work and Post-Closing Work. With respect to the former, § 9.2 provides in relevant part that

> Stonebrae shall deliver written notice to Builder upon substantial completion of the Stonebrae Pre-Closing Work (subject to completion of the punch-list items referred to below). Within ten (10) days after delivery of such notice, Builder and Stonebrae shall conduct a joint inspection (the "Pre-Closing Walk-Through") of the Stonebrae Pre-Closing Work. At such Pre-Closing Walk-Through, Builder and Stonebrae shall jointly prepare a "punch list" of any and all agreed upon patent defects with respect to Stonebrae Pre-Closing Work and Stonebrae shall complete the designated work within a reasonable time thereafter.

Agreement § 9.2. Stonebrae's position, as reflected in its November 5 letter, is that it could have completed the punch list by the date it claimed is the real closing date – *i.e.*, January 31, 2008, and not November 1, 2007.

provide us with any facts which would give you the right to terminate the Agreement. We also note that your letters claim the right to terminate the Agreement, but do not do so."

(5) Letter, dated November 20, 2007, from Mr. Boyd of Toll to Mr. Yuen and Mr. Letchinger of Stonebrae. *See* Boyd Decl., Ex. E (letter). In response to the above letter, Mr. Boyd stood on Toll's "right to terminate the Agreement as a result of Seller's failed closing conditions and hereby gives notice of that termination." Mr. Boyd also listed several items that had not been completed in terms of the Pre-Closing Work – *e.g.*, "the joint trench work is unfinished so there is no electrical service to any lots, the emergency vehicle access (EVA) is not installed, and the retaining and rockery walls have not been installed." Mr. Boyd concluded his letter by stating: "Toll hereby terminates the Agreement and, by copy of this letter to Escrow Holder, demands that Escrow Holder release the Deposit to Toll."

(6) Letter, dated November 28, 2007, from Mr. Letchinger of Stonebrae to Mr. Boyd of Toll. *See* Boyd Decl., Ex. F (letter). In response to the above letter, Mr. Letchinger stated: "[W]hile your letter of November 2, 2007 might be construed as a Default Notice under Section 17.2 of the Agreement, neither that letter nor any of your subsequent correspondence recognize or provide for the opportunity to cure specifically set forth in Section 17.2 of the Agreement." Mr. Letchinger added: "Toll's attempted termination of the Agreement without regard to the cure period expressly built into the Agreement is, in and of itself, a default by Toll under the Agreement."

(7) Letter, dated December 7, 2007, from Mr. Boyd of Toll to Mr. Yuen and Mr. Letchinger of Stonebrae. *See* Boyd Decl., Ex. G (letter). In response to the above letter, Mr. Boyd stated: "To the extent that section 17.2 is applicable, Toll has complied with it. In my November 2 and November 20, 2007 letters to you, I described in detail those obligations and closing conditions that have not been satisfied or met by Seller prior to the Date Certain Closing Date, as that term is defined in the Agreement. Section 17.2 provides Seller a ten-day period to cure after receiving notice of default. To the extent Seller is entitled to ten days to cure under Section 17.2, Seller did not do so. It still had not done so."

## II. DISCUSSION

A.   Legal Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

In the instant case, Stonebrae moves for summary judgment on Toll's counterclaim for breach of contract for failure to comply with § 17.2. In turn, Toll cross-moves for partial summary judgment that it did comply with § 17.2. Because Toll has the ultimate burden of proof on its breach-of-contract counterclaim, Stonebrae may prevail on its motion for summary judgment simply by pointing to Toll's failure "to make a showing sufficient to establish the existence of an element essential to [its] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In contrast, Toll may prevail on its own motion for partial summary judgment only if it affirmatively demonstrates that there is no genuine dispute as to every essential element of its counterclaim. *See River City Mkts., Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458, 1462 (9th Cir. 1992).

B.   Interpretation of "Default Notice"

In its motion, Stonebrae argues that it is entitled to summary judgment on the breach-of-contract counterclaim because there is no genuine dispute of material fact that (1) Toll's letter of November 2 did not constitute adequate notice and (2) the same letter did not give Stonebrae an opportunity to cure as required by § 17.2. Both of these issues require interpretation of § 17.2 of the Purchase Agreement -- more specifically, what a "Default Notice" requires.

1    As indicated above, the term "Default Notice" is not defined anywhere in the Purchase
2 Agreement. All that is stated is that the Default Notice must be written. Nowhere does the
3 Agreement specify what the contents of a Default Notice must be. In short, the term "Default
4 Notice" is ambiguous on its face.

