UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STONEBRAE, L.P., | No. C-08-0221 EMC |
| Plaintiff, | |
| v. | **ORDER DENYING COUNTER-DEFENDANT STONEBRAE'S MOTION TO DISMISS COUNTERCLAIM** |
| TOLL BROS., INC., *et al.*, | |
| Defendants. | **(Docket No. 148)** |

Plaintiff Stonebrae, L.P. initiated this lawsuit against Defendant Toll Brothers, Inc. for declaratory relief and breach of contract. Subsequently, Toll filed counterclaims against Stonebrae. Currently pending before the Court is Stonebrae's motion to dismiss the counterclaim for breach of the implied covenant of good faith and fair dealing. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **DENIES** the motion to dismiss.

## I. FACTUAL & PROCEDURAL BACKGROUND

In its counterclaims, Toll alleges as follows. Stonebrae is the owner and master developer of the Stonebrae Development, a planned residential community in Hayward, California. *See* Countercl. ¶ 5. The first phase of the Stonebrae Development was Village A; the second phase was Village B. *See id.* ¶¶ 6-7. In July 2005, Stonebrae and Toll entered into an agreement pursuant to which Toll purchased a certain number of lots in Village A. *See id.* ¶ 6. In May 2006, the parties entered into an agreement pursuant to which Toll purchased a certain number of lots in Village B. *See id.* ¶ 7. At issue in this litigation is the parties' agreement with respect to Village B.

Paragraph A of the Village B agreement provides in relevant part that Stonebrae "intends to construct . . . an 18-hole championship golf course, clubhouse and related facilities (the '<u>Gold Course</u>'), both adjacent to the Stonebrae Community [*i.e.*, the residential lots]." Village B Agreement ¶ A. According to Toll, based on Stonebrae's promotional materials, Toll "entered into the Village B Purchase agreement with the expectation that Stonebrae would build a high-end luxury club house in the Stonebrae Development," Countercl. ¶ 40, but instead of building such a clubhouse, "Stonebrae installed a modular club house and temporary facilities" and thereby breached its duty of good faith and fair dealing. *Id.* ¶ 41. Toll also alleges that Stonebrae breached its duty of good faith and fair dealing by "eliminat[ing] numerous parks from the Stonebrae Development and fail[ing] to construct other high quality amenities in conjunction with the Stonebrae Development and Village B." *Id.*

## II. DISCUSSION

In its motion to dismiss, Stonebrae argues that the claim for breach of the implied covenant is not viable to the extent it is based on either the clubhouse or the parks. To the extent Stonebrae has raised a challenge to the claim based on the parks, the Court defers ruling. Stonebrae has essentially admitted that that issue is better left for resolution on summary judgment. *See* Mot. at 5 & n.5. Furthermore, Stonebrae has now filed a motion for summary judgment on that issue (as well as others), which is currently set for hearing on May 12, 2010. This order therefore focuses on the claim for breach of the implied covenant with respect to the clubhouse only.

As to this claim, Stonebrae argues that it must be dismissed because the express terms of the parties' contract preclude the claim. It is true that, when "acts and conduct [are] authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct." *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 372, 374 (1992) (internal quotation marks omitted). But in the instant case Toll's claim for breach of the implied covenant is not contrary to any express term in the Village B Agreement.

The Court notes that, in so concluding, it is proceeding on the assumption that the Village B Agreement does in fact require Stonebrae to build a golf course, clubhouse, and related facilities. In

1  its papers, Stonebrae never argued that it did not have this obligation under the contract.[1]

2  Proceeding with this assumption for purposes of the instant motion, the critical provision in the

3  Village B Agreement is ¶ 15.1(g)(iii),[2] which provides as follows:

> (iii).  <u>Golf Course</u>. An eighteen (18) hole golf course is currently planned for a portion of the Stonebrae Development, although Stonebrae makes *no commitment* regarding the Golf Course generally, including *without limitation*, when it may be completed or where it will be located. . . .

