KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Donald J. Putterman (SBN 90822)
E-mail: dputterman@kasowitz.com
Christopher J. McNamara (SBN 209205)
E-mail: cmcnamara@kasowitz.com
Emily de Ayora (SBN 250349)
E-mail: edeayora@kasowitz.com
101 California Street, Suite 2300
San Francisco, California 94111
Telephone: (415) 421-6140
Facsimile: (415) 398-5030

TIMOTHY J. HOBAN (SBN 192461)
Regional Counsel for Toll Bros., Inc.
E-mail: thoban@tollbrothersinc.com
725 Town & Country Road, Suite 500
Orange, California 92868
Telephone: (714) 347-1300
Facsimile: (714) 835-9683

Attorneys for Defendant
TOLL BROS, INC.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### (SAN FRANCISCO DIVISION)

| | |
|---|---|
| STONEBRAE L.P., a Delaware limited partnership,<br><br>                        Plaintiff,<br><br>        v.<br><br>TOLL BROS., INC., a Pennsylvania Corporation,<br><br>                        Defendant.<br><br>And Related Counterclaims. | Case No. 08-cv-00221 EMC<br><br>**STIPULATION TO ALLOW DEFENDANT TO FILE DEFENDANT TOLL BROS., INC. FIRST AMENDED ANSWER TO SECOND AMENDED COMPLAINT; AFFIRMATIVE DEFENSES: AND COUNTERCLAIMS  ; ORDER**<br><br>Judge:  Hon. Edward Chen<br>Trial Date:  February 28, 2011 |

*(left margin, vertical text)* KASOWITZ, BENSON, TORRES & FRIEDMAN LLP  101 CALIFORNIA STREET, SUITE 2300  SAN FRANCISCO, CALIFORNIA 94111

Pursuant to Federal Rule of Civil Procedure 15(a), Plaintiff and Counter-Defendant Stonebrae L.P. ("Stonebrae") and Defendant and Counter-Claimant Toll Bros., Inc. ("Toll") hereby stipulate that Toll may file Defendant Toll Bros., Inc. First Amended Answer to Second Amended Complaint; Affirmative Defenses; and Counterclaims.

**STIPULATION**

WHEREAS Stonebrae filed a Second Amended Complaint ("Complaint") in this matter on January 12, 2010;

WHEREAS Toll filed an Answer, Affirmative Defenses, and Counterclaims of Defendant Toll Bros., Inc., to Second Amended Complaint on January 26, 2010;

WHEREAS the trial in this matter is set for February 28, 2011;

WHEREAS Toll desires to file Defendant Toll Bros., Inc. First Amended Answer to Second Amended Complaint; Affirmative Defenses; and Counterclaims, to assert additional affirmative defenses and counterclaims;

WHEREAS Plaintiff Stonebrae has agreed, subject to the following conditions, that Toll may file Defendant Toll Bros., Inc. First Amended Answer to Second Amended Complaint; Affirmative Defenses; and Counterclaims;

IT IS HEREBY STIPULATED AND AGREED, by and between the parties hereto and their respective undersigned attorneys, as follows:

1. Toll may file Defendant Toll Bros., Inc. First Amended Answer to Second Amended Complaint; Affirmative Defenses; and Counterclaims, a true and correct copy of which is attached as Exhibit A.

2. Within 3 days of the date this Stipulation is filed, Toll Bros. will inform Stonebrae in writing of the identity of any witnesses who may have discoverable information that Toll may use to support any claim or defense added in Defendant Toll Bros., Inc. First Amended Answer to Second Amended Complaint; Affirmative Defenses; and Counterclaims.  Within 5 days of the date of this stipulation is filed, Toll will produce any documents in its possession that have not

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

been previously produced that are relevant to any newly added claim or defense.

      3.     Stonebrae shall have 30 days from the filing date to file a response to Defendant Toll Bros., Inc. First Amended Answer to Second Amended Complaint; Affirmative Defenses; and Counterclaim.

DATED:  August 12, 2010            KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

                             By:    /s/ Christopher J. McNamara
                                    Christopher J. McNamara
                                    Attorneys for Defendant and Counter-Claimant
                                    TOLL BROS., INC.

DATED:  August 12, 2010            SHEPPARD MULLIN RICHTER & HAMPTON LLP

                                  COOPER & KIRKHAM, P.C.

                             By:    /s/ Philip Atkins-Pattenson
                                    Philip Atkins-Pattenson
                                    Attorneys for Plaintiff and Counter-Defendant
                                    STONEBRAE L.P.

8070621

IT IS SO ORDERED



_____
Edward M. Chen
U. S. Magistrate
Judge

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

# EXHIBIT A

1    KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
     Donald J. Putterman (SBN 90822)
2    E-mail:  dputterman@kasowitz.com
     Christopher J. McNamara (SBN 209205)
3    E-mail:  cmcnamara@kasowitz.com
     101 California Street, Suite 2300
4    San Francisco, California 94111
     Telephone:  (415) 621-6140
5    Facsimile:  (415) 398-5030

6    TIMOTHY J. HOBAN (SBN 192461)
     Regional Counsel for Toll Bros., Inc.
7    E-mail:  thoban@tollbrothersinc.com
     725 Town & Country Road, Suite 500
8    Orange, California 92868
     Telephone:  (714) 347-1300
9    Facsimile:  (714) 835-9683

10   Attorneys for Defendant/Counterclaimant
     TOLL BROS, INC.

11

12                  IN THE UNITED STATES DISTRICT COURT

13            FOR THE NORTHERN DISTRICT OF CALIFORNIA

14                       (SAN FRANCISCO DIVISION)

15   STONEBRAE L.P., a Delaware limited        Case No. 08-CV-00221 EMC
     partnership,
16                                             DEFENDANT TOLL BROS., INC. FIRST
                    Plaintiff,                 AMENDED ANSWER TO SECOND
17                                             AMENDED COMPLAINT;
            vs.                                AFFIRMATIVE DEFENSES; AND
18                                             COUNTERCLAIMS
     TOLL BROS, INC., a Pennsylvania
19   Corporation, TOLL BROTHERS, INC., a       Removal Filed:  January 11, 2008
     Delaware corporation, DOES 1 through 15,  Judge:  Hon. Edward Chen
20   inclusive,                                Trial Date:  July 19, 2010

21                   Defendants.

22

23   And Related Counterclaims.

24

25          Defendant Toll Bros., Inc. ("Toll") responds to the Second Amended Complaint

26   ("Complaint") of Plaintiff Stonebrae L.P. ("Stonebrae") as follows:

27          1.      Toll lacks knowledge or information sufficient to form a belief about the truth of

28   the allegations of Paragraph 1, and on that basis denies them.

                                            1

ASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

ASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1  2.  Toll admits the allegations in Paragraph 2 of the Complaint.

2  3.  Toll denies Toll Brothers, Inc. is a defendant in this action.  The claims against Toll

3  Brothers, Inc. were dismissed by the Court on May 21, 2008.  Docket No. 48.  Toll admits the

4  remaining allegations in Paragraph 3 of the Complaint.

5  4.  Toll lacks knowledge or information sufficient to form a belief about the truth of

6  the allegations of Paragraph 4, and on that basis denies them.

7  5.  Toll denies the allegations in Paragraph 5 of the Complaint.

8  6.  Toll admits the allegations in Paragraph 6 of the Complaint.

9  7.  Toll admits the allegations in Paragraph 7 of the Complaint.

10  8.  Toll admits the allegations in Paragraph 8 of the Complaint.

11  9.  Toll admits the allegations in Paragraph 9 of the Complaint.

