1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2     Including Professional Corporations
   PHILIP F. ATKINS-PATTENSON, Cal. Bar No. 94901
3  ARTHUR J. FRIEDMAN, Cal. Bar No. 160867
   Four Embarcadero Center, 17th Floor
4  San Francisco, California  94111-4109
   Telephone:    415-434-9100
5  Facsimile:    415-434-3947
   E-Mail:       patkinspattenson@sheppardmullin.com
6                afriedman@sheppardmullin.com

7  COOPER & KIRKHAM, P.C.
   JOSEF D. COOPER, Cal. Bar No. 53015
8  TRACY R. KIRKHAM, Cal. Bar No. 69913
   357 Tehama Street, 2nd Floor
9  San Francisco, CA 94103-4169
   Telephone:    415-788-3030
10 Facsimile:    415-882-7040
   E-Mail:       jdc@coopkirk.com
11               trk@coopkirk.com

12 Attorneys for Plaintiff and Counter-Defendant
   STONEBRAE L.P.

13

14              UNITED STATES DISTRICT COURT

15             NORTHERN DISTRICT OF CALIFORNIA

16               (SAN FRANCISCO DIVISION)

17 STONEBRAE L.P., a Delaware limited          Case No. C 08-00221-EMC
   partnership,
18                                             **DECLARATION OF PHILIP F.**
                  Plaintiff,                   **ATKINS-PATTENSON IN**
19                                             **SUPPORT OF STONEBRAE L.P.'S**
        v.                                     **MOTION FOR AWARD OF**
20                                             **ATTORNEYS' FEES AND COSTS**
   TOLL BROS., INC.; a Pennsylvania corporation;
21 TOLL BROTHERS, INC., a Pennsylvania         Date:    March 16, 2011
   corporation; DOES 1 through 15, inclusive,  Time:    10:30 a.m.
22                                             Dept.:   Courtroom C, 15th Fl.
                  Defendants.
23                                             Trial Date:  February 28, 2011
                                                            [Vacated]
24

25

26

27

28

DECLARATION OF PHILIP F. ATKINS-PATTENSON IN SUPPORT
                                     OF STONEBRAE L.P.'S MOTION FOR AWARD OF ATTORNEYS'
                                                         FEES AND COSTS

I, Philip F. Atkins-Pattenson, hereby declare:

1. I am an attorney admitted to practice before all courts in the State of California and am a member of the bar of this Court in good standing.

2. I am a partner in the law firm Sheppard, Mullin, Richter & Hampton LLP, attorneys for Plaintiff and Counter-Defendant Stonebrae L.P. ("Stonebrae").

3. I have personal knowledge of the matters stated herein and, if called as a witness, could and would competently testify thereto.

4. I make this Declaration in support of Stonebrae's motion for award of attorneys' fees, taxable and non-taxable costs and Stonebrae's companion motion for determination of pre-judgment interest.

## **BACKGROUND**

5. Since 1995, Sheppard, Mullin has represented YCS Investments, Inc. ("YCS Investments") in a variety of matters, both transactional and litigation. YCS Investments manages various assets in the United States on behalf of Yeung Chi Shing Estates Limited, which is headquartered in Hong Kong. Included in the United States assets managed by YCS Investments is the Stonebrae Development, the residential master planned community and private country club located in Hayward, California. Stonebrae is the owner and master developer of the Stonebrae Development, and is an indirect subsidiary of YCS Investments.

6. For the past 15 years, Sheppard, Mullin has represented YCS Investments in connection with all phases of the Stonebrae Development, including in the areas of land use and entitlements, federal and state natural resources permitting, purchase and sale contracts, and several items of litigation, including the present lawsuit.