5    Under California law, "[e]xtrinsic evidence is admissible . . . to interpret an agreement when
6 a material term is ambiguous." *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107,
7 1126 (2008). In the instant case, however, the parties did not submit any extrinsic evidence to
8 establish what the term "Default Notice" means. In the absence of any extrinsic evidence, the
9 interpretation of the term is solely a question of law for the Court to decide. *See Wolf v. Superior
10 Court*, 114 Cal. App. 4th 1343, 1351 (2004) ("The trial court's resolution of an ambiguity is . . . a
11 question of law if no parol evidence is admitted or if the parol evidence is not in conflict."); *Badie v.
12 Bank of Am.*, 67 Cal. App. 4th 779, 799 (1998) ("Interpretation of a contract is solely a question of
13 law unless the interpretation turns upon the credibility of extrinsic evidence."). Neither party
14 disputes that proposition.

15    The Court agrees with Stonebrae that the purpose of the Default Notice provision is to give
16 Stonebrae an opportunity to cure any asserted default within a given time period before it loses the
17 right to complete the sale. This purpose is obvious from the structure of the Agreement and the
18 substantive content of § 17.2. Given this purpose, the Court finds that a Default Notice, as the term
19 is used in § 17.2, is a written notice by Toll that (1) gives Stonebrae fair notice that there has been a
20 failure to perform and describes with sufficient specificity the work that has not been performed
21 such that Stonebrae is able to cure within 10 days or commence a cure within 10 days and complete
22 it in 60 days, and that (2) does not foreclose the opportunity to cure -- *i.e.*, the Default Notice must
23 not effectively terminate the Agreement which would moot any cure efforts by the seller. A Default
24 Notice, however, need not expressly state that an opportunity to cure is being given, since § 17.2
25 endows the seller the right to cure. Furthermore, the Purchase Agreement was negotiated by two
26 sophisticated parties represented by counsel and any Default Notice was to be sent not only to
27 Stonebrae but also its counsel, as required by § 19.2 of the Agreement. On the other hand, if the
28 notice communicates the buyer's position that the seller has irretrievably defaulted and thus

7

foreclose any cure effort, such a notice would not satisfy the purpose of § 17.2 and would not constitute an adequate "Default Notice" thereunder.

C.  Genuine Dispute of Material Fact

Having so interpreted § 17.2 and the term "Default Notice" as used in that section, the Court now turns to the issue of whether either party is entitled to summary judgment or partial summary adjudication based on that interpretation.

The only evidence that has been submitted in conjunction with the parties' cross-motions for summary judgment are the letters described above. However, even though the evidence is not disputed, that does not mean that the Court must decide whether Toll's Default Notice was proper as a matter of law. Ordinarily, whether a party has performed as required under a contract is a question of fact for a jury, not a judge, to decide. *See Sanford v. East Riverside Irrigation Dist.*, 101 Cal. 275, 279 (1894) (noting that "it was a question of fact for the jury to determine whether or not plaintiff performed on his part all that was requisite under the contract"); *Louison v. Yohanan*, 117 Cal. App. 3d 258, 267 (1981) (stating that "the basic issue here was . . . whether there was a breach of the condition precedent requiring Louison's written consent to any changes in the existing leases" and that this was a question of fact for the jury); *Whitney Inv. Co. v. Westview Development Co.*, 273 Cal. App. 2d 594, 601 (1969) (noting that "[w]hether a breach is so material as to constitute cause for the injured party to terminate a contract is ordinarily a question for the trier of fact."). Only if the Court could conclude that, based on the undisputed evidence, no reasonable jury could find in favor of Toll would Stonebrae be entitled to summary judgment. Likewise, only if the Court could conclude that no reasonable jury could find in Stonebrae's favor would Toll be entitled to summary judgment. *See, e.g.*, *United States v. Carrigan*, 31 F.3d 130, 133-34 (3d Cir. 1994) (concluding that there was a genuine dispute of material fact even though the evidence was undisputed). At the hearing, both parties agreed with this standard.

1.  Adequacy of Notice

The first issue that the Court must address is whether there is a genuine dispute of material fact as to the adequacy of the notice sent by Toll to Stonebrae on November 2. As discussed above, under the Court's interpretation of § 17.2, Toll's November 2 letter would be adequate notice if it

8

gave Stonebrae fair notice that there was a failure to perform and described with sufficient specificity the work that had not been performed such that Stonebrae would be able to cure within 10 days or be able to commence a cure within 10 days and complete it in 60 days.