Village B Agreement ¶ 15.1(g)(iii) (emphasis added). Stonebrae argues that, in light of this provision, Stonebrae did not have any obligation to make the clubhouse look in any particular way or to complete the clubhouse by any particular time. Toll argues that, nevertheless, where a party to a contract is given discretion to act and that discretionary power affects the right of the other contracting party, "a duty is imposed [on the former] to exercise that discretion in good faith and fair

---

[1] At the hearing, Stonebrae argued for the first time that it did *not* have such an obligation under the Village B Agreement. While the Court is not, at this juncture, precluding Stonebrae from making this assertion in the lawsuit, it is skeptical of the assertion. The Court notes that this lawsuit has been ongoing for more than two years, but this is the first time that Stonebrae has articulated that position. It made no such argument in support of its motion. It only argued that "Stonebrae was under no obligation regarding *when* the clubhouse or the related facilities would be completed or *what they would look like*." (Opening Brief, pp. 4-5) (emphasis added). Indeed, at the hearing on the motion to dismiss, Stonebrae actually conceded outright that it had that obligation; only later in the hearing did Stonebrae backtrack. Finally, the Court notes that the Development Agreement for the Stonebrae Development suggests that Stonebrae had an obligation to build. *See* Def.'s RJN, Ex. A (Development Agreement ¶ 3.10) (noting that the golf course and related facilities "are amenities which will significantly enhance OWNER's ability to market and sell at a premium the residential units to be developed on the Property").

Of course, if Stonebrae now chooses to assert it had no contractual obligation to build the golf course and clubhouse, this could lead to the Court permitting additional pleadings or motions by Toll.

[2] In its papers, Stonebrae also argues that Toll's claim for breach of the implied covenant is also contrary to ¶ 15.1(a) of the parties' contract. Paragraph 15.1(a) basically provides that, with limited exceptions not applicable here, Toll is not relying on any representations furnished by Stonebrae. According to Stonebrae, given this provision in the contract, Toll was not entitled to rely on any promotional materials in which Stonebrae described what the intended clubhouse would look like. *See* Countercl. ¶ 40 ("In promotional materials, Stonebrae described the intended club house as a 32,000 square foot clubhouse designed in a Scottish style by an award winning architect. Toll entered into the Village B Purchase agreement with the expectation that Stonebrae would build a high-end luxury club house in the Stonebrae Development.").

This argument is not persuasive. Even if Toll was not entitled to rely on any promotional materials, that does not mean that Stonebrae was therefore free to construct any kind of clubhouse that it wanted (*e.g.*, a shack) or whenever it wanted (*e.g.*, in a million years). The bigger issue is what impact ¶ 15.1(g)(iii) of the Village B Agreement has on Toll's claim for breach of the implied covenant.

3

dealing." *Locke v. Warner Bros., Inc.*, 57 Cal. App. 4th 354, 363 (1997) (internal quotation marks omitted); *see also California Lettuce Growers, Inc. v. Union Sugar Co.*, 45 Cal. 2d 474, 484 (1955) (noting the same).

While the parties' contract does not expressly provide that Stonebrae has discretion with respect to the timing and quality of the clubhouse, it is clear that the contract implicitly gives Stonebrae discretion in that regard. The parties do not dispute this. The contract contains no specific or objective standards regarding the construction of the clubhouse. The question is whether or not Stonebrae was given *unfettered* discretion under the terms of the Village B Agreement. If so, Toll cannot assert a claim for breach of the implied covenant. The conferral of unfettered discretion would defeat any claim of an implied covenant of good faith. *See generally Vectren Communications Services. v. City of Alameda*, No. C 08-3137 SI, 2009 U.S. Dist. LEXIS 72811 (N.D. Cal. Aug. 18, 2009); *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107 (2008); *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798 (1995).[3]

In *Vectren*, Judge Illston discussed the concept of unfettered discretion. There, a private company and the City of Alameda had an agreement pursuant to which the City's telecommunications system was engineered, constructed, and operated by the company. In 2002, the company and the City agreed to terminate the relationship. The parties also agreed that the City would buy out the company's right to manage the telecom system – but the company was to be paid only if the telecom system made money. *See Vectren*, 2009 U.S. Dist. LEXIS 72811, at *2-4. Ultimately, the telecom system experienced serious financial problems and the City ended up selling the system to a third party. *See id.* at *5. Thereafter, the private company filed suit against the City, asserting, *inter alia*, claims for breach of contract and breach of the implied covenant of good faith and fair dealing. *See id.* at *5-6. With respect to the claim for breach of the implied covenant, the private company argued that the City was in breach because it had failed to add voice service to the telecom system. According to the company, because the City had agreed to pay the company only if

---

[3] Conversely, if the contract imposed objective terms of performance, there would be no need to imply a covenant of good faith because the express contract would govern. *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 100 Cal. App. 4th 44 (2002).

the telecom system made money, it became obligated to take acts to make the system competitive such as adding voice service. *See id.* at *12-13.