12  10.  Toll admits the allegations in Paragraph 10 of the Complaint.

13  11.  Toll admits the allegations in Paragraph 11 of the Complaint.

14  12.  Toll admits it conducted due diligence in connection with the Village A Purchase

15  Agreement.  Toll denies the remaining allegations in Paragraph 12.

16  13.  Toll admits it negotiated with Stonebrae to purchase additional lots located in

17  Village B.  Toll denies the remaining allegations in Paragraph 13.

18  14.  Toll admits the allegations in Paragraph 14 of the Complaint.

19  15.  Toll admits the allegations in Paragraph 15 of the Complaint.

20  16.  Toll admits it conducted a due diligence investigation with respect to the Village B

21  Purchase Agreement.  Toll admits it timely provided Stonebrae with written approval of Toll's due

22  diligence investigation pursuant to the Village B Purchase Agreement.  Toll denies all other

23  allegations in Paragraph 16 of the Complaint.

24  17.  Toll lacks knowledge or information sufficient to form a belief about the truth of

25  the allegations in Paragraph 17, and on that basis denies them.

26  18.  Toll denies the allegations in Paragraph 18 of the Complaint.

27  19.  Toll admits that on November 2, 2007, Toll sent a notice of default to Stonebrae.

28  Toll denies the remaining allegations in Paragraph 19 of the Complaint.

20.     Toll admits it knew Stonebrae was required to complete the Stonebrae Pre-Closing Work prior to the close of escrow.  Toll denies the remaining allegations in Paragraph 20.

21.     Toll admits that under the Village B Purchase Agreement, the close of escrow was November 1, 2007.  Toll admits it did not advise Stonebrae that it would terminate the Village B Purchase Agreement if escrow did not close on November 1, 2007.  Toll denies the remaining allegations in Paragraph 21 of the Complaint.

22.     Toll denies the allegations in Paragraph 22 of the Complaint.

23.     Toll admits it did not participate in a joint inspection of the Stonebrae Pre-Closing Work prior to November 1, 2007.  Toll denies the remaining allegations of Paragraph 23.

24.     Toll admits that on November 2, 2007, Toll sent a notice of default to Stonebrae. Toll denies the remaining allegations in Paragraph 24 of the Complaint.

25.     Toll denies the allegations in Paragraph 25 of the Complaint.

26.     Toll admits Toll Brothers, Inc. filed a Form 8-K for the fourth quarter of 2007, the content of which speaks for itself.  Toll denies the remaining allegations in Paragraph 26 of the Complaint.

27.     Toll admits that Prior to November 1, 2007, Toll had inventory of complete and partially complete homes in Village A.  Toll admits there were cancellations of contracts to purchase certain of its home in Village A.  Toll denies the remaining allegations in Paragraph 27 of the Complaint.

28.     Toll admits that on November 2, 2007, Toll sent a notice of default to Stonebrae, which set forth a number of reasons why Stonebrae was in default and Toll was not obligated to close escrow.  Toll denies the remaining allegations of Paragraph 28 of the Complaint.

29.     Toll denies the allegations of Paragraph 29 of the Complaint.

30.     Toll denies the allegations of Paragraph 30 of the Complaint.

31.     Toll admits that after receiving Toll's November 2, 2007, notice of default, Stonebrae disputed it was in default.  Toll also admits Stonebrae and Toll conducted a joint inspection of the Village B.  Toll denies the remaining allegations in Paragraph 31 of the Complaint.

3

ASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1    32.    Toll admits it terminated the Village B Agreement on November 20, 2007.  Toll

2  denies the remaining allegations of Paragraph 32.

3    33.    Toll denies the allegations in Paragraph 33 of the Village B Agreement.

4    34.    Toll incorporates by reference its responses to the allegations set forth in

5  Paragraphs 1 through 33 of the Complaint.

6    35.    Toll admits the allegations in Paragraph 35 of the Complaint.

7    36.    Toll admits the allegations in Paragraph 36 of the Complaint.

8    37.    Toll admits Stonebrae makes the allegations set forth in Paragraph 37 of the

9  Complaint.  Toll denies the remaining allegations of Paragraph 37 of the Complaint.

10    38.    Toll denies the allegations in Paragraph 38 of the Complaint.

11    39.    Toll incorporates by reference its responses to the allegations set forth in

12  Paragraphs 1 through 38 of the Complaint.

13    40.    Toll denies the allegations in Paragraph 40 of the Complaint.

14    41.    Toll denies the allegations in Paragraph 41 of the Complaint.

15    42.    Toll incorporates by reference its responses to the allegations set forth in

16  Paragraphs 1 through 41 of the Complaint, above, as though fully set forth herein.

17    43.    Toll admits the allegations in Paragraph 43 of the Complaint.

18    44.    Toll admits that in its first affirmative defense (Failure to State a Claim) to

19  Stonebrae's First Amended Complaint, Toll referred to California Civil Code Section 1671(b) and

20  that Toll has stated it intends to delete that reference.  Toll denies the remaining allegations of

21  Paragraph 44.

22    45.    Toll admits Stonebrae now seeks a judicial declaration that the Liquidated

23  Damages Clause violates Civil Code Section 1671(b).  Toll denies the remaining allegations of

24  Paragraph 45 of the Complaint.

25    46.    Paragraph 46 of the Complaint is a legal conclusion to which no response is

26  required.  To the extent a response is required, Toll denies the allegations in Paragraph 46 of the

27  Complaint.

28

47. Paragraph 47 of the Complaint is a legal conclusion to which no response is required. To the extent a response is required, Toll denies the allegations in Paragraph 47 of the Complaint.

48. Stonebrae represented that the amount of liquidated damages was a reasonable sum considering all the circumstances in existence when the parties entered into the Village B Agreement. On that basis, Toll denies denies the allegations in Paragraph 48 of the Complaint.

49. Paragraph 49 of the Complaint is a legal conclusion to which no response is required. To the extent a response is required, Toll denies the allegations in Paragraph 49 of the Complaint.

50. Toll admits there exists a ripe and justiciable controversy between Stonebrae and Toll regarding the validity and enforceability of the Liquidated Damages Clause. Toll denies the remaining allegations in Paragraph 50 of the Complaint.

51. Toll admits Stonebrae makes the requests set forth in Paragraph 51 of the Complaint.

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

### (Estoppel)

Stonebrae's claims against Toll are barred in whole or in part by the doctrine of estoppel. In particular, Stonebrae is estopped from contending the Liquidated Damages Clause is unenforceable on the theory it does not represent the result of a reasonable endeavor by the parties to the Village B Purchase Agreement to estimate the amount of actual damages that might be suffered by Stonebrae in the event of a breach by Toll. As the owner and master developer of the Stonebrae development, Stonebrae was in the best position to know the amount of potential damages in the event of a breach by Toll; indeed, the amount of the liquidated damages was insisted upon by Stonebrae, which knew the amount was double what even Stonebrae acknowledged was the typical percentage of liquidated damages. In the Village B Purchase Agreement, Stonebrae represented "That Stonebrae's actual damages resulting from such builder

ASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

5

default would be substantial but extremely difficult to ascertain and (b) such amount is a reasonable sum considering all of the circumstances existing as of the Agreement date." The representation was material. Stonebrae made the representation with the intent Toll rely upon it. Toll justifiably relied on Stonebrae's representation, was induced to enter into the Village B Purchase Agreement by the representation, and has been damaged by its reliance on Stonebrae's representation. Stonebrae is therefore estopped from contending the amount of the Liquidated Damages Clause was not a reasonable sum considering all the circumstances at the time and is therefore unenforceable.