7. Where significant litigation is involved, YCS Investments has retained Sheppard, Mullin and Cooper & Kirkham P.C. ("Cooper & Kirkham") to serve as co-counsel. This has been YCS Investments' practice for many years. Both firms have worked on several prior matters relating to the Stonebrae Development, including the

-1-

DECLARATION OF PHILIP F. ATKINS-PATTENSON IN SUPPORT OF STONEBRAE L.P.'S MOTON FOR AWARD OF ATTORNEYS' FEES AND COSTS

1  federal court litigation challenging the approvals of the Stonebrae Development in 1988

2  under the Endangered Species Act.

3      8.     Defendant and Counter-Claimant Toll Bros., Inc. ("Toll") terminated

4  the Village B Purchase Agreement on November 20, 2007.  Stonebrae retained Sheppard,

5  Mullin and Cooper & Kirkham as co-counsel to pursue claims relating to Toll's breach of

6  the Village B Purchase Agreement.

7                          **THIS LITIGATION**

8      9.     This litigation arose from Toll's failure to close escrow on a $32

9  million purchase and sale agreement.  To justify its failure to close escrow, Toll asserted in

10  its November 2, 2007 Default Notice that the transaction was required to have closed on

11  November 1, 2007, and no later date, and a large number of purported defaults by

12  Stonebrae also entitled Toll to terminate the contract.  To prevail, it was incumbent upon

13  Stonebrae to establish that November 1, 2007 was not the closing date provided in the

14  Village B Purchase Agreement, or even it was, that none of the alleged defaults had any

15  factual or legal merit, or that Toll had failed also to follow the requirements of the Village

16  B Purchase Agreement, and California law, to establish a Stonebrae Default entitling Toll

17  to terminate the contract.

18      10.    From the outset, Stonebrae believed that the case could be

19  expeditiously resolved by having the Court rule on the "closing date" issue by interpreting

20  the closing date provisions of the Village B Purchase Agreement.  For that reason,

21  Stonebrae brought an early motion to dismiss directed to Toll's defenses and counterclaims

22  based on the allegation that escrow under the Village B Purchase Agreement had to close

23  on November 1, 2007, and no later date.  Knowing that if the Court granted this motion,

24  the case would over, as all of Toll's asserted breaches turned on its interpretation of the

25  closing date, Toll asserted that the closing date provision was ambiguous and that it was

26  entitled to present parol evidence that would show that the parties intended for November

27  1, 2007 to be a fixed closing date. (Dkt. # 95, at pp. 32-33.)  In interrogatory answers, Toll

28

1    stated that the negotiation and drafting history of the Village B Purchase Agreement would

2    show that the parties actually intended for November 1, 2007 to be a fixed date for closing.

3    That was not true, as demonstrated by Stonebrae's motion for partial summary judgment

4    (where every Toll witness admitted in deposition that they had no such parol evidence, and

5    the drafting history establishes that November 1, 2007 was not a fixed date for closing).

6    (Dkt. # 229, 232-233, 235-246.)

7             11.    As the litigation progressed, Toll asserted additional defenses and

8    counterclaims in an effort to defeat Stonebrae's right to recover for Toll's invalid

9    termination of the Village B Purchase Agreement.  For example, after the Initial Case

10   Management Conference and exchange of Initial Disclosures, Toll asserted that the Village

11   B Purchase Agreement was illegal, and thus void, because these sophisticated parties

12   supposedly had waived the requirements of California's Subdivision Map Act, *i.e.*, the

13   *"Black Hills"* issue.  Toll's belated interjection of this new issue required the expenditure of

14   time and effort by Stonebrae, which resulted in the Court ruling in favor of Stonebrae on

15   the parties' motions directed to the *Black Hills* issue.  (Dkt. # 89.)