The Court concludes that a reasonable jury could find that Toll's letter of November 2 was adequate notice. Toll stated in its November 2 letter that Stonebrae had failed to perform all of the Pre-Closing Work. *See* Boyd Decl., Ex. A (letter) (stating that "Seller has failed to satisfy several conditions to close under that Agreement and is in material default"). Furthermore, Toll did more than make a generic claim that there had been a failure to perform. For example, it specifically stated: "[I]t appears that the lots have not been finished in substantial conformance with grading elevations as shown on the mass-grading plan, nor are the streets ready for City acceptance." Boyd Decl., Ex. A (letter). To be sure, more specificity would have been helpful to Stonebrae. However, the Court cannot say that no reasonable juror could find that the detail was not enough for Stonebrae to, at the very least, commence a cure within 10 days. Commencing a cure could well be examining the grading elevations or evaluating the streets and City requirements. Furthermore, it is notable that, in response to the November 2 letter, Stonebrae did not make any contention that the information provided was not sufficiently specific for it to begin a cure. Rather, it was Stonebrae's position that it had substantially completed the Pre-Closing Work. *See* Boyd Decl., Ex. B (letter, dated November 5, 2007).

On the other hand, the Court concludes that a reasonable jury could also find that Toll's letter of November 2 was not adequate notice. For instance, while Toll did refer to a problem with grading elevations and streets, it contained no further detail. The complexity and dimension of this default and hence cure is unknown at this point. It is possible that additional survey work may have been required to define the grading problems absent further specification by Toll, and that it was not possible for Stonebrae to initiate a cure within 10 days and complete it within 60 days.[2]

---

[2] The fact that the letter did not provide a complete list of asserted defaults does not automatically render it inadequate under § 17.2. To the extent Toll omitted asserted defaults, those might have been deemed waived -- *i.e.*, Stonebrae was excused from having to cure any omitted defaults within the time frame set forth in § 17.2.

9

### 2. Foreclosure of Opportunity to Cure

The second issue is whether there is a genuine dispute of material fact as to whether Toll's November 2 letter (assuming that it constituted adequate notice) foreclosed Stonebrae's opportunity to cure under § 17.2 of the Agreement.

The Court concludes that a reasonable jury could find that there was no such foreclosure – *i.e.*, that the letter did not effectively terminate the Agreement between the parties. Although Toll stated in the letter that, based on Stonebrae's failure to perform, Toll was "under no obligation and is instead entitled to terminate the Agreement," Toll did not expressly terminate the Agreement. More important, Toll went on to add that, "[i]f you disagree or believe [Toll is] mistaken, please advise immediately. Otherwise, it is our intention *to proceed* with termination of the Agreement." Boyd Decl., Ex. A (letter) (emphasis added). A reasonable jury could infer that the Agreement had not actually been terminated as of that date. A subsequent letter from Toll also indicated that the Agreement had not actually been terminated, *see* Boyd Decl., Ex. C (letter, dated November 13, 2007) (agreeing to participate in a walk-through proposed but reserving the right to terminate the transaction), and a letter thereafter from Stonebrae indicated that even Stonebrae did not view the Agreement as having terminated yet. *See* Boyd Decl., Ex. D (letter, dated November 19, 2007) (pointing out that Toll's "letters claim the right to terminate the Agreement, but do not do so").

On the other hand, a reasonable jury could also find that Toll's November 2 effectively told Stonebrae that there was nothing more that it could do to keep the Agreement alive, that any cure effort was foreclosed as the contract was effectively terminated. Although Toll did not have to expressly state in its letter that Stonebrae would be given the opportunity to cure before the Agreement terminated, it is significant that Toll did not make any reference to a cure and instead focused solely on the right to terminate – a point that was underscored in a subsequent letter. *See* Boyd Decl., Ex. C (letter, dated November 13, 2007). If Toll had truly wanted the business transaction to go forward, then it would have notified Stonebrae prior to the alleged closing date of November 1 that Pre-Closing Work had not been completed. Instead, Toll waited until the day *after* the alleged closing date to notify Stonebrae of the failure to perform. The terms and content of Toll's letters together with the timing of the November 2 letter strongly suggest Toll was attempting

to terminate the transaction, not provide Stonebrae with a notice to cure. Nonetheless, the Court concludes this is an issue for trial.

### III.  CONCLUSION

Because a reasonable jury or fact-finder could disagree, based on the undisputed evidence, whether Toll's letter of November 2 constituted adequate notice and whether the same letter foreclosed Stonebrae's right to cure, both parties' motions for summary judgment or partial summary adjudication on the breach-of-contract counterclaim are **DENIED**. Whether Toll complied with § 17.2 is for trial.

This order disposes of Docket Nos. 65 and 91

IT IS SO ORDERED.

Dated: April 22, 2009

_____
EDWARD M. CHEN
United States Magistrate Judge