As a starting point, Judge Illston acknowledged that "covenants to use 'good faith' or 'best efforts' to generate profits for a licensor are 'routinely implied where the licensor grants exclusive promotional or licensing rights in exchange for a percentage of profits or royalties,' even though the licensee does not expressly promise to do anything." *Id.* at *13. But, she added,

> an implied covenant will not be read into a contract to prohibit a party from doing something that is expressly permitted by the agreement. "Thus, although it has been said the implied covenant finds 'particular application in situations where one party is invested with a discretionary power affecting the rights of another' if the express purpose of the contract is to grant *unfettered discretion*, and the contract is otherwise supported by adequate consideration, then the conduct is, by definition, within the reasonable expectation of the parties and 'can never violate an implied covenant of good faith and fair dealing.'"

*Id.* at *13-14 (emphasis added).

Judge Illston then concluded in *Vectren* that there was no breach of the implied covenant based on the City's failure to add voice services to the telecom system. She explained that the agreement between the private company and the City

> conferred complete discretion on the City to decide whether to make any additions or modifications to the system: "*Alameda P&T may at any time and from time to time, in its sole discretion and at its own expense, install or permit to be installed other items of equipment or other personal property in or upon the Telecom System.*" [This] section[] permit[s] the City to decide whether and how to modify the telecom system, and whether to install other equipment in the system. In light of the complete absence of any language in the [parties' agreement] requiring the addition of voice service, and the discretionary language in Sections 6.2 and 6.3, there is no breach. "[Implied] terms cannot vary the express terms of a contract; if the defendant did what it was expressly given the right to do, there can be no breach."

*Id.* at *17-18 (emphasis added).

In *Wolf*, a state appellate court also addressed the issue of unfettered discretion. There,

> an author entered into a written purchase agreement granting Disney the right to exploit the "Roger Rabbit" characters in a wide variety of contexts. [The agreement specified that] "*Purchaser [Disney] shall not be under any obligation to exercise any of the rights granted to Purchaser hereunder; and any and all said rights may be assigned by*

5

*Purchaser, and/or licenses may be granted by Purchaser with respect thereto, as Purchaser may see fit.*" In exchange, Disney agreed to give the author 2.5% of any motion picture net profits, and 5% of the "gross receipts" derived from the exploitation of the Roger Rabbit characters. The author claimed that Disney breached the implied covenant of good faith and fair dealing by negotiating promotional agreements for which it received no monetary consideration, thus reducing the percentage of "gross receipts" to which the author was entitled. The Court of Appeal rejected that claim:

> [T]he 1983 Agreement afforded Disney the unlimited discretion to grant (or not grant) to third parties licenses to exploit the Roger Rabbit characters.

*Id.* at *14-15 (emphasis added). The court emphasized:

> Had Disney . . . simply elected not to exploit the rights granted to it under the 1983 Agreement, Cry Wolf agrees it would have no recourse against Disney. However, once Disney elected to enter into licensing agreements with third parties in connection with the exploitation of the Roger Rabbit characters, Cry Wolf argues, it had a duty to do so fairly and in good faith so as not to deliberately thwart Cry Wolf's opportunity to obtain a royalty. That argument rests on a distortion of the language in the 1983 Agreement, which did not merely grant Disney the ability to refrain from exercising the rights conveyed, but also conferred the express authority to "grant licenses" to third parties in connection with the exploitation of the Roger Rabbit characters in any manner it "saw fit." As explained, recognizing an implied term that would limit the unfettered discretion given to Disney to license the characters as it saw fit would be at odds with the express terms of the agreement.

*Wolf*, 162 Cal. App. 4th at 1122-23.

Thus, in the instant case, the question is whether the parties' Village B Agreement conferred unfettered discretion on Stonebrae with respect to the clubhouse, similar to the agreements in *Vectren* and *Wolf*. As noted above, ¶ 15.1(g)(iii) of the Village B Agreement states as follows:

> (iii). <u>Golf Course</u>. An eighteen (18) hole golf course is currently planned for a portion of the Stonebrae Development, although Stonebrae makes no commitment regarding the Golf Course generally, including without limitation, when it may be completed or where it will be located. . . .

Village B Agreement ¶ 15.1(g)(iii) (emphasis added). Stonebrae's argument that this provision gives it unfettered discretion is unavailing.