## SECOND AFFIRMATIVE DEFENSE

### (Mistake)

Stonebrae's Complaint is barred by sections 1567, 1568, 1577 of the California Civil Code regarding mistake of fact. As the owner and master developer of the Stonebrae development, Stonebrae was in the best position to know the amount of potential damages in the event of a breach by Toll. Based on Stonebrae's representation and Stonebrae's insistence on a significantly higher amount of liquidated damages than would otherwise be expected in the industry, Toll believed Stonebrae had determined the liquidated damages amount was a reasonable sum considering all of the circumstances existing as of the date of the Village B Purchase Agreement. If, these facts were not true, as Stonebrae alleges in its Complaint, then Toll was mistaken as to a material fact. Toll would not have entered into the Village B Purchase Agreement but for Stonebrae's representation that it believed that the liquidated damages provision was a reasonable sum considering all of the circumstances existing at the time and was enforceable.

## THIRD AFFIRMATIVE DEFENSE

### (Fraud)

The complaint is barred by sections 1566, 1567, 1568, 1571, 1572, 1573 and 1574 of the California Civil Code regarding fraud. As the owner and master developer of the Stonebrae development, Stonebrae was in the best position to know the amount of potential damages in the event of a breach by Toll. In the Village B Purchase Agreement, Stonebrae represented, "That Stonebrae's actual damages resulting from such builder default would be substantial but extremely

A S O W I T Z,  B E N S O N,  T O R R E S  &  F R I E D M A N  L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

ASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1    difficult to ascertain and (b) such amount is a reasonable sum considering all of the circumstances

2    existing as of the Agreement date."  Based on Stonebrae's representation, Toll believed Stonebrae

3    had determined the liquidated damages amount was a reasonable sum considering all of the

4    circumstances existing as of the date of the Village B Purchase Agreement.  The representation

5    was material.  Stonebrae made the representation with the intent Toll rely upon it.  Toll justifiably

6    relied on Stonebrae's representation, was induced to enter into the Village B Purchase Agreement

7    by the representation, and has been damaged by its reliance on Stonebrae's representation.

8                              **FOURTH AFFIRMATIVE DEFENSE**

9                                    **(Waiver/Laches)**

10       Stonebrae's Third Cause of Action for declaratory relief is barred by waiver and/or laches.

11   Stonebrae has waived its rights to assert the Liquidated Damages Clause is illegal because it has

12   acted contrary to an intent to enforce any rights under California Civil Code section 1671.  In

13   particular, in each of its prior complaints (all of which, like the present Second Amended

14   Complaint, were filed subject to Rule 11 of the Federal Rules of Civil Procedure) Stonebrae

15   alleged that it is entitled to the deposit amount as liquidated damages.  Stonebrae also claimed that

16   it was entitled to the deposit amount as liquidated damages in other pleadings, including the initial

17   Joint Case Management Conference Statement and Stonebrae's initial disclosures.

18                              **FIFTH AFFIRMATIVE DEFENSE**

19                          **(Unclean Hands/Inequitable Conduct)**

20       Stonebrae's claims against Toll are barred in whole or in part by the doctrine of unclean

21   hands.  Stonebrae represented, "That Stonebrae's actual damages resulting from such builder

22   default would be substantial but extremely difficult to ascertain and (b) such amount is a

23   reasonable sum considering all of the circumstances existing as of the Agreement date."  In the

24   Complaint Stonebrae alleges that was not true.  If Stonebrae's current allegations are true then

25   Stonebrae purposefully included an unenforceable provision in the Village B Purchase Agreement

26   to induce Toll to enter into the contract.  Stonebrae's claims are therefore barred by unclean hands.

27

28

## SIXTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

Stonebrae's claims against Toll are barred in whole or in part by Stonebrae's failure or failures to mitigate its damages allegedly resulting from any alleged wrongs by Toll.

## SEVENTH AFFIRMATIVE DEFENSE

### (Illegal Contract)

The Village B Purchase Agreement is illegal under California's Subdivision Map Act (the "SMA"), which is set forth at California Government Code, section 66410 et seq., and is therefore void.

## EIGHTH AFFIRMATIVE DEFENSE

### (Failure to State a Cause of Action)

Stonebrae's claims against Toll are barred in whole or in part because Stonebrae's Complaint fails to assert facts sufficient to state a cause of action. In particular, in its third cause of action, Stonebrae fails to include sufficient factual allegations in support of its claim that the Liquidated Damages Clause is unenforceable.

## NINTH AFFIRMATIVE DEFENSE

### (Failure of Consideration)

Stonebrae's claims against Toll are barred in whole or in part by the failure of consideration. As set forth in the counterclaims below, a fundamental part of the consideration for the Village B Agreement was Stonebrae's obligation to construct a luxury clubhouse and related facilities. The consideration failed in whole or part by Stonebrae's decision to stop the design work on the clubhouse without Toll's knowledge, the extension of the Development Agreement (which included construction of the clubhouse) between Stonebrae and the City for an additional period of five years without Toll's consent, and the installation of the mobile modular facilities rather than the construction of the promised luxury clubhouse and related facilities.

## TENTH AFFIRMATIVE DEFENSE

### (Rescission)

Stonebrae's claims against Toll are barred under California Civil Code sections 1688 et

8

ASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

A S O W I T Z , B E N S O N , T O R R E S & F R I E D M A N  L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1    seq. regarding rescission of contracts.  As the owner and master developer of the Stonebrae

2    development, Stonebrae was in the best position to know the amount of potential damages in the

3    event of a breach by Toll.  In the Village B Purchase Agreement, Stonebrae represented, "That

4    Stonebrae's actual damages resulting from such builder default would be substantial but extremely

5    difficult to ascertain and (b) such amount is a reasonable sum considering all of the circumstances

6    existing as of the Agreement date."  Based on Stonebrae's representation, Toll believed Stonebrae

7    had determined the liquidated damages amount was a reasonable sum considering all of the

8    circumstances existing as of the date of the Village B Purchase Agreement.  The representation

9    was material.  Stonebrae made the representation with the intent that Toll rely upon it.  Toll

10   justifiably relied on Stonebrae's representation, was induced to enter into the Village B Purchase

11   Agreement by the representation, and has been damaged by its reliance on Stonebrae's

12   representation.

13        Additionally, Toll is entitled to rescind the Village B Agreement based on a failure of

14   consideration or fraudulent inducement.  As set forth in the counterclaims below, a fundamental

15   part of the consideration for the Village B Agreement was Stonebrae's obligation to construct a

16   luxury clubhouse and related facilities.  Further, Stonebrae continuously represented to Toll that

17   the clubhouse would be built, and encouraged Toll to market Toll's lots in Village A based upon

18   the Stonebrae amenities, including the clubhouse.  The consideration failed in whole or part by

19   Stonebrae's decision to stop the design work on the clubhouse without Toll's knowledge; the

20   extension of the Development Agreement between Stonebrae and the City by five years without

21   Toll's consent; and the installation of the mobile modular facilities rather than the construction of

22   the promised luxury clubhouse and related facilities.  Moreover, Stonebrae contends that either it

23   had no de facto or legal obligation to build the clubhouse at all, yet never disclosed to Toll that it

24   believed it had no such obligation while representing that the clubhouse would be built.

25                                **ELEVENTH AFFIRMATIVE DEFENSE**

26                                        **(Termination)**

27        Stonebrae's claims are barred because the Village B Agreement was terminated.  As set

28   forth in counterclaims below, Toll justifiably terminated the Village B Agreement based on

9

1  Stonebrae's failure to complete the Pre-Closing Work in a timely manner and Stonebrae's

2  repudiation of its obligation to build the promised clubhouse and related facilities.