16            12.    To take another example, in August 2010 Toll filed its First Amended

17   Answer, Affirmative Defenses And Counterclaims (Dkt. #190) that greatly expanded

18   Toll's defenses and counterclaims.  Toll went so far as to allege that it was entitled to

19   rescind the Village B Purchase Agreement because Stonebrae had not constructed a

20   permanent clubhouse, and that it was relieved of its obligations to perform because

21   Stonebrae had purportedly anticipatorily repudiated an obligation to build a permanent

22   clubhouse – despite the fact that the Village B Purchase Agreement contains no

23   enforceable promise to Toll to build a permanent clubhouse (and, indeed, expressly

24   disclaims any such obligation), and the other documents relied upon by Toll to create a

25   "third party beneficiary" entitlement to a permanent clubhouse do not themselves create a

26   present obligation to construct a permanent clubhouse, as established by Stonebrae's

27   motion for partial summary judgment on the clubhouse issue.  (Dkt. ## 230,232,235-242.)

28

1    13.    Even after Toll expanded the scope of this litigation, Stonebrae

2  persisted in its efforts to narrow or eliminate issues in order to reduce the burden and cost

3  of discovery, which fell disproportionately upon Stonebrae.  For example, Stonebrae

4  requested Toll to stipulate to the non-controversial proposition that the only potential

5  Stonebrae Defaults were the acts or omissions listed in Toll's November 2, 2007 "Default

6  Notice" letter.  Toll refused.  In response, Stonebrae filed a motion for partial summary

7  judgment/motion *in limine* to establish the scope of alleged defaults prior to completion of

8  document discovery and commencement of deposition discovery.  (Dkt. #168.)  (The

9  original hearing date of June 23, 2010 date was continued by the Court to July 28, 2010.)

10  Toll opposed this motion on the grounds that it had no obligation to specify Stonebrae's

11  claimed defaults because Stonebrae knew what obligations it was required to perform

12  under the parties' contract.  Stonebrae also filed four other partial summary judgment

13  motions that were likewise targeted to eliminate issues for deposition discovery and trial.

14  (Dkt. ## 172, 173, 175, and 176.)  (These motions were originally noticed for June 23,

15  2010, but continued by the Court to August 25, 2010.)  Because the hearing on Stonebrae's

16  motions would not occur until deposition discovery was well underway, Stonebrae agreed

17  to Toll's request to take them off-calendar pending completion of fact discovery.

18  Following the conclusion of fact discovery, Stonebrae filed renewed versions of these

19  motions, all of which demonstrated the merits of Stonebrae's original positions and

20  provided Toll with no legitimate basis for opposition.  (Dkt. ## 229-246.)

21    14.    Stonebrae is the owner and master developer of the Stonebrae

22  Development, which finally received its approvals from the City of Hayward in 1988 after

23  many years spent securing these local land use entitlements.  In light of Toll's claim that

24  the source of the promise by Stonebrae to Toll to construct a permanent clubhouse lay in

25  the entitlement documents and marketing materials for the Stonebrae Development, as well

26  as Toll's claims relating to the alleged incompletion of the Stonebrae Pre-Closing Work,

27  Toll's serial document requests called for Stonebrae to produce substantially all non-

28

1  privileged documents associated with the development and construction of the Stonebrae
2  Development (other than those relating to the environment review for the project).
3  Stonebrae sought to narrow the scope of Toll's document requests through negotiation with
4  Toll, and thereby reduce the expense associated with this aspect of discovery.  I, along
5  with Josef Cooper, met with Toll's lawyers on several occasions to discuss ways of
6  narrowing Toll's requests.  These efforts were unsuccessful.  Because they represent such a
7  substantial share of Stonebrae's attorneys' fees and costs in this litigation, I discuss
8  Stonebrae's extensive document productions to Toll in some detail below.

9                    **STONEBRAE'S DOCUMENT PRODUCTIONS TO TOLL**

10                    15.     Toll propounded three separate document requests to Stonebrae.
11  Toll's last document request was served February 22, 2010.