First, the plain language of the provision does not clearly confer unfettered discretion upon Stonebrae. The provision vaguely states that "Stonebrae makes no commitment regarding the Golf Course *generally*." (Emphasis added.) This contrasts with the language used in the contracts in

6

*Vectren* and *Wolf*. In *Vectren*, the agreement between the private company and the City specified that the City "'may at any time and from time to time, *in its sole discretion* and at its own expense, install or permit to be installed other items of equipment or other personal property in or upon the Telecom System.'" *Vectren*, 2009 U.S. Dist. LEXIS 72811, at *18 (emphasis added). In *Wolf*, the agreement between the author and Disney provided: "'Purchaser [Disney] *shall not be under any obligation* to exercise any of the rights granted to Purchaser hereunder; and any and all said rights may be assigned by Purchaser, and/or licenses may be granted by Purchaser with respect thereto, *as Purchaser may see fit.*'" *Wolf*, 162 Cal. App. 4th at 1121 n.7 (emphasis added). In *Third Story*, 41 Cal. App. 4th at 801, the agreement referenced defendant's manufacture, sell, distribute, and advertise the works of Tom Waits, but provided that defendant "'*may at our election* refrain from any or all of the foregoing.'" (Emphasis added.) The language of § 15.1(g)(iii) is less conclusive than that in these cases.

Second, even if the language used in ¶ 15.1(g)(iii) is sufficiently comparable to that used in the agreements in *Vectren* and *Wolf*, that does not mean that ¶ 15.1(g)(iii) necessarily conferred unfettered discretion. In *Vectren* and *Wolf* – as well as *Third Story* – the defendants were given the discretion to take an action or decline to take an action. They were not, as here, given discretion only as to *how* or *when* to take the action (assuming as noted above there was an obligation to take action (*i.e.* build a clubhouse)). That difference is material. It is possible to give unfettered discretion with respect to a decision whether or not to take an action. But if the contract requires an action, there cannot be unfettered discretion as to *how* or *when* to take such action lest the obligation to take the action be entirely defeated. For example, if ¶ 15.1(g)(iii) of the Village B Agreement did give Stonebrae unfettered discretion as to when to build a clubhouse (Stonebrae's position), then this would effectively give Stonebrae the right to delay construction ad infinitum. Stonebrae would, in effect, never have to build the clubhouse at all – contrary to the express terms of the contract (as assumed herein). In short, Stonebrae's interpretation of the contract is not reasonable given its assumed obligation to build the golf course and clubhouse. Such a grant of unfettered discretion would be contrary to the express contractual obligation (assumed herein) to build a clubhouse. *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 100 Cal. App. 4th 44 (2002).

Accordingly, as a matter of contract interpretation, the Court concludes that ¶ 15.1(g)(iii) of the Village B Agreement did not confer unfettered discretion on Stonebrae with respect to the construction of the golf course and clubhouse. Since the contract conferred discretion without either imposing objective terms or conferring unfettered discretion, the covenant of good faith and fair dealing is implied.

As a final point, the Court addresses Stonebrae's contention that, even if its discretion had limits, thereby giving rise to an implied duty of good faith and fair dealing, no breach of the implied covenant could have taken place in the instant case because no breach could have happened by November 1, 2007, the day that Toll argues was the close of escrow. In other words, according to Stonebrae, even if it could not, under the Village B Agreement, wait one million years to complete the clubhouse, nothing required it to complete the clubhouse by the day escrow was to close. That argument, however, deals with the merits of Toll's claim for breach of the implied covenant. At this juncture, the Court cannot say as a matter of law that there was no breach. Even if Stonebrae did not have to complete the clubhouse by the close of escrow, that does not preclude the possibility of a breach. For example, if it were clear by the close that escrow that Stonebrae had decided to build no clubhouse or only a clubhouse of sub-par caliber (*e.g.*, a shack), then arguably Toll could possibly claim an anticipatory breach. Whether there was an actual breach is not before the Court. Moreover, as stated above, in concluding that a covenant of good faith may be implied with respect to construction timing and quality of the clubhouse, the Court does not address nor has it resolved the foundation question whether the express contract obligated Stonebrae to build a golf course and clubhouse at all.

///
///
///
///
///
///
///

8

### III. CONCLUSION

For the foregoing reasons, the Court denies Stonebrae's motion to dismiss the counterclaim to the extent it is based on the clubhouse. The denial is without prejudice to the issue whether Stonebrae was generally obligated to build a clubhouse at all.

This order disposes of Docket No. 148.

IT IS SO ORDERED.

Dated: April 8, 2010

_____
EDWARD M. CHEN
United States Magistrate Judge