3  **TWELFTH AFFIRMATIVE DEFENSE**

4  **(Failure to Form a Contract)**

5  Stonebrae's claims against Toll are barred because there was no meeting of the minds on

6  the essential terms of the contract. As set forth in the counterclaims below, a fundamental part of

7  the consideration was Stonebrae's obligation to construct a luxury clubhouse and related facilities.

8  Stonebrae now contends it has never had any obligation to build the promised clubhouse and

9  related facilities. If true, there was no meeting of the minds and a contract was not formed.

10

11  **COUNTERCLAIMS**

12  **PARTIES**

13  1.      Toll Bros. Inc. ("Toll") is a corporation organized under the laws of the State of

14  Pennsylvania.

15  2.      Toll is informed and believes and thereon alleges that Stonebrae L.P. ("Stonebrae")

16  is a limited partnership organized under the laws of the State of Delaware.

17  **JURISDICTION AND VENUE**

18  3.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332.

19  4.      Venue is proper in this district pursuant to 28 U.S.C. § 1441.

20  **FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

21  A.    **Stonebrae Is an Experienced Developer.**

22  5.      Stonebrae is the legal entity that owns the Stonebrae Development in Hayward,

23  California (previously known as the Blue Rock Country Club Project). For practical purposes, the

24  Stonebrae Development is owned by the Yeungs, a wealthy Hong Kong family that made its

25  fortune primarily through the retail gold and jewelry business and real estate development. The

26  Yeungs own substantial real property in the U.S. through various entities. At the top of the

27  Yeungs' American corporate pyramid is Yeung Chi Shing Holding. Inc. ("YCS"). YCS owns

28  YCS Nevada, Inc., and Hayward 1900, Inc. YCS Nevada is the general partner of Stonebrae L.P.,

A SONNENSCHEIN NATH & ROSENTHAL LLP
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1  with less than a 1% interest in Stonebrae.  Hayward 1900 is the sole limited partner with the

2  remaining interest.  The Stonebrae Development is primarily managed by Paul Yuen, Michael

3  Letchinger, and Steve Miller, all of whom report directly or indirectly to Howard Yueng, who

4  lives in Hong Kong and makes all material decisions concerning Stonebrae.  The Yeungs have

5  owned the property comprising the Stonebrae Development for some time.  In the mid-1990s,

6  Stonebrae (then known as Hayward 1900) began the entitlement process to develop the property

7  with the City of Hayward (the "City").  In 1998, Stonebrae entered into the Blue Rock Country

8  Club Project Development Agreement with the City (the "Development Agreement").

9      6.      The Stonebrae Development Agreement was entered into in January 1998.  Its

10  operative date was February 26, 1998, and its term was for 10 years.  Section 3.10, which is in a

11  section titled "Owner's Obligations: Provision of Public Benefits," includes the following:

> The PARTIES acknowledge that the golf course and related
> facilities which are conceptually described in OWNER's application
> for Zone Change No. 97-120-02 and Preliminary Development Plan,
> are amenities which will significantly enhance OWNER's ability to
> market and sell at a premium the residential units to be developed on
> the Property.

16      7.      The Stonebrae Development was also subject to Conditions of Approval, which

17  required Stonebrae to submit a precise plan for the entire project, including drawings for the entire

18  golf course facility.  Under the Conditions of Approval, Stonebrae was required to complete the

19  clubhouse in the 5th phase of the development, which, because of the Development Agreement's

20  ten-year duration, had to occur by February 26, 2008.

21      8.      Stonebrae understood that to get the best price for the property Stonebrae had to

22  rise above the Hayward image and demographics, which Stonebrae planned to do by creating a

23  high-end luxury golf course community.  An important aspect of the planned high-end luxury golf

24  course community was a luxury clubhouse and related facilities.

25      9.      As required by the City, Stonebrae submitted a precise development plan ("Precise

26  Plan") and a vesting tentative map ("Tentative Map") in December 2000.  In response to City

27  requests for additional information, Stonebrae submitted revised and supplemental documents,

28

11

including the Supplement to Precise Plan in July 2001.  The Supplement to the Precise Plan included the following conceptual drawings of the golf course clubhouse.





10.     In September 2002, the City approved the Precise Plan and the Tentative Map by Resolution 02-132, subject to Conditions of Approval and the Addendum to the Conditions of Approval.  Under the Addendum to the Conditions of Approval, Stonebrae was required to demonstrate its ability to complete all aspects of the project in compliance with the approved phasing plan, which required completion of the clubhouse in the fifth phase of the development.

11.     In late 2004, Stonebrae began soliciting bids from merchant homebuilders for lots in Village A.  At the same time, Letchinger and Miller (both experienced golf course community developers) worked with outside consultants to determine the value of the lots based on the current market conditions as well as expected future market conditions.  Stonebrae developed proformas that were updated regularly to analyze projected income and expenses and evaluate the bids from homebuilders.

A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

ASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

12.     According to a Stonebrae Project Review prepared for a January 2005 meeting in Hong Kong, Stonebrae received bids from eight different builders, including Toll.  In comparing the bids, one of the primary factors Stonebrae considered was the amount of the deposit. Stonebrae narrowed the list to five builders and met with Toll and three others to discuss various issues prior to the January meeting Hong Kong.  According to the Project Review, Stonebrae believed it could obtain a 10% increase in the bids through further negotiation and that the final structure of the purchase and sale contracts would be based on Stonebrae's tolerance for risk and the needs of its lender.

13.     While it was soliciting bids from homebuilders, Stonebrae was also soliciting financing proposals from lenders.  On February 7, 2005, Stonebrae received a term sheet from its eventual lender, HSBC.  Among other things, HSBC proposed terms included the assignment of "all sales agreements, deposits (including minimum 15% non-refundable deposits required to secure contracts for the sale of the finished lots), rents and leases."  As a condition precedent to closing, HSBC required a satisfactory review and approval of the sale contracts.

14.     Prior to entering into any agreements with Toll, Stonebrae evaluated the risk from a potential default by a purchaser.  These risks were discussed in a April 12, 2005 memorandum from Paul Yuen and Mike Letchinger to Howard Yeung and Roy Chan.  Section III of the memorandum is titled "Economic Risk from the Default of the Homebuilders," and in part states the following:

- "All three sales contracts are with extremely strong homebuilders.  (Toll Brothers, Inc., which will purchase 50% of the lots, is now a Fortune 500 company; and Standard Pacific, Inc., is a NYSE listed company).  By splitting the sale up among three builders we have also spread our risk in the event of the default by one of the builders."

- "In each case, the builders are providing us with a full 15% deposit, which is far in excess of the standard 5% to 7.5% customary deposit amount.  As a result, we will have over $17 million in non-refundable builder deposits.  In the event of a builder bankruptcy or default we simply keep their deposit and are then free to re-sell the lots

1    to another builder at full price without offset or re-imbursement to the defaulting

2    builder."

3    • "As we had 12 serious offers and five final offers, there is strong evidence that finding

4    a replacement builder should be a orderly process."

5    15.    After Stonebrae determined that it would require a 15% non-refundable deposit,

6    rather than the standard 5% to 7.5%, it entered into the Village A Agreement with Toll.