12                    16.     Toll's document requests were extremely broad in scope, touching
13  upon virtually every aspect of the Stonebrae Development.  For example, Toll requested
14  that Stonebrae produce "all spreadsheets, schedules, compilations and summaries, in
15  whatever form" concerning all expenses incurred by Stonebrae "on a monthly, quarterly
16  and annual basis" in connection with "any phase, aspect or portion" of the Stonebrae
17  Development.  (Request No. 1, Set No. 3.)  To take another example, Toll requested
18  Stonebrae to produce "all document concerning any expenses incurred at any time" in
19  connection with both the Stonebrae Golf Course and the Stonebrae Club House.  (Request
20  Nos. 4-5, Set No. 3.).

21                    17.     Stonebrae responded to Toll's document requests by making a limited
22  number of objections.  However, with very few exceptions, Stonebrae agreed (in light of
23  the breadth of Toll's defenses and counterclaims) to produce responsive, non-privileged
24  documents.

25                    18.     As a result of the extreme breadth of Toll's various requests, and the
26  multiple issues that were involved in this case given Toll's defenses and counterclaims
27  (which morphed as the case continued), Stonebrae was forced to expend substantial time
28

-5-

1    and effort to identify, locate, retrieve, review for responsiveness and privilege, and produce

2    documents (both hard copy and electronic) to Toll.

3            19.     These documents were gathered from Stonebrae, YCS Investments,

4    Sheppard, Mullin, and third party contractors who provided various services to Stonebrae

5    relating to the Stonebrae Development.

6            20.     Sheppard, Mullin created and hosted an electronic database of the

7    documents it had indentified as potentially responsive to Toll's document requests, as well

8    as the documents produced by Toll and third parties in this litigation.  This database

9    allowed Sheppard, Mullin to manage efficiently Stonebrae's multiple document

10   productions to Toll, as well as to search for particular documents as issues arose in the

11   case, create "issues" modules and witness files for deposition and trial preparation.  The

12   electronic database was accessible to our co-counsel, Cooper & Kirkham, as well as the

13   client.

14           21.     Stonebrae made a total of 10 "rolling" productions of documents to

15   Toll:

16           •       September 29, 2009:        2,107 documents (= 6,070 pages)

17           •       October 22, 2009:            661 documents (= 6,956 pages)

18           •       December 9, 2009:         1,252 document (= 11,315 pages)

19           •       December 21, 2009:        5,889 documents (= 12,207 pages)

20           •       February 9, 2010:        20,400 documents (= 45,424 pages)

21           •       March 9, 2010:           10,016 documents (= 61,271 pages)

22           •       March 26, 2010:          18,817 documents (= 73,705 pages)

23           •       July 2, 2010:               788 documents (= 6,267 pages)

24           •       July 15, 2010:            9,919 documents (= 103,107 pages)

25           •       July 20, 2010:            2,847 documents (= 8,157 pages)

26           22.     Stonebrae's productions were substantially completed prior to the

27   commencement of depositions on August 3, 2010.  Stonebrae produced a total of 72,696

28

DECLARATION OF PHILIP F. ATKINS-PATTENSON IN
SUPPORT OF STONEBRAE L.P.'S MOTON FOR AWARD OF
ATTORNEYS' FEES AND COSTS

1  documents to Toll, consisting of 334,695 pages.  The largest volume of production of

2  Stonebrae documents took place as part of Stonebrae's installments on December 21, 2009

3  and February 9, March 9, March 26, and July 15, 2010.  The total number of documents

4  produced in these five productions was 65,041, consisting of a total of 295,714 pages.

5         23.    Stonebrae reviewed (either electronically or by physical review) a

6  total of 456,082 documents (estimated to be well in excess of one million pages) for

7  responsiveness and privilege to arrive at the 72,696 documents (334,695 pages) produced

8  to Toll in the course of its 10 "rolling" productions.

9  **STAFFING AND COORDINATION**

10         24.    I have served as the lead lawyer from Sheppard, Mullin for this case.