7    **B.    Stonebrae And Toll Entered Into The Village A Agreement.**

8    16.    In February 2005, Stonebrae began negotiating the purchase and sale agreements

9    with Toll.  Stonebrae was represented by Sheppard Mullin Richter & Hamilton LLP during the

10   negotiations.  Toll was represented by Bingham McCutchen.  Stonebrae prepared the initial draft

11   of the Purchase and Sale Agreement for lots in Village A ("Village A Agreement") and sent it to

12   Toll on March 17, 2005.  Thereafter, the parties negotiated the terms and exchanged multiple

13   drafts and entered into the final version of the Village A Agreement on June 16, 2005.

14   17.    On March 25, 2005 (shortly after receiving a draft purchase agreement), Toll

15   requested a number of due diligence documents, including any amendments to and/or assignments

16   of the Development Agreement.  Stonebrae responded on April 5, 2005.  Among other things,

17   Stonebrae confirmed that the Development Agreement had not been amended and that, other than

18   an assignment to HSBC as collateral, it had not been assigned.  Stonebrae also confirmed that the

19   Precise Development Plan was still in effect.  While negotiating the terms of the Village A

20   Agreement, Toll also conducted due diligence by reviewing the Development Agreement, Precise

21   Plan, Tentative Map, Conditions of Approval and other development documents.

22   18.    The final version of the Village A Agreement incorporated by reference the

23   Development Agreement, Precise Plan, Tentative Map, Conditions of Approval and other

24   documents related to the development, which were collectively defined as "Governmental

25   Development Documents."  Under section 15.1(a) of the Village A Agreement, Stonebrae was

26   required to defend and enforce the Governmental Development Documents in the event of a

27   challenge that interfered with Toll's development of the property.  This requirement was included

28   at Toll's request during the negotiation of the contract.

A S O W I T Z   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

14

ASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

19.     Toll's original proposal included a deposit amount just under 2.5% of the total purchase price.  During negotiations with Stonebrae, Toll agreed to a deposit amount of about 15% of the total purchase price.  Stonebrae's damages for a Toll breach were liquidated in the amount of the deposit.  In section § 17.1(c)(ii) of the Village A Agreement, Stonebrae represented that such amount was reasonable considering the circumstances at the time.  Toll is informed and believes that Stonebrae's contracts with other homebuilders at the time also required the buyer to pay a deposit of 15%, which would be retained by Stonebrae as liquidated damages in the event of buyer's breach.

**C.     Stonebrae Understood It Was Obligated To Complete The Clubhouse.**

20.     In late 2005, after Stonebrae had entered into the Village A Agreement with Toll, Stonebrae's Letchinger and Yuen worked with a consultant to analyze the viability of adding a full service spa or health farm to the Stonebrae Development.  They concluded a spa or health farm was not economically viable, as explained in a November 1, 2005 memorandum to Howard Yeung and Roy Chan.  (Mr. Chan was and is a close advisor to Mr. Yeung who also works out of Hong Kong.)  In the memorandum, Letchinger and Yuen emphasized that Stonebrae was obligated to the homebuilders (including Toll) to build the clubhouse and related facilities a promised.  Among other things, Letchinger and Yuen stated the following:

> Finally, all such spa facilities would have to be in addition to the current planned country club facility *which we are required to deliver*, which club facilities *we have promised to the homebuilders buying our lots* and for which we are already pressed to be able to construct within the permitted area for development.
>
> **Existing Obligations To Homebuilders.**  *The existing homebuilders have entered into contracts with us based upon an understanding that we would be offering a standard set of golf, swim and tennis facilities to their home purchasers.*  Obviously we cannot delete any of these family oriented facilities in exchange for the spa facilities. . . Any change to the *current representation to the builders that we will be a "best of class" country club at Stonebrae (currently priced at the top end of the market)* could significantly affect the sales of future villages.

Emphasis added.

21.     Stonebrae now contends that it never had an obligation to build the golf clubhouse or the related amenities of a 'best of class' country club.  But at no time when Stonebrae was negotiating with Toll for the purchase and sale of lots in either Village A or Village B did Stonebrae ever disclose its position in that regard to Toll, not withstanding its representations and promises concerning providing the Clubhouse and other amenities of a 'best in class' country club.

**D.     Stonebrae And Toll Entered Into The Village B Agreement After Escrow Closed On The Village A Agreement.**

22.     On February 6, 2006, Toll submitted a proposal to purchase 56 lots in Village B for $31,854,200.  Stonebrae agreed to the price but not the deposit amount.  Thereafter the parties began negotiating the terms. Over the next few months the parties exchanged multiple drafts and entered into a final version of the Village B Agreement on May 1, 2006.

**E.     The Parties Negotiated The Amount Of The Deposit.**

23.     As in the Village A Agreement, the Village B Agreement included a liquidated damages provision under which Stonebrae's damages would be liquidated in the amount of Toll's deposit.  Toll initially proposed a deposit amount of $1,000,000, just over 3% of the proposed purchase price.  On or about March 30, 2006, Stonebrae and Toll, through counsel, discussed the deposit amount.  In an early draft of the agreement the deposit amount was $6,370,840, representing 20% of the purchase price.  After further discussions the deposit was reduced to $4,774,944, 14.99% of the purchase price.  As in the Village A Agreement, the Village B Agreement limited Stonebrae's damages to the deposit, which Stonebrae represented was reasonable considering all the circumstances at the time.  Section 17.1(c)(ii) of the Village B Agreement states:

> The parties expressly understand and agree (A) that Stonebrae's actual damages resulting from such builder default would be substantial but extremely difficult to ascertain and (B) such sum is a reasonable sum considering all of the circumstances existing as of the agreement date.

24.     As the owner and master developer of the Stonebrae Development, Stonebrae was in the best position to determine the reasonableness of the deposit amount.  For example,

ASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

16

ASOWITZ   BENSON   TORRES   &   FRIEDMAN   LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1    Stonebrae developed proformas that were continually updated to reflect current and expected

2    market changes.  In April 2006, Stonebrae obtained an appraisal of the value of the lots in

3    Stonebrae.  And, Stonebrae already had reached an agreement with its lender regarding the amount

4    of the deposit.  In reliance on Stonebrae's representation that the liquidated damages amount was

5    reasonable, Toll entered into the Village B Agreement and placed a letter of credit for $4,774,944

6    in escrow, as required by the agreement.

7         25.    Toll is informed and believes that in subsequent negotiations with prospective

8    purchasers, Stonebrae continued to insist on a deposit of 15% of the purchase price.

9

**F.    The Village B Agreement Incorporated The Development Agreement And Other
10        Development Documents By Reference.**

11        26.    As in the Village A Agreement, the Village B Agreement incorporated the

12   Development Agreement and other Development Documents by reference.  The Development

13   Agreement, which required the construction of the clubhouse by February 26, 2008, is referenced

14   in Recital B, Sections 6.2(e), 12.1, 15.1, and Exhibit C.  Boyd Decl., Ex. J.  The Conditions of

15   Approval, which required the construction of the clubhouse during the fifth phase, is referenced in

16   Recital B, Sections 6.2(e).  The Precise Plan or the Supplement to the Precise Plan, which includes

17   conceptual designs of the clubhouse, is referenced in Exhibit D.

18        27.    The parties agreed the Due Diligence Documents, including those listed above,

19   were material to Toll's ownership or development of the property.  Exhibit C to the Village B

20   Agreement states:

21            The term "Due Diligence Documents" includes all of the following
             that are in Stonebrae's possession which are material to the
22            ownership or development of the Lots by Builder.