11  The core team from Sheppard, Mullin during the three years this case has been pending has

12  consisted of Art Friedman, a partner, and Craig Pinedo, a senior associate who left this

13  Spring to join Axiom, and Lai Yip, a junior level associate, who took the lead in managing

14  Stonebrae's extensive document production efforts.  Allen Rose, a lawyer by training,

15  provided the principal paralegal support.  This core team was supplemented for specific

16  projects.  For example, in light of the extant pre-trial dates, Stonebrae accelerated its

17  document production efforts in January, February and March 2010 by supplementing the

18  core Sheppard, Mullin team with junior level associates from various California offices to

19  review document batches for responsiveness and privilege, and otherwise assist in the

20  Stonebrae's extensive document production activities.

21         25.    I coordinated closely with my co-counsel from Cooper & Kirkham,

22  Joe Cooper and Tracy Kirkham.  We consulted regarding the development of case

23  strategies and with respect to major milestones in the case.  To the greatest extent possible,

24  we tried to avoid unnecessary duplication of effort.  By way of example, Sheppard, Mullin

25  assumed principal responsibility for Stonebrae's extensive document production to Toll,

26  which I have described above.  Sheppard, Mullin also took the lead in propounding written

27  discovery to Toll (document requests, interrogatories and requests for admission), and in

28

Case No. C 08-00221-EMC
W02-WEST:FAP\403132628.3

DECLARATION OF PHILIP F. ATKINS-PATTESON IN
SUPPORT OF STONEBRAE L.P.'S MOTON FOR AWARD OF
ATTORNEYS' FEES AND COSTS

1  drafting responses to Toll's written discovery to Stonebrae.  Sheppard, Mullin also

2  prepared witness files and issues modules for deposition and trial preparation.

3      26.    To take another example, when it came to motion practice, which was

4  a very significant part of the case activity, one firm would take the lead on preparing or

5  opposing a particular motion, while the other firm would provide comments and edits

6  thereto.  Stonebrae prepared and filed a total of 17 substantive motions in this case, and

7  opposed four substantive motions by Toll.

8      27.    With respect to depositions, Ms. Kirkham and I were the two lawyers

9  almost exclusively involved in the preparation and defense of Stonebrae's witnesses and

10  the taking of Toll's witnesses.  Here, too, we endeavored as much as possible to avoid

11  unnecessary duplication of effort.  We divided the case by issues and, to the extent

12  possible, the preparation and defense of Stonebrae's witnesses and the interrogation of

13  Toll's witnesses.  Ms. Kirkham focused on the issues of the adequacy of Toll's purported

14  Default Notice and the status of the Stonebrae Pre-Closing Work in November 2007, while

15  I focused on the drafting history of the Village B Purchase Agreement (particularly the

16  closing date and liquidated damages provisions), Toll's obligations under the contract

17  refuting Toll's claims that Stonebrae had promised (in the entitlement documents,

18  marketing materials or the contract) to construct a permanent clubhouse or had repudiated

19  any (non-existent) obligation to do so.  Based upon this division of responsibilities, one of

20  the two of us would take the lead on preparing and defending a Stonebrae witness, or

21  preparing for and taking the deposition of a Toll witness.  However, because there was so

22  much overlap in the subject matters of an individual witness's testimony, we determined it

23  was most efficient for both Ms. Kirkham and I to attend most depositions even though one

24  of us had principal responsibility for defending or taking the particular deposition.

25  However, for a number of the depositions, only one of us attended.

28.     Starting August 3, 2010 and continuing through October 13, 2010, a total of 18 depositions were taken. Ms. Kirkham took the lead on 8 of them, and I took the lead on the remaining 10 witnesses.