23        28.    Exhibit C to the Village B Agreement specifically identifies a number of Due

24   Diligence Documents, including the Development Agreement, the Conditions of Approval, and

25   the Supplement to the Precise Plan.  *Id.,* p. C-2.  Exhibit C also includes the following general

26   descriptions of Due Diligence Documents:

27            all current binding authorizations, approvals, permits, variances,
             allocations and entitlements with respect to land use, utilities and
28

17

governmental services for the Property, and all current improvement plans, grading plans, engineering and soils reports, and the current draft Final Map, with respect to the Property.

all current plans, specifications, engineering drawings, as-builts and other drawings and prints with respect to the construction of the Lots by Stonebrae owned by Stonebrae or in Stonebrae's possession or control.

29.     Consistent with the Village A Agreement, Stonebrae agreed to enforce the Governmental Development Documents, which were defined as "the Development Agreement, the City's specific plan applicable to the Stonebrae Development, any maps applicable to the Property, or any other agreements with or entitlements or approvals from Governing Agencies. Section 15.1(a) of the Village B Agreement states:

Stonebrae shall enforce the Governmental Development Documents and defend against any challenge by private or public parties thereto in the event that the challenge interferes with Builder's development of the property.

**G.     Stonebrae Was Required to Complete the Pre-Closing Work by November 1, 2007.**

30.     The form of the Village B Agreement was based on the Village A Agreement. Section 7.2 of each agreement established the closing date.  Section 7.2 of the Village A Agreement provided that the closing would occur after all closing conditions had been satisfied.  It did not include a date-certain closing date.  The Village B Agreement, however, includes a Date Certain Closing Date.  Section 7.2 of the Village B Agreement defines November 1, 2007, as the "Date Certain Closing Date.

31.     Paragraph 7.3 of the Village B Agreement sets forth two circumstances by which the close of escrow could be extended past November 1, 2007:  (1) Toll could elect to postpone the close of escrow if the closing conditions had not been met and (2) the close of escrow could be postponed due to force majeure.

32.     Under the Village B Agreement, Stonebrae was required to complete the Stonebrae Pre-Closing Work by the close of escrow.  The Stonebrae Pre-Closing Work was specifically set forth in Exhibit H to the agreement and included the following:

18

ASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, Suite 2300
SAN FRANCISCO, CALIFORNIA 94111

ASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

- "Electrical services to each lot from the joint utilities trench in front of the lot as shown on the Approved Improvement Plans."

- "Street lighting to be provided as required and approved by any and all governing authorities and as depicted on the Approved Improvement Plans."

- "Telephone service to each lot from the joint utilities trench in front of the Lot as depicted on the Approved Improvement Plans."

- "Cable television service to each lot from the joint utilities trench as depicted on the Approved Improvement Plans."

- "Retaining walls/rockeries as depicted on the approved grading plans and Approved Improvement Plans."

- "Surface improvements (paving/concrete) as depicted on the Approved Improvement Plans approved by any and all governing agencies."

- "Approved wet and dry utility improvements (sewer, storm, water, electric, telephone, gas, cable television and if applicable fiber optic cable) by any and all governing agencies."

33.    Section 17.2(a) of the Village B Agreement defines a Stonebrae Default as follows:

> It shall be a "Stonebrae Default" ("Stonebrae Default") if Stonebrae fails to perform any material act to be performed by Stonebrae, or to refrain from performing an material act, prior to the Close of Escrow under any of the Development Documents, where such failure is not cured by Stonebrae within ten (10) days after receipt by Stonebrae of a Default Notice from Builder; provided, however, that if such failure is of such a nature that it cannot be cured within such ten (10) day period, then a Stonebrae Default shall not occur if Stonebrae shall commence a cure within such ten (10) day period and shall diligently pursue such cure to completion not later than sixty (60) days following receipt of the Default Notice.

34.    Toll's remedies for a Stonebrae Default include termination of the agreement, a return of its deposit and reimbursement for expenses incurred during due diligence costs and related expenses. *Id.,* § 17.2(b).

19

1

**H.     Stonebrae Sought And Received Toll's Agreement To Amend The Conditions Of Approval.**

2

3        35.     Prior to entering into the Village B Agreement, Stonebrae advised Toll that it had

4    reached a tentative agreement with the City to amend the Conditions of Approval to reduce the

5    interior parks and "increase the recreational components of the country club." The issue was not

6    resolved prior to the effective date of the Village B Agreement. Stonebrae recognized, as it had to

7    do, that Stonebrae would breach the Village B Agreement if it amended the Conditions of

8    Approval or other development documents without Toll's consent. Stonebrae therefore proposed

9    an amendment to the Village B Agreement to allow Stonebrae to amend the Conditions of

10   Approval as specifically proposed. Toll agreed, and on June 2, 2006, the parties entered into the

11   Second Amendment to the Village B Agreement. In November 2006, at Stonebrae's request, the

12   City amended the Conditions of Approval to eliminate the requirement for additional park space,

13   based in part on Stonebrae's promise to build "a 4-acre fitness center at the clubhouse site,

14   including exercise rooms, swimming pools and tennis courts."

15

**I.     Stonebrae Stopped Designing The Clubhouse And Extended The Development Agreement Without Toll's Consent.**

16

17       36.     As initially contemplated, the clubhouse was to consist of two elements: a golf

18   clubhouse and a fitness center. In late 2005, Stonebrae hired Marsh & Associates, Inc. ("MAI") to

19   design the clubhouse. The initial drawings for the clubhouse were consistent with the drawings

20   submitted in the Supplement to the Precise Plans.

21       37.     By late 2006, Stonebrae's actual construction costs for the Stonebrae Development

22   had significantly exceeded its budget, and Stonebrae had disagreements with certain vendors over

23   amounts due and owing and over future costs. In early 2006, without advising Toll, Stonebrae

24   stopped all design work on the golf clubhouse but continued to move forward with the fitness

25   center; however, later in 2006, Stonebrae put the design of the fitness center on hold as well.

26   Stonebrae, however, continued to promote the clubhouse and related facilities in promotional

27   materials to builders as well as the general public. In March 2007, Stonebrae renegotiated its

28   agreement with MAI, revising the scope of the fitness center while the design for the clubhouse

ASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

20

1  continued to be placed on hold.  In the summer of 2007, Stonebrae stopped all design work on the

2  clubhouse and related facilities and sought a five-year extension of the Development Agreement.

3  On October 7, 2007, the City approved Stonebrae's request to extend the Development

4  Agreement, which extended the completion date for the clubhouse and related facilities from

5  February 26, 2008, to February 26, 2013.  Stonebrae did not obtain Toll's consent to an extension

6  of the Development Agreement as it had when it earlier sought to amend the Conditions of

7  Approval.

8      38.    On information and belief, since that time, Stonebrae has made no effort to

9  complete the promised clubhouse and related facilities and, to Toll's knowledge, has not even

10  done anything to advance the ball.  Instead of the promised luxury clubhouse and related facilities,

11  the Stonebrae Country Club consists of three modular trailers (pictured below) originally installed

12  as purported 'temporary' facilities – in no way resembling the luxury amenities promised to Toll

13  and other merchant builders, and which Stonebrae encouraged Toll to promote to prospective

14  home purchasers.



**J.    Stonebrae Failed To Complete The Pre-Closing Work.**

25      39.    Stonebrae was required to complete the Pre-Closing Work under the Village B

26  Agreement by November 1, 2007.  After the execution of the Agreement, Stonebrae entered into a

27  contract with its general contractor, DeSilva Gates Construction L.P. (the "DeSilva Contract"),

28  which required completion of the Stonebrae Pre-Closing Work for Village B by November 1,

A S O W I T Z    B E N S O N,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

2007, the closing date for the Village B Agreement.  Under the DeSilva Contract, substantial completion of the work was required by October 22, 2007 and final completion was required by November 1, 2007.