## SHEPPARD, MULLIN'S INVOICES FOR NOVEMBER 2007 THROUGH NOVEMBER

29.     Although not entirely clear, Stonebrae interprets Toll's Rule 68 Offer of Judgment to cut-off Stonebrae's "merits fees" as of the date of the offer, which was October 18, 2010. Stonebrae accepted Toll's Rule 68 Offer of Judgment on November 1, 2010. After that date, it commenced preparation of Stonebrae's motions (1) for award of attorneys' fees and costs and (2) for mandatory pre-judgment interest.

30.     Attached hereto as Exhibits 1 through 37 are true and correct copies of the monthly invoices in this litigation from Sheppard, Mullin to YCS Investments that cover the period November 2007 through November, which have been paid by YCS Investments in the ordinary course.

31.     For the month of October 2010 (Exhibit 36), the portion after October 18, 2010 (the date of Toll's Rule 68 Offer of Judgment) is redacted. The amount of fees during this period totals $119,686, consisting principally of the preparation and filing of Stonebrae's four partial summary judgment motions that were due November 1, 2010 – the last date to accept Toll's Rule 68 Offer of Judgment – and so had to be prepared pending Stonebrae's decision whether or not to accept Toll's offer. We also performed various legal analysis related to Toll's Rule 68 Offer of Judgment, and had extensive discussions with the client and co-counsel regarding whether to accept. The amount of $119,686 is not included in the amount of "merits fees" sought by Stonebrae for the period November 20, 2007 through October 18, 2010.

32.     Sheppard, Mullin's monthly invoices show, for each day, all the services rendered by a particular timekeeper. The amount reflected on a particular entry reflects the amount of time recorded by the timekeeper multiplied by that individual's standard hourly rate in existence at that time. (Hourly rates are adjusted annually.) The

-9-

1    disbursements, or costs, that Sheppard, Mullin advanced on behalf of Stonebrae are

2    detailed separately at the end of each invoice.

3              33.    Attached hereto as Exhibits 38 through 44 are true and correct copies

4    of the *curriculum vitaes* for the core group of attorneys who performed services for

5    Stonebrae in this litigation.  As noted, over the course of the three years this litigation has

6    been pending, the core group of lawyers who provided legal services consisted of myself,

7    my partner Art Friedman, Craig Pinedo, a senior associate who left the firm in mid- 2010

8    to join Axiom, and a junior-level litigation associate Lai Yip.  We were assisted by

9    paralegal Allen Rose, a lawyer by training, and Richard Freitas, a litigation support

10   specialist who created and managed the extensive document database I described above.

11   From time to time, specific projects were assigned to certain other individuals.  For

12   example, Jim Rusk, a junior associate in the firm's Real Estate and Land Use practice, did

13   detailed analyses of the drafting histories of the Village A and Village B Purchase

14   Agreements (to address Toll's claim that the drafting history would show the parties

15   intended November 1, 2007 to be a fixed date for the close of escrow).  Martin White and

16   David Snyder, both junior litigation associates, did various legal research projects, with

17   Mr. Snyder assisting in connection with the issues in Stonebrae's motion for award of

18   attorneys' fees and costs.  During the months of January through March 2010, we

19   assembled a team of junior associates from the firm's various California offices to assist

20   with the completion of Stonebrae's extensive document productions to Toll.  I have not

21   attached their *curriculum vitaes*.

22             34.    I am the person at Sheppard, Mullin principally responsible for the

23   representation of Stonebrae in this litigation, and so am familiar with the tasks performed

24   by the various Sheppard, Mullin personnel during the course of this litigation.  Prior to

25   preparing the final monthly invoice to the client, I evaluated where the tasks performed

26   during the prior month and the costs charged to this client-matter number had been

27   properly recorded to this account.  I determined also that the tasks described had been

28

-10-

1   authorized and the time spent was reasonable in light of the tasks involved and the

2   circumstances existing in the case at the time.  Where appropriate, based upon my 30 years

3   practicing in the area of complex business litigation, I exercised my billing judgment to

4   reduce the amount of time recorded and/or write-off costs prior to the finalization of the

5   invoice.