40.      Under section 9.2 of the Village B Agreement, Stonebrae was required to deliver written notice to Toll of substantial completion of the Pre-Closing Work.  On information and belief, Stonebrae participated in regular meetings with its general contractor and closely monitored the status of the Pre-Closing Work.  On October 29, 2007, Stonebrae representatives walked the Village B site with Stonebrae's general contractor, and electrical subcontractor, and PG&E representatives.  A list of unfinished utility related Pre-Closing Work was prepared and circulated to the participants after the walk-through.

41.      Stonebrae did not finish the Stonebrae Pre-Closing Work or deliver a notice of substantial completion by November 1, 2007.  On November 2, 2007, Toll sent a Default Notice to Stonebrae.  The Default Notice specifically stated that Stonebrae was in default because (1) Stonebrae had not completed the Pre-Closing Work, which was specifically defined in Exhibit H to the Village B Agreement, (2) Stonebrae had installed a modular clubhouse with no signs of progress on the promised permanent clubhouse and related facilities, and (3) Stonebrae had unilaterally delayed construction of the promised amenities. As the owner and master developer, Stonebrae had enough information to cure their defaults without any additional information.

42.      Stonebrae responded on November 5, 2007.  Regarding the Pre-Closing Work, Stonebrae took the position that it was not required to complete the work until January 31, 2008, unless it was extended due to Force Majeure, and stated that it would be completed by that time. Stonebrae did not express any confusion about what Pre-Closing Work had not been completed by that time.  Regarding the clubhouse and related amenities, Stonebrae took the position the modular clubhouse and sports facilities were sufficient and that Stonebrae was not obligated to build the promised facilities.

43.      On November 14, Toll's Glen Martin inspected the site with Stonebrae's construction manager Marshall Carr and compiled a list of problems with individual lots.  On

ASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1  November 19, Stonebrae advised Toll that it would not cure the defaults until December 5.  Toll

2  terminated the Village B Agreement on November 20.

3       44.     Stonebrae did not receive a notice of substantial completion from its sub-contractor

4  until December 14, 2007 (34 days after Toll sent the Default Notice), and even then the utilities

5  still were not completed.

6                          **FIRST CLAIM FOR RELIEF**

7                    **(Rescission Based on Misrepresentation)**

8       45.     Toll incorporates by reference the allegations contained in Paragraphs 1 through 44.

9       46.     Under California Civil Code Section 1689, Toll is entitled to rescind the contract

10  based on mistake and fraud.

11       47.     As the owner and master developer of the Stonebrae development, Stonebrae was

12  in the best position to know the amount of potential damages in the event of a breach by Toll.  In

13  the Village B Purchase Agreement, Stonebrae represented, "That Stonebrae's actual damages

14  resulting from such builder default would be substantial but extremely difficult to ascertain and (b)

15  such amount is a reasonable sum considering all of the circumstances existing as of the Agreement

16  date."  Based on Stonebrae's representation, Toll believed Stonebrae had determined the

17  liquidated damages amount was a reasonable sum considering all of the circumstances existing as

18  of the date of the Village B Purchase Agreement.  The representation was material.  Stonebrae

19  made the representation with the intent that Toll rely upon it.  Toll justifiably relied on Stonebrae's

20  representation, was induced to enter into the Village B Purchase Agreement by the representation,

21  and has been damaged by its reliance on Stonebrae's representation.

22       48.     If Stonebrae's representations were not true, as Stonebrae alleges in its Complaint,

23  then Toll was mistaken as to a material fact and induced to enter into the Village B Purchase

24  Agreement by Stonebrae's intentional or negligent misrepresentation.

25                          **SECOND CLAIM FOR RELIEF**

26                                **(Fraud)**

27       49.     Toll incorporates by reference the allegations contained in Paragraphs 1 through 48.

28

A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

50.     As the owner and master developer of the Stonebrae development, Stonebrae was in the best position to know the amount of potential damages in the event of a breach by Toll.  In the Village B Purchase Agreement, Stonebrae represented, "That Stonebrae's actual damages resulting from such builder default would be substantial but extremely difficult to ascertain and (b) such amount is a reasonable sum considering all of the circumstances existing as of the Agreement date."  Based on Stonebrae's representation, Toll believed Stonebrae had determined the liquidated damages amount was a reasonable sum considering all of the circumstances existing as of the date of the Village B Purchase Agreement.  The representation was material.  Stonebrae made the representation with the intent that Toll rely upon it.  Toll justifiably relied on Stonebrae's representation, was induced to enter into the Village B Purchase Agreement by the representation, and has been damaged by its reliance on Stonebrae's representation.

51.     If Stonebrae's representations were not true, as Stonebrae alleges in its Complaint, then Stonebrae knowingly misrepresented facts upon which Toll relied to its detriment.

52.     Toll has been damaged by Stonebrae's fraud in an amount to be proven at trial.  Among other things, Toll incurred expenses performing under the Village B Purchase Agreement and has incurred substantial expense in connection with this dispute, which it would not have incurred if it had not entered into the Village B Purchase Agreement.

### THIRD CLAIM FOR RELIEF

### (Negligent Misrepresentation)

53.     Toll incorporates herein by this reference the allegations contained in Paragraphs 1 through 52.

54.     In the Village B Purchase Agreement, Stonebrae represented, "That Stonebrae's actual damages resulting from such builder default would be substantial but extremely difficult to ascertain and (b) such amount is a reasonable sum considering all of the circumstances existing as of the Agreement date."  Based on Stonebrae's representation, Toll believed Stonebrae had determined the liquidated damages amount was a reasonable sum considering all of the circumstances existing as of the date of the Village B Purchase Agreement.  The representation was material.  Stonebrae made the representation with the intent that Toll rely upon it.  Toll

24

1    justifiably relied on Stonebrae's representation, was induced to enter into the Village B Purchase

2    Agreement by the representation, and has been damaged by its reliance on Stonebrae's

3    representation.

4        55.     If, Stonebrae's representations were not true, as Stonebrae alleges in its Complaint,

5    then Stonebrae made an intentional or negligent misrepresentation upon which Toll relied to its

6    detriment.

7        56.     Toll has been damaged by Stonebrae's negligent misrepresentation in an amount to

8    be proven at trial.  Among other things, Toll incurred expenses performing under the Village B

9    Purchase Agreement and has incurred substantial expense in connection with this dispute, which it

10   would not have incurred if it had not entered into the Village B Purchase Agreement.

11                          **FOURTH CLAIM FOR RELIEF**

12                             **(Declaratory Relief)**

13       57.     Toll incorporates by reference the allegations contained in Paragraphs 1 through 57.

14       58.     An actual and justiciable controversy now exists between Toll and Stonebrae

15   regarding the rights and obligations under the Village B Purchase Agreement.

16       59.     Toll alleges Toll is entitled to terminate the Village B Purchase Agreement, not

17   close the escrow, not pay Stonebrae the purchase price of $31,854,200.00, and have the letter of

18   credit in the amount of $4,774,944.00 terminated based on (1) Stonebrae's breaches of the Village

19   B Purchase Agreement and (2) Stonebrae's misrepresentations, which induced Toll to enter into

20   the Village B Purchase Agreement.

21       60.     Stonebrae alleges it did not breach the Village B Purchase Agreement, the

22   Liquidated Damages Clause of the Village B Purchase Agreement in unenforceable, and it is

23   therefore entitled to recover its actual damages caused by Toll's termination of the Village B

24   Purchase Agreement.

25                          **FIFTH CLAIM FOR RELIEF**

26                             **(Breach of Contract)**

27       61.     Toll incorporates by reference the allegations set forth in Paragraphs 1 though 60.