6           35.     After exercising billing judgment as to time entries and costs for the

7   month in question, and prior to the finalization of the invoice for delivery to the client, an

8   amount representing 5% of the indicated amount of attorneys' fees was then deducted,

9   which appears on the face of each invoice.

10          36.     The monthly invoices attached hereto also set forth categories of

11  disbursements advanced by Sheppard, Mullin on behalf of Stonebrae in this litigation, *e.g.*,

12  computerized legal research, copying, travel, transcripts, etc.  These disbursements are not

13  included in Sheppard, Mullin's hourly rates and are billed separately to and paid by YCS

14  Investments in this matter.  These disbursements are of the kind that are customarily billed

15  to YCS Investments, and other clients of the firm.

16          37.     For the periods covered by the Sheppard, Mullin invoices attached as

17  Exhibits 1 – 37, they break down as follows:

18  • "merits fees" (November 20, 2007 – October 18, 2010):  $2,396,065.50

19  • additional fees for two motions (November 2010):           63,359.00

20  • expenses (November 20, 2007 – November 30, 2010):          146,861.07

21  At the time Stonebrae files its reply papers in support of its motions for award of attorneys'

22  fees and costs and for mandatory pre-judgment interest, I will provide the Court with the

23  amount of fees and costs subsequent to November 2010, and an estimate of fees and costs

24  through the hearing on these motions.

25                          **RECENT ATTORNEYS' FEE AWARDS**

26          38.     In the past two years, I have represented prevailing parties in litigation

27  and so have applied for and received attorneys' fee awards in two cases.  In addition, I have

28

DECLARATION OF PHILIP F. ATKINS-PATTENSON IN
SUPPORT OF STONEBRAE L.P.'S MOTON FOR AWARD OF
ATTORNEYS' FEES AND COSTS

1   also negotiated with the Department of Justice what is believed to be the largest attorneys'

2   fee settlement under the Endangered Species Act.  (The amount of that settlement is

3   confidential, but entailed compensation to Sheppard, Mullin at full standard rates from

4   2001 to 2009 for all hours submitted.)

5          39.    In the first of the above two cases, I represented a Petitioner in a

6   successful *mandamus* action under the California Environmental Quality Act to set aside

7   Redwood City's Downtown Precise Plan.  (*Carcione v. City of Redwood City*, San Mateo

8   County Superior Court Case No. 463195.).  San Mateo County Superior Court Judge

9   Marie Weiner awarded Petitioners their attorneys' fees (covering calendar years 2007,

10  2008 and 2007), finding that Sheppard, Mullin's standard hourly rates "were reasonable

11  based on the market rate in the San Francisco Bay Area as well as the experience and

12  expertise of the attorneys' involved."  (Sheppard, Mullin's lodestar in that case was

13  calculated using its standard hourly rates for the periods in question, and did not include

14  the 5% discount on fees provided to Stonebrae by the firm in this case.)

15         40.    In the second of the two cases, I represented a defendant in a RICO

16  case in the United States District Court for the Central District of California where we

17  successfully moved to dismiss the case under California's anti-SLAPP statute.  (*Dalidio v.*

18  *Responsible County Development LLC*; Case No.CV-07-6446 CAS (CWx).)  District

19  Court Judge Snyder awarded attorneys' fees and expenses at Sheppard, Mullin's standard

20  hourly rates for period 2007 through 2008 finding them to be reasonable.  On appeal, the

21  Ninth Circuit awarded us additional attorneys' fees and expenses based on the firm's

22  standard hourly rates in 2009 and 2010.

23  ### SHEPPARD, MULLIN'S ATTORNEYS' FEES AND COSTS INCURRED IN CONNECTION WITH STONEBRAE'S MOTION FOR AWARD OF ATTORNEYS' FEES AND DETERMINATION OF PRE-JUDGMENT INTEREST

25         41.    Toll's Rule 68 Offer of Judgment left two issues for determination by

26  the Court:  (1) the amount of attorneys' fees and costs to be awarded to Stonebrae and (2)

27  the determination of pre-judgment interest.