28

A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

62.     Toll performed its obligations under Village B Purchase Agreement.

63.     All conditions precedent to performance by Stonebrae were met.

64.     As set forth more fully, above, Stonebrae has breached the Village B Purchase Agreement.

65.     Toll has been damaged as the direct and proximate result of Stonebrae's breaches of the Village B Purchase Agreement.

66.     Pursuant to Section 17.2(b) of the Village B Purchase Agreement, Toll is entitled to return of the deposit held in escrow, and is further entitled to recover its damages incurred by Stonebrae's breaches, including, due diligence costs and expenses incurred.

## SIXTH CLAIM FOR RELIEF

### (Breach of Duty of Good Faith and Fair Dealing)

67.     Toll incorporates by reference the allegations set forth in Paragraphs 1 through 66.

68.     Toll entered into the Village B Purchase Agreement and Stonebrae has a duty of good faith and fair dealing to Toll.

69.     As demonstrated by Paragraph A of the Village B Purchase Agreement, Stonebrae represented that it intended to build a golf course, clubhouse and related facilities in the Stonebrae Development.  In promotional materials, Stonebrae described the intended club house as a 32,000 square foot clubhouse designed in a Scottish style by an award winning architect.  Toll entered into the Village B Purchase agreement with the expectation that Stonebrae would build a high-end luxury club house in the Stonebrae Development.

70.     Rather than build a high-end luxury club house, Stonebrae installed a mobile modular club house -- a gussied-up group of doublewides -- and temporary facilities.  By doing so, Stonebrae breached its duty of good faith and fair dealing to Toll and prevented Toll from obtaining the benefit of its bargain: finished lots in a luxury development with a high-end luxury golf course, clubhouse, and related facilities.  Further, Toll is informed and believes and thereon alleges that by no later than mid-2007, well before the date set for closing on the Village B Purchase Agreement, Stonebrae already had no intention of providing a luxury clubhouse and related facilities any time in the foreseeable future, or at all, but hid that fact from Toll.

71.     Toll has been damaged as the direct and proximate result of Stonebrae's breaches of its duty of good faith and fair dealing to Toll.

### SEVENTH CLAIM FOR RELIEF

#### (Declaratory Relief that the Contract Is Illegal)

72.     Toll incorporates by reference the allegations set forth in Paragraph 1 through 71.

73.     Toll seeks a judicial declaration that the Village B Purchase Agreement is illegal under California's Subdivision Map Act (the "SMA"), which is set forth at California Government Code, section 66410 et seq., and is therefore void.

74.     The Village B Purchase Agreement includes, as a mutual condition, a requirement that the Second Final Map shall have been recorded prior to the close of escrow.  Village B Purchase Agreement § 6.3(b).  The Village B Purchase Agreement, however, allows that condition to be waived by the parties.  *Id.* at § 6.3.  Thus, the Village B Purchase Agreement does not expressly condition the sale on the recording of the subdivision map and is therefore illegal under the SMA.

75.     An actual controversy has arisen and now exists between Toll and Stonebrae regarding the legality of the Village B Purchase Agreement.

76.     Toll therefore requests a judicial determination that the Village B Purchase Agreement is illegal and void under the SMA.

### EIGHTH CLAIM FOR RELIEF

#### (Rescission Based on Failure of Consideration)

77.     Toll incorporates by reference the allegations contained in Paragraphs 1 through 76.

78.     Under California Civil Code Section 1689, Toll is entitled to rescind the contract based on a failure of consideration.

79.     As set forth above, a fundamental part of the consideration for the Village B Agreement was Stonebrae's construction of a luxury clubhouse and related facilities.  The consideration failed in whole or part by the fact that Stonebrae apparently believed it was under no obligation to construct a clubhouse and in fact decided to stop the design work on the clubhouse without Toll's knowledge, extend the Development Agreement between Stonebrae and the City by

A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

1    five years without Toll's consent, and install mobile facilities rather than build the promised

2    luxury clubhouse and related facilities.

3                        **NINTH CLAIM FOR RELIEF**

4                **(Rescission Based on Mistake and No Meeting of the Minds)**

5            80.    Toll incorporates by reference the allegations contained in Paragraphs 1 through 79.

6            81.    As set forth above, as the owner and master developer of the Stonebrae

7    development, Stonebrae was in the best position to know the amount of potential damages in the

8    event of a breach by Toll.  In the Village B Purchase Agreement, Stonebrae represented, "That

9    Stonebrae's actual damages resulting from such builder default would be substantial but extremely

10   difficult to ascertain and (b) such amount is a reasonable sum considering all of the circumstances

11   existing as of the Agreement date."  Based in part on Stonebrae's representation, Toll believed the

12   liquidated damages amount was a reasonable sum considering all of the circumstances existing as

13   of the date of the Village B Purchase Agreement.  If, as Stonebrae now claims, the liquidated

14   damages amount was not reasonable, then Toll's consent was given by mistake, which entitles

15   Toll to rescind the contract.

16           82.    Additionally, as set forth above, Toll believed Stonebrae was obligated to build a

17   permanent clubhouse and related facilities.  If, as Stonebrae now claims, Stonebrae was under no

18   such obligation, then Toll's consent was given by mistake, which entitles Toll to rescind the

19   contract.

20                        **TENTH CLAIM FOR RELIEF**

21                      **(Anticipatory Breach of Contract)**

22           83.    Toll incorporates by reference the allegations contained in Paragraphs 1 through 82.

23           84.    As set forth above, under the express terms of the Village B Agreement or the

24   implied covenant of good faith and fair dealing, Stonebrae was obligated to build the promised

25   clubhouse in a timely manner.  Stonebrae expressly or impliedly repudiated its obligation to build

26   the promised clubhouse by, among other things, stopping all design work on the permanent

27   clubhouse, extending the Development Agreement with the City without Toll's consent, and

28   taking the position that the temporary facilities were sufficient and that Stonebrae was not

A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111

                                    28

1   obligated to build the promised clubhouse and related facilities.

2       85.     Toll terminated the Village B Agreement prior to Stonebrae's nullification of its

3   repudiation.

4       86.     Pursuant to Section 17.2(b) of the Village B Purchase Agreement, Toll is entitled to

5   return of the deposit held in escrow, and is further entitled to recover its damages incurred by

6   Stonebrae's breaches, including, due diligence costs and expenses incurred.

7                          **PRAYER FOR RELIEF**

8       WHEREFORE, Toll prays for judgment against Stonebrae, as follows:

9           1.      For declaratory relief and judgment as follows:

10          2.      Stonebrae is in material breach of the Village B Purchase Agreement;

11          3.      Toll was authorized to terminate the Village B Purchase Agreement;

12          4.      The Village B Purchase Agreement is rescinded;

13          5.      Toll was authorized to demand and receive its deposits into escrow pursuant

14                  to the Village B Purchase Agreement; and

15          6.      The Village B Purchase Agreement is illegal and void under the SMA.

16          7.      For return of deposit;

17          8.      For damages according to proof;

18          9.      For attorneys' fees and costs; and,

19          10.     For such other relief as the Court may find just and proper.

20   DATED:  August 5, 2010

21

22                              KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

23

24                          By:    /s/ Donald J. Putterman
                                   Donald J. Putterman
25                          Attorneys for Defendant
                            TOLL BROS, INC.
26

27

28

A S O W I T Z ,   B E N S O N ,   T O R R E S   &   F R I E D M A N   L L P
101 CALIFORNIA STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94111