28

-12-

42. As noted, while Stonebrae has interpreted Toll's Rule 68 Offer of Judgment to limit Stonebrae's "merits fees" to those incurred through the date of the offer (October 18, 2010), Stonebrae's position is that Toll's Rule 68 Offer of Judgment does not affect Stonebrae's established right to recover its attorneys' fees and costs incurred after Stonebrae's acceptance on November 1, 2010 in connection with Stonebrae's motion for an award of attorneys' fees and costs and its companion motion for mandatory pre-judgment interest.

43. Sheppard, Mullin has prepared the moving papers in support of Stonebrae's motion for attorneys' fees and costs, while Cooper & Kirkham has taken the lead on Stonebrae's motion for mandatory pre-judgment interest.

44. On the motion for attorneys' fees and costs, I have taken the lead on the drafting Stonebrae's moving papers, including the brief and supporting Declarations. I have also interviewed expert witnesses, and have coordinated with Richard Pearl, the expert witness retained by Stonebrae on this matter. David Snyder, a junior associate, has researched the various legal issues related to Stonebrae's attorneys' fee motion. I have also reviewed and commented upon drafts of Stonebrae's motion for mandatory pre-judgment interest, and have consulted with the client and co-counsel from Cooper & Kirkham regarding both motions.

45. The amount of attorneys' fees and costs in connection with these two motions in November 2010 is $76,024.76 (Exhibit 37 attached hereto).

**PRE-JUDGMENT INTEREST ON THE FEES AND COSTS PAID BY STONEBRAE DURING THE PENDENCY OF THIS LITIGATION**

46. As noted, during the three years this litigation has been pending, Stonebrae has been invoiced for attorneys' fees and costs by Sheppard, Mullin and Cooper & Kirkham, and has paid those invoices in the ordinary course of business.

47. I have had a calculation performed to determine the amount of pre-judgment interest on these amounts paid by Stonebrae over the past three years, by calculating for each payment, the amount of simple interest, at 10% per annum, from the

-13-

DECLARATION OF PHILIP F. ATKINS-PATTENSON IN SUPPORT OF STONEBRAE L.P.'S MOTON FOR AWARD OF ATTORNEYS' FEES AND COSTS

1  date of such payment by Stonebrae through the date of the noticed hearing on Stonebrae's

2  motion, *i.e.*, March 16., 2011.  This calculation includes payments by Stonebrae to both

3  Sheppard, Mullin and to Cooper & Kirkham.

4        48.    The result of this calculation is that the total sum of pre-judgment

5  interest is $366,775.17.  Stonebrae seeks recovery of this amount under the authority

6  discussed in accompanying motion for award of attorneys' fees and costs.

7  **SUMMARY**

8        49.    For the Court's convenience, the following is a summary of the

9  attorneys' fees, costs and interest thereon that Stonebrae seeks by its motion (subject to

10  being updated through the hearing on the motion):

11    •  Sheppard, Mullin's "merits" fees:          $2,396,065.50

12    •  Sheppard, Mullin's additional fees:        63,359.00

13    •  Sheppard, Mullin's expenses:         146,861.07

14    •  Cooper & Kirkham's "merits" fees:      1,330,203.00

15    •  Cooper & Kirkham's additional fees:     49,392.50

16    •  Cooper & Kirkham's expenses:       12,315.11

17    •  Interest on Stonebrae's payments to co-counsel:  366,775.17

18        I declare under penalty of perjury of the laws of the United States that the

19  foregoing is true and correct.

20        Executed this 29th day of December 2010 at San Francisco, California.

21

22                        */s/ Philip F. Atkins-Pattenson*

23                        PHILIP F. ATKINS-PATTENSON

24

25

26

27

28

